**In the Matter of:**

MORTGAGE RESOLUTION SERVICING

VS

JPMORGAN CHASE

---

# JOSEPH SMITH

*February 09, 2017*

---

LEGAL | MEDIA | EXPERTS

```
 1                 UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF NEW YORK

 3

 4    MORTGAGE RESOLUTION SERVICING,   )
      et al.,                          )
 5                                     )
                    Plaintiffs,        )
 6                                     )
      vs.                              )    Case No.
 7                                     )    15-cv-00293-LTS-JCF
      JPMORGAN CHASE, N.A., et al.,    )
 8                                     )
                    Defendants.        )
 9    _____  /

10

11

12

13

14

15

16        VIDEOTAPED DEPOSITION OF JOSEPH A. SMITH, JR.

17                   (Taken by Plaintiffs)

18                  Raleigh, North Carolina

19               Thursday, February 9th, 2017

20

21

22

23

24               Reported in Stenotype by
                Amy A. Brauser, RPR, RMR, CLR
25     Transcript produced by computer-aided transcription
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

**Page 2**

```
 1                    APPEARANCES
 2   ON BEHALF OF THE PLAINTIFFS:
 3        BRENT TANTILLO, Esquire
          Tantillo Law PLLC
 4        1629 K. Street N.W., Suite 300
          Washington, D.C.  20006
 5        (954) 617-8100
          btantillo@tantillolaw.com
 6
          (and)
 7
          ROBERTO L. Di MARCO, Esquire
 8        Walker & Di Marco, P.C.
          350 Main Street
 9        First Floor
          Malden, Massachusetts 02148
10        (781) 322-3700
          (781) 322-3755 Fax
11        rdimarco@walkerdimarcopc.com
12        (and)
13        MATTHEW D. QUINN, Esquire
          Law Offices of F. Bryan Brice, Jr.
14        127 W. Hargett Street
          Suite 600
15        Raleigh, North Carolina 27601
          (919) 754-1600
16        (919) 573-4252
          matt@attybryanbrice.com
17
     ON BEHALF OF THE DEFENDANTS:
18
          CHRISTIAN J. PISTILLI, Esquire
19        Covington & Burling, LLP
          One City Center
20        850 Tenth Street, NW
          Washington, D.C. 20001-4956
21        (202) 662-5342
          cpistilli@cov.com
22
23
24
25
```

**Page 3**

```
 1                 APPEARANCES  (con't)
 2   ON BEHALF OF THE WITNESS:
 3        STEVEN B. EPSTEIN, Esquire
          Poyner Spruill, LLP
 4        301 Fayetteville Street
          Suite 1900
 5        Raleigh, North Carolina 27601
          (919) 783-2846
 6        (919) 783-1075 Fax
          sepstein@poynerspruill.com
 7
 8   ALSO PRESENT:
 9        Laurence Schneider
          Dave Severance, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1        VIDEOTAPED DEPOSITION OF JOSEPH A. SMITH,
 2   JR., a witness called on behalf of Plaintiffs, before
 3   Amy A. Brauser, Notary Public, in and for the State of
 4   North Carolina, at the Law Offices of Poyner Spruill,
 5   301 Fayetteville Street, Suite 1900, Raleigh, North
 6   Carolina, on Thursday, the 9th day of February, 2017,
 7   commencing at 9:31 a.m.
 8        * * * * * * * *
```

**Page 5**

```
 1              INDEX OF EXAMINATIONS
 2   By Mr. Tantillo. . . . . . . . . . . . . Page 8
 3
 4              INDEX OF EXHIBITS
 5   NUMBER       DESCRIPTION        MARKED/IDENTIFIED
 6   Exhibit 1    DOJ/AG National Mortgage      26
 7                Settlement Bates
 8                JPMC-MRS-00134158 to 163
 9   Exhibit 2    National Mortgage Settlement  34
10                Activities; Recovery Update Bates
11                JPMC-MRS-00050891 to 893
12   Exhibit 3    E-mail string Bates           40
13                JPMC-MRS-00368705 to 706
14   Exhibit 4    City of Milwaukee letter of   41
15                July 9, 2014 Bates
16                JPMC-MRS-00159624 to 632
17   Exhibit 5    E-mail string Bates           45
18                JPMC-MRS-00054148 to 150
19   Exhibit 6    DOJ Metric 31 Summary Bates   46
20                JPMC-MRS-00165682 to 711
21   Exhibit 7    REG-X Loan Lien Release Bates 62
22                JPMC-MRS-00314536
23   Exhibit 8    Letter from Patrick Boyle of  75
24                Chase Bates JPMC-MRS-00023726
25                to 727
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 6

```
 1          INDEX OF EXHIBITS  (con't)
 2   Exhibit 9    Letter from Patrick Boyle of      80
 3                Chase Bates JPMC-MRS-00159554
 4                to 555
 5   Exhibit 10   Lien Release Summary Bates        82
 6                JPMC-MRS-00155435 to 436
 7   Exhibit 11   E-mail string Bates               84
 8                JPMC-MRS-00051853
 9   Exhibit 12   E-mail string Bates               85
10                JPMC-MRS-00054148 to 150
11   Exhibit 13   E-mail string Bates               96
12                JPMC-MRS-00051742 to 746
13   Exhibit 14   Exhibit D - Consumer Relief      102
14                Requirements
15   Exhibit 15   Request for Mortgage             107
16                Assistance Form
17   Exhibit 16   Lien Release Program Bates       119
18                JPMC-MRS-00022205 to 206
```
```
19
20
21
22
23
24
25
```

Page 8

```
 1   Defendants.
 2          MR. EPSTEIN:  And I'm Steven Epstein.
 3   I represent the witness, Joseph A. Smith, Jr.
 4          THE VIDEOGRAPHER:  May I ask the court
 5   reporter to, please, swear in the witness.
 6          (WITNESS SWORN)
 7          THE VIDEOGRAPHER:  Thank you.
 8   You may begin.
 9          MR. TANTILLO:  Thank you.
10          JOSEPH A. SMITH, JR.,
11   having been first duly sworn to tell the truth, was
12   examined and testified as follows:
13                EXAMINATION
14   BY MR. TANTILLO:
15      Q.   Mr. Smith, can you, please, state your
16   full name for the record?
17      A.   My name is Joseph Alderson Smith, Jr.
18      Q.   How old are you, sir?
19      A.   I am 67 years old.
20      Q.   Mr. Smith, I'm going to be asking you
21   various questions.  I want to ask you first, have you
22   ever been deposed before?
23      A.   I have.
24      Q.   Obviously, if you've been deposed before,
25   you certainly know the drill.  Obviously, our position
```

Page 7

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  This begins
 3   Volume 1, Tape Number 1 of the videotaped
 4   deposition of Joseph Smith, taken in the matter
 5   of Morgan Resolution Servicing, et al., versus
 6   JPMorgan Chase, NA, et al., in the United States
 7   District Southern -- sorry, in the United States
 8   Court, Southern District of New York, case
 9   number 12-CV-00293-LTS-JCF.  This deposition is
10   being held at Poyner and Spruill, located at 301
11   Fayetteville Street, Suite 1900, Raleigh, North
12   Carolina 27601, on February 9, 2017 at
13   approximately 9:31 a.m.
14          My name is Dave Severance with the firm
15   of Legal Media Experts.  I am the legal video
16   specialist.  The court reporter with us today,
17   also in association with Legal Media Experts, is
18   Amy Brauser.
19          For the record, may I ask counsel to
20   introduce themselves and whom they represent.
21          MR. TANTILLO:  Good morning, my name is
22   Brent Tantillo.  I represent Mortgage Resolution
23   Servicing, LLC; S&A Capital Partners, Inc.; and
24   1st Fidelity Loan Servicing, LLC.
25          MR. PISTILLI:  Chris Pistilli for
```

Page 9

```
 1   is you must answer the -- obviously, each question
 2   truthfully unless your attorney tells you clear --
 3   clearly not to do so.  Although, as you know, there's
 4   no judge present, this is a formal legal proceeding
 5   just like testifying in court and you're under the
 6   same legal obligation to tell the truth as if you were
 7   testifying in court.
 8          If you do not understand anything I say,
 9   just ask me to rephrase the question.  And before the
10   deposition can be used in court, you will have the
11   opportunity to amend or correct your statement.  Do
12   you understand this?
13      A.   I do.
14      Q.   Mr. Smith, we have received documentation
15   production from your attorney, Mr. Epstein, of Poyner
16   Spruill pursuant to our subpoena issued January 10th,
17   2017.  The documents you have produced are
18   communications between your office and Wall Street
19   Journal reporter, Emily Glazer, and your production
20   regarding consumer complaints.  Is that your
21   understanding?
22      A.   Yes.
23      Q.   Did you communicate with anyone about the
24   subpoena you received and your testimony today?
25      A.   I communicated with my counsel and with my
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 10

1  colleagues who I asked to do a document search
2  necessary to respond to your subpoena.
3      Q.    And who -- what colleagues are you talking
4  about?
5      A.    Ruth McCree who is a paralegal in the law
6  firm and Martha Svoboda, S-V-O-B-O-D-A, who is of
7  counsel in the firm.
8      Q.    Did you review or prepare any documents in
9  preparation for this deposition?
10     A.    No.
11     Q.    Are you on any medication today that would
12 impair your testimony?
13     A.    No, I'm not.
14     Q.    What is your education, sir?
15     A.    Well, I'm a graduate of the Kanawha County
16 public schools in West Virginia, Davidson College, and
17 the University of Virginia Law School.
18     Q.    And where are you licensed to practice
19 law?
20     A.    In New York and North Carolina.
21     Q.    And how long have you -- oh, well, excuse
22 me, where do you currently work?
23     A.    I'm a partner, an income partner I should
24 say, of Poyner Spruill, LLP, and I'm also president of
25 Office of Mortgage Settlement Oversight.

Page 11

1      Q.    So that's its own separate corporation?
2      A.    It is.
3      Q.    And for how long have worked at Poyner
4  Spruill?
5      A.    In my most recent employment by the firm,
6  it was after my -- it was from 2012, right before the
7  commencement of the National Mortgage Settlement.
8      Q.    And where did you work prior to joining
9  Poyner Spruill?
10     A.    I was North Carolina Commissioner of
11 Banks.
12     Q.    Now, for which settlements do you serve as
13 the monitor?
14     A.    I am monitor under consent judgments,
15 commonly called the National Mortgage Settlement
16 currently, with regard to Ocwen Loan Servicing, HSBC,
17 and SunTrust Banks.  Prior, from -- from 2012 until
18 2015 -- '16, actually, finally was -- I completed my
19 work on five consent judgments, which ultimately
20 became six consent judgments, between Bank of --
21 between Bank of America, Wells Fargo, Chase, Citi, and
22 originally GMAC which then became Ocwen and Ditech.
23 Well, became Greentree which then became Ditech.
24 Those settlements were with 49 states and the United
25 States of America.

Page 12

1      Q.    And those were regarding the National
2  Mortgage Settlement?
3      A.    They were -- they were mortgage
4  settlements, yes.  They were settlements of mortgage
5  issues, yes.
6      Q.    Now, is -- was there another settlement
7  that you were previously a monitor for relating to
8  residential mortgage-backed securities?
9      A.    Yes, I was monitor of the settlement
10 between the United States Department of Justice and
11 several states and JPMorgan Chase regarding
12 residential mortgage-backed securities.
13     Q.    How were you chosen to become the monitor
14 of these settlements?
15     A.    I was agreed to -- in the case of the --
16 in the case of the judgments commonly called the
17 National Mortgage Settlement, I was agreed to by the
18 parties.
19     Q.    Was there like an application process?
20     A.    No.
21     Q.    You were just recommended?
22     A.    I have no idea what happened.  I -- I
23 don't.  I was -- I was -- I was -- I received a
24 request -- a request for an indication of interest
25 and -- from then Attorney General of North

Page 13

1  Carolina, and having said yes, I was then -- had
2  discussions with the governments and with the
3  servicers and was chosen.
4      Q.    What day did you start as monitor for the
5  National Mortgage Settlement?
6      A.    April 4th -- well, the -- the judgments
7  were filed April 4th and 5th of 2012.
8      Q.    And what day did you start as the monitor
9  of the residential mortgage-backed security
10 settlement?
11     A.    I honestly don't remember the date of that
12 settlement.
13     Q.    How much was the total budget for the
14 monitor for the National Mortgage Settlement?
15     A.    It varied over time.  As it got -- in
16 recent -- during the time when the five original
17 consent judgments were ongoing, it was about
18 $70 million a year.  And in recent times, it is --
19 because there are fewer judgments now, it is a smaller
20 budget.  It is still, in the last year, the year
21 just -- and we're on fiscal years ending June 30, it
22 was just under 60 million and it will go down from
23 there.
24     Q.    Now, who pays this particular fee for
25 the -- I guess, for the monitoring of these

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 14

1  settlements?

2  A.   The settlement -- the consent judgments
3  for -- that comprise a settlement each require the
4  adoption of a budget which has to be reviewed and
5  approved.  It has to be agreed to with the servicers
6  and then reviewed and approved by a monitoring
7  committee comprised of representatives of state and
8  federal governments and -- so that's -- that's how it
9  was -- was always done.

10  Q.   Now, do the banks pay for part of this --

11  A.   They paid the entire --

12  Q.   -- monitoring?

13  A.   -- they paid the -- they paid assessments
14  under the budget.

15  Q.   And are you aware of the amount that
16  JPMorgan Chase paid towards these budgets?

17  A.   I don't remember.

18  Q.   Now, how much were you personally
19  compensated to be the monitor of these settlements?

20  A.   In the first year, it was around $350,000
21  and the subsequent years it was 650,000 per year.

22  Q.   And was that the same for the NMS and the
23  RMBS settlements?

24  A.   No, um, no.

25  Q.   So the RMBS settlement, how much was --

Page 15

1  what's the budget for that and how much were you
2  compensated?

3  A.   I don't remember exactly.  I had a fee of
4  200,000 per year of -- of work in that settlement.

5  Q.   Now, who were the third-party contractors
6  and attorneys used by the Offices of the Monitor?

7  A.   I retained -- well, first, let me point
8  out, I created the Office of Mortgage Settlement
9  Oversight, Inc., which is a not-for-profit corporation
10  through which I contracted with -- Poyner Spruill, LLP
11  was a counsel -- one of my counsels.  Smith Moore
12  Leatherwood, which is another North Carolina firm, was
13  another of my counsel.  I then had -- I then -- OMSO
14  contracted with six accounting firms, although they
15  now call themselves professional services firms.

16  Q.   Right.

17  A.   One primary professional services firm
18  which was BDO USA, which is a subsidiary of BDO
19  Worldwide, I guess.  That was the -- the primary firm.
20  Then -- and that -- and then with Grant Thorton, Crow
21  Horwath, Baker Tilly, and there -- there are longer
22  strings of names that's on each of these firms, but
23  there are -- there were six in all.  RS -- what's now
24  called RSM used to be called McGladrey.  B -- BKD
25  which is a large accounting firm from the midwest.

Page 16

1  And I think that's it.

2  Q.   Who are your primary contacts at BDO?

3  A.   Anthony Lendez was the engagement partner
4  at BDO.

5  Q.   And how do spell his last name, do you
6  know?

7  A.   L-E-N -- yes, I do.  L-E-N-D-E-Z.

8  Q.   Who are your primary contacts at Grant
9  Thorton?

10  A.   Oh, gosh, senior moment.  Well, Dave
11  Wedding is the chairman of Grant Thornton, but he was
12  not my primary contact.  I forget Aaron's last name,
13  but I can -- I will correct it in my -- if allowed.

14  Q.   Who served as the outside counsel for
15  OMSO?

16  A.   Poyner Spruill, LLP and Smith Moore
17  Leatherwood.

18  Q.   And who were the primary individuals at
19  Poyner Spruill that were handling your representation?

20  MR. EPSTEIN:  During what period of
21  time are you referencing?

22  MR. TANTILLO:  From, I guess, the
23  period of the settlement, 2012 until '14 or '15.

24  THE WITNESS:  The primary lawyers --
25  lawyer at Poyner Spruill, LLP was William S.

Page 17

1  Cherry, Jr.  There were a number of other
2  lawyers from that firm who were engaged,
3  involved.

4  BY MR. TANTILLO:

5  Q.   Was -- you mentioned her name, Martha
6  Svoboda, is that --

7  A.   Yes.

8  Q.   Was she also involved?

9  A.   Oh, yes, yes.

10  Q.   What about Scott Stein, was he also
11  involved at some point?

12  MR. EPSTEIN:  You mean Josh Stein?

13  BY MR. TANTILLO:

14  Q.   Excuse me, Josh Stein.

15  A.   Josh Stein was the primary lawyer or
16  contact with Smith Moore Leatherwood, LLP which is a
17  different law firm.

18  Q.   And what was the difference between what
19  Smith Moore Leatherwood would do for OMSO versus
20  Poyner Spruill?

21  A.   They both were part of a management group
22  which helped me interpret the settlement documents and
23  implement the settlement, so there was no -- there's
24  no distinction of the kind of things they did.

25  Q.   Did you receive partnership compensation

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 18

1    as a result of hiring Poyner Spruill for OMSO?
2        A.    No.  I'm an income partner.
3        Q.    Was there any other compensation or
4    referral fees?
5        A.    No.
6        Q.    Did the National Mortgage Settlement place
7    a bar on you for not being retained by any party to
8    settlement for a period of two years after the
9    conclusion of the terms of the engagement?
10       A.    Yes.
11       Q.    Was Poyner Spruill or other professionals
12   barred as well from serving for one year?
13       A.    Yes, although it's -- it's a more limited
14   limitation than that, but yeah, and that year has
15   passed, by the way.
16       Q.    If that's so, how are you able to be
17   retained as the monitor of the -- of the RMBS
18   settlement?
19       A.    It was the same -- it was not viewed by
20   the parties of that settlement as being retention by
21   Chase.  Chase -- it's -- it's the same -- it was
22   exactly the same kind of work that we did in the NMS,
23   and so it was -- I was -- I was -- I was retained by
24   agreement between the Justice Department and Chase and
25   compensated by Chase, but I was -- I was to be

Page 19

1    independent.
2        Q.    What is the Monitoring Committee?  I know
3    you mentioned that previously.
4        A.    The Monitoring Committee is a committee
5    provided for in the settlement documents that is
6    comprised of representatives, at least in the
7    original -- well, in the -- in the original five
8    judgments, it was comprised of representatives of 15
9    states and had federal government representation also
10   from the Department of HUD and from the US Justice
11   Department Trustee Program, which is a bankrupt --
12   bankruptcy trustee program.
13       Q.    Do you remember who you dealt with at DOJ?
14       A.    Yes.
15       Q.    Who was that individual?
16       A.    Usually it was Diarmuid Gorham.
17       Q.    Do you remember who you dealt with
18   regarding the state AGs?
19       A.    Well, there were again, it was a
20   committee.  The chairman of the committee was Patrick
21   Madigan who is an assistant attorney general or deputy
22   attorney general of Iowa and Richard Bischoff of
23   Texas, they were cochairs.
24       Q.    And they were your two point people
25   regarding the state AGs?

Page 20

1        A.    Yes, although I met with that committee
2    weekly to start and then biweekly for the entire
3    period of the settlement.
4        Q.    Now, did the Monitor Committee change as
5    people would leave government or not?
6        A.    Yes.
7        Q.    Do you remember any particular changes
8    that occurred?
9        A.    No.
10             MR. EPSTEIN:  Objection to form.
11             THE WITNESS:  No.  Yeah, no.
12   BY MR. TANTILLO:
13       Q.    Was there a Monitoring Committee for the
14   RMBS settlement?
15       A.    No.
16       Q.    Did you or your office participate in any
17   cross servicer meetings?
18       A.    We had meetings with the servicers as a
19   group.
20       Q.    So the meetings would be all the people
21   involved in the National Mortgage Settlement together?
22       A.    Yes.
23       Q.    Who attended it and why?  What was the
24   purpose of those meetings?
25       A.    The purpose of the meetings was to

Page 21

1    establish uniform rules of performance and measurement
2    for all the servicers and to work out disagreements
3    over interpretations of the settlement doc --
4    settlement -- the consent judgments, their terms.
5        Q.    So the different servicers, you want to
6    make sure they were all on the same page?
7        A.    Yes.
8        Q.    In relation to your duties as monitor of
9    the National Mortgage Settlement and the RMBS
10   settlements, did you review JPMorgan Chase -- Chase's
11   system of records?
12       A.    We did.  I did and my colleagues did.
13       Q.    What did you do in order to review Chase's
14   system of records?
15       A.    We met with the management, and by the
16   way, we did this with every servicer, not just with
17   Chase, with every servicer.  We would meet with the
18   management and with the people involved with the --
19   the management of their mortgage servicing programs
20   including the information technology people, and we
21   would get a -- they would present to us the nature of
22   their systems, and they all had several, the
23   relationship with those systems, and we began with
24   that process, a familiarization with those systems,
25   which was preparatory to doing the work necessary to

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 22

```
1    monitor the settlement.
2         Q.    So would you actually go into the bank and
3    actually look at the various systems and they would
4    sort of walk you through that process?
5         A.    We -- we would review the nature of the
6    systems themselves and had significant disclosures
7    about it.  We never operated the system or in any way
8    took control of the system.
9         Q.    Did your third-party representatives, such
10   as BDO and the various accounting firms, did they do a
11   process by which they would actually go into the
12   various system of records and perform various tests?
13        A.    We didn't -- we never went into systems of
14   record.  We would review output from systems of
15   record.
16        Q.    And what was the nature of that output?
17        A.    We would review the output to determine --
18   we would review with the managements the queries which
19   they would -- sent into the systems of record to -- to
20   extract, where necessary, populations of loans covered
21   by various metrics.  And so it involved a long and
22   continuous, by my colleagues, interaction with the
23   managements of all the servicers and their technical
24   people to satisfy ourselves as best we could that we
25   were getting a complete population where needed.
```

Page 23

```
1         Q.    Now, you mentioned various queries, what
2    type of queries were those?
3         A.    I don't remember in detail.  We have -- in
4    my reports to the court, we have fairly significant,
5    some discussions at least, of the kinds of things --
6    processes we went through.
7         Q.    Would they be -- was there various types
8    of metric testing that was performed?
9         A.    Well, the whole purpose -- the settlement
10   had two parts, one was consumer relief, the other was
11   servicing standards, measurement under metrics.
12          In the case of metrics, there was testing
13   which was provided for in the settle -- in the consent
14   judgment documents.  They -- it was defined what we
15   were to do.  And so this exercise I've just described
16   was in furtherance of implementing what the consent
17   judgments said.
18        Q.    But you had to rely on what the various
19   servicers were providing to you?
20        A.    Yes.
21        Q.    So there was no independent process on
22   your part to verify the integrity of the systems of
23   records?
24        A.    That is correct.
25          MR. PISTILLI:  Objection.
```

Page 24

```
1    BY MR. TANTILLO:
2         Q.    Can you -- let me just restate the
3    question because you answered it.  So you said there's
4    no independent integrity?
5          MR. EPSTEIN:  Objection to form.
6          THE WITNESS:  No.
7    BY MR. TANTILLO:
8         Q.    You had -- Mr. Smith, did you have a duty
9    to review the integrity of the systems of records?
10        A.    We did not.
11        Q.    Did any independent third party working
12   with OMSO review the integrity of the system of
13   records?
14        A.    No.
15        Q.    As monitor of the settlements, are you
16   responsible for reviewing the servicers' system of
17   records?
18          MR. EPSTEIN:  Objection to form as to
19      what you mean by "records."
20          THE WITNESS:  I actually don't
21      understand that question.
22   BY MR. TANTILLO:
23        Q.    Under the National Mortgage Settle --
24   Settlement, who is responsible to review the
25   servicers' system of records?
```

Page 25

```
1          MR. EPSTEIN:  Objection to form as to
2      what the word "reviewing" means.
3          MR. PISTILLI:  Objection.
4    BY MR. TANTILLO:
5         Q.    Let's move to IRG.  What is the IRG, or
6    the Independent Review Group.
7          MR. EPSTEIN:  Objection to form,
8      mischaracterizes the actual name of the group,
9      but go ahead.
10          THE WITNESS:  Well, there is -- each of
11      the servicers was required by the consent
12      judgments to establish an independent review
13      group which was -- could be, and usually was,
14      employees of the servicers -- of the servicer
15      but who were independent of the mortgage
16      servicing operation.  I would analogize that to
17      being independent in the way independent
18      auditors are -- are independent of management,
19      operating management, in another context.  They
20      were to report in a way that was independent of
21      the -- of management such as to preserve their
22      independence.  And they were review -- they were
23      the first review of management's submission of
24      its various proofs that it had complied.
25
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 26

```
 1   BY MR. TANTILLO:
 2        Q.    Mr. Smith, I'm going to show you what's
 3   been marked as Exhibit Number 1.
 4        (EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION)
 5   BY MR. TANTILLO:
 6        Q.    This is document Bates number
 7   JPMC-MRS-00134158.
 8             MR. TANTILLO:  And I'll let counsel for
 9        Chase review this.
10             MR. PISTILLI:  Do you have copies?
11             MR. TANTILLO:  Of course, I do.
12             MR. EPSTEIN:  Do you have one for me as
13        well, please?
14             MR. TANTILLO:  Yes, sir.
15             MR. EPSTEIN:  Thank you.
16   BY MR. TANTILLO:
17        Q.    Mr. Smith, if you could turn to page 2 of
18   this document.
19             MR. EPSTEIN:  Oh, take whatever time
20        you need to review the document.
21             MR. PISTILLI:  And sorry, do you have a
22        copy for me?
23             MR. TANTILLO:  Yeah, of course.
24             MR. PISTILLI:  Thank you.
25
```

Page 27

```
 1   BY MR. TANTILLO:
 2        Q.    Please let me know when you've had a
 3   chance to fully review the document.
 4        (WITNESS REVIEWS DOCUMENT)
 5             Mr. Smith, have you reviewed this
 6   document, Exhibit Number 1?
 7        A.    Yes.
 8        Q.    Referring to page 2 of this document, you
 9   just described how the IRG worked.  Was this a fair
10   representation of your understanding of how this
11   particular process worked?
12        A.    Well, it describes the organization
13   through which they did their work.
14        Q.    And there is a -- sort of a dotted line
15   between the line of business and the IRG.  Was that
16   the sort of the representation as you said previously
17   that there -- this group was supposed to be separate
18   from the line of business?
19        A.    Yes.
20        Q.    Thank you.
21             Let me ask you a question, what is the
22   work plan?
23        A.    The work plan for each of the judgments
24   that comprised the settlement was a negotiated
25   document that outlined in some detail -- well, in
```

Page 28

```
 1   detail the protocols under which the company, as I
 2   recall, it would do its -- the IRG would do its work
 3   in reviewing the company's performance and the
 4   servicer's performance, and my colleagues and I would
 5   do our work in validating or reviewing their work.
 6        Q.    And what type of items were inside a work
 7   plan?
 8        A.    I don't remember the details of work
 9   plans.
10        Q.    Who would produce -- or who would create
11   this work plan?
12        A.    It would be negotiated between the
13   servicer and my colleagues and me.
14        Q.    And who created the final document itself
15   or what the work plan was?
16        A.    I don't recall.
17        Q.    Did the Department of Justice or the
18   Monitoring Committee see this work plan?
19        A.    Yes.
20        Q.    Does the work plan change any of the
21   requirements of the National Mortgage Settlement?
22        A.    No.
23        Q.    How about the HAMP, did it change any of
24   the requirements --
25        A.    I'm sorry?
```

Page 29

```
 1        Q.    Did it change any of the requirements
 2   regarding the HAMP?
 3        A.    We were not engaged in monitoring
 4   conformity with HAMP.
 5             MR. PISTILLI:  I'm -- I'm just going to
 6        make an objection.  Just want to -- I've been
 7        giving you some latitude to ask some background
 8        questions, Brent, but as you know, the
 9        magistrate judge on this case has entered an
10        order limiting discovery that can go forward at
11        this time.  I've not yet heard a single question
12        that touches on any of the narrow issues on
13        which the magistrate judge has permitted
14        discovery.  To the extent any of the questions
15        you've been asking so far have relevance to any
16        issues that I'm aware of would be relevant only
17        to the state portion of the MRS case or the now
18        dismissed DC action.  So, you know, I'm really
19        going to have to insist as we move forward that
20        you comply with Judge Francis's order and limit
21        your questioning appropriately.
22             MR. TANTILLO:  My response to that is
23        the following:  The magistrate allowed us to
24        inquire into several areas.  First of all, the
25        Recovery 1 system of records, the second lien
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 30

```
1    extinguishment program, and the various lien
2    releases that occurred. I believe our position
3    is that all of this is relevant to those
4    particular claims that are within the -- Judge
5    Francis's order.
6         MR. PISTILLI:  I disagree and I'm going
7    to continue to object, and if necessary, we'll
8    get Judge Francis on the phone to clarify.
9         THE WITNESS:  May I consult with my
10   counsel for a minute?
11        (DISCUSSION HELD OFF THE RECORD)
12        THE VIDEOGRAPHER:  The time is
13   9:59 a.m.  We'll be going off record.
14        (RECESS TAKEN)
15        THE VIDEOGRAPHER:  The time now is
16   10:05 a.m.  We will be going back on record
17   after I offer a correction. I read the case
18   number incorrectly as 12-CV. It is
19   15-CV-00293-LTS-FCP. I apologize for that
20   error, and you may begin.
21        MR. TANTILLO:  I want to go back to the
22   objection that Mr. Pistilli made. It's our
23   position that it's a standing objection that you
24   have at this point.
25        MR. PISTILLI:  It's a standing
```

Page 31

```
1    objection, and I'll certainly object further
2    as -- you know, if the inappropriate questioning
3    continues.
4         MR. TANTILLO:  Well, regarding that,
5    Mr. Pistilli, obviously, you are an invited
6    guest here. I believe that would be the
7    position Mr. Epstein would be able to object to
8    that. Under the local rules, that's my
9    understanding.
10        MR. PISTILLI:  I -- I disagree. It is
11   Judge Francis's order in this case. Here to
12   represent Chase's interest in this case. I'm
13   entitled to object on the basis on your
14   continuing violation of a court order in this
15   case.
16        MR. EPSTEIN:  And let me just -- since
17   you invoked my name, let me state for the
18   record, we view our position here today as -- as
19   a nonparty, and as a nonparty, we have not
20   studied the court's order, we have not studied
21   the Complaint, we have not studied what is or is
22   not relevant today, and we're not here to make those
23   decisions today. And we will answer questions
24   that are calling for nonprivileged information
25   and we'll let the parties sort out the other
```

Page 32

```
1    issues that you all have been discussing.
2         MR. TANTILLO:  Mr. Pistilli, I think
3    our position would be if there's any questions
4    in this deposition that you're opposed to, you
5    can move it to -- move to strike that testimony
6    at a later date.
7         MR. PISTILLI:  So you'd violate the
8    court order now and then we move to strike
9    later?  That -- that's unacceptable. We're
10   going to continue to object, and if the
11   inappropriate lines of questioning continue, we
12   reserve all rights to seek any appropriate
13   actions from the magistrate judge, either during
14   the course of the deposition or after.
15        MR. TANTILLO:  That's reasonable, but I
16   think our position is that, obviously, we're
17   willing to allow you to move to strike the, you
18   know, matters and the questions later.
19        MR. PISTILLI:  I understand your
20   position.  Our position is that you may not ask
21   questions that violate a court order.
22        MR. TANTILLO:  Well, obviously we have
23   a difference of opinion about that.
24   BY MR. TANTILLO:
25   Q.   Regarding -- moving back to the systems of
```

Page 33

```
1    record, Mr. Smith, you stated you did not have the
2    ability to review the integrity of the systems of
3    record?
4         MR. PISTILLI:  Objection, misstates
5    prior testimony.
6         MR. EPSTEIN:  You can answer to the
7    extent you can.
8         THE WITNESS:  We were not required to
9    do that and we were not under the orders under
10   the consent judgments given the authority to do
11   that. It was, one, we were allowed to receive
12   an independent report on the system of record
13   annually.
14   BY MR. TANTILLO:
15   Q.   As part of the systems of record that you
16   reviewed, were you informed about a system of record
17   called Recovery 1?
18   A.   Yes.
19   Q.   As you understand it, what is Recovery 1?
20   A.   I actually don't have a -- a -- a good
21   recollection of what Recovery 1 entails entirely.
22   I'm -- I'm aware it was one of the systems that Chase
23   had for managing the servicing portfolio.
24   Q.   Mr. Smith, I'm showing you what has been
25   marked as Exhibit Number 2.
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 34

```
 1        (EXHIBIT NUMBER 2 WAS MARKED FOR IDENTIFICATION)
 2              MR. TANTILLO:  Let me show it to Chase
 3    counsel.
 4              MR. PISTILLI:  Could I have a copy,
 5    please?
 6              MR. TANTILLO:  Of course.
 7              MR. EPSTEIN:  Thank you.
 8              MR. TANTILLO:  Yes, sir.
 9              (WITNESS REVIEWS DOCUMENT)
10    BY MR. TANTILLO:
11        Q.    This document refers to a discovery by
12    Grant Thorton.  Were you aware of that, when Grant
13    Thorton became aware of Recovery 1?
14        A.    Yes.
15              MR. PISTILLI:  Object to form.
16              THE WITNESS:  Well, no.  I -- yeah, I
17        was aware of the fact that Grant Thorton had
18        determined that Recovery 1 loans were not being
19        included in populations for metrics testing.
20    BY MR. TANTILLO:
21        Q.    Would that surprise you?
22        A.    I don't remember whether it surprised me
23    or not.
24        Q.    With regards to Grant Thorton's discovery,
25    what actions did you take to resolve this particular
```

Page 35

```
 1    problem?
 2              MR. EPSTEIN:  Objection to the form of
 3        that question.
 4              MR. PISTILLI:  Join.
 5    BY MR. TANTILLO:
 6        Q.    What did you do when you learned of this
 7    discovery?
 8        A.    I consulted with my colleagues about what
 9    an appropriate response would be.  As this document
10    suggests, there was an interpretative issue here and
11    after consultation, determined that the loans in
12    Recovery 1 should be included in populations and
13    instructed -- in fact, instructed all parties to
14    prospectively include these loans when defining
15    populations for the metrics where they were -- could
16    be included.  Well, for all metrics, but they were in
17    some and not others.
18        Q.    Now, you're referring to metrics, what is
19    the metrics testing of the National Mortgage
20    Settlement?
21        A.    Each -- the National Mortgage Settlement
22    had about 300 -- just over 300 servicing standards.
23    Measurement of performance of those standards was only
24    to be done through metrics testing, that is to say the
25    use of tests to determine whether the -- each of the
```

Page 36

```
 1    servicers had -- had complied with the servicing
 2    standards that the metrics tested.  We had originally
 3    29, that number grew to 33 for the original five over
 4    time, and so that was the -- by the way again, that
 5    was the only -- the only -- the extent of my authority
 6    to monitor compliance with the servicing standards was
 7    through this metrics testing.
 8        Q.    How would the metrics testing work?
 9        A.    The management in the first instance would
10    determine a population of loans as to which the
11    particular test applied.  And this was all -- again,
12    this was all included in both the consent judgment
13    itself and in the work plans.  I mean, they were --
14    these were -- these were -- these weren't made up.  I
15    mean, these were determined when we started.
16              They would conduct a series of queries --
17    I mean, of -- there were actual test questions that
18    had to be answered with regard to a -- well, to go
19    back to a step.  From the population, a statistically
20    valid sample of loans would be extracted, and those
21    loans would be subjected to a series of questions with
22    regard to whether they -- they -- and -- and the
23    answers to those questions would -- by -- through the
24    answers to those questions, it would be determined
25    whether the servicer had complied with the -- first of
```

Page 37

```
 1    all, had passed the test.  If it did not, there were
 2    consequences.  But it would, thus, measure compliance
 3    with servicing standards through these various tests
 4    and then the IRG would review management's submission
 5    and would, if it agreed with management, assert that
 6    it -- on behalf of the company, that they had -- well,
 7    whatever the results were, that they had passed X
 8    number of tests and failed some others, not -- not --
 9    and the performance, by the way, is judged on the
10    basis of a error rate.  There was a permissible rate
11    of error and it varied by metric, and if the company
12    exceeded the error rate on a particular test, it did
13    not pass the metrics, so the company would tell us how
14    many they passed and how many they did not pass.
15              The secondary professional firm would then
16    essentially re-perform the same process to determine
17    whether it agreed with management's assertions and BDO
18    would do a final subtest of its -- of the SPF's work
19    to determine whether it did.  And once that had been
20    done, I would report -- we would collate this for each
21    of the servicers and I would report to the court on
22    the -- on the -- on the results of those tests.
23        Q.    Was there a point in time when you
24    reported to the court the exclusion of the Recovery 1
25    population?
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 38

1    A.    I don't recall that I did.
2    Q.    Why did you add these three metrics?
3    A.    It's -- I actually added four metrics.
4  Four metrics are added.  Well, let's start from the
5  beginning.
6          Of the 304 servicing standards, not all
7  were covered by the -- by the 19 metrics.  There --
8  there were some that weren't.  And as we got
9  experience with measurement of these metrics and as we
10 learned what was going on in the marketplace through
11 our complaints and through my trips to ten states
12 around the country to meet with attorneys general,
13 advocates and the like, it was determined that there
14 were some areas where we needed further testing and so
15 the four metrics were negotiated between myself, the
16 Monitoring Committee, and the servicers to address
17 additional areas of concern.
18   Q.    Was the exclusion of the Recovery 1
19 population from the metrics testing one of your areas
20 of concern?
21   A.    No.
22   Q.    Upon learning of the exclusion of
23 Recovery 1, did you provide JPMorgan Chase the time to
24 cure these violations?
25          MR. PISTILLI:  Objection.

Page 39

1          MR. EPSTEIN:  Objection to form.
2          MR. PISTILLI:  And lacks foundation.
3          THE WITNESS:  My only job was to
4      measure performance under the settlement and so
5      we revised our protocols to include Recovery 1
6      and proceeded forward.
7  BY MR. TANTILLO:
8    Q.    Mr. Smith, did you provide JPMorgan Chase
9  with extensions of time to bring Recovery 1 into
10 metrics testing?
11   A.    I don't recall.
12   Q.    Mr. Smith, did you tell JPMorgan Chase
13 that so long as they released the first and second
14 liens they would not have to be subject to metrics
15 testing?
16   A.    Whether I told them or not, I don't know.
17 I -- I -- there was -- I don't remember.
18   Q.    Was there a point in time regarding
19 Recovery 1 population, and obviously in terms of
20 bringing the metrics testing, that you directed them
21 to release the first and second liens?
22   A.    What I remember is, we included Recovery 1
23 loans in our considerations of metrics testing and
24 proceeded on that protocol perspectively from a date I
25 don't recall.  I don't recall much else.

Page 40

1          (EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION)
2          MR. PISTILLI:  Do you have copies?
3          MR. TANTILLO:  Yeah, of course.
4          (WITNESS REVIEWS DOCUMENT)
5  BY MR. TANTILLO:
6    Q.    Did OMSO instruct JPMorgan Chase that so
7  long as the JPM -- JP -- JPMC, excuse me, is releasing
8  the first and second liens on the subject properties
9  that RCB1 loans could be excluded from metrics
10 testing?
11   A.    Well, this document, Exhibit 3, you've
12 just given me says that, and it is -- would be
13 consistent with the fact that the settlement only
14 applied to loans as to which a mortgage -- an existing
15 mortgage and lien.
16   Q.    Did you know that this caused Chase to
17 file lien releases on loans that were sold in note
18 sales to companies like my client, Mortgage Resolution
19 Servicing?
20   A.    No.
21          MR. PISTILLI:  Objection, lacks
22      foundation.
23 BY MR. TANTILLO:
24   Q.    Was the intent of this directive that OMSO
25 provided, was it to apply to all loans in Recovery 1

Page 41

1  or was it to apply just to occupied properties?
2          MR. EPSTEIN:  Objection to form.
3          MR. PISTILLI:  Join the objection.
4          MR. EPSTEIN:  You can answer to the
5      extent you can.
6          THE WITNESS:  Yeah, I don't have
7      anything to add to Exhibit 3.
8  BY MR. TANTILLO:
9    Q.    Did you analyze the effects of such lien
10 release on municipalities?
11   A.    No.
12   Q.    Did any municipalities contact you
13 regarding their concerns?
14   A.    Could you be more specific?  I mean, I
15 don't --
16   Q.    Sure.
17   A.    -- about --
18   Q.    Did any municipalities contact you
19 regarding their concerns and the impact of such lien
20 releases in their communities?
21   A.    I don't recall that.
22          (EXHIBIT NUMBER 4 WAS MARKED FOR IDENTIFICATION)
23 BY MR. TANTILLO:
24   Q.    Mr. Smith, I'm going to show you what's
25 been marked as Plaintiffs' Exhibit Number 4.

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 42

```
 1    A.    Uh-huh.
 2          MR. TANTILLO:  Excuse me, Chris.
 3          MR. PISTILLI:  I'm just, at this point,
 4    going to renew my continuing objection that this
 5    line of questioning violates Judge Francis's
 6    order limiting discovery in this case.  I can't
 7    see how any of this has any conceivable
 8    relevance to any of the issues that the court
 9    determined were appropriate subjects of
10    discovery at this time, and certainly invite you
11    to make a proffer, but, you know, this line of
12    questioning is highly improper, in violation of
13    Judge Francis's order as near as I can tell.
14          MR. TANTILLO:  I believe your objection
15    is duly noted.
16          MR. PISTILLI:  You're declining my
17    opportunity to explain what conceivable
18    relevance this line of questioning has to issues
19    that are permitted within the scope of Judge
20    Francis's order limiting discovery?
21          MR. TANTILLO:  Judge Francis, in his
22    order, said that anything regarding lien
23    releases was applicable to the case that -- as
24    it stands.
25          MR. PISTILLI:  Anything regarding
```

Page 43

```
 1    releases of liens involving your client.  None
 2    of this has any relevance to any of the
 3    commercial disputes between the parties in this
 4    case.
 5          MR. TANTILLO:  Our position --
 6          MR. PISTILLI:  I will continue my
 7    objection, reserve all rights to seek
 8    appropriate relief from the court.
 9          (WITNESS REVIEWS DOCUMENT)
10          THE WITNESS:  I was -- is there a
11    question?
12    BY MR. TANTILLO:
13    Q.    Yes, sir.
14          Do you remember receiving this letter?
15    A.    I do, or letters like it, there were
16    several.
17    Q.    What municipalities contacted you
18    regarding letters like this?
19    A.    Milwaukee was the one I remember.
20    Q.    And upon receiving this letter, what was
21    your response?
22    A.    I don't recall.
23    Q.    The City of Milwaukee, in this letter, was
24    concerned, obviously, about the lien releases.  And
25    did the Office of the Monitor, I'm sorry, Office of
```

Page 44

```
 1    Mortgage Settlement, did they do anything in terms of
 2    trying to relieve the concerns of cities like
 3    Milwaukee?
 4    A.    No.
 5    Q.    Mr. Smith, do you know what the pre DOJ
 6    lien release project was?
 7    A.    No.
 8    Q.    Did JPMorgan Chase inform you that they
 9    released liens prior to October 1st of 2012?
10    A.    I don't recall if they did.
11    Q.    Were you informed of the fact that lien
12    releases were occurring by JPMorgan Chase through the
13    crediting process of these various settlements?
14          MR. EPSTEIN:  Objection to form.
15          THE WITNESS:  Could you -- could you be
16    a little more specific of what . . .
17    BY MR. TANTILLO:
18    Q.    Yes, sir.
19          Why would JPMorgan Chase release these
20    liens, did you know?
21    A.    I'm not sure --
22          MR. PISTILLI:  Objection.
23          THE WITNESS:  I'm not sure I know what
24    liens we're discussing.
25
```

Page 45

```
 1    BY MR. TANTILLO:
 2    Q.    In Recovery 1?
 3    A.    Oh, I don't know.
 4    Q.    I'm going to show you a document marked
 5    Government Exhibit Number 5.
 6          MR. TANTILLO:  Would it be 5 or 6?
 7          MR. EPSTEIN:  5.
 8          THE VIDEOGRAPHER:  5.
 9          MR. PISTILLI:  Is the highlighting on
10    this document yours or is it . . .
11          MR. TANTILLO:  I don't know.
12          MR. PISTILLI:  Copy, please.
13          MR. TANTILLO:  Sure.
14    (EXHIBIT NUMBER 5 WAS MARKED FOR IDENTIFICATION)
15          (WITNESS REVIEWS DOCUMENT)
16    BY MR. TANTILLO:
17    Q.    This document refers to a date of
18    April 1st, 2014.
19    A.    Uh-huh.
20    Q.    Do you recall OMSO providing a date of
21    April 1st, 2014 for the Recovery 1 population to be --
22    A.    I don't recall that personally, no.
23    Q.    -- in compliance.
24          I'm going to show you what's marked as
25    Government's -- excuse me, Plaintiffs' Exhibit
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 46

1  Number 6.
2              Will you hold them for me?
3      (EXHIBIT NUMBER 6 WAS MARKED FOR IDENTIFICATION)
4              MR. TANTILLO:  I will show you that,
5      Chris, before I show it to him.
6              MR. EPSTEIN:  Thank you.
7              MR. TANTILLO:  Yes, sir.
8              MR. PISTILLI:  Thanks.
9              THE WITNESS:  I'm going to review this
10     with this one.
11         (WITNESS REVIEWS DOCUMENT)
12  BY MR. TANTILLO:
13     Q.     On the first page of Exhibit Number 6, do
14  you see where it appears that there was a extension
15  for Recovery 1 that's on 5/1 of '14?
16     A.     There was a -- I'm sorry, would you --
17     Q.     There was an extension that was provided
18  by yourself in order for them to come into metrics
19  testing?
20     A.     This is --
21             MR. PISTILLI:  Objection, foundation.
22             THE WITNESS:  Well, I don't -- this
23     page relates to Metric 31.  That was one of the
24     additional metrics that were added after
25     experience with the original 19 -- 29 metrics,

Page 47

1      rather, I said 19 earlier, 29.
2              I don't know -- I don't know that
3      this -- well, I would not -- I don't know that I
4      can agree with your characterization of this as
5      an extension.  This may well have been when we
6      began testing, but I don't know that either.
7      This was an added metric.
8   BY MR. TANTILLO:
9      Q.     Mr. Smith, what constitutes borrower
10  remediation when there's a potential violation within
11  the settlements?
12     A.     If a servicer had an error rate on a
13  metric that exceeded the error rate permitted by the
14  consent judgments and they were established by a
15  schedule in the consent judgments, there was a
16  remediation obligation.  It -- the amount of the --
17  extent of the obligation depended on whether I
18  determined separately that the failure to pass the
19  test was a widespread error or merely -- or was not an
20  error.
21             So if there were a 5 percent error rate
22  and the actual error rate determined by test was
23  5.7 percent, that would not, as a rule, have been
24  determined by me to be widespread.  In that case,
25  remediation would be done under the terms of the

Page 48

1      settlement for the borrowers in the sample who --
2      whose loans had not been properly dealt with.
3              If a failure was widespread, a servicer
4      would be required to determine the totality of the
5      remediation required for all borrowers in the
6      population affected by the metric.
7      Q.     Was there ever a borrower remediation that
8   you filed or you courted regarding the Recovery 1
9   loans?
10     A.     I -- any remediation activities for any
11     servicer would have been publicly disclosed in our
12     reports.  The -- the failures did not have to do with
13     particular portfolios, it had to do with the entire
14     population, so it -- it -- so I can't really answer
15     your question.
16             Well, I can answer your question that
17     it -- that the remediation would be for all loans in
18     the population that was tested or for only in the --
19     in the sample or in the case of widespread error in
20     the total population.
21     Q.     So if the total number of loans, for
22  example, was 8 million, hypothetically.
23     A.     Yes, all right.
24     Q.     But it's around that, let's say.  If the
25  pool of loans, let's say hypothetically Recovery 1,

Page 49

1   was below the threshold error rate then --
2      A.     Well --
3              MR. PISTILLI:  Object to the form,
4      lacks foundation, calls for speculation.
5              THE WITNESS:  -- each -- let me -- let
6      me restate it.
7              Each metric, there were 29 metrics, I
8      misstated earlier and I apologize, it went on up
9      to 33 in the case of Chase, ultimately.  All but
10     three of those metrics did not involve testing.
11     They were so-called policy and procedures
12     metrics.  Those, you either passed or failed --
13     the service either passed or failed by either
14     having done what the metric required or not
15     done, and it was pretty binary.
16             For the metrics that required testing,
17     sampling, in each case we would -- the servicer
18     first, then reviewed by IRG, then reviewed by us
19     twice, would determine a population of loans.
20     Those loans could be extracted -- depending on
21     the metric, could be extracted from any one of a
22     number of systems that the servicer operated.
23     There wasn't -- there weren't tests for
24     particular systems, they were -- it was for
25     loans covered by the metrics.

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 50

```
1        If -- if a failure was not determined
2   to be widespread, if -- if the servicer exceeded
3   the threshold error rate but not to an extent
4   that caused me to determine it was widespread,
5   and I did in every case determine that, one way
6   or the other, the remediation would be given
7   only to the loans in the sample where the --
8   where the -- where there had been -- where the
9   company had not handled the loan -- or the
10  servicer had not handled the loan appropriately.
11       If I determined the failure to be
12  widespread, the servicer was required to look at
13  the entire population of loans covered by the
14  metric and to determine what the -- what the
15  remediation was required for all loans in that
16  population.
17  BY MR. TANTILLO:
18       Q.    Does the settlement require you to go
19  beyond sample testing if there's an indication that
20  there may be a pattern of noncompliance?
21       A.    If there is a pattern of -- if I
22  determined -- if -- if the servicer tells me there's a
23  pattern of noncompliance or if I determine in some way
24  there is a pattern of noncompliance, I have authority
25  to do additional investigation.
```

Page 51

```
1        Q.    So the servicer was mainly responsible for
2   telling you if they were not in noncompliance?
3             MR. PISTILLI:  Objection, misstates
4        prior testimony.
5             THE WITNESS:  The settlement itself --
6        and again, noncompliance is with the servicing
7        standards, the 304 servicing standards.  So if I
8        determined there was a pattern of noncompliance
9        with the servicing standard, what the -- what
10       the -- what I was allowed to do was create
11       another metric, by the way, not an open-ended --
12       not a -- not an investigation of a kind that
13       would lead to specific sanctions.
14  BY MR. TANTILLO:
15       Q.    Was the threshold error rate applied on a
16  metric-by-metric bases?
17       A.    Yes.
18       Q.    Okay.  So it wasn't applied to a
19  population as a whole?
20            MR. PISTILLI:  Object to the form.
21            THE WITNESS:  I don't understand -- I
22       don't understand the question.
23  BY MR. TANTILLO:
24       Q.    For example, let's say, going back to
25  Metric 31.
```

Page 52

```
1        A.    Uh-huh.
2        Q.    If -- if they violate -- if they did -- if
3   they were within Metric 31 in terms of the sample that
4   was provided but perhaps they violated Metric 29, was
5   the -- the threshold error rate applied by each sample
6   or was it applied as a whole to all the loans?
7             MR. EPSTEIN:  Objection to form.
8             MR. PISTILLI:  Join.
9             THE WITNESS:  A population was pooled
10       for each metric.  A separate population was
11       pooled for each metric, and the sample was drawn
12       from each population separately and the testing
13       was done in each case for that metric only.
14  BY MR. TANTILLO:
15       Q.    Who was responsible for pulling together
16  those sample pools?
17       A.    The samples were drawn -- the
18  populations -- the populations were determined by the
19  operating management, reviewed by the IRG, and
20  reviewed by us.  The samples were generally randomized
21  samples that were pooled using a software tool and it
22  varied and I can't name them, but we named them in our
23  reports.  Each -- each sample was drawn by random,
24  not -- not -- not selected.  In other words, it was --
25  the population was -- was developed and a randomized
```

Page 53

```
1   sample was drawn in a way we found satisfactory and
2   reviewed.  That's what -- and it was from that sample
3   that the testing -- that sample was tested and then we
4   determined whether the threshold error rate had been
5   exceeded or not.
6        Q.    If Chase had made a determination that a
7   certain group of loans, let's say Recovery 1, was not
8   subject to the servicing standards, would you have
9   ever received a sample pool?
10            MR. PISTILLI:  Objection.
11            MR. EPSTEIN:  Objection to form.
12            THE WITNESS:  Yeah.  We received, in
13       each case, populations developed by the company
14       on bases that we have reviewed.  We have gone
15       through the -- the methodology they had used
16       to -- to determine the populations because all
17       this was done through computer query.  And we
18       would then -- as I follow again, I'm getting to
19       be a broken record, but we would do the same
20       thing, we would -- we -- once the population was
21       agreed, the population would be pooled, the
22       sample would be drawn from the population by
23       randomization, and the testing would be done.
24  BY MR. TANTILLO:
25       Q.    Let's turn to the RMBS settlement.
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 54

1    A.    Uh-huh.

2        Q.    Did loans that were being credited

3    pursuant to the RMBS settlement have to have an intact

4    lien?

5        A.    At the -- yes, before the relief was

6    given, yes.

7        Q.    And after they did a validation of an

8    intact lien, at that point in time would the servicer

9    release the lien?

10        A.    It depends on the form of relief they were

11    using.  The -- the -- the RMBS settlement, like the

12    consent judgments that formed the National Mortgage

13    Settlement, had a -- what was called a menu of relief

14    options and it included a variety of -- of things.

15    First lien mortgage modification or forgiveness,

16    second lien mortgage modification or forgiveness,

17    short sale assistance.  There were a number of others,

18    and, in fact, in the Chase matter, also included

19    things like loans to first-time home buyers or

20    included for credit.  There was a list of things they

21    could do and so there might have been some relief

22    where a lien release was part of the relief, but it

23    wasn't mandated.

24            MR. PISTILLI:  Just at this time, can I

25        reassert, again, my continuing objection to this

Page 55

1    line of questioning in that it blatantly, in my

2    opinion, violates Judge Francis's order in this

3    case limiting discovery.

4            Again, I would invite counsel for

5    Plaintiffs to make a proffer as to what

6    conceivable relevance this line of questioning

7    has to the commercial dispute between the

8    parties as brought in Plaintiffs' tort and

9    contract claims.  I see absolutely no relevance

10    to any of the issues in this case that are not

11    subject to the discovery stay.  I continue to

12    believe that this entire line of questioning is

13    in direct violation of Judge Francis's order.

14            MR. TANTILLO:  Mr. Pistilli, my clients

15    were harmed by the various lien release

16    processes that occurred because Chase was

17    seeking consumer relief credit.

18            MR. PISTILLI:  Whether your clients

19    were or weren't harmed by lien releases, your

20    entire line of questioning to Mr. Smith has no

21    relevance to either the fact of the harm or any

22    other pleaded issue in your claims.

23            MR. TANTILLO:  We'd obviously beg to

24    differ.  The fact and the circumstance and the

25    intent of why Chase was releasing my client's

Page 56

1    loans are particularly applicable to our causes

2    of action that are currently not stayed and

3    without the background information as about what

4    happened, we're -- all we're left with is the

5    fact that liens were released.

6            MR. PISTILLI:  My continuing objection

7    stands and we reserve all rights to seek

8    appropriate sanctions from Judge Francis.

9            MR. TANTILLO:  Break?  We're going to

10    take a few-minute break.

11            THE VIDEOGRAPHER:  The time now is

12    10:52 and we will be going off record.  We're

13    off record at 10:52.

14            (RECESS TAKEN)

15            THE VIDEOGRAPHER:  The time now is

16    11:15 a.m., and we are back on the record.  You

17    may begin.

18            MR. TANTILLO:  Before we begin, as we

19    were reviewing our exhibits I noticed that we

20    did have a privileged document that was from

21    Chase counsel to, I guess, various employees at

22    Chase.  We have not used it, but I wanted to

23    hand it over to Mr. Pistilli.  And we'll,

24    obviously, destroy that or any copies we have.

25            MR. PISTILLI:  Great.

Page 57

1            MR. TANTILLO:  Thank you.  It's from

2        Mr. Wick.

3            MR. PISTILLI:  Thank you.

4            MR. TANTILLO:  Chris, you okay for us

5        to proceed?

6            MR. PISTILLI:  Yes, go ahead.

7    BY MR. TANTILLO:

8        Q.    Mr. Smith, can you tell us what is the

9    intact lien validation process?

10        A.    No.

11        Q.    As we stated earlier, there was a

12    requirement for the liens to be intact, I guess, in

13    order to receive credit.  Was that for just the RMBS

14    settlement or also for the NMS settlement as well?

15        A.    It was required -- determination that a

16    lien was intact was required for some forms of relief

17    in both the NMS and the RMBS settlement.

18        Q.    Were there instances in both settlements

19    where a servicer could obtain credit if the loans were

20    charged off?

21        A.    Yes.  I believe so, yes.

22        Q.    What instances come to mind to you?

23        A.    Well, there was a form of relief, several

24    forms of relief, where liens were released to -- that

25    come to mind.  There was actually a lien release form

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

1  of relief in the NMS consent judgments.  I'm not sure
2  that there was such a thing in -- I just don't
3  remember whether there's a similar one in Chase.
4          There were a variety of -- in second lien
5  relief there was -- release of the lien was not always
6  required, it depended -- the bank could elect -- the
7  servicer could elect to do it or not.  There was
8  some -- there was an option to do a modification of a
9  second lien loan.
10        But in a substantial number of cases it
11  was easier for the servicers, frankly, to expunge the
12  lien and release -- expunge the loan, write it off, if
13  you call it, and release the lien.  And there may have
14  been -- or there was a need to release the lien in
15  cases where there was a short sale.
16      Q.   Let's dig into that further.  What were
17  the instances in which they were required to release a
18  lien in a short sale?  And do you remember the
19  provision for that?
20          MR. PISTILLI:  Object to the form.
21          THE WITNESS:  Well, by its vary nature
22      a short sale required that all liens on the
23      property be released.
24  BY MR. TANTILLO:
25      Q.   What is the second lien extinguishment

1  program, are you familiar with that?
2      A.   I'm not.
3      Q.   Are you familiar with the process of
4  sending letters to borrowers to say that we're
5  releasing your lien in order to obtain credit?
6      A.   Letters to borrowers notifying them of a
7  release of lien were included in some of the
8  documentation that we reviewed in order to validate
9  relief.
10      Q.   Do you know whether or not it was a
11  requirement that the debt actually be forgiven?
12      A.   Some forms of relief gave credit for
13  forgiveness of loan amounts.  It depends on the form
14  of relief we're talking about.
15      Q.   Are there forms of relief that allow the
16  banks to continue to collect on the debt after they
17  release a lien or they send an extinguishment letter?
18          MR. PISTILLI:  Object to the form.
19          THE WITNESS:  In cases where we gave --
20      my recollection is that in cases where we gave
21      credit for relief where a lien was released -- I
22      better take that back.
23      There was -- there was a question of
24      whether a deficiency still remained or not.  And
25      I don't want to generalize.  I -- I can't recall

1  a situation where we didn't require a waiver of
2  the deficiency.  But I'm not -- I cannot tell
3  you right now that I remember with my own
4  knowledge whether that was required for all or
5  not.
6  BY MR. TANTILLO:
7      Q.   Was it possible to do a loan modification
8  on loans in the RCD1 system?
9      A.   I don't know.
10      Q.   Were there instances in which a lien
11  release was considered a modification?
12      A.   My recollection is that modifications were
13  generally done as to first lien loans, and that a
14  modification generally did not release a lien, it
15  merely reduced the principal amount of and/or extended
16  the time of payment.
17      Q.   So you're not -- go ahead, I'm sorry.
18      A.   I will say, in addition, there were
19  situations where if -- if there was a first and second
20  lien loan, there were times when it was required to
21  modify both to give the borrower relief in terms of
22  payment burden.
23      Q.   And how would they achieve that, through
24  an application process?
25      A.   In general, yes.  Although, again,

1  I -- yes.
2      Q.   Were there instances where an application
3  process was not used?
4      A.   I don't know.  I don't recall.
5      Q.   What is the alternative foreclosure
6  process?  Are you familiar with that?
7      A.   No.
8      Q.   Are you familiar with the anti-blight
9  provisions of the various agreements?
10      A.   I'm aware of them, yes.
11      Q.   Could you tell us how those worked in --
12  regarding to the --
13      A.   I will have a difficult time doing that,
14  because I don't believe any of the servicers availed
15  themselves of the anti-blight provisions.  To my -- I
16  don't recall one.
17      Q.   What is Regulation X?
18      A.   This is very hard for me to say this, I
19  don't know.  I can't describe it to you right now.
20      Q.   Did -- did OMSO ever -- ever require the
21  servicers to release liens in order to be compliant
22  with Regulation X?
23      A.   OMSO didn't require servicers to do
24  anything with regard to relief.  The servicers granted
25  relief and presented it, first of all, to their IRG

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 62

1    for validation, then to us for validation.

2        Q.    Did OMSO ever provide counsel regarding

3    ways to be in compliance with Regulation X?

4        A.    I'm not aware of that, no.

5    (EXHIBIT NUMBER 7 WAS MARKED FOR IDENTIFICATION)

6            MR. PISTILLI:   So the same question

7        about this document, it's got some yellow

8        highlighting on certain portions.   Was that

9        highlighting applied by Plaintiffs' counsel?

10           MR. TANTILLO:   I don't know, Chris.

11           MR. PISTILLI:   So you're not sure what

12       the yellow highlighting is?

13           MR. TANTILLO:   Actually, not.

14           MR. PISTILLI:   Okay.   Just want that

15       clear for the record.

16   BY MR. TANTILLO:

17       Q.    Mr. Smith, I'm handing you what's been

18   marked as Plaintiffs' Exhibit Number 7.   Could you

19   please review that?

20           (WITNESS REVIEWS DOCUMENT)

21       Q.    Have you reviewed the document, Mr. Smith?

22       A.    I have.

23       Q.    Do you recall providing Chase, the

24   servicer in this particular situation, providing them

25   with approval or guidance to release the liens in

Page 63

1    order to be compliant with the Regulation X?

2        A.    No.

3        Q.    Do you know anybody in your office who

4    would have provided that kind of guidance?

5        A.    I'm not aware of anybody who did.

6        Q.    And that particular document does state

7    that through speaking with somebody in your office

8    they were provided guidance to do that?

9            MR. EPSTEIN:   Objection, was that a

10       question?

11           MR. TANTILLO:   Yes, sir.

12           MR. EPSTEIN:   You can answer that

13       question.

14           THE WITNESS:   The answer is that I

15       don't know that we did this, and I don't know --

16       if we did it, I don't know who did it, who gave

17       this alleged guidance.

18   BY MR. TANTILLO:

19       Q.    Would it -- would the individuals

20   potentially be outside counsel that we've spoken about

21   before either Mr. Josh Stein or Martha, was it

22   Svobada?

23       A.    Svobada.

24       Q.    Svobada, excuse me.

25       A.    If this was given, it was given by one of

Page 64

1    those people.

2        Q.    Mr. Smith, what constitutes a de minimis

3    violation pursuant to the settlements?

4        A.    Well, de minimis is not a term of -- of

5    art in the settlement, so I don't have an answer to

6    that -- or a defined term, I should say.

7        Q.    Are you aware of instances where various

8    servicers would present to OMSO arguments to the

9    degree that violation was quote/unquote de minimis

10   and, therefore, not a violation of the agreements --

11   or the judgments, excuse me?

12       A.    Well, the discussions we would have had

13   with servicers would be about whether they had

14   exceeded the threshold error rate or not.

15       Q.    Did you see your role as monitor as a

16   regulatory function?

17           MR. EPSTEIN:   Objection to form.

18           THE WITNESS:   I saw my role as being a

19       defined and specific one in the enforcement of

20       an agreed consent judgment.

21   BY MR. TANTILLO:

22       Q.    I'm going to turn back to -- you

23   mentioned, I believe, three or four metrics that were

24   binary in scope.   Even though you -- you --

25       A.    Yeah, right.

Page 65

1        Q.    When you're -- when the OMSO was

2    evaluating those metrics, were those metrics done on a

3    entire loan population, or were they done on various

4    pools, for example, maybe MSP, VLS, Recovery 1?

5            MR. PISTILLI:   Objection to form.

6            MR. EPSTEIN:   Objection to form.

7            THE WITNESS:   The policies and

8        procedures metrics that I can remember were

9        metrics with regard to the entire mortgage

10       servicing operation of the -- each servicer.

11   BY MR. TANTILLO:

12       Q.    So either yes or no, they would -- they

13   were in compliance or they weren't regarding those?

14       A.    Yes.

15       Q.    For example, somebody -- a single point of

16   contact or --

17       A.    There was -- single point of contact was

18   one, as I recall it.   There were two others and,

19   I'm -- third-party vendors was one, and I forget the

20   third.

21       Q.    Do you know if the Recovery 1 system of

22   records was able to have a single point of contact?

23           MR. EPSTEIN:   Objection to form.

24           MR. PISTILLI:   Join.

25           THE WITNESS:   I only know what we

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 66

```
 1        tested, and what we tested was overall policy
 2    with -- with the -- all servicers.
 3    BY MR. TANTILLO:
 4        Q.     Did you have a custom or customary way in
 5    which you would work with various IRGs, various
 6    servicers, to negotiate the work plans?
 7        A.     Well, first and foremost, we negotiated
 8    the basic work plan template with all servicers
 9    together.  The entire -- well, the protocols that we
10    employed -- by "we" I mean myself and my colleagues
11    and -- and counsel, particularly counsel -- was to
12    negotiate a broad overall set of protocols under which
13    we would implement our monitoring function.  We fine
14    tuned, somewhat, in the case of each servicer to the
15    extent necessary to reflect differences in their
16    systems.
17        Q.     And was it for OMSO to determine who was
18    in compliance with these various servicing standards
19    of metrics in the way you were talking about?
20            MR. EPSTEIN:  Objection to form.
21            THE WITNESS:  Well, as I said to you
22        before, we determined compliance with the
23        servicing standards through the metrics testing
24        I described previously.
25
```

Page 67

```
 1    BY MR. TANTILLO:
 2        Q.     Did OMSO require the servicers to undergo
 3    what may be called a lien scrub?
 4        A.     No.
 5        Q.     So that was something that the servicers
 6    would do on their own?
 7            MR. PISTILLI:  Objection, foundation.
 8            THE WITNESS:  I don't know.
 9    BY MR. TANTILLO:
10        Q.     What was the sequence of events or
11    requirements to enable a loan that, let's say, was
12    charged off to obtain credits under the various
13    settlements?
14        A.     It would depend.  It would depend on the
15    nature of the loan itself, when the relief was
16    granted, what category of relief was being sought.  It
17    was -- and it was a variety of -- and whether the
18    relief had been granted appropriately and credited --
19    and properly credited.
20        Q.     Was it possible for RCV1 loans or liens to
21    be intact and then released at the same time?  Were
22    there -- was that a possibility?
23            MR. PISTILLI:  Objection to form.
24            MR. EPSTEIN:  Objection to form.
25            THE WITNESS:  I don't understand the
```

Page 68

```
 1    question.
 2    BY MR. TANTILLO:
 3        Q.     The liens, obviously, at RC -- excuse me.
 4            The liens at RCV1 were released.  Was
 5    the -- was it possible for Chase, for example, to
 6    obtain credit on these lien in both settlements?
 7            MR. EPSTEIN:  Objection to form.
 8            MR. PISTILLI:  Join.
 9            THE WITNESS:  I can't answer that
10        question, because it's -- it's -- it was --
11        Chase sought -- and there's a public record on
12        this.  The -- we have published -- a
13        published report to the court on consumer relief
14        for all servicers, and I've published public
15        reports about all servicers and the forms of
16        relief they sought and the amounts they were
17        granted is public.
18            And that's -- the source of those loans
19        were -- were looked at at the time we did the
20        validation work.  But it was a question -- what
21        we reported on was the overall result.  If
22        you're asking whether the same loan could be
23        credited in both, the answer -- for the same
24        relief, the answer to that would be no.
25
```

Page 69

```
 1    BY MR. TANTILLO:
 2        Q.     So it was not possible for one loan
 3    number, let's say 1234, to receive credit in the
 4    National Mortgage Settlement and then 1234 to receive
 5    credit in the RMBS settlement?
 6            MR. PISTILLI:  Objection, misstates
 7        prior testimony.
 8            THE WITNESS:  This is all very
 9        hypothetical.  It would depend, frankly.  There
10        were some loans as -- if a short -- if a second
11        lien was expunged in connection with a short
12        sale, there may have been instances where short
13        sale relief was granted and second lien
14        expungement relief was granted.  And it's
15        possible it could have been the two different
16        settlements, but I -- I don't know whether it
17        was or not.
18    BY MR. TANTILLO:
19        Q.     Were bankruptcy loans subject to consumer
20    relief credit?
21        A.     Loans of debtors in bankruptcy could
22    receive consumer relief credit.
23        Q.     And were you aware of any RCD1 loans or
24    Recovery 1 system loans that received credit that were
25    in bankruptcy?
```

Page 70

```
 1        A.    I'm not aware of that, no.  That's to say
 2  I don't know.
 3        Q.    With regards to the Recovery 1 system of
 4  loans, did you ever at any time notify other
 5  regulators such as Department of Justice or the
 6  Consumer Financial Protection Bureau of the fact that
 7  the Recovery 1 loans were not being serviced?
 8              MR. EPSTEIN:  Objection to form.
 9              MR. PISTILLI:  Join.
10              THE WITNESS:  No.
11  BY MR. TANTILLO:
12        Q.    Was there a reason why you didn't do so?
13              MR. EPSTEIN:  Same objection.
14              THE WITNESS:  I didn't -- your question
15         is about did I know they weren't being serviced,
16         and the answer is I didn't know that.
17  BY MR. TANTILLO:
18        Q.    You previously stated that only loans that
19  have an intact lien can be serviced; is that correct?
20              MR. EPSTEIN:  Objection to form.
21              THE WITNESS:  What was said was a
22         predicate of the servicing -- the application of
23         servicing standards was that there be, yeah, an
24         intact lien, that it be -- there be a mortgage.
25         It was a mortgage settlement, and so there had
```

Page 71

```
 1         to be a mortgage.
 2  BY MR. TANTILLO:
 3        Q.    So under that theory, loans that were
 4  within the Recovery 1 system that were lien released
 5  could have not received consumer relief credit?
 6              MR. PISTILLI:  Object to the form,
 7         misstates prior testimony, calls for a legal
 8         conclusion.
 9              THE WITNESS:  That, it depends on
10         when -- I don't think I can say that, no.  If --
11         if there was -- if there was a valid lien that
12         was released, a servicer could obtain credit for
13         the release of that loan.  Now, it wasn't a
14         significant amount of release.  It was -- if
15         that was all there was, it was pretty -- it was
16         a very, very -- on the scoring system was a very
17         small amount of credit.
18              You had to have an existing loan, an
19         intact loan, before the relief was given and
20         claimed, and the -- and then you could claim the
21         relief if it were within -- granted within the
22         time periods.
23  BY MR. TANTILLO:
24        Q.    So if the lien was intact during the time
25  periods of the settlement, were they able to obtain
```

Page 72

```
 1  relief?
 2        A.    It was --
 3              MR. PISTILLI:  Object to the form.
 4              THE WITNESS:  It was -- it was possible
 5         to do that.
 6  BY MR. TANTILLO:
 7        Q.    And if they had released the liens prior
 8  to the beginning of the settlement, wouldn't they have
 9  been able to obtain consumer relief on those releases?
10        A.    No.
11        Q.    Did you see a equivalent system of records
12  similar to Recovery 1 with other banks?
13        A.    We did a thorough review of the systems of
14  all of the servicers as part of our -- our --
15  establishment of our protocols, our infrastructure.  I
16  don't recall the structure, myself, of any of the
17  other servicers.
18        Q.    So you weren't aware of other servicers
19  having a system of records of charge-off loans
20  or . . .
21              Let's leave the question.
22              MR. PISTILLI:  I object to the form,
23         misstates prior testimony.
24              THE WITNESS:  Well, each of the
25         servicers charged off loans, and they were
```

Page 73

```
 1         accounted for in a system that each of them had.
 2         But the precise nature of those systems and how
 3         they did it would vary between servicers,
 4         probably.  I say "probably," again, because I
 5         don't recall the specifics.
 6  BY MR. TANTILLO:
 7        Q.    Were you aware of instances where prior to
 8  the entry of the starting date of the NMS and the RMBS
 9  settlements that servicers would release loans so they
10  would not be subject to metric testing?
11        A.    I don't remember specifics.  We -- in each
12  case of each servicer we did a -- we did a careful
13  review to make sure that they -- we did not give
14  credit for that kind of situation.
15        Q.    So in the event that they had done that,
16  they would not receive credit for those loans?
17        A.    They should not receive credit.
18        Q.    Would you -- would it have surprised you
19  if various servicers had released liens prior to entry
20  into the National Mortgage Settlement?
21        A.    I don't -- well, I don't think "surprised"
22  is the right word.  Our job was to determine that we
23  did not give credit in those circumstances.
24        Q.    And let me ask you, how would you do that?
25  How would you know if a servicer had previously
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 74

1    released a lien and then subsequently tried to obtain
2    credit for it?
3         A.    All the information we had that we used,
4    and there was an extensive protocol developed with
5    each servicer to determine whether and how much credit
6    should be given, was gone through in each case.  But
7    in each case, it was determined with regard -- by
8    reference to the system of record itself.
9         Q.    Was it possible to compare the loan data
10   based on loan numbers, or how was that done?  Was
11   it -- was it done through a particular identification
12   requirement?
13        A.    Both.
14              MR. PISTILLI:  Object to the form.
15              THE WITNESS:  Both.
16   BY MR. TANTILLO:
17        Q.    It was done through loan number and what
18   other method?
19        A.    We had -- it was mainly through loan
20   number.  But we took careful steps to assure that we
21   knew -- we -- to identify a loan and to follow its
22   history through the servicer's system of record.  But
23   we -- and we would rely on the -- and if necessary,
24   and I don't know in this case what else we -- whether
25   we did something else, I don't remember that we did --

Page 75

1    perhaps, require additional information to assure
2    ourselves that the loan was intact, for example, and a
3    bunch -- and a number of other things.  Then determine
4    how much relief had been given and -- and whether the
5    credit was proper -- the amount of the credit was
6    proper.
7         Q.    And how would a servicer either notify you
8    or certify that, for example, a lien was intact, as
9    just one example?
10        A.    I can't give you details about that.  It
11   was -- we would do it by reference, again, through our
12   agreed protocols, to the corporate records of the
13   servicer through which we would determine that the
14   lien had been intact.
15        Q.    Did the various servicers require -- did
16   you require them to file certifications from various
17   individuals?
18        A.    There were circumstances where we did.  I
19   don't recall all of them.
20        Q.    And why would they need to file a type of
21   certification with the --
22        A.    It depends.  It varies.  And I don't
23   recall the details.
24        (EXHIBIT NUMBER 8 WAS MARKED FOR IDENTIFICATION)
25

Page 76

1    BY MR. TANTILLO:
2         Q.    Mr. Smith, have you reviewed Plaintiffs'
3    Exhibit Number 7?
4              MR. EPSTEIN:  8.
5              THE WITNESS:  8.
6              MR. TANTILLO:  8, I apologize.
7    BY MR. TANTILLO:
8         Q.    Was this the type of certification that
9    you would receive?
10        A.    This appears to be a certification that --
11   it's actually not addressed to me, but it does refer
12   to the National Mortgage Settlement.
13        Q.    Was this similar to the types of
14   certifications that you would receive from time to
15   time?
16        A.    This is a certification we received.
17              And within that certification it,
18   obviously, talks about various things that they did in
19   order to comply with the settlement, obviously, in
20   terms of intact lien validations.  Was that a
21   requirement that your office had in order for them to
22   ensure the various systems of record were being
23   reviewed and, obviously, in terms of the fact that
24   there was actually an intact lien?
25              MR. EPSTEIN:  Objection to form.

Page 77

1              MR. PISTILLI:  Objection to form.
2              THE WITNESS:  I'm not going to
3    speculate on this.  It's, clearly, we had --
4    there was a purpose for which we had -- we may
5    well have sought assurance that liens had been
6    released.  It is not clear to me -- well, it
7    says -- this probably does refer -- I don't want
8    to speculate -- to eCredit as a specific kind
9    of -- of consumer relief credit.
10   BY MR. TANTILLO:
11        Q.    What was --
12        A.    Second lien -- yeah, okay, for second
13   lien -- second lien extinguishments.  The issue was
14   how to establish for second liens that had been
15   extinguished -- where they claimed credit for an
16   extinguishment of a second lien, how to -- how to
17   determine that the lien had been valid -- intact to
18   start and had, then, been completely -- well, had been
19   released.
20        Q.    And what was the concern for OMSO
21   regarding that?
22              MR. PISTILLI:  Object to the form.
23              THE WITNESS:  It was merely -- it was
24   merely a form of evidence to assure ourselves
25   that the actions that had been taken under

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

**Page 78**

1    Section 2E of the consumer relief menu or,
2    perhaps, the consumer relief exhibit had been
3    done.
4    BY MR. TANTILLO:
5    Q.    And in order for a servicer to obtain
6    relief under 2E, what requirements were required?
7    A.    I'd have to look at the -- at the, you
8    know, the schedule again.  I'm reasonably confident
9    that this is -- this regards seeking credit for the
10   expungement of a loan.  And I don't recall whether
11   it's -- whether this -- this relief relates also to
12   the -- how far past due it was.  2E, as I recall it,
13   was 180 days past due, and the relief was -- the
14   amount of relief was fairly small.
15   Q.    Was there a provision in either the
16   National Mortgage Settlement or in the RMBS settlement
17   where a servicer could obtain relief under what this
18   document calls HUD Consumer Relief Program?
19   A.    The National Mortgage Settlement contained
20   a menu -- well, first of all, it had a -- it had a --
21   an exhibit that described in detail the kinds of
22   consumer relief for which credit would be given.  It,
23   then, had a menu attached to that exhibit which gave
24   some additional detail and also disclosed how much --
25   how much credit would be given for each category of

**Page 79**

1    relief.
2    Q.    However, was there a particular part of --
3    either of the RMBS settlement or the National Mortgage
4    Settlement that related to something called HUD
5    Consumer Relief?
6    MR. PISTILLI:  Objection.
7    THE WITNESS:  I don't recall -- I don't
8    recall that it was.
9    MR. PISTILLI:  And that -- the
10   objection was it calls for a legal conclusion.
11   BY MR. TANTILLO:
12   Q.    Regarding the RMBS settlements, was Chase
13   able to receive credit for lien releases in what's
14   called hardest hit areas?
15   A.    Chase was able to receive credit for -- I
16   thought it was -- my recollection is for credit
17   extended in hardest hit areas.
18   Q.    And "credit extended" meaning what?
19   A.    Meaning new loans.
20   Q.    New loans?
21   A.    Yes.  Or -- but I -- again, I'd -- I would
22   rather refer to the document itself.  There was --
23   there was credit allowed for relief in hardest hit
24   areas.
25   Q.    And was a lien release part of that

**Page 80**

1    relief?
2    A.    May have been, I don't recall.
3    (EXHIBIT NUMBER 9 WAS MARKED FOR IDENTIFICATION)
4    MR. EPSTEIN:  Thank you.
5    MR. TANTILLO:  Yes, sir.
6    THE WITNESS:  I take it you want me to
7    review this?
8    BY MR. TANTILLO:
9    Q.    Yes, sir, I apologize.
10   (WITNESS REVIEWS DOCUMENT)
11   A.    Yes.
12   Q.    Mr. Smith, do you recognize Government's
13   Exhibit Number 9 -- I'm sorry, as Government --
14   A.    I'm sorry?
15   Q.    Sorry, Prosecutor.
16   Do you remember -- have you -- have you
17   reviewed that document -- I'm sorry, have reviewed --
18   A.    Yes.
19   Q.    -- Plaintiffs' Exhibit Number 9?
20   A.    I have.
21   Q.    And it mentions in there, once again, this
22   HUD Consumer Relief Program.
23   MR. EPSTEIN:  Wait, wait for a
24   question.
25   THE WITNESS:  Thank you.

**Page 81**

1    BY MR. TANTILLO:
2    Q.    The HUD Consumer Relief Program, do you
3    know what they're talking about here?
4    A.    I believe that they are talking about the
5    RMBS settlement.  They distinguished between the NMS
6    settlement which they called the DOJ settlement and
7    the RMBS settlement which they called the HUD
8    settlement.  They called the internal review group in
9    the NMS the internal review group -- I've been
10   chastised by Mr. Epstein about this -- the IRG.  And
11   they called it the -- it's equivalent in the Chase
12   document, the HRG for HUD.
13   Q.    So, once again, they -- you were -- your
14   office was requiring them to ensure that they had lien
15   validations over various periods of time, because
16   it's -- obviously, this is a different date than
17   Plaintiffs' Exhibit Number, I believe, 8?
18   MR. PISTILLI:  Objection to form and --
19   MR. EPSTEIN:  Objection to form.
20   THE WITNESS:  Well, it's --
21   MR. PISTILLI:  -- also lacks
22   foundation.
23   THE WITNESS:  This was a document,
24   clearly, delivered in -- well, clearly, probably
25   delivered in connection with the RMBS settlement

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 82

1    and deals with the validation of liens.
2    BY MR. TANTILLO:
3        Q.    And under the RMBS settlement, how --
4    obviously, there was a menu of options that -- that
5    Chase had to obtain credit.  One of those menu options
6    was releasing the first lien?
7        A.    Although, it's -- in -- in almost every
8    case in almost every settlement first lien loans were
9    modified.  There may have been some cases where a
10   first lien was expunged, but they're very few.  Most
11   of the -- most of the expungement activity was for
12   second lien loans.
13       (EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION)
14           MR. PISTILLI:  Same question.  The
15       yellow highlighting on this document, do you
16       know where that comes from?
17           MR. TANTILLO:  I don't, but I'll make
18       sure that it doesn't happen again.
19           (WITNESS REVIEWS DOCUMENT)
20   BY MR. TANTILLO:
21       Q.    Mr. Smith, have you reviewed Plaintiffs'
22   Exhibit Number 10?
23       A.    Yes.
24       Q.    Regarding this document, it states that:
25   (Reading)

Page 83

1               There is approximately 699,000
2           loans that are still in the Recovery 1
3           on or about October 1st of 2014.
4           Was there a directive by your office to
5    release these liens?
6           MR. PISTILLI:  Object to the form.
7           THE WITNESS:  As I believe I said
8       before, I don't know that we directed any
9       release of liens.  There may have been an
10      agreement to -- for release of liens.  I don't
11      know what purpose this -- this certification --
12      or this document has been generated for.  If --
13      some prior exhibits discussed an agreement
14      regarding inclusion or noninclusion in metrics
15      testing, but it's not clear to me why this was
16      prepared.
17   BY MR. TANTILLO:
18       Q.    Did the -- do you recall whether or not
19   the Office of Mortgage Settlement required Chase to
20   bring the entire Recovery 1 population in on
21   September 30th of 2014?
22       A.    I do not recall that.
23       Q.    Was there a period of time in which your
24   office counseled, obviously not directed, Chase to
25   bring these loans into metric testing?

Page 84

1        A.    As previously -- as I have previously
2    testified, there was a determination to include
3    Recovery 1 loans in metrics testing if they had,
4    according to the documentation, if they had an extent
5    lien, an existing lien.
6        Q.    So long as there was not an extent lien,
7    the lien you released, these loans would have not have
8    been subject to metrics testing?
9        A.    That's correct.
10       (EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION)
11           MR. PISTILLI:  Same question regarding
12       the yellow highlighting, and I assume the same
13       answer unless you tell me otherwise.
14           MR. TANTILLO:  It's the same answer,
15       Mr. Pistilli.  But as I assure you, it won't
16       happen again.
17           MR. PISTILLI:  Yellow highlighting is
18       not a problem, I just want to establish my
19       record that the document that's being shown has
20       been changed from the version in which it was
21       produced.
22           (WITNESS REVIEWS DOCUMENT)
23   BY MR. TANTILLO:
24       Q.    Mr. Smith, have you had a chance to review
25   Exhibit Number 11?

Page 85

1        A.    Yes.
2        Q.    Does that document in any way refresh your
3    recollection at all about the inclusion of these loans
4    into metrics testing?
5        A.    As regards what we did, the answer is no.
6        (EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION)
7           MR. PISTILLI:  This is my copy.
8           MR. TANTILLO:  Let us label it.
9           MR. PISTILLI:  Same observation
10       regarding the highlighting of the document.
11           MR. TANTILLO:  I'll have the same
12       response.
13           MR. PISTILLI:  Is this the same as
14       Exhibit 5, Counsel?
15           MR. EPSTEIN:  I was thinking --
16           THE WITNESS:  This looks very similar
17       to a document we've already gone over.
18           MR. EPSTEIN:  It is.
19           MR. TANTILLO:  I apologize.
20           Yes, it is, sir.
21   BY MR. TANTILLO:
22       Q.    Regarding -- I'm sure you just reviewed
23   this document again.
24       A.    Well, actually not.
25       Q.    Oh, Number 12.  All right.  I'll let you

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 86

1    take a look, Mr. Smith.
2                (WITNESS REVIEWS DOCUMENT)
3         A.    Yes, all right.
4         Q.    Mr. Smith, this document refers to an
5    extension of a date and to April 1st of 2014.  Do you
6    recall that at all?
7         A.    No.
8         Q.    Do you know who in your office would have
9    provided an extension?
10        A.    Well, I would have done it on the basis of
11   discussion with counsel.
12        Q.    And that would have been either somebody
13   from this office, Poyner Spruill, or was it
14   Leatherwood?
15               MR. EPSTEIN:  Smith Moore.
16               THE WITNESS:  Smith Moore Leatherwood,
17        yeah.
18   BY MR. TANTILLO:
19        Q.    And beyond those individuals, would you
20   have also asked your third-party servicers, the people
21   at BDO or Grant Thornton --
22        A.    No.
23        Q.    -- about that decision?
24        A.    No.
25        Q.    Now, was it customary or common for your

Page 87

1    office to be in direct contact with the servicer
2    regarding issues like these?
3         A.    We were in contact with all servicers on a
4    regular basis.  First of all, we did -- the validation
5    process itself had us in almost continuous contact
6    with the servicers.  If there were issues of policy,
7    we, generally, dealt with all of them together, not
8    individually.
9         Q.    Was there a particular flow of information
10   and how it would reach to you?  Would it go from the
11   IRG to BDO to Grant Thornton to you, or was there a
12   way that the servicers could contact you directly and
13   ask these sorts of questions about metrics testing?
14               MR. EPSTEIN:  Well, objection to form.
15        By "you" do you mean you Joe Smith, or do you
16        mean OMSO?
17               MR. TANTILLO:  You Joe Smith and OMSO.
18               THE WITNESS:  There was a constant flow
19        of discussion about issues regarding the
20        implementation of the settlement.  And the
21        initial contacts could have come either --
22        probably would have -- could have come through a
23        number of those channels you just mentioned.
24   BY MR. TANTILLO:
25        Q.    Now, were you only able to interact with

Page 88

1    IRG representatives of the servicer, or could you be
2    in direct contact with people at the line of business
3    level?
4                MR. PISTILLI:  Object to the form.
5                MR. EPSTEIN:  And, again, by "you" you
6         mean Joe Smith, OMSO and all affiliated people?
7                MR. TANTILLO:  Yes, sir.
8                THE WITNESS:  In most -- in the
9         majority of cases my colleagues were in contact
10        with the internal review groups, the people
11        outside the operation.  There were some meetings
12        where my operational people met with both the
13        IRG and the servicer operations personnel.  But
14        that was to iron out tech -- any technical --
15        those were very technical meetings, iron out
16        technical issues.
17   BY MR. TANTILLO:
18        Q.    So would it be fair to say, generally, you
19   were in communication with representatives of the
20   servicers' IRG?
21        A.    Yes.  In general, yes.
22        Q.    Now, were you aware of any sort of cross
23   communication with sort of the IRG and the line of
24   business people in relation to the duties to fulfill
25   these settlements?

Page 89

1                MR. EPSTEIN:  Objection to form.
2                MR. PISTILLI:  Join.
3                THE WITNESS:  There did have to be
4         contact between the IRG and the -- and the --
5         and the management to assure that the -- that
6         the management understood what it was supposed
7         to do, because the initial presentation of
8         information was from the management's
9         information.  So there were contacts.
10   BY MR. TANTILLO:
11        Q.    As you understand it and from your own
12   experience, was the data that you were receiving from
13   the various servicers as well as Chase, in particular,
14   was that being done in an independent way with --
15   inside the bank or the servicer, or was it being drawn
16   from the management and line of business?
17               MR. PISTILLI:  Objection to form.
18               MR. EPSTEIN:  Objection to form.
19               THE WITNESS:  All information that was
20        used to develop populations, to develop the
21        background information on the basis of which
22        both monitoring was done and consumer relief was
23        done, was developed through management
24        information systems that were under control of
25        the management.  There was contact between the

Page 90

1   IRG and the management to determine the
2   populations were correctly defined and that the
3   populations were correctly pooled and the -- and
4   to determine -- and there were also issues when
5   the IRG found, and this was for all servicers as
6   they often -- well, not often, but sometimes
7   did, that a loan had not passed, was not able --
8   for metrics testing had not passed.
9           There were discussions between the --
10  the IRG and the servicer and management about
11  whether that was a correct determination or not.
12  And we reviewed all that.  I mean, we were aware
13  of those conversations.  And then we did our own
14  validation which was entirely separate from
15  either of those two entities.
16  BY MR. TANTILLO:
17      Q.    The samples that you just spoke of, was
18  there a certain percentage of loans that were sampled
19  from various buckets or various systems of record, or
20  was it just --
21      A.    What --
22            MR. EPSTEIN:  Let him finish his
23  question.
24  BY MR. TANTILLO:
25      Q.    -- or hypothetically 1 percent of all

Page 91

1   loans in Chase's system of records.
2            MR. PISTILLI:  Object to the form.
3            THE WITNESS:  I will need you to be
4   more specific about that.  Are we talking about
5   metrics testing or consumer relief?
6   BY MR. TANTILLO:
7       Q.    I'm talking about metrics testing, and
8   then we can go to consumer relief.
9            In terms of metrics testing, when you
10  received a sample, do you know the sample size in
11  terms of percentages that were used in order to
12  conduct the metrics testing?
13      A.    Yes.
14      Q.    And what was that sample size?
15      A.    The sample size would depend on the
16  population, the number of total loans in the
17  population.  The sample was then drawn based on an
18  agreed protocol between the operating management, the
19  IRG and the SPF and PPF, my people, to -- to derive a
20  random -- randomized sample -- statistically valid
21  randomized sample from the population for the metric
22  in question.
23            And that the statistical analysts had an
24  agreed protocol which is apparently is -- and this is
25  not my field, but I was satisfied and we satisfied

Page 92

1   ourselves and my people who know this stuff satisfied
2   themselves, that the samples were drawn in a random
3   method from a properly -- as far -- as best we could
4   tell a properly determined population, and the test --
5   the testing was then applied to that random sample.
6       Q.    Understood.
7             Was there a certain percentage that was
8   used?
9       A.    It -- the number depended -- no.  The
10  short answer to that is no.
11      Q.    Was it proportionally done by the number
12  of loans that were in the population?
13      A.    Yes.
14      Q.    And let's move to consumer relief.  Was a
15  similar type of sampling process used for consumer
16  relief?
17      A.    In consumer relief the management would
18  assert that it had given relief on a defined number of
19  loans which I guess you would also call a -- a
20  population.  It would be divided by forms of relief.
21  So first lien relief, they would submit.  That was one
22  population.  Second lien relief or expungement is
23  another population.  Short sales and other was a third
24  population.
25            And a statistically valid random sample

Page 93

1   was drawn for each of those separate populations, and
2   it was -- it was tested to determine whether the loan
3   was an appropriate loan for relief of any kind or of
4   the kind given, whether the kind of relief given was
5   given within the time frame for which was authorized
6   and -- was done in accordance with the
7   requirements of the settlement.  There were
8   requirements about what kinds of loans could be
9   included and how much relief -- how the relief had to
10  be given.
11            And the third thing was, had the -- had
12  the management and the IRG given the proper amount of
13  credit with regard to each of the loans for which
14  relief had been granted.  And if, in this case, the
15  error -- the total error rate for any of those
16  populations exceeded 1 percent, they would turn --
17  they were returned and not -- credit was not given for
18  the entire population.  They had to do it over.
19  That's for all servicers.
20      Q.    Did OMSO ever receive from a servicer all
21  of the raw data of every single loan that, let's say
22  Chase for example, took credit for?
23      A.    I don't know what you mean.
24      Q.    Do you have in your possession or does one
25  of your third-party servicer-type people, do they have

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 94

1  in their possession a list of every single lien for
2  which Chase took credit?
3       A.    Chase has that information.
4       Q.    But you do not?
5       A.    I do not believe we have it now.
6       Q.    Was there a point in time when you did
7  have that information?
8       A.    We never took possession of information,
9  data, specific information regarding any of the loans.
10  We reviewed them in data rooms, and we did not -- and
11  this is, by the way, is all in our published reports.
12  We made it clear we did not take possession, we
13  reviewed it through -- through review, I think were
14  called review rooms that were set up in the data
15  system of the -- all the servicers.
16       Q.    In order for you and OMSO to feel as if
17  the credit -- the crediting process was appropriate,
18  you relied on the samples they provided you of the
19  crediting?
20            MR. PISTILLI:  Objection.
21            THE WITNESS:  We determined that the
22       sample had been properly pooled, and we -- and
23       we -- we, then, did testing based on the data
24       that was given to us, yes.
25            MR. TANTILLO:  One moment, please.

Page 95

1            MR. SCHNEIDER:  Everybody waiting on
2       me, sorry.
3  BY MR. TANTILLO:
4       Q.    Do you know if the sampling that was done
5  and the crediting that was done in any way violated
6  the Equal Credit Opportunity Act?
7            MR. PISTILLI:  Object to the form.
8            THE WITNESS:  For what?  What are we --
9       again, you have to be more specific.  Are you
10       talking about consumer relief or metrics?
11  BY MR. TANTILLO:
12       Q.    Consumer relief.
13       A.    The consumer relief that was granted was
14  not the -- on the entire portfolio that Chase had.  It
15  was a -- it was selected -- I mean, it was -- it was a
16  significant but not the complete sample of -- I mean,
17  it wasn't every loan they had.  We were not -- and we
18  were not empowered and did not do a fair lending test.
19       Q.    So you weren't aware if -- yeah, you said
20  there was no fair lending test done --
21       A.    No.
22       Q.    -- on what was done in consumer relief.
23  How about the metrics testing, was there a fair
24  lending test on those?
25       A.    There was not.

Page 96

1       Q.    All right.
2            MR. TANTILLO:  Do you guys want to
3       break for lunch?
4            THE WITNESS:  How much more?
5            MR. EPSTEIN:  That's the question, if
6       you're going to be another 30 minutes, no.  If
7       you're going to be more than 30 minutes, then,
8       yes.
9            MR. DI MARCO:  More than 30.
10            THE VIDEOGRAPHER:  The time now is
11       12:21 p.m., and we will be going off record.
12            (RECESS TAKEN)
13            THE VIDEOGRAPHER:  The time now is
14       1:32 p.m., and we are back on record.  You may
15       begin.
16  BY MR. TANTILLO:
17       Q.    Mr. Smith, I want to show you what we've
18  marked as Plaintiffs' Number 13, and let counsel for
19  Defendants review the document.
20  (EXHIBIT NUMBER 13 WAS MARKED FOR IDENTIFICATION)
21            MR. PISTILLI:  I will just comment
22       again that it has the yellow highlighting that
23       was not in the produced version.
24            MR. TANTILLO:  Our position, as I said
25       previously --

Page 97

1            MR. PISTILLI:  You don't need a
2       position on it.  I'm just noting for the record
3       what the document is --
4            MR. EPSTEIN:  Can I get a copy, please?
5            MR. PISTILLI:  -- as well.
6            (WITNESS REVIEWS DOCUMENT)
7  BY MR. TANTILLO:
8       Q.    Mr. Smith, have you reviewed Number 13?
9       A.    I have.
10       Q.    Towards the bottom of the page highlighted
11  there for you, sir, there's a statement which states
12  in effect, I'm paraphrasing, that until the lien is
13  released, the requirements of there being a single
14  point of contact is still necessary.  Is that your
15  understanding as well?
16            MR. PISTILLI:  Objection --
17            THE WITNESS:  No, that's what this --
18            MR. PISTILLI:  Pardon me -- objection,
19       lacks foundation and calls for a legal
20       conclusion.
21            THE WITNESS:  That's what this says.
22  BY MR. TANTILLO:
23       Q.    Was that the -- was that the law or was
24  that the provision of the National Mortgage
25  Settlement, was that the -- was the National Mortgage

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 98

1  Settlement required?
2      A.   It required a single point of contact
3  for -- at the very least, for applications for loan
4  modification. And I don't have it here in front of
5  me, obviously, but it may have well gone beyond that.
6  This also does -- yeah -- yes. So the short answer,
7  yes.
8      Q.   So for loans that -- but you said that for
9  loans that needed to be modified or -- was there an
10 application necessary for that?
11     A.   Well, no, it did -- it required -- and,
12 again, it's been a while since I've read through the
13 SPOC provisions, single point of contact, but the --
14 the settlement required the availability of a single
15 point of contact. It was mainly, again, in the
16 context of the application for relief.
17          I will say that Reg X which is the Real
18 Estate Settlement Procedure Act, is much of what's
19 referred to in this memo. And so I think they may
20 well be talking also and even more about compliance
21 with the CFPB rules than about the settlement.
22          MR. PISTILLI: And I'm just now, again,
23     going to renew with increased vigor my objection
24     regarding Counsel's continued violation of
25     Judge Francis's order limiting regarding

Page 99

1  discovery in this case. I, frankly, can't see
2  what relevance this line of questioning has to
3  any pleaded issue in this case. And it,
4  clearly, is not relevant to any of the narrower
5  issues that are not subject to a stay of
6  discovery.
7          I'd, again, invite Plaintiffs' Counsel
8  to make a proffer if he believes that this is
9  somehow relevant to any of the pleaded issues in
10 the case that are not subject to the discovery
11 stay and reserve all of Chase's rights to seek
12 relief from Judge Francis either during the
13 course of this deposition or thereafter.
14          MR. TANTILLO: Thank you, Chris. I
15 appreciate your objection. Our proffer
16 regarding this is two-fold. I renew my response
17 to you regarding the fact that we -- it was
18 Chase's violations of various federal and state
19 laws which within the master loan purchase
20 agreement stated that, very clearly, that Chase
21 was in conformance with all of these laws. And
22 it's our --
23          MR. PISTILLI: Sorry, no connection
24 with this line of questioning. I'm sorry, go
25 ahead.

Page 100

1          MR. TANTILLO: And secondarily,
2  obviously, it was the lien releases and the
3  processes and the various things that happened
4  pursuant to these settlements which caused the
5  harm to my clients.
6          MR. PISTILLI: Chase's position is that
7  you have not adequately stated any basis for
8  pursuing this discovery at this time. It's a
9  violation of Judge Francis's order, and we
10 reserve all rights.
11          But if you insist on continuing despite
12 that fact, go ahead.
13 BY MR. TANTILLO:
14     Q.   With regards to -- you mentioned Reg X and
15 the substances that was within, I believe it was
16 Number 13. I previously asked you about Reg X,
17 obviously. And my question was, in order to comply
18 with Regulation X, did there come a point in time when
19 the servicers may have asked you whether or not they
20 needed to release their first and second liens. Now
21 having known what Reg X is, do you have any response
22 to that?
23     A.   The answer to that question is -- I'm
24 sorry.
25          MR. PISTILLI: Object to form.

Page 101

1          THE WITNESS: The answer to that
2      question is no.
3  BY MR. TANTILLO:
4      Q.   Now, the National Mortgage Settlement and
5  RMBS settlement were pursuant and subject to the
6  various SPAs that were implemented by the Treasury; is
7  that correct?
8      A.   I don't understand that question.
9      Q.   Was there various regulations, for
10 example, the HAMP and various Treasury regulations
11 that were subsumed under the National Mortgage
12 Settlement?
13          MR. PISTILLI: Object to the form.
14          THE WITNESS: The National Mortgage
15     Settlement settled a number of claims under
16     federal law relating, primarily, and I don't
17     have them here with me, but they were federal
18     consumer compliance claims and state claims
19     regarding the handling of these loans.
20          HAMP regulations were referred to in
21     some provisions of the settlement, but the
22     settlement did not enforce any HAMP requirements
23     directly. It had its own explicit requirements
24     which may or may not have been consistent with
25     HAMP.

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 102

1   BY MR. TANTILLO:
2        Q.   So it's your --
3        A.   And -- and -- and the -- and the RMBS
4   settlement was about allegations of misconduct, shall
5   we say, in the -- in the -- in the original -- in the
6   pooling together and selling of mortgage-backed
7   securities.
8        Q.   So it's your position that nothing within
9   the National Mortgage Settlement required compliance
10  with HAMP or any servicer participation agreements?
11       A.   The National Mortgage Settlement required
12  compliance with the servicing standards set forth in
13  the -- in the consent judgments.  Any other -- any
14  other legal requirements were not -- some legal
15  requirements were stayed -- not stayed, but were
16  settled by -- alleged violations of some legal
17  requirements were settled by this compliance, but
18  other outstanding legal obligations of mortgage
19  lenders and servicers generally were not settled.
20       (EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION)
21  BY MR. TANTILLO:
22       Q.   Mr. Smith, I'm going to show you what's
23  been marked as Plaintiffs' Exhibit Number 14.  I'm
24  going to ask you to read number 11 of this.
25            MR. EPSTEIN:  Can I get a copy?

Page 103

1            MR. TANTILLO:  Yes, sir.
2            (WITNESS REVIEWS DOCUMENT)
3            THE WITNESS:  Yes, I'm familiar with
4       this.
5   BY MR. TANTILLO:
6        Q.   So that states that the National Mortgage
7   Settlement was pursuant, obviously, to the HAMP and
8   the servicers --
9        A.   No -- no, it doesn't.
10            MR. PISTILLI:  Object to the form, it
11       calls for a legal conclusion.
12            THE WITNESS:  With respect, it does
13       not.  This provision deals with -- applicable
14       requirements means requirements of -- from
15       outside the settlement that could toll or limit
16       compliance with the settlement's terms.  So,
17       yeah, if there was a conflict between the
18       requirements of the settlement and the law
19       referred to in this paragraph, this law
20       prevailed.  And we were required -- authorized,
21       certainly, and probably required to amend our
22       protocols in order to comply with the other --
23       with the other law.
24  BY MR. TANTILLO:
25       Q.   So which came first, the other law or the

Page 104

1   National Mortgage Settlement?
2            MR. PISTILLI:  Object to the form.
3            THE WITNESS:  I believe I just said,
4       the other law prevailed.  In other words, the
5       National Mortgage Settlement provisions had to
6       be modified or the enforcement of them had to be
7       modified to comply with other law.
8   BY MR. TANTILLO:
9        Q.   Was there any metrics that would determine
10  whether or not there was compliance with the other
11  law, the applicable laws, i.e., the service
12  participation agreements and the HAMP?
13            MR. PISTILLI:  Object to the form.
14            THE WITNESS:  No.
15  BY MR. TANTILLO:
16       Q.   And did your office and/or you do anything
17  to ensure compliance with the HAMP and the service
18  participation agreements?
19       A.   What we did with all servicers was to meet
20  and require them to provide to us their assessment of
21  what the applicable requirements we've just
22  discussed -- applicable to their compliance with the
23  settlement were.  And we worked through a series of
24  protocols to work through
25  protocols and adjustments necessary to ensure that we

Page 105

1   wouldn't cause them not to comply.
2            The issue really was whether compliance
3       with the National Mortgage Settlement would require
4       that a servicer put itself in a position of default or
5       where it could be penalized.
6        Q.   Is there any documents which show this
7   type of protocol to ensure that they weren't going to
8   be in default of that service participation agreement
9   and/or HAMP?
10       A.   We had a written protocol -- we had a
11  written protocol, it was reviewed and agreed by all
12  servicers and my people and me that -- that
13  specified -- that specified where -- what the
14  applicable requirements were.  And it changed from
15  time to time.  If there were new regulations or a
16  change in regulations, there could be a change.
17            And there were some individual cases, not
18  many, where applicable requirements were alleged as a
19  basis for noncompliance or for -- or the compliance
20  should either be waived or that it should be altered,
21  but not many.
22       Q.   Is there a certain title for that
23  document?
24       A.   I don't know.  I don't recall.  If there
25  is, I don't recall it.

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 106

1    Q.    And who would be in possession of such a
2  document?
3        A.    It would have been in -- it might -- it
4  was in the possession of my colleagues and of me.
5  Whether it is still in our possession, I don't know.
6  Settlements are completed.
7        Q.    I want to turn to -- you previously
8  brought up or I previously brought up and you answered
9  me, the anti-blight provisions of the settlement, and
10  I think your response was to the consumer relief
11  aspect of it.  Was there a metrics testing aspect of
12  the anti-blight requirements?
13        A.    No.
14        Q.    So there was no metric that -- that took
15  into effect whether or not either the consumer relief
16  or the actions of the National Mortgage Settlement
17  caused blight of any sort?
18        A.    Yes, that's correct.
19        Q.    Is there a servicing standard under the
20  National Mortgage Settlement for blight?
21        A.    Servicing standards I believe do
22  include -- there are some servicing standards that
23  apply.  I'm not sure whether the term "blight" is
24  used, but to distressed areas.  I -- I can't remember.
25  There were just a few.  They are not covered by a

Page 107

1  metric, and we didn't -- it's not that we paid no
2  attention to them, it's just we -- they weren't --
3  they weren't what we were testing or we weren't
4  required to do anything about them.
5        Q.    Do you know whether or not, under those
6  requirements you just mentioned, if there were lien
7  releases whether or not borrowers would have to be
8  notified of these releases?
9              MR. PISTILLI:  Object to the form.
10              THE WITNESS:  Again, I need you to be a
11        little more -- I'm sorry.
12  BY MR. TANTILLO:
13        Q.    Okay.  Let's ask -- let's say there's a
14  second lien release on a second mortgage.  After a
15  letter was sent to or if there was a letter sent, in
16  order for them -- in order for them to receive
17  consumer relief credit, would they have to notify the
18  borrower or the municipalities?
19              MR. PISTILLI:  Object to the form.
20              THE WITNESS:  They notified the
21        borrowers, whether they were required to do so I
22        just don't recall now.  They were not required
23        to notify the municipalities.  "They" being the
24        servicers.
25        (EXHIBIT NUMBER 15 WAS MARKED FOR IDENTIFICATION)

Page 108

1  BY MR. TANTILLO:
2        Q.    I'm going to ask you to review Plaintiffs'
3  Exhibit Number 15.
4        A.    Yes, sir.
5              (WITNESS REVIEWS DOCUMENT)
6        Q.    Mr. Smith, you've had a chance to review
7  Plaintiffs' Exhibit Number 16 -- excuse me, 15?
8        A.    15, yes, I have.
9        Q.    What is this, do you know?  Have you
10  recognized something like this?
11        A.    Well, it's entitled Request for Mortgage
12  Assistance Form.
13        Q.    Have you seen these types of forms before?
14        A.    No.
15        Q.    Was there supposed to be a form such as a
16  Request for Mortgage Assistance filed to obtain
17  various types of consumer relief?
18        A.    Consumer relief credit was obtained under
19  the settlement by the servicer after the servicer
20  showed us that it had given -- granted relief to
21  borrowers on loans that qualified for relief under the
22  definitions set forth in the settlement, that the
23  relief had been done in a manner consistent with the
24  settlement and that the credit sought was consistent
25  with the amount the settlement allowed.  The

Page 109

1  formalities -- for this purpose, the formalities of
2  how the relief was sought were not our concern.
3        Q.    So there was no determination on your part
4  whether or not a borrower even wanted consumer -- even
5  wanted to have their mortgage modified?
6              MR. PISTILLI:  Object to the form.
7              THE WITNESS:  Well, if a mortgage --
8        again, there were various forms of consumer
9        relief.  If the form of relief you're talking
10        about is mortgage loan modification, change of
11        the payment terms, we did always have in the --
12        in our review if not -- yes, if not an
13        application, an agreement under which the
14        modification was to be given.  It varied by
15        servicer.  And we did have to determine for some
16        forms of relief that the house was
17        owner-occupied, and there were times we did;
18        times we didn't.
19              But if we did, we had to -- we had
20        documentation that the -- the relief had been
21        sought -- or the relief had been grounded based
22        on documentation that showed that it was -- the
23        loan was qualified for whatever the relief we're
24        talking about was.
25

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 110

1    BY MR. TANTILLO:
2        Q.    As you know, my client bought thousands of
3    mortgages from Chase, as you may know.  Many of his
4    borrowers received lien releases, and also his
5    borrowers received second lien extinguishment letters.
6    Based on what you just said there, how would that be
7    possible if these individuals never asked for any kind
8    of modification?
9                MR. PISTILLI:  Object to the form.
10               MR. EPSTEIN:  Object to the form.
11               MR. PISTILLI:  Lacks foundation.
12               THE WITNESS:  As I said to you, that --
13       my prior answer was about first lien mortgage
14       modifications.  There may have been
15       circumstances where if a loan was being
16       expunged, the amount of proof required under
17       the -- under the protocols that we'd agreed with
18       all servicers may have been less.  I don't
19       recall whether we required notice to the
20       borrower and consent of the borrower or not.
21   BY MR. TANTILLO:
22       Q.    So with regards to second lien
23   extinguishments or second lien releases, what kind of
24   proof did you require?
25       A.    I don't remember if there was a --

Page 111

1        Q.    Is there anybody in your office who would
2    know that?
3        A.    Well, in the first place, there's a
4    document that's a public document called -- which is
5    an exhibit to the consent judgment itself, which
6    discusses in some detail what's required.  There is
7    also attached to that a -- a schedule showing the
8    credits we give for various kinds of relief.  And we
9    do have work plan and test scripts which follow which
10   show how we went through the various steps to
11   determine that relief was, in fact, granted and
12   consistent with the settlement.  And who would have it
13   would be -- it would still be in our files if we kept
14   those files.
15       Q.    Was there a certain period of time in
16   which you're required to keep the files?
17       A.    No.  Although, Chase also has those
18   agreements.  They were done, basically, to an agreed
19   set of protocols.
20       Q.    However, how would it be possible under
21   the various rubrics that you had in terms -- in order
22   to determine if a borrower sought some kind of relief
23   for modification that the individuals such as my
24   clients, his borrowers, how would they conceivably be
25   able to, using all the various safeguards that you had

Page 112

1    in place, have second lien extinguishments sent to
2    them?
3                MR. EPSTEIN:  Objection to form.
4                MR. PISTILLI:  Object to the form.
5                THE WITNESS:  What I know is second
6        liens were extinguished, the borrowers were
7        notified.  That's what I know sitting here right
8        now.
9    BY MR. TANTILLO:
10       Q.    You previously stated that there was a
11   minimal amount of first liens that received credit
12   under the settlements; is that correct?
13       A.    No.  I don't know that I did say that.  In
14   fact, I'm sure I didn't say that, or if I did say
15   that, I was incorrect.
16       Q.    Well, we can go back to that.
17             But, nevertheless, what were the
18   parameters in order to obtain a first lien credit
19   under the RMBS settlement?
20               MR. PISTILLI:  Object to the form.
21               THE WITNESS:  Those parameters are set
22       out in, again, agreed protocols we had with
23       them.  There was -- it was not a -- there was a
24       publicly filed -- for a prosecution agreement, I
25       don't think we had the same kind of backup to

Page 113

1        that that we had on the NMS, but it was done on
2        roughly the same basis.
3                And relief was granted based on the
4        nature of the loan, was it a distressed loan,
5        generally, although it could have been
6        otherwise, and did it -- were payments under the
7        loan reduced in a way -- manner sufficient to
8        justify credit.  But there's -- there was a
9        whole set of protocols developed to implement
10       this.  Some of it, I believe, was in the
11       deferred prosecution agreement, we fleshed it
12       out and when -- in more -- more -- much more
13       detailed agreements when we implemented it.
14   BY MR. TANTILLO:
15       Q.    Now, in order for a first lien loan to be
16   taken for credit, did the occupancy have to be
17   verified?
18       A.    I'm sorry?
19       Q.    Would occupancy have to be verified?
20       A.    In some -- at least in some of the cases,
21   yes.
22       Q.    And what were the cases where it did not
23   have to be?
24       A.    I don't know.  I can't remember the exact
25   details.  For most of the credits we got, to get the

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 114

1 maximum credit a loan had to be owned by the servicer,
2 serviced by the servicer and owner -- owner-occupied.
3      Q.    And they were able to take credit for
4 loans that also were not occupied under a different
5 rubric?
6      A.    There may well have been some of those for
7 less credit.
8           MR. TANTILLO:  One moment.
9 BY MR. TANTILLO:
10     Q.    Under the situation where owner-occupancy
11 was required, what type of servicing standards were
12 the banks held to?
13          MR. PISTILLI:  Object to the form.
14          THE WITNESS:  Are we talking now about
15      National Mortgage Settlement servicing
16      standards?
17 BY MR. TANTILLO:
18     Q.    Let's start with the National Mortgage --
19 National Mortgage Settlement.
20     A.    It would depend on the metric.  And I'm
21 not sure how many if -- of the mortgage -- of the
22 metrics -- the servicing standard -- the metrics that
23 measured servicing standard compliance required
24 owner-occupancy.  There was -- there was
25 owner-occupancy -- some owner-occupancy requirement

Page 115

1 and -- for much -- for some of the credit for consumer
2 relief under both the NMS and the RMBS settlement.
3      Q.    Do you know or have any idea how the
4 servicers would determine owner-occupied?  What they
5 would do to determine whether or not there was
6 somebody living in the residence?
7      A.    A form, I don't know -- I'm not sure I can
8 tell you all -- don't know today all the forms.  One
9 was to simply -- when the -- there -- there was
10 documentation in terms of consumer relief of the
11 agreement with regard to modification, and among the
12 evidence we looked at for those loans was an agreement
13 where the borrower had checked a box, essentially,
14 saying they were resident in the -- in the -- in the
15 premises.  There was some additional bits of
16 information you would see from time to time when
17 addresses were -- correspondence was sent different
18 from the address on the -- on the loan -- on the
19 premises where the loan was located.  But it varied,
20 so we did do some follow-up on that if it was
21 required.
22     Q.    Do you know if owner-occupancy was
23 required for a first lien extinguishment?
24          MR. PISTILLI:  Object to the form.
25          THE WITNESS:  Let's be clear.  What I

Page 116

1 said to you before was, there were very few, if
2 any, first lien extinguishments.
3 BY MR. TANTILLO:
4      Q.    I apologize.
5      A.    We did not -- the difference there --
6 there's a difference between that, and I'm -- just for
7 the record, between that and a loan modification where
8 you reduce or defer payment of principal where you
9 either forgive the payment of principal or reduce it
10 for a period -- forbear on it for a period in order to
11 reduce the cost -- the cost of ownership.
12      Again, I -- there may well -- there may
13 have been -- I hate to say never with the settlement,
14 because we ran into a lot of different things -- but
15 for all servicers, I think that it was very seldom
16 if -- very seldom, at the most, we ever ran into a
17 extinguishment of a first lien loan.  I can't say
18 never, because I don't know that.  But I think it was
19 very -- the majority of modifications were
20 reductions -- were either -- were forgiveness of loan
21 principal or in some cases forbearance of loan
22 principal, in other words, just -- just not collecting
23 on a portion of the loan.
24      Q.    Were there first lien extinguishments
25 under the RMBS settlement?

Page 117

1      A.    Again, I don't -- I don't know that there
2 were, but I'm -- I hate to say it, I don't know for
3 sure.  But I -- if there were, it was -- it was very
4 few if any.
5      Q.    Was there a reason why the servicers did
6 not use that provision?
7      A.    Well, in general, the category of
8 relief -- the objective of many of these -- of these
9 settlements was to keep families in their homes and to
10 put the -- based on repayment.  I mean, putting them
11 in a position where they could actually repay the loan
12 based on -- on their income levels and so forth.
13 Forgiveness of a first lien was more than, I think,
14 the parties had bargained for and more than most
15 servicers were willing to do.  I mean, theoretically,
16 I guess they could have done it.  But, again, they
17 almost never did that.
18      Q.    Was it possible for a servicer under,
19 let's start with, the National Mortgage Settlement to
20 provide consumer relief without providing notice to
21 the borrower?
22          MR. PISTILLI:  Object to the form.
23          THE WITNESS:  Well, again, there are
24      different forms of consumer relief.  For
25      example, in a short sale the borrower actually

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 118

1    asks for it, so there's notice there.  In the --
2    in the case of most of the first lien
3    forgivenesses we were just talking about there
4    had been -- there had been a request for
5    forgiveness for -- for a forgiveness of
6    principal or a -- or a request for modification
7    is generally what was done.  In the case of
8    second liens it -- I think it really did vary.
9  BY MR. TANTILLO:
10       Q.    So there was a possibility that the
11  borrower would never know --
12       A.    Oh, the borrower --
13       Q.    -- until they sold their house or
14  something like --
15       A.    Oh, no, the borrower would know, because
16  one of the evidences that we have that the forgiveness
17  had actually been made was the providing to the
18  borrower of a 1099 for forgiveness -- forgiveness
19  income.
20       Q.    But it was possible that for a period of
21  time, at least until they receive a 1099, that they
22  could still be paying on that second lien?
23       A.    I would have to speculate to say that,
24  I -- but it's -- I -- I can't -- I don't know for
25  sure.

Page 119

1        Q.    Just one moment, sir.
2    (EXHIBIT NUMBER 16 WAS MARKED FOR IDENTIFICATION)
3             MR. PISTILLI:  Copy, please?
4             MR. TANTILLO:  Yes, sir.
5  BY MR. TANTILLO:
6        Q.    Mr. Smith, have you had a chance to
7  review --
8        A.    Yes.
9        Q.    -- Plaintiffs' Number 16?
10       A.    Yes, sir, I have.
11       Q.    The first highlighted part talks about the
12  releasing of liens so they would not be included in
13  the DOJ metrics.  Was that something that you were
14  aware of?
15            MR. PISTILLI:  Objection, lacks
16       foundation.
17            THE WITNESS:  You're asking was I
18       personally aware of it, the answer is no.
19  BY MR. TANTILLO:
20       Q.    Was your office aware?
21       A.    Given what we have reviewed until now, I
22  think there was an understanding -- there was an
23  understanding that releases of liens would take when
24  it was out of -- out of the populations for metrics
25  testing.  And so I -- I suppose in that sense I was

Page 120

1  institutionally aware of it, yes.
2        Q.    Do you know who in your office is
3  personally aware of the fact that they were releasing
4  liens to take them out of metrics testing?
5        A.    Well --
6             MR. EPSTEIN:  Are you saying -- you
7        said "they," they being Chase?
8             MR. TANTILLO:  Yes.
9             THE WITNESS:  It would have been my
10       counsel.
11  BY MR. TANTILLO:
12       Q.    So it did come as a surprise to you when
13  you learned that they were releasing liens to take
14  them out of the metrics?
15       A.    Well, I didn't -- I didn't know that I
16  learn or needed to learn any of that.  The documents
17  we've looked at before show that we had agreed that if
18  they did that, which their -- was at their discretion,
19  not mine.  We didn't direct them to do anything.  If
20  they did that, loans that did not have a lien
21  applicable to them were not subject to the settlement.
22       Q.    With regards to loan level data, and I
23  know we spoke about this before, did the Office of
24  Mortgage Settlement have the ability to review loan
25  level data?

Page 121

1        A.    What do you mean by that?
2        Q.    Did they have the ability to review the
3  actual -- not just the systems of record, but, you
4  know, payment history, escrow and taxes, all the types
5  of things that are required under various laws for
6  servicing?
7             MR. PISTILLI:  Object to the form.
8             THE WITNESS:  In assessing compliance
9        with the metrics and in consumer relief we used
10       loan level data with regard to loans in the
11       sample populations, and we derived that from the
12       systems of record of all the -- of each of the
13       servicers.
14  BY MR. TANTILLO:
15       Q.    But -- so loan level data was used to
16  determine the samples?
17       A.    No.
18            MR. PISTILLI:  Object to the form.
19            THE WITNESS:  No.  The samples -- as I
20       said before, we went through a very long -- "we"
21       being my colleagues including both counsel and
22       the professional firms -- went through a long
23       series of discussions and protocol development
24       activities with the IRG and in some cases with
25       the -- with the operations of the -- servicer --

Page 122

```
1    operations of the servicers to determine that
2    the population -- to determine a population of
3    loans as to which a metric applied.  There were
4    different populations -- well, not obviously,
5    there were different populations for different
6    metrics.
7            A statistically valid sample was
8    selected in each case from the population for a
9    particular metric.  Compliance by the servicer
10   with the -- with settlement was measured by the
11   application of tests included in the metric
12   definition to the loans in the statistically
13   valid sample.  And the basis for determining
14   whether or not there had been compliance was
15   loan level data drawn from the system of record
16   of the servicer.
17  BY MR. TANTILLO:
18       Q.   So if a metric did not apply, then the
19   loan data or the -- anything related to that
20   particular loan would never appear or never come
21   before you?
22       A.   If a loan was not in the population
23   covered by a metric, no data -- well, we would -- they
24   would not be in the population.  It would not -- none
25   of the -- and it would not be selected in the
```

Page 123

```
1    statistically valid sample, and so we would not -- we
2    would not see that information.
3        Q.   Would this explain why a system of record
4    such as Recovery 1, perhaps, didn't appear in your
5    system of record until a certain period of time?
6            MR. PISTILLI:  Object to the form,
7    misstates prior testimony, lacks foundation.
8            THE WITNESS:  First, I don't know that
9    you -- I don't know the system -- that the
10   Recovery 1 didn't exist in the those systems.
11   And in our -- it was known to us.  The question
12   was did we query -- did we include that -- that
13   system in queries for metrics when we were
14   deriving populations from which to draw
15   statistically valid samples to test.
16            And so the -- so if there were no loans
17   and if it were established that there were no
18   loans in a system of a servicer, they would --
19   there would be no query extended to that system
20   or there would be no response from that system.
21   It wouldn't be included in the population by
22   the -- by the population draw.  It wouldn't --
23   there would be -- if there was no -- if there
24   was no mortgage which would -- which I expect
25   was in the system request, then no loans from
```

Page 124

```
1    that -- that loan that didn't have a lien
2    attached to it would not be in the population.
3   BY MR. TANTILLO:
4        Q.   So if there was a lien attached to it,
5    then it should have shown up at the population?
6        A.   It might have, it depends on the metric.
7            MR. TANTILLO:  All right.  We're going
8    to finish up.  Could we take a break just for
9    five minutes to see if we have any last
10   questions?
11           THE WITNESS:  Sure.
12           THE VIDEOGRAPHER:  The time now is
13   2:13 p.m., and we will be going off record.
14           (RECESS TAKEN)
15           THE VIDEOGRAPHER:  The time now is
16   2:25 p.m., and we are back on record.  You may
17   begin.
18           MR. TANTILLO:  Thank you.
19   BY MR. TANTILLO:
20       Q.   Mr. Smith, who on the Chase IRG was your
21   or OMSO's primary contact?
22       A.   Nikki -- gosh, I hope I can pronounce it
23   right -- Hops.
24       Q.   Holsopple?
25       A.   Holsopple.
```

Page 125

```
1        Q.   And who in the line of business was your
2    primary contact or OMSO's?
3        A.   I'm actually trying to remember.  I don't
4    remember in their operation, I just can't -- I just
5    can't remember.
6        Q.   As the monitor of the National Mortgage
7    Settlement, who was the supervising entity for your
8    work?
9            MR. EPSTEIN:  Objection to form.
10           THE WITNESS:  Well, I -- I was
11   monitored, for want of a better word, by the
12   monitoring committee, which we have just
13   discussed, which was provided for in each of the
14   consent judgments.  And I believe I described
15   that previously in this testimony.  And I guess,
16   theoretically, by Judge Rosemary Collyer with
17   whom the settlement documents were filed.
18   BY MR. TANTILLO:
19       Q.   As the monitor of the Residential Mortgage
20   Backed Security Settlement, who was your supervising
21   entity for your work there?
22           MR. EPSTEIN:  Objection to form.
23           THE WITNESS:  In that case, I was in
24   communication both with Chase and with the
25   Justice Department.  There was no oversight,
```

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 126

1    formal oversight, of the kind that was presently
2    at NMS.
3    BY MR. TANTILLO:
4        Q.   Before we broke, you mentioned that there
5    was a deferred prosecution agreement?
6        A.   I'm -- that -- it -- there was an
7    agreement between the -- a settlement agreement
8    between the parties, that's a public document you can
9    get on the Justice web site.  This was a kind of --
10   this was a settlement that stayed prosecution.  There
11   was no filing with the court.  So it was never -- it
12   was never under -- under judicial oversight.  And
13   there were some provisions, ongoing provisions, in
14   the -- in the agreement, but it was much less detailed
15   than the NMS had been.  And the relief was only --
16   there was no -- there was no -- it's -- well, was --
17   now, was no equivalent of metric, you know, compliance
18   metrics, there was only consumer relief.  There had
19   been -- there were other provisions, but I was not
20   involved with them.
21       Q.   Who was your primary contact or the Office
22   of Mortgage Settlement's primary contact at the
23   Department of Justice?
24       A.   Well, first and foremost, OMSO did not
25   do -- was not the entity through which I conducted the

Page 127

1    RMBS settlement.  It was the internationally famous
2    firm Joseph A. Smith, Jr. Monitoring Limited which was
3    a Subchapter S corporation.
4            And what was -- the question, who were my
5    contacts?
6        Q.   Yes, sir.
7        A.   My contacts at Justice changed, I had
8    several assistant US Deputy Attorney's General.  And
9    there has been a change there, and so I don't think
10   any of them are still -- in fact, I know my last
11   contact was -- has gone into private practice.
12           At Chase, did you ask me about Chase, I'm
13   sorry?
14       Q.   Well, you already asked -- you already
15   answered about Chase previously, you said Nikki
16   Holsopple?
17       A.   Well, it actually it turns out she was --
18   didn't have to be, but she was.  She was in charge
19   of -- of the -- where they call the HRG for that
20   settlement which -- and it was the same -- and, yeah,
21   she is the same contact.
22       Q.   Had there been a violation of the deferred
23   prosecution agreement or the agreement between DOJ and
24   Chase, who would have enforced it, or what was the
25   provision to --

Page 128

1            MR. PISTILLI:  Objection.
2            THE WITNESS:  You would have to read --
3    you're the lawyer -- you're the Justice lawyer,
4    you would have to read this and determine it.
5    I -- there was -- it was an agreement not to
6    prosecute, and the parties are all stated there.
7    There was -- and it was -- it didn't happen, so
8    I don't know.
9            MR. TANTILLO:  Tender the witness.
10           MR. PISTILLI:  No questions.
11           MR. EPSTEIN:  All right.  You're done.
12           THE WITNESS:  Thank you all very much.
13   Hope you have a safe trip home.
14           THE VIDEOGRAPHER:  The time now is
15   2:30 p.m.  This concludes the videotaped
16   deposition of Joseph Smith.  We are going off
17   record, once again, at 2:30 p.m.
18           (SIGNATURE RESERVED)
19       (DEPOSITION CONCLUDED AT 2:30 P.M.)
20                       -  -  -
21
22
23
24
25

Page 129

1        CHANGES AND SIGNATURE
2    Witness Name:  Joseph A. Smith, Jr.  February 9, 2017
     Page      Line      Change      Reason
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17       I, Joseph A. Smith, Jr., have read the foregoing
     deposition and hereby affix my signature that same is
18   true and correct, except as noted above.
     _____
19   Joseph A. Smith, Jr.
20
21   Sworn to and Subscribed before me
22   _____, Notary Public.
23   This _____ day of _____, 20____.
24   My Commission Expires:
25

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Page 130

1    STATE OF NORTH CAROLINA

2    COUNTY OF DAVIDSON

3

4                    C E R T I F I C A T E

5           I, Amy A. Brauser, RPR RMR CLR, the officer

6    before whom the foregoing deposition was taken, do

7    hereby certify that the witness was duly sworn by me

8    prior to the taking of the foregoing deposition; that

9    the testimony of said witness was taken by me to the

10   best of my ability and thereafter reduced to

11   typewriting under my direction; that I am neither

12   counsel for, related to, nor employed by any of the

13   parties to the action in which this deposition was

14   taken, and further that I am not a relative or

15   employee of any attorney or counsel employed by the

16   parties thereto, nor financially or otherwise interest

17   in the outcome of the action.

18

19          This is the 10th day of February, 2017.

20

21          _____

22          Amy A. Brauser, RPR RMR CLR
            Notary Public # 20023030055

23

24

25

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017                                    Index: $350,000..9:59

**Exhibits**

**2-4 Smith EXHIBIT 1** 5:6 26:3,4 27:6

**2-4 Smith EXHIBIT 2** 5:9 33:25 34:1

**2-4 Smith EXHIBIT 3** 5:12 40:1,11 41:7

**2-4 Smith EXHIBIT 4** 5:14 41:22,25

**2-4 Smith EXHIBIT 5** 5:17 45:5,14 85:14

**2-4 Smith EXHIBIT 6** 5:19 45:25 46:1,3,13

**2-4 Smith EXHIBIT 7** 5:21 62:5,18 76:3

**2-4 Smith EXHIBIT 8** 5:23 75:24

**2-4 Smith EXHIBIT 9** 6:2 80:3,13,19

**2-4 Smith EXHIBIT 10** 6:5 82:13,22

**2-4 Smith EXHIBIT 11** 6:7 84:10,25

**2-4 Smith EXHIBIT 12** 6:9 85:6

**2-4 Smith EXHIBIT 13** 6:11 96:20

**2-4 Smith EXHIBIT 14** 6:13 102:20, 23

**2-4 Smith EXHIBIT 15** 6:15 107:25 108:3

**2-4 Smith EXHIBIT 16** 6:17 108:7 119:2

---

**$**

**$350,000** 14:20

**$70** 13:18

---

**1**

**1** 7:3 26:3,4 27:6 29:25 33:17,19,21 34:13,18 35:12 37:24 38:18,23 39:5,9, 19,22 40:25 45:2,21 46:15 48:8,25 53:7 65:4,21 69:24 70:3,7 71:4 72:12 83:2,20 84:3 90:25 93:16 123:4,10

**10** 82:13,22

**1099** 118:18,21

**10:05** 30:16

**10:52** 56:12,13

**10th** 9:16

**11** 84:10,25 102:24

**11:15** 56:16

**12** 85:6,25

**12-CV** 30:18

**12-CV-00293-LTS-JCF** 7:9

**1234** 69:3,4

**12:21** 96:11

**13** 96:18,20 97:8 100:16

**14** 16:23 46:15 102:20,23

**15** 16:23 19:8 107:25 108:3,7,8

**15-CV-00293-LTS-FCP** 30:19

**16** 11:18 108:7 119:2,9

**180** 78:13

**19** 38:7 46:25 47:1

**1900** 7:11

**1:32** 96:14

**1st** 7:24 44:9 45:18,21 83:3 86:5

---

**2**

**2** 26:17 27:8 33:25 34:1

**200,000** 15:4

**2012** 11:6,17 13:7 16:23 44:9

**2014** 45:18,21 83:3,21 86:5

**2015** 11:18

**2017** 7:12 9:17

**27601** 7:12

**29** 36:3 46:25 47:1 49:7 52:4

**2:13** 124:13

**2:25** 124:16

**2:30** 128:15,17,19

**2E** 78:1,6,12

---

**3**

**3** 40:1,11 41:7

**30** 13:21 96:6,7,9

**300** 35:22

**301** 7:10

**304** 38:6 51:7

**30th** 83:21

**31** 46:23 51:25 52:3

**33** 36:3 49:9

---

**4**

**4** 41:22,25

**49** 11:24

**4th** 13:6,7

---

**5**

**5** 45:5,6,7,8,14 47:21 85:14

**5.7** 47:23

**5/1** 46:15

**5th** 13:7

---

**6**

**6** 45:6 46:1,3,13

**60** 13:22

**650,000** 14:21

**67** 8:19

**699,000** 83:1

---

**7**

**7** 62:5,18 76:3

---

**8**

**8** 48:22 75:24 76:4,5,6 81:17

---

**9**

**9** 7:12 80:3,13,19

**9:31** 7:13

**9:59** 30:13

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: a.m...back

| A |
|---|

**a.m.** 7:13 30:13,16 56:16

**Aaron's** 16:12

**ability** 33:2 120:24 121:2

**absolutely** 55:9

**accordance** 93:6

**accounted** 73:1

**accounting** 15:14,25 22:10

**achieve** 60:23

**Act** 95:6 98:18

**action** 29:18 56:2

**actions** 32:13 34:25 77:25 106:16

**activities** 48:10 121:24

**activity** 82:11

**actual** 25:8 36:17 47:22 121:3

**add** 38:2 41:7

**added** 38:3,4 46:24 47:7

**addition** 60:18

**additional** 38:17 46:24 50:25 75:1 78:24 115:15

**address** 38:16 115:18

**addressed** 76:11

**addresses** 115:17

**adequately** 100:7

**adjustments** 104:24,25

**adoption** 14:4

**advocates** 38:13

**affected** 48:6

**affiliated** 88:6

**agree** 47:4

**agreed** 12:15,17 14:5 37:5,17 53:21 64:20 75:12 91:18,24 105:11 110:17 111:18 112:22 120:17

**agreement** 18:24 83:10,13 99:20 105:8 109:13 112:24 113:11 115:11, 12 126:5,7,14 127:23 128:5

**agreements** 61:9 64:10 102:10 104:12,18 111:18 113:13

**AGS** 19:18,25

**ahead** 25:9 57:6 60:17 99:25 100:12

**Alderson** 8:17

**allegations** 102:4

**alleged** 63:17 102:16 105:18

**allowed** 16:13 29:23 33:11 51:10 79:23 108:25

**altered** 105:20

**alternative** 61:5

**amend** 9:11 103:21

**America** 11:21,25

**amount** 14:15 47:16 60:15 71:14,17 75:5 78:14 93:12 108:25 110:16 112:11

**amounts** 59:13 68:16

**Amy** 7:18

**analogize** 25:16

**analysts** 91:23

**analyze** 41:9

**and/or** 60:15 104:16 105:9

**annually** 33:13

**answers** 36:23,24

**Anthony** 16:3

**anti-blight** 61:8,15 106:9,12

**apologize** 30:19 49:8 76:6 80:9 85:19 116:4

**apparently** 91:24

**appears** 46:14 76:10

**applicable** 42:23 56:1 103:13 104:11, 21,22 105:14,18 120:21

**application** 12:19 60:24 61:2 70:22 98:10,16 109:13 122:11

**applications** 98:3

**applied** 36:11 40:14 51:15,18 52:5,6 62:9 92:5 122:3

**apply** 40:25 41:1 106:23 122:18

**appropriately** 29:21 50:10 67:18

**approval** 62:25

**approved** 14:5,6

**approximately** 7:13 83:1

**April** 13:6,7 45:18,21 86:5

**areas** 29:24 38:14,17,19 79:14,17,24 106:24

**arguments** 64:8

**art** 64:5

**asks** 118:1

**aspect** 106:11

**assert** 37:5 92:18

**assertions** 37:17

**assessing** 121:8

**assessment** 104:20

**assessments** 14:13

**assistance** 54:17 108:12,16

**assistant** 19:21 127:8

**association** 7:17

**assume** 84:12

**assurance** 77:5

**assure** 74:20 75:1 77:24 84:15 89:5

**attached** 78:23 111:7 124:2,4

**attended** 20:23

**attention** 107:2

**attorney** 9:2,15 12:25 19:21,22

**Attorney's** 127:8

**attorneys** 15:6 38:12

**auditors** 25:18

**authority** 33:10 36:5 50:24

**authorized** 93:5 103:20

**availability** 98:14

**availed** 61:14

**aware** 14:15 29:16 33:22 34:12,13,17 61:10 62:4 63:5 64:7 69:23 70:1 72:18 73:7 88:22 90:12 95:19 119:14,18,20 120:1,3

| B |
|---|

**back** 30:16,21 32:25 36:19 51:24 56:16 59:22 64:22 96:14 112:16 124:16

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: Backed..claim

**Backed** 125:20

**background** 29:7 56:3 89:21

**backup** 112:25

**Baker** 15:21

**bank** 11:20,21 22:2 58:6 89:15

**bankrupt** 19:11

**bankruptcy** 19:12 69:19,21,25

**banks** 11:11,17 14:10 59:16 72:12 114:12

**bar** 18:7

**bargained** 117:14

**barred** 18:12

**based** 74:10 91:17 94:23 109:21 110:6 113:3 117:10,12

**bases** 51:16 53:14

**basic** 66:8

**basically** 111:18

**basis** 31:13 37:10 86:10 87:4 89:21 100:7 105:19 113:2 122:13

**Bates** 26:6

**BDO** 15:18 16:2,4 22:10 37:17 86:21 87:11

**beg** 55:23

**began** 21:23 47:6

**begin** 8:8 30:20 56:17,18 96:15 124:17

**beginning** 38:5 72:8

**begins** 7:2

**behalf** 37:6

**believes** 99:8

**binary** 49:15 64:24

**Bischoff** 19:22

**bits** 115:15

**biweekly** 20:2

**BKD** 15:24

**blatantly** 55:1

**blight** 106:17,20,23

**borrower** 47:9 48:7 60:21 107:18 109:4 110:20 111:22 115:13 117:21,

25 118:11,12,15,18

**borrowers** 48:1,5 59:4,6 107:7,21 108:21 110:4,5 111:24 112:6

**bottom** 97:10

**bought** 110:2

**box** 115:13

**Brauser** 7:18

**break** 56:9,10 96:3 124:8

**Brent** 7:22 29:8

**bring** 39:9 83:20,25

**bringing** 39:20

**broad** 66:12

**broke** 126:4

**broken** 53:19

**brought** 55:8 106:8

**buckets** 90:19

**budget** 13:13,20 14:4,14 15:1

**budgets** 14:16

**bunch** 75:3

**burden** 60:22

**Bureau** 70:6

**business** 27:15,18 88:2,24 89:16 125:1

**buyers** 54:19

**C**

**call** 15:15 58:13 92:19 127:19

**called** 11:15 12:16 15:24 33:17 54:13 67:3 79:4,14 81:6,7,8,11 94:14 111:4

**calling** 31:24

**calls** 49:4 71:7 78:18 79:10 97:19 103:11

**Capital** 7:23

**careful** 73:12 74:20

**Carolina** 7:12 10:20 11:10 13:1 15:12

**case** 7:8 12:15,16 23:12 29:9,17 30:17 31:11,12,15 42:6,23 43:4 47:24 48:19 49:9,17 50:5 52:13 53:13 55:3, 10 66:14 73:12 74:6,7,24 82:8 93:14 99:1,3,10 118:2,7 122:8 125:23

**cases** 58:10,15 59:19,20 82:9 88:9 105:17 113:20,22 116:21 121:24

**category** 67:16 78:25 117:7

**caused** 40:16 50:4 100:4 106:17

**certification** 75:21 76:8,10,16,17 83:11

**certifications** 75:16 76:14

**certify** 75:8

**CFPB** 98:21

**chairman** 16:11 19:20

**chance** 27:3 84:24 108:6 119:6

**change** 20:4 28:20,23 29:1 105:16 109:10 127:9

**changed** 84:20 105:14 127:7

**channels** 87:23

**characterization** 47:4

**charge** 127:18

**charge-off** 72:19

**charged** 57:20 67:12 72:25

**Chase** 7:6 11:21 12:11 14:16 18:21, 24,25 21:10,17 26:9 33:22 34:2 38:23 39:8,12 40:6,16 44:8,12,19 49:9 53:6 54:18 55:16,25 56:21,22 58:3 62:23 68:5,11 79:12,15 81:11 82:5 83:19,24 89:13 93:22 94:2,3 95:14 99:20 110:3 111:17 120:7 124:20 125:24 127:12, 15,24

**Chase's** 21:10,13 31:12 91:1 99:11, 18 100:6

**chastised** 81:10

**checked** 115:13

**Cherry** 17:1

**chosen** 12:13 13:3

**Chris** 7:25 42:2 46:5 57:4 62:10 99:14

**circumstance** 55:24

**circumstances** 73:23 75:18 110:15

**Citi** 11:21

**cities** 44:2

**City** 43:23

**claim** 71:20

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

**claimed** 71:20 77:15

**claims** 30:4 55:9,22 101:15,18

**clarify** 30:8

**clear** 9:2 62:15 77:6 83:15 94:12 115:25

**client** 40:18 43:1 110:2

**client's** 55:25

**clients** 55:14,18 100:5 111:24

**cochairs** 19:23

**collate** 37:20

**colleagues** 10:1,3 21:12 22:22 28:4,13 35:8 66:10 88:9 106:4 121:21

**collect** 59:16

**collecting** 116:22

**College** 10:16

**Collyer** 125:16

**commencement** 11:7

**comment** 96:21

**commercial** 43:3 55:7

**Commissioner** 11:10

**committee** 14:7 19:2,4,20 20:1,4,13 28:18 38:16 125:12

**common** 86:25

**commonly** 11:15 12:16

**communicate** 9:23

**communicated** 9:25

**communication** 88:19,23 125:24

**communications** 9:18

**communities** 41:20

**companies** 40:18

**company** 28:1 37:6,11,13 50:9 53:13

**company's** 28:3

**compare** 74:9

**compensated** 14:19 15:2 18:25

**compensation** 17:25 18:3

**Complaint** 31:21

**complaints** 9:20 38:11

**complete** 22:25 95:16

**completed** 11:18 106:6

**completely** 77:18

**compliance** 36:6 37:2 45:23 62:3 65:13 66:18,22 98:20 101:18 102:9, 12,17 103:16 104:10,17,22 105:2,19 114:23 121:8 122:9,14 126:17

**compliant** 61:21 63:1

**complied** 25:24 36:1,25

**comply** 29:20 76:19 100:17 103:22 104:7 105:1

**comprise** 14:3

**comprised** 14:7 19:6,8 27:24

**computer** 53:17

**conceivable** 42:7,17 55:6

**conceivably** 111:24

**concern** 38:17,20 77:20 109:2

**concerned** 43:24

**concerns** 41:13,19 44:2

**CONCLUDED** 128:19

**concludes** 128:15

**conclusion** 18:9 71:8 79:10 97:20 103:11

**conduct** 36:16 91:12

**conducted** 126:25

**confident** 78:8

**conflict** 103:17

**conformance** 99:21

**conformity** 29:4

**connection** 69:11 81:25 99:23

**consent** 11:14,19,20 13:17 14:2 21:4 23:13,16 25:11 33:10 36:12 47:14,15 54:12 58:1 64:20 102:13 110:20 111:5 125:14

**consequences** 37:2

**considerations** 39:23

**considered** 60:11

**consistent** 40:13 101:24 108:23,24 111:12

**constant** 87:18

**constitutes** 47:9 64:2

**consult** 30:9

**consultation** 35:11

**consulted** 35:8

**consumer** 9:20 23:10 55:17 68:13 69:19,22 70:6 71:5 72:9 77:9 78:1,2, 18,22 79:5 80:22 81:2 89:22 91:5,8 92:14,15,17 95:10,12,13,22 101:18 106:10,15 107:17 108:17,18 109:4,8 115:1,10 117:20,24 121:9 126:18

**contact** 16:12 17:16 41:12,18 65:16, 17,22 87:1,3,5,12 88:2,9 89:4,25 97:14 98:2,13,15 124:21 125:2 126:21,22 127:11,21

**contacted** 43:17

**contacts** 16:2,8 87:21 89:9 127:5,7

**contained** 78:19

**context** 25:19 98:16

**continue** 30:7 32:10,11 43:6 55:11 59:16

**continued** 98:24

**continues** 31:3

**continuing** 31:14 42:4 54:25 56:6 100:11

**continuous** 22:22 87:5

**contract** 55:9

**contracted** 15:10,14

**contractors** 15:5

**control** 22:8 89:24

**conversations** 90:13

**copies** 26:10 40:2 56:24

**copy** 26:22 34:4 45:12 85:7 97:4 102:25 119:3

**corporate** 75:12

**corporation** 11:1 15:9 127:3

**correct** 9:11 16:13 23:24 70:19 84:9 90:11 101:7 106:18 112:12

**correction** 30:17

**correctly** 90:2,3

**correspondence** 115:17

**cost** 116:11

**counsel** 7:19 9:25 10:7 15:11,13

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: Counsel's..discussion

16:14 26:8 30:10 34:3 55:4 56:21
62:2,9 63:20 66:11 85:14 86:11 96:18
99:7 120:10 121:21

**Counsel's** 98:24

**counseled** 83:24

**counsels** 15:11

**country** 38:12

**County** 10:15

**court** 7:8,16 8:4 9:5,7,10 23:4 31:14
32:8,21 37:21,24 42:8 43:8 68:13
126:11

**court's** 31:20

**courted** 48:8

**covered** 22:20 38:7 49:25 50:13
106:25 122:23

**create** 28:10 51:10

**created** 15:8 28:14

**credit** 54:20 55:17 57:13,19 59:5,12,
21 68:6 69:3,5,20,22,24 71:5,12,17
73:14,16,17,23 74:2,5 75:5 77:9,15
78:9,22,25 79:13,15,16,18,23 82:5
93:13,17,22 94:2,17 95:6 107:17
108:18,24 112:11,18 113:8,16 114:1,
3,7 115:1

**credited** 54:2 67:18,19 68:23

**crediting** 44:13 94:17,19 95:5

**credits** 67:12 111:8 113:25

**cross** 20:17 88:22

**Crow** 15:20

**cure** 38:24

**custom** 66:4

**customary** 66:4 86:25

---

**D**

**data** 74:9 89:12 93:21 94:9,10,14,23
120:22,25 121:10,15 122:15,19,23

**date** 13:11 32:6 39:24 45:17,20 73:8
81:16 86:5

**Dave** 7:14 16:10

**Davidson** 10:16

**day** 13:4,8

**days** 78:13

**DC** 29:18

**de** 64:2,4,9

**deals** 82:1 103:13

**dealt** 19:13,17 48:2 87:7

**debt** 59:11,16

**debtors** 69:21

**decision** 86:23

**decisions** 31:23

**declining** 42:16

**default** 105:4,8

**Defendants** 8:1 96:19

**defer** 116:8

**deferred** 113:11 126:5 127:22

**deficiency** 59:24 60:2

**defined** 23:14 64:6,19 90:2 92:18

**defining** 35:14

**definition** 122:12

**definitions** 108:22

**degree** 64:9

**delivered** 81:24,25

**Department** 12:10 18:24 19:10,11
28:17 70:5 125:25 126:23

**depend** 67:14 69:9 91:15 114:20

**depended** 47:17 58:6 92:9

**depending** 49:20

**depends** 54:10 59:13 71:9 75:22
124:6

**deposed** 8:22,24

**deposition** 7:4,9 9:10 10:9 32:4,14
99:13 128:16,19

**deputy** 19:21 127:8

**derive** 91:19

**derived** 121:11

**deriving** 123:14

**describe** 61:19

**describes** 27:12

**destroy** 56:24

**detail** 23:3 27:25 28:1 78:21,24 111:6

**detailed** 113:13 126:14

**details** 28:8 75:10,23 113:25

**determination** 53:6 57:15 84:2 90:11
109:3

**determine** 22:17 35:25 36:10 37:16,
19 48:4 49:19 50:4,5,14,23 53:16
66:17 73:22 74:5 75:3,13 77:17 90:1,4
93:2 104:9 109:15 111:11,22 115:4,5
121:16 122:1,2 128:4

**determined** 34:18 35:11 36:15,24
38:13 42:9 47:18,22,24 50:1,11,22
51:8 52:18 53:4 66:22 74:7 92:4 94:21

**determining** 122:13

**develop** 89:20

**developed** 52:25 53:13 74:4 89:23
113:9

**development** 121:23

**DI** 96:9

**Diarmuid** 19:16

**differ** 55:24

**difference** 17:18 32:23 116:5,6

**differences** 66:15

**difficult** 61:13

**dig** 58:16

**direct** 55:13 87:1 88:2 120:19

**directed** 39:20 83:8,24

**directive** 40:24 83:4

**directly** 87:12 101:23

**disagree** 30:6 31:10

**disagreements** 21:2

**disclosed** 48:11 78:24

**disclosures** 22:6

**discovery** 29:10,14 34:11,24 35:7
42:6,10,20 55:3,11 99:1,6,10 100:8

**discretion** 120:18

**discussed** 83:13 104:22 125:13

**discusses** 111:6

**discussing** 32:1 44:24

**discussion** 30:11 86:11 87:19

---

*Legal Media Experts*
*800-446-1387*

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: discussions..extension

**discussions** 13:2 23:5 64:12 90:9 121:23

**dismissed** 29:18

**dispute** 55:7

**disputes** 43:3

**distinction** 17:24

**distinguished** 81:5

**distressed** 106:24 113:4

**District** 7:7,8

**Ditech** 11:22,23

**divided** 92:20

**doc** 21:3

**document** 10:1 26:6,18,20 27:3,4,6, 8,25 28:14 34:9,11 35:9 40:4,11 43:9 45:4,10,15,17 46:11 56:20 62:7,20,21 63:6 78:18 79:22 80:10,17 81:12,23 82:15,19,24 83:12 84:19,22 85:2,10, 17,23 86:2,4 96:19 97:3,6 103:2 105:23 106:2 108:5 111:4 126:8

**documentation** 9:14 59:8 84:4 109:20,22 115:10

**documents** 9:17 10:8 17:22 19:5 23:14 105:6 120:16 125:17

**DOJ** 19:13 44:5 81:6 119:13 127:23

**dotted** 27:14

**draw** 123:14,22

**drawn** 52:11,17,23 53:1,22 89:15 91:17 92:2 93:1 122:15

**drill** 8:25

**due** 78:12,13

**duly** 8:11 42:15

**duties** 21:8 88:24

**duty** 24:8

_____

E

**earlier** 47:1 49:8 57:11

**easier** 58:11

**ecredit** 77:8

**education** 10:14

**effect** 97:12 106:15

**effects** 41:9

**elect** 58:6,7

**Emily** 9:19

**employed** 66:10

**employees** 25:14 56:21

**employment** 11:5

**empowered** 95:18

**enable** 67:11

**ending** 13:21

**enforce** 101:22

**enforced** 127:24

**enforcement** 64:19 104:6

**engaged** 17:2 29:3

**engagement** 16:3 18:9

**ensure** 76:22 81:14 104:17,25 105:7

**entails** 33:21

**entered** 29:9

**entire** 14:11 20:2 48:13 50:13 55:12, 20 65:3,9 66:9 83:20 93:18 95:14

**entities** 90:15

**entitled** 31:13 108:11

**entity** 125:7,21 126:25

**entry** 73:8,19

**Epstein** 8:2 9:15 16:20 17:12 20:10 24:5,18 25:1,7 26:12,15,19 31:7,16 33:6 34:7 35:2 39:1 41:2,4 44:14 45:7 46:6 52:7 53:11 63:9,12 64:17 65:6,23 66:20 67:24 68:7 70:8,13,20 76:4,25 80:4,23 81:10,19 85:15,18 86:15 87:14 88:5 89:1,18 90:22 96:5 97:4 102:25 110:10 112:3 120:6 125:9,22 128:11

**Equal** 95:6

**equivalent** 72:11 81:11 126:17

**error** 30:20 37:10,11,12 47:12,13,19, 20,21,22 48:19 49:1 50:3 51:15 52:5 53:4 64:14 93:15

**escrow** 121:4

**essentially** 37:16 115:13

**establish** 21:1 25:12 77:14 84:18

**established** 47:14 123:17

**establishment** 72:15

**Estate** 98:18

**et al** 7:5,6

**evaluating** 65:2

**event** 73:15

**events** 67:10

**evidence** 77:24 115:12

**evidences** 118:16

**exact** 113:24

**EXAMINATION** 8:13

**examined** 8:12

**exceeded** 37:12 47:13 50:2 53:5 64:14 93:16

**excluded** 40:9

**exclusion** 37:24 38:18,22

**excuse** 10:21 17:14 40:7 42:2 45:25 63:24 64:11 68:3 108:7

**exercise** 23:15

**exhibit** 26:3,4 27:6 33:25 34:1 40:1, 11 41:7,22,25 45:5,14,25 46:3,13 62:5,18 75:24 76:3 78:2,21,23 80:3, 13,19 81:17 82:13,22 84:10,25 85:6, 14 96:20 102:20,23 107:25 108:3,7 111:5 119:2

**exhibits** 56:19 83:13

**exist** 123:10

**existing** 40:14 71:18 84:5

**expect** 123:24

**experience** 38:9 46:25 89:12

**Experts** 7:15,17

**explain** 42:17 123:3

**explicit** 101:23

**expunge** 58:11,12

**expunged** 69:11 82:10 110:16

**expungement** 69:14 78:10 82:11 92:22

**extended** 60:15 79:17,18 123:19

**extension** 46:14,17 47:5 86:5,9

**extensions** 39:9

**extensive** 74:4

**extent** 29:14 33:7 36:5 41:5 47:17
50:3 66:15 84:4,6

**extinguished** 77:15 112:6

**extinguishment** 30:1 58:25 59:17
77:16 110:5 115:23 116:17

**extinguishments** 77:13 110:23
112:1 116:2,24

**extract** 22:20

**extracted** 36:20 49:20,21

---

**F**

**fact** 34:17 35:13 40:13 44:11 54:18
55:21,24 56:5 70:6 76:23 99:17
100:12 111:11 112:14 120:3 127:10

**failed** 37:8 49:12,13

**failure** 47:18 48:3 50:1,11

**failures** 48:12

**fair** 27:9 88:18 95:18,20,23

**fairly** 23:4 78:14

**familiar** 59:1,3 61:6,8 103:3

**familiarization** 21:24

**families** 117:9

**famous** 127:1

**Fargo** 11:21

**Fayetteville** 7:11

**February** 7:12

**federal** 14:8 19:9 99:18 101:16,17

**fee** 13:24 15:3

**feel** 94:16

**fees** 18:4

**few-minute** 56:10

**fewer** 13:19

**Fidelity** 7:24

**field** 91:25

**file** 40:17 75:16,20

**filed** 13:7 48:8 108:16 112:24 125:17

**files** 111:13,14,16

**filing** 126:11

**final** 28:14 37:18

**finally** 11:18

**Financial** 70:6

**fine** 66:13

**finish** 90:22 124:8

**firm** 7:14 10:6,7 11:5 15:12,17,19,25
17:2,17 37:15 127:2

**firms** 15:14,15,22 22:10 121:22

**first-time** 54:19

**fiscal** 13:21

**fleshed** 113:11

**flow** 87:9,18

**follow** 53:18 74:21 111:9

**follow-up** 115:20

**forbear** 116:10

**forbearance** 116:21

**foreclosure** 61:5

**foremost** 66:7 126:24

**forget** 16:12 65:19

**forgive** 116:9

**forgiven** 59:11

**forgiveness** 54:15,16 59:13 116:20
117:13 118:5,16,18

**forgivenesses** 118:3

**form** 20:10 24:5,18 25:1,7 34:15 35:2
39:1 41:2 44:14 49:3 51:20 52:7 53:11
54:10 57:23,25 58:20 59:13,18 64:17
65:5,6,23 66:20 67:23,24 68:7 70:8,20
71:6 72:3,22 74:14 76:25 77:1,22,24
81:18,19 83:6 87:14 88:4 89:1,17,18
91:2 95:7 100:25 101:13 103:10
104:2,13 107:9,19 108:12,15 109:6,9
110:9,10 112:3,4,20 114:13 115:7,24
117:22 121:7,18 123:6 125:9,22

**formal** 9:4 126:1

**formalities** 109:1

**formed** 54:12

**forms** 57:16,24 59:12,15 68:15 92:20
108:13 109:8,16 115:8 117:24

**forward** 29:10,19 39:6

**found** 53:1 90:5

**foundation** 39:2 40:22 46:21 49:4
67:7 81:22 97:19 110:11 119:16 123:7

**frame** 93:5

**Francis** 30:8 42:21 56:8 99:12

**Francis's** 29:20 30:5 31:11 42:5,13,
20 55:2,13 98:25 100:9

**frankly** 58:11 69:9 99:1

**front** 98:4

**fulfill** 88:24

**full** 8:16

**fully** 27:3

**function** 64:16 66:13

**furtherance** 23:16

---

**G**

**gave** 59:12,19,20 63:16 78:23

**general** 12:25 19:21,22 38:12 60:25
88:21 117:7 127:8

**generalize** 59:25

**generally** 52:20 60:13,14 87:7 88:18
102:19 113:5 118:7

**generated** 83:12

**give** 60:21 73:13,23 75:10 111:8

**giving** 29:7

**Glazer** 9:19

**GMAC** 11:22

**good** 7:21 33:20

**Gorham** 19:16

**gosh** 16:10 124:22

**government** 19:9 20:5 45:5 80:13

**Government's** 45:25 80:12

**governments** 13:2 14:8

**graduate** 10:15

**Grant** 15:20 16:8,11 34:12,17,24
86:21 87:11

**granted** 61:24 67:16,18 68:17 69:13,
14 71:21 93:14 95:13 108:20 111:11

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

113:3

**Great** 56:25

**Greentree** 11:23

**grew** 36:3

**grounded** 109:21

**group** 17:21 20:19 25:6,8,13 27:17 53:7 81:8,9

**groups** 88:10

**guess** 13:25 15:19 16:22 56:21 57:12 92:19 117:16 125:15

**guest** 31:6

**guidance** 62:25 63:4,8,17

**guys** 96:2

---

**H**

**HAMP** 28:23 29:2,4 101:10,20,22,25 102:10 103:7 104:12,17 105:9

**hand** 56:23

**handing** 62:17

**handled** 50:9,10

**handling** 16:19 101:19

**happen** 82:18 84:16 128:7

**happened** 12:22 56:4 100:3

**hard** 61:18

**hardest** 79:14,17,23

**harm** 55:21 100:5

**harmed** 55:15,19

**hate** 116:13 117:2

**heard** 29:11

**held** 7:10 30:11 114:12

**helped** 17:22

**highlighted** 97:10 119:11

**highlighting** 45:9 62:8,9,12 82:15 84:12,17 85:10 96:22

**highly** 42:12

**hiring** 18:1

**history** 74:22 121:4

**hit** 79:14,17,23

**hold** 46:2

**Holsopple** 124:24,25 127:16

**home** 54:19 128:13

**homes** 117:9

**honestly** 13:11

**hope** 14:22 128:13

**Hops** 124:23

**Horwath** 15:21

**house** 109:16 118:13

**HRG** 81:12 127:19

**HSBC** 11:16

**HUD** 19:10 78:18 79:4 80:22 81:2,7,12

**hypothetical** 69:9

**hypothetically** 48:22,25 90:25

---

**I**

**i.e.** 104:11

**idea** 12:22 115:3

**identification** 26:4 34:1 40:1 41:22 45:14 46:3 62:5 74:11 75:24 80:3 82:13 84:10 85:6 96:20 102:20 107:25 119:2

**identify** 74:21

**impact** 41:19

**impair** 10:12

**implement** 17:23 66:13 113:9

**implementation** 87:20

**implemented** 101:6 113:13

**implementing** 23:16

**improper** 42:12

**inappropriate** 31:2 32:11

**include** 35:14 39:5 84:2 106:22 123:12

**included** 34:19 35:12,16 36:12 39:22 54:14,18,20 59:7 93:9 119:12 122:11 123:21

**including** 21:20 121:21

**inclusion** 83:14 85:3

**income** 10:23 18:2 117:12 118:19

**incorrect** 112:15

**incorrectly** 30:18

**increased** 98:23

**independence** 25:22

**independent** 19:1 23:21 24:4,11 25:6,12,15,17,18,20 33:12 89:14

**indication** 12:24 50:19

**individual** 19:15 105:17

**individually** 87:8

**individuals** 16:18 63:19 75:17 86:19 110:7 111:23

**inform** 44:8

**information** 21:20 31:24 56:3 74:3 75:1 87:9 89:8,9,19,21,24 94:3,7,8,9 115:16 123:2

**informed** 33:16 44:11

**infrastructure** 72:15

**initial** 87:21 89:7

**inquire** 29:24

**inside** 28:6 89:15

**insist** 29:19 100:11

**instance** 36:9

**instances** 57:18,22 58:17 60:10 61:2 64:7 69:12 73:7

**institutionally** 120:1

**instruct** 40:6

**instructed** 35:13

**intact** 54:3,8 57:9,12,16 67:21 70:19, 24 71:19,24 75:2,8,14 76:20,24 77:17

**integrity** 23:22 24:4,9,12 33:2

**intent** 40:24 55:25

**interact** 87:25

**interaction** 22:22

**interest** 12:24 31:12

**internal** 81:8,9 88:10

**internationally** 127:1

**interpret** 17:22

**interpretations** 21:3

**interpretative** 35:10

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: introduce..loan

**introduce** 7:20

**investigation** 50:25 51:12

**invite** 42:10 55:4 99:7

**invited** 31:5

**invoked** 31:17

**involve** 49:10

**involved** 17:3,8,11 20:21 21:18 22:21 126:20

**involving** 43:1

**Iowa** 19:22

**IRG** 25:5 27:9,15 28:2 37:4 49:18 52:19 61:25 81:10 87:11 88:1,13,20, 23 89:4 90:1,5,10 91:19 93:12 121:24 124:20

**IRGS** 66:5

**iron** 88:14,15

**issue** 35:10 55:22 77:13 99:3 105:2

**issued** 9:16

**issues** 12:5 29:12,16 32:1 42:8,18 55:10 87:2,6,19 88:16 90:4 99:5,9

**items** 28:6

J

**January** 9:16

**job** 39:3 73:22

**Joe** 87:15,17 88:6

**Join** 35:4 41:3 52:8 65:24 68:8 70:9 89:2

**joining** 11:8

**Joseph** 7:4 8:3,10,17 127:2 128:16

**Josh** 17:12,14,15 63:21

**Journal** 9:19

**JP** 40:7

**JPM** 40:7

**JPMC** 40:7

**JPMC-MRS-00134158** 26:7

**JPMORGAN** 7:6 12:11 14:16 21:10 38:23 39:8,12 40:6 44:8,12,19

**Jr** 8:3,10,17 17:1 127:2

**judge** 9:4 29:9,13,20 30:4,8 31:11 32:13 42:5,13,19,21 55:2,13 56:8 98:25 99:12 100:9 125:16

**judged** 37:9

**judgment** 23:14 36:12 64:20 111:5

**judgments** 11:14,19,20 12:16 13:6, 17,19 14:2 19:8 21:4 23:17 25:12 27:23 33:10 47:14,15 54:12 58:1 64:11 102:13 125:14

**judicial** 126:12

**June** 13:21

**Justice** 12:10 18:24 19:10 28:17 70:5 125:25 126:9,23 127:7 128:3

**justify** 113:8

K

**Kanawha** 10:15

**kind** 17:24 18:22 51:12 63:4 73:14 77:8 93:3,4 110:7,23 111:22 112:25 126:1,9

**kinds** 23:5 78:21 93:8 111:8

**knew** 74:21

**knowledge** 60:4

L

**L-E-N** 16:7

**L-E-N-D-E-Z** 16:7

**label** 85:8

**lacks** 39:2 40:21 49:4 81:21 97:19 110:11 119:15 123:7

**large** 15:25

**latitude** 29:7

**law** 10:5,17,19 17:17 97:23 101:16 103:18,19,23,25 104:4,7,11

**laws** 99:19,21 104:11 121:5

**lawyer** 16:25 17:15 128:3

**lawyers** 16:24 17:2

**lead** 51:13

**learn** 120:16

**learned** 35:6 38:10 120:13

**learning** 38:22

**Leatherwood** 15:12 16:17 17:16,19 86:14,16

**leave** 20:5 72:21

**left** 56:4

**legal** 7:15,17 9:4,6 71:7 79:10 97:19 102:14,16,18 103:11

**lenders** 102:19

**Lendez** 16:3

**lending** 95:18,20,24

**letter** 43:14,20,23 59:17 107:15

**letters** 43:15,18 59:4,6 110:5

**level** 88:3 120:22,25 121:10,15 122:15

**levels** 117:12

**licensed** 10:18

**lien** 29:25 30:1 40:15,17 41:9,19 42:22 43:24 44:6,11 54:4,8,9,15,16,22 55:15,19 57:9,16,25 58:4,5,9,12,13, 14,18,25 59:5,7,17,21 60:10,13,14,20 67:3 68:6 69:11,13 70:19,24 71:4,11, 24 74:1 75:8,14 76:20,24 77:12,13,16, 17 79:13,25 81:14 82:6,8,10,12 84:5, 6,7 92:21,22 94:1 97:12 100:2 107:6, 14 110:4,5,13,22,23 112:1,18 113:15 115:23 116:2,17,24 117:13 118:2,22 120:20 124:1,4

**liens** 39:14,21 40:8 43:1 44:9,20,24 56:5 57:12,24 58:22 61:21 62:25 67:20 68:3,4 72:7 73:19 77:5,14 82:1 83:5,9,10 100:20 112:6,11 118:8 119:12,23 120:4,13

**limit** 29:20 103:15

**limitation** 18:14

**limited** 18:13 127:2

**limiting** 29:10 42:6,20 55:3 98:25

**lines** 32:11

**list** 54:20 94:1

**living** 115:6

**LLC** 7:23,24

**LLP** 10:24 15:10 16:16,25 17:16

**loan** 7:24 11:16 50:9,10 58:9,12 59:13 60:7,20 65:3 67:11,15 68:22 69:2

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: loans..mortgage-backed

71:13,18,19 74:9,10,17,19,21 75:2
78:10 90:7 93:2,3,21 95:17 98:3 99:19
109:10,23 110:15 113:4,7,15 114:1
115:18,19 116:7,17,20,21,23 117:11
120:22,24 121:10,15 122:15,19,20,22
124:1

**loans** 22:20 34:18 35:11,14 36:10,20,
21 39:23 40:9,14,17,25 48:2,9,17,21,
25 49:19,20,25 50:7,13,15 52:6 53:7
54:2,19 56:1 57:19 60:8,13 67:20
68:18 69:10,19,21,23,24 70:4,7,18
71:3 72:19,25 73:9,16 79:19,20 82:8,
12 83:2,25 84:3,7 85:3 90:18 91:1,16
92:12,19 93:8,13 94:9 98:8,9 101:19
108:21 114:4 115:12 120:20 121:10
122:3,12 123:16,18,25

**local** 31:8

**located** 7:10 115:19

**long** 10:21 11:3 22:21 39:13 40:7 84:6
121:20,22

**longer** 15:21

**looked** 68:19 115:12 120:17

**lot** 116:14

**lunch** 96:3

---

**M**

**made** 30:22 36:14 53:6 94:12 118:17

**Madigan** 19:21

**magistrate** 29:9,13,23 32:13

**majority** 88:9 116:19

**make** 21:6 29:6 31:22 42:11 55:5
73:13 82:17 99:8

**management** 17:21 21:15,18,19
25:18,19,21 36:9 37:5 52:19 89:5,6,
16,23,25 90:1,18 91:18 92:17 93:12

**management's** 25:23 37:4,17 89:8

**managements** 22:18,23

**managing** 33:23

**mandated** 54:23

**manner** 108:23 113:7

**MARCO** 96:9

**marked** 26:3,4 33:25 34:1 40:1 41:22,
25 45:4,14,24 46:3 62:5,18 75:24 80:3
82:13 84:10 85:6 96:18,20 102:20,23

107:25 119:2

**marketplace** 38:10

**Martha** 10:6 17:5 63:21

**master** 99:19

**matter** 7:4 54:18

**matters** 32:18

**maximum** 114:1

**Mccree** 10:5

**Mcgladrey** 15:24

**meaning** 79:18,19

**means** 25:2 103:14

**measure** 37:2 39:4

**measured** 114:23 122:10

**measurement** 21:1 23:11 35:23 38:9

**Media** 7:15,17

**medication** 10:11

**meet** 21:17 38:12 104:19

**meetings** 20:17,18,20,24,25 88:11,15

**memo** 98:19

**mentioned** 17:5 19:3 23:1 64:23
87:23 100:14 107:6 126:4

**mentions** 80:21

**menu** 54:13 78:1,20,23 82:4,5

**met** 20:1 21:15 88:12

**method** 74:18 92:3

**methodology** 53:15

**metric** 23:8 37:11 46:23 47:7,13 48:6
49:7,14,21 50:14 51:11,25 52:3,4,10,
11,13 73:10 83:25 91:21 106:14 107:1
114:20 122:3,9,11,18,23 124:6 126:17

**metric-by-metric** 51:16

**metrics** 22:21 23:11,12 34:19 35:15,
16,18,19,24 36:2,7,8 37:13 38:2,3,4,7,
9,15,19 39:10,14,20,23 40:9 46:18,24,
25 49:7,10,12,16,25 64:23 65:2,8,9
66:19,23 83:14 84:3,8 85:4 87:13 90:8
91:5,7,9,12 95:10,23 104:9 106:11
114:22 119:13,24 120:4,14 121:9
122:6 123:13 126:18

**midwest** 15:25

**million** 13:18,22 48:22

**Milwaukee** 43:19,23 44:3

**mind** 57:22,25

**mine** 120:19

**minimal** 112:11

**minimis** 64:2,4,9

**minute** 30:10

**minutes** 96:6,7 124:9

**mischaracterizes** 25:8

**misconduct** 102:4

**misstated** 49:8

**misstates** 33:4 51:3 69:6 71:7 72:23
123:7

**modification** 54:15,16 58:8 60:7,11,
14 98:4 109:10,14 110:8 111:23
115:11 116:7 118:6

**modifications** 60:12 110:14 116:19

**modified** 82:9 98:9 104:6,7 109:5

**modify** 60:21

**moment** 16:10 94:25 114:8 119:1

**monitor** 11:13,14 12:7,9,13 13:4,8,14
14:19 15:6 18:17 20:4 21:8 22:1 24:15
36:6 43:25 64:15 125:6,19

**monitored** 125:11

**monitoring** 13:25 14:6,12 19:2,4
20:13 28:18 29:3 38:16 66:13 89:22
125:12 127:2

**Moore** 15:11 16:16 17:16,19 86:15,16

**Morgan** 7:5

**morning** 7:21

**mortgage** 7:22 10:25 11:7,15 12:2,3,
4,17 13:5,14 15:8 18:6 20:21 21:9,19
24:23 25:15 28:21 35:19,21 40:14,15,
18 44:1 54:12,15,16 65:9 69:4 70:24,
25 71:1 73:20 76:12 78:16,19 79:3
83:19 97:24,25 101:4,11,14 102:9,11,
18 103:6 104:1,5 105:3 106:16,20
107:14 108:11,16 109:5,7,10 110:13
114:15,18,19,21 117:19 120:24
123:24 125:6,19 126:22

**mortgage-backed** 12:8,12 13:9
102:6

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: mortgages..owner-occupancy

**mortgages** 110:3

**move** 25:5 29:19 32:5,8,17 92:14

**moving** 32:25

**MSP** 65:4

**municipalities** 41:10,12,18 43:17
107:18,23

**N**

**NA** 7:6

**named** 52:22

**names** 15:22

**narrow** 29:12

**narrower** 99:4

**National** 11:7,15 12:1,17 13:5,14
18:6 20:21 21:9 24:23 28:21 35:19,21
54:12 69:4 73:20 76:12 78:16,19 79:3
97:24,25 101:4,11,14 102:9 103:6
104:1,5 105:3 106:16,20 114:15,18,19
117:19 125:6

**nature** 21:21 22:5,16 58:21 67:15
73:2 113:4

**needed** 22:25 38:14 98:9 100:20
120:16

**negotiate** 66:6,12

**negotiated** 27:24 28:12 38:15 66:7

**Nikki** 124:22 127:15

**NMS** 14:22 18:22 57:14,17 58:1 73:8
81:5,9 113:1 115:2 126:2,15

**noncompliance** 50:20,23,24 51:2,6,
8 105:19

**noninclusion** 83:14

**nonparty** 31:19

**nonprivileged** 31:24

**North** 7:11 10:20 11:10 12:25 15:12

**not-for-profit** 15:9

**note** 40:17

**noted** 42:15

**notice** 110:19 117:20 118:1

**noticed** 56:19

**notified** 107:8,20 112:7

**notify** 70:4 75:7 107:17,23

**notifying** 59:6

**noting** 97:2

**number** 7:3,9 17:1 26:3,4,6 27:6
30:18 33:25 34:1 36:3 37:8 40:1
41:22,25 45:5,14 46:1,3,13 48:21
49:22 54:17 58:10 62:5,18 69:3 74:17,
20 75:3,24 76:3 80:3,13,19 81:17
82:13,22 84:10,25 85:6,25 87:23
91:16 92:9,11,18 96:18,20 97:8
100:16 101:15 102:20,23,24 107:25
108:3,7 119:2,9

**numbers** 74:10

**O**

**object** 30:7 31:1,7,13 32:10 34:15
49:3 51:20 58:20 59:18 71:6 72:3,22
74:14 77:22 83:6 88:4 91:2 95:7
100:25 101:13 103:10 104:2,13 107:9,
19 109:6 110:9,10 112:4,20 114:13
115:24 117:22 121:7,18 123:6

**objection** 20:10 23:25 24:5,18 25:1,
3,7 29:6 30:22,23 31:1 33:4 35:2
38:25 39:1 40:21 41:2,3 42:4,14 43:7
44:14,22 46:21 51:3 52:7 53:10,11
54:25 56:6 63:9 64:17 65:5,6,23 66:20
67:7,23,24 68:7 69:6 70:8,13,20 76:25
77:1 79:6,10 81:18,19 87:14 89:1,17,
18 94:20 97:16,18 98:23 99:15 112:3
119:15 125:9,22 128:1

**objective** 117:8

**obligation** 9:6 47:16,17

**obligations** 102:18

**observation** 85:9

**obtain** 57:19 59:5 67:12 68:6 71:12,
25 72:9 74:1 78:5,17 82:5 108:16
112:18

**obtained** 108:18

**occupancy** 113:16,19

**occupied** 41:1 114:4

**occurred** 20:8 30:2 55:16

**occurring** 44:12

**October** 44:9 83:3

**Ocwen** 11:16,22

**offer** 30:17

**office** 9:18 10:25 15:8 20:16 43:25
63:3,7 76:21 81:14 83:4,19,24 86:8,13
87:1 104:16 111:1 119:20 120:2,23
126:21

**Offices** 15:6

**OMSO** 15:13 16:15 17:19 18:1 24:12
40:6,24 45:20 61:20,23 62:2 64:8 65:1
66:17 67:2 77:20 87:16,17 88:6 93:20
94:16 126:24

**OMSO's** 124:21 125:2

**ongoing** 13:17 126:13

**open-ended** 51:11

**operated** 22:7 49:22

**operating** 25:19 52:19 91:18

**operation** 25:16 65:10 88:11 125:4

**operational** 88:12

**operations** 88:13 121:25 122:1

**opinion** 32:23 55:2

**opportunity** 9:11 42:17 95:6

**opposed** 32:4

**option** 58:8

**options** 54:14 82:4,5

**order** 21:13 29:10,20 30:5 31:11,14,
20 32:8,21 42:6,13,20,22 46:18 55:2,
13 57:13 59:5,8 61:21 63:1 76:19,21
78:5 91:11 94:16 98:25 100:9,17
103:22 107:16 111:21 112:18 113:15
116:10

**orders** 33:9

**organization** 27:12

**original** 13:16 19:7 36:3 46:25 102:5

**originally** 11:22 36:2

**outlined** 27:25

**output** 22:14,16,17

**outstanding** 102:18

**oversight** 10:25 15:9 125:25 126:1,
12

**owned** 114:1

**owner** 114:2

**owner-occupancy** 114:10,24,25

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

115:22

**owner-occupied** 109:17 114:2 115:4

**ownership** 116:11

**P**

**p.m.** 96:11,14 124:13,16 128:15,17,19

**paid** 14:11,13,16 107:1

**paragraph** 103:19

**paralegal** 10:5

**parameters** 112:18,21

**paraphrasing** 97:12

**Pardon** 97:18

**part** 14:10 17:21 23:22 33:15 54:22 72:14 79:2,25 109:3 119:11

**participate** 20:16

**participation** 102:10 104:12,18 105:8

**parties** 12:18 18:20 31:25 35:13 43:3 55:8 117:14 126:8 128:6

**partner** 10:23 16:3 18:2

**Partners** 7:23

**partnership** 17:25

**parts** 23:10

**party** 18:7 24:11

**pass** 37:13,14 47:18

**passed** 18:15 37:1,7,14 49:12,13 90:7,8

**past** 78:12,13

**Patrick** 19:20

**pattern** 50:20,21,23,24 51:8

**pay** 14:10

**paying** 118:22

**payment** 60:16,22 109:11 116:8,9 121:4

**payments** 113:6

**pays** 13:24

**penalized** 105:5

**people** 19:24 20:5,20 21:18,20 22:24 64:1 86:20 88:2,6,10,12,24 91:19 92:1

93:25 105:12

**percent** 47:21,23 90:25 93:16

**percentage** 90:18 92:7

**percentages** 91:11

**perform** 22:12

**performance** 21:1 28:3,4 35:23 37:9 39:4

**performed** 23:8

**period** 16:20,23 18:8 20:3 83:23 111:15 116:10 118:20 123:5

**periods** 71:22,25 81:15

**permissible** 37:10

**permitted** 29:13 42:19 47:13

**personally** 14:18 45:22 119:18 120:3

**personnel** 88:13

**perspectively** 39:24

**phone** 30:8

**Pistilli** 7:25 23:25 25:3 26:10,21,24 29:5 30:6,22,25 31:5,10 32:2,7,19 33:4 34:4,15 35:4 38:25 39:2 40:2,21 41:3 42:3,16,25 43:6 44:22 45:9,12 46:8,21 49:3 51:3,20 52:8 53:10 54:24 55:14,18 56:6,23,25 57:3,6 58:20 59:18 62:6,11,14 65:5,24 67:7,23 68:8 69:6 70:9 71:6 72:3,22 74:14 77:1,22 79:6,9 81:18,21 82:14 83:6 84:11,15, 17 85:7,9,13 88:4 89:2,17 91:2 94:20 95:7 96:21 97:1,5,16,18 98:22 99:23 100:6,25 101:13 103:10 104:2,13 107:9,19 109:6 110:9,11 112:4,20 114:13 115:24 117:22 119:3,15 121:7, 18 123:6 128:1,10

**place** 18:6 111:3 112:1

**Plaintiffs** 55:5

**Plaintiffs'** 41:25 45:25 55:8 62:9,18 76:2 80:19 81:17 82:21 96:18 99:7 102:23 108:2,7 119:9

**plan** 27:22,23 28:7,11,15,18,20 66:8 111:9

**plans** 28:9 36:13 66:6

**pleaded** 55:22 99:3,9

**point** 15:7 17:11 19:24 30:24 37:23 39:18 42:3 54:8 65:15,17,22 94:6 97:14 98:2,13,15 100:18

**policies** 65:7

**policy** 49:11 66:1 87:6

**pool** 48:25 53:9

**pooled** 52:9,11,21 53:21 90:3 94:22

**pooling** 102:6

**pools** 52:16 65:4

**population** 22:25 36:10,19 37:25 38:19 39:19 45:21 48:6,14,18,20 49:19 50:13,16 51:19 52:9,10,12,25 53:20,21,22 65:3 83:20 91:16,17,21 92:4,12,20,22,23,24 93:18 122:2,8,22, 24 123:21,22 124:2,5

**populations** 22:20 34:19 35:12,15 52:18 53:13,16 89:20 90:2,3 93:1,16 119:24 121:11 122:4,5 123:14

**portfolio** 33:23 95:14

**portfolios** 48:13

**portion** 29:17 116:23

**portions** 62:8

**position** 8:25 30:2,23 31:7,18 32:3, 16,20 43:5 96:24 97:2 100:6 102:8 105:4 117:11

**possession** 93:24 94:1,8,12 106:1,4, 5

**possibility** 67:22 118:10

**possible** 67:22 118:10

**potential** 47:10

**potentially** 63:20

**Poyner** 7:10 9:15 10:24 11:3,9 15:10 16:16,19,25 17:20 18:1,11 86:13

**PPF** 91:19

**practice** 10:18 127:11

**pre** 44:5

**precise** 73:2

**predicate** 70:22

**premises** 115:15,19

**preparation** 10:9

**preparatory** 21:25

**prepare** 10:8

**prepared** 83:16

**present** 9:4 21:21 64:8

presentation 89:7

presented 61:25

presently 126:1

preserve 25:21

president 10:24

pretty 49:15 71:15

prevailed 103:20 104:4

previously 12:7 19:3 27:16 66:24 70:18 73:25 84:1 96:25 100:16 106:7, 8 112:10 125:15 127:15

primarily 101:16

primary 15:17,19 16:2,8,12,18,24 17:15 124:21 125:2 126:21,22

principal 60:15 116:8,9,21,22 118:6

prior 11:8,17 33:5 44:9 51:4 69:7 71:7 72:7,23 73:7,19 83:13 110:13 123:7

private 127:11

privileged 56:20

problem 35:1 84:18

Procedure 98:18

procedures 49:11 65:8

proceed 57:5

proceeded 39:6,24

proceeding 9:4

process 12:19 21:24 22:4,11 23:21 27:11 37:16 44:13 57:9 59:3 60:24 61:3,6 87:5 92:15 94:17

processes 23:6 55:16 100:3

produce 28:10

produced 9:17 84:21 96:23

production 9:15,19

professional 15:15,17 37:15 121:22

professionals 18:11

proffer 42:11 55:5 99:8,15

program 19:11,12 30:1 59:1 78:18 80:22 81:2

programs 21:19

project 44:6

pronounce 124:22

proof 110:16,24

proofs 25:24

proper 75:5,6 93:12

properly 48:2 67:19 92:3,4 94:22

properties 40:8 41:1

property 58:23

proportionally 92:11

prosecute 128:6

prosecution 112:24 113:11 126:5,10 127:23

Prosecutor 80:15

prospectively 35:14

Protection 70:6

protocol 39:24 74:4 91:18,24 105:7, 10,11 121:23

protocols 28:1 39:5 66:9,12 72:15 75:12 103:22 104:24,25 110:17 111:19 112:22 113:9

provide 38:23 39:8 62:2 104:20 117:20

provided 19:5 23:13 40:25 46:17 52:4 63:4,8 86:9 94:18 125:13

providing 23:19 45:20 62:23,24 117:20 118:17

provision 58:19 78:15 97:24 103:13 117:6 127:25

provisions 61:9,15 98:13 101:21 104:5 106:9 126:13,19

public 10:16 68:11,14,17 111:4 126:8

publicly 48:11 112:24

published 68:12,13,14 94:11

pulling 52:15

purchase 99:19

purpose 20:24,25 23:9 77:4 83:11 109:1

pursuant 9:16 54:3 64:3 100:4 101:5 103:7

pursuing 100:8

put 105:4 117:10

putting 117:10

## Q

qualified 108:21 109:23

queries 22:18 23:1,2 36:16 123:13

query 53:17 123:12,19

question 9:1,9 24:3,21 27:21 29:11 35:3 43:11 48:15,16 51:22 59:23 62:6 63:10,13 68:1,10,20 70:14 72:21 80:24 82:14 84:11 90:23 91:22 96:5 100:17,23 101:2,8 123:11 127:4

questioning 29:21 31:2 32:11 42:5, 12,18 55:1,6,12,20 99:2,24

questions 8:21 29:8,14 31:23 32:3, 18,21 36:17,21,23,24 87:13 124:10 128:10

quote/unquote 64:9

## R

Raleigh 7:11

ran 116:14,16

random 52:23 91:20 92:2,5,25

randomization 53:23

randomized 52:20,25 91:20,21

rate 37:10,12 47:12,13,21,22 49:1 50:3 51:15 52:5 53:4 64:14 93:15

raw 93:21

RC 68:3

RCB1 40:9

RCD1 60:8 69:23

RCV1 67:20 68:4

re-perform 37:16

reach 87:10

read 30:17 98:12 102:24 128:2,4

Reading 82:25

Real 98:17

reason 70:12 117:5

reasonable 32:15

reassert 54:25

recall 28:2,16 38:1 39:11,25 41:21 43:22 44:10 45:20,22 59:25 61:4,16

62:23 65:18 72:16 73:5 75:19,23
78:10,12 79:7,8 80:2 83:18,22 86:6
105:24,25 107:22 110:19

**receive** 17:25 33:11 57:13 69:3,4,22
73:16,17 76:9,14 79:13,15 93:20
107:16 118:21

**received** 9:14,24 12:23 53:9,12 69:24
71:5 76:16 91:10 110:4,5 112:11

**receiving** 43:14,20 89:12

**recent** 11:5 13:16,18

**RECESS** 30:14 56:14 96:12 124:14

**recognize** 80:12

**recognized** 108:10

**recollection** 33:21 59:20 60:12 79:16
85:3

**recommended** 12:21

**record** 7:19 8:16 22:14,15,19 30:11,
13,16 31:18 33:1,3,12,15,16 53:19
56:12,13,16 62:15 68:11 74:8,22
76:22 84:19 90:19 96:11,14 97:2
116:7 121:3,12 122:15 123:3,5
124:13,16 128:17

**records** 21:11,14 22:12 23:23 24:9,
13,17,19,25 29:25 65:22 72:11,19
75:12 91:1

**Recovery** 29:25 33:17,19,21 34:13,
18 35:12 37:24 38:18,23 39:5,9,19,22
40:25 45:2,21 46:15 48:8,25 53:7
65:4,21 69:24 70:3,7 71:4 72:12 83:2,
20 84:3 123:4,10

**reduce** 116:8,9,11

**reduced** 60:15 113:7

**reductions** 116:20

**refer** 76:11 77:7 79:22

**reference** 74:8 75:11

**referencing** 16:21

**referral** 18:4

**referred** 98:19 101:20 103:19

**referring** 27:8 35:18

**refers** 34:11 45:17 86:4

**reflect** 66:15

**refresh** 85:2

**Reg** 98:17 100:14,16,21

**regard** 11:16 36:18,22 61:24 65:9
74:7 93:13 115:11 121:10

**regular** 87:4

**Regulation** 61:17,22 62:3 63:1
100:18

**regulations** 101:9,10,20 105:15,16

**regulators** 70:5

**regulatory** 64:16

**related** 79:4 122:19

**relates** 46:23 78:11

**relating** 12:7 101:16

**relation** 21:8 88:24

**relationship** 21:23

**release** 39:21 41:10 44:6,19 54:9,22
55:15 57:25 58:5,12,13,14,17 59:7,17
60:11,14 61:21 62:25 71:13,14 73:9
79:25 83:5,9,10 100:20 107:14

**released** 39:13 44:9 56:5 57:24 58:23
59:21 67:21 68:4 71:4,12 72:7 73:19
74:1 77:6,19 84:7 97:13

**releases** 30:2 40:17 41:20 42:23
43:1,24 44:12 55:19 72:9 79:13 100:2
107:7,8 110:4,23 119:23

**releasing** 40:7 55:25 59:5 82:6
119:12 120:3,13

**relevance** 29:15 42:8,18 43:2 55:6,9,
21 99:2

**relevant** 29:16 30:3 31:22 99:4,9

**relied** 94:18

**relief** 23:10 43:8 54:5,10,13,21,22
55:17 57:16,23,24 58:1,5 59:9,12,14,
15,21 60:21 61:24,25 67:15,16,18
68:13,16,24 69:13,14,20,22 71:5,19,
21 72:1,9 75:4 77:9 78:1,2,6,11,13,14,
17,18,22 79:1,5,23 80:1,22 81:2 89:22
91:5,8 92:14,16,17,18,20,21,22 93:3,
4,9,14 95:10,12,13,22 98:16 99:12
106:10,15 107:17 108:17,18,20,21,23
109:2,9,16,20,21,23 111:8,11,22
113:3 115:2,10 117:8,20,24 121:9
126:15,18

**relieve** 44:2

**rely** 23:18 74:23

**remained** 59:24

**remediation** 47:10,16,25 48:5,7,10,
17 50:6,15

**remember** 13:11 14:17 15:3 19:13,17
20:7 23:3 28:8 34:22 39:17,22 43:14,
19 58:3,18 60:3 65:8 73:11 74:25
80:16 106:24 110:25 113:24 125:3,4,5

**renew** 42:4 98:23 99:16

**repay** 117:11

**repayment** 117:10

**rephrase** 9:9

**report** 25:20 33:12 37:20,21 68:13

**reported** 37:24 68:21

**reporter** 7:16 8:5 9:19

**reports** 23:4 48:12 52:23 68:15 94:11

**represent** 7:20,22 8:3 31:12

**representation** 16:19 19:9 27:10,16

**representatives** 14:7 19:6,8 22:9
88:1,19

**request** 12:24 108:11,16 118:4,6
123:25

**require** 14:3 50:18 60:1 61:20,23 67:2
75:1,15,16 104:20 105:3 110:24

**required** 25:11 33:8 48:4,5 49:14,16
50:12,15 57:15,16 58:6,17,22 60:4,20
78:6 83:19 98:1,2,11,14 102:9,11
103:20,21 107:4,21,22 110:16,19
111:6,16 114:11,23 115:21,23 121:5

**requirement** 57:12 59:11 74:12
76:21 114:25

**requirements** 28:21,24 29:1 67:11
78:6 93:7,8 97:13 101:22,23 102:14,
15,17 103:14,18 104:21 105:14,18
106:12 107:6

**requiring** 81:14

**reserve** 32:12 43:7 56:7 99:11 100:10

**RESERVED** 128:18

**residence** 115:6

**resident** 115:14

**residential** 12:8,12 13:9 125:19

**Resolution** 7:5,22 40:18

**resolve** 34:25

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

**respect** 103:12

**respond** 10:2

**response** 29:22 35:9 43:21 85:12
99:16 100:21 106:10 123:20

**responsible** 24:16,24 51:1 52:15

**restate** 24:2 49:6

**result** 18:1 68:21

**results** 37:7,22

**retained** 15:7 18:7,17,23

**retention** 18:20

**returned** 93:17

**review** 10:8 21:10,13 22:5,14,17,18
24:9,12,24 25:6,12,22,23 26:9,20 27:3
33:2 37:4 46:9 62:19 72:13 73:13 80:7
81:8,9 84:24 88:10 94:13,14 96:19
108:2,6 109:12 119:7 120:24 121:2

**reviewed** 14:4,6 27:5 33:16 49:18
52:19,20 53:2,14 59:8 62:21 76:2,23
80:17 82:21 85:22 90:12 94:10,13
97:8 105:11 119:21

**reviewing** 24:16 25:2 28:3,5 56:19

**REVIEWS** 27:4 34:9 40:4 43:9 45:15
46:11 62:20 80:10 82:19 84:22 86:2
97:6 103:2 108:5

**revised** 39:5

**Richard** 19:22

**rights** 32:12 43:21 56:7 99:11 100:10

**RMBS** 14:23,25 18:17 20:14 21:9
53:25 54:3,11 57:13,17 69:5 73:8
78:16 79:3,12 81:5,7,25 82:3 101:5
102:3 112:19 115:2 116:25 127:1

**role** 64:15,18

**rooms** 94:10,14

**Rosemary** 125:16

**roughly** 113:2

**RS** 15:23

**RSM** 15:24

**rubric** 114:5

**rubrics** 111:21

**rule** 47:23

**rules** 21:1 31:8 98:21

**Ruth** 10:5

**S**

**S&a** 7:23

**S-V-O-B-O-D-A** 10:6

**safe** 128:13

**safeguards** 111:25

**sale** 54:17 58:15,18,22 69:12,13
117:25

**sales** 40:18 92:23

**sample** 36:20 48:1,19 50:7,19 52:3,5,
11,16,23 53:1,2,3,9,22 91:10,14,15,
17,20,21 92:5,25 94:22 95:16 121:11
122:7,13 123:1

**sampled** 90:18

**samples** 52:17,20,21 90:17 92:2
94:18 121:16,19 123:15

**sampling** 49:17 92:15 95:4

**sanctions** 51:13 56:8

**satisfactory** 53:1

**satisfied** 91:25 92:1

**satisfy** 22:24

**schedule** 47:15 78:8 111:7

**SCHNEIDER** 95:1

**School** 10:17

**schools** 10:16

**scope** 42:19 64:24

**scoring** 71:16

**Scott** 17:10

**scripts** 111:9

**scrub** 67:3

**search** 10:1

**secondarily** 100:1

**secondary** 37:15

**Section** 78:1

**securities** 12:8,12 102:7

**security** 13:9 125:20

**seek** 32:12 43:7 56:7 99:11

**seeking** 55:17 78:9

**seldom** 116:15,16

**selected** 52:24 95:15 122:8,25

**selling** 102:6

**send** 59:17

**sending** 59:4

**senior** 16:10

**sense** 119:25

**separate** 11:1 27:17 52:10 90:14 93:1

**separately** 47:18 52:12

**September** 83:21

**sequence** 67:10

**series** 36:16,21 104:23 121:23

**serve** 11:12

**served** 16:14

**service** 49:13 104:11,17 105:8

**serviced** 70:7,15,19 114:2

**servicer** 20:17 21:16,17 25:14 28:13
36:25 47:12 48:3,11 49:17,22 50:2,10,
12,22 51:1 54:8 57:19 58:7 62:24
65:10 66:14 71:12 73:12,25 74:5 75:7,
13 78:5,17 87:1 88:1,13 89:15 90:10
93:20 102:10 105:4 108:19 109:15
114:1,2 117:18 121:25 122:9,16
123:18

**servicer's** 28:4 74:22

**servicer-type** 93:25

**servicers** 13:3 14:5 20:18 21:2,5
22:23 23:19 25:11,14 36:1 37:21
38:16 58:11 61:14,21,23,24 64:8,13
66:2,6,8 67:2,5 68:14,15 72:14,17,18,
25 73:3,9,19 75:15 86:20 87:3,6,12
89:13 90:5 93:19 94:15 100:19 102:19
103:8 104:19 105:12 107:24 110:18
115:4 116:15 117:5,15 121:13 122:1

**servicers'** 24:16,25 88:20

**services** 15:15,17

**servicing** 7:5,23,24 11:16 21:19
23:11 25:16 33:23 35:22 36:1,6 37:3
38:6 40:19 51:6,7,9 53:8 65:10 66:18,
23 70:22,23 102:12 106:19,21,22
114:11,15,22,23 121:6

**serving** 18:12

**set** 66:12 94:14 102:12 108:22 111:19 112:21 113:9

**settle** 23:13 24:23

**settled** 101:15 102:16,17,19

**settlement** 10:25 11:7,15 12:2,6,9,17 13:5,10,12,14 14:2,3,25 15:4,8 16:23 17:22,23 18:6,8,18,20 19:5 20:3,14,21 21:3,4,9 22:1 23:9 24:24 27:24 28:21 35:20,21 39:4 40:13 44:1 48:1 50:18 51:5 53:25 54:3,11,13 57:14,17 64:5 69:4,5 70:25 71:25 72:8 73:20 76:12, 19 78:16,19 79:3,4 81:5,6,7,8,25 82:3, 8 83:19 87:20 93:7 97:25 98:1,14,18, 21 101:4,5,12,15,21,22 102:4,9,11 103:7,15,18 104:1,5,23 105:3 106:9, 16,20 108:19,22,24,25 111:12 112:19 114:15,19 115:2 116:13,25 117:19 120:21,24 122:10 125:7,17,20 126:7, 10 127:1,20

**settlement's** 103:16 126:22

**settlements** 11:12,24 12:4,14 14:1, 19,23 21:10 24:15 44:13 47:11 57:18 64:3 67:13 68:6 69:16 73:9 79:12 88:25 100:4 106:6 112:12 117:9

**Severance** 7:14

**short** 54:17 58:15,18,22 69:10,11,12 92:10,23 98:6 117:25

**show** 26:2 34:2 41:24 45:4,24 46:4,5 96:17 102:22 105:6 111:10 120:17

**showed** 108:20 109:22

**showing** 33:24 111:7

**shown** 84:19 124:5

**SIGNATURE** 128:18

**significant** 22:6 23:4 71:14 95:16

**similar** 58:3 72:12 76:13 85:16 92:15

**simply** 115:9

**single** 29:11 65:15,17,22 93:21 94:1 97:13 98:2,13,14

**sir** 8:18 10:14 26:14 34:8 43:13 44:18 46:7 63:11 80:5,9 85:20 88:7 97:11 103:1 108:4 119:1,4,10 127:6

**site** 126:9

**sitting** 112:7

**situation** 60:1 62:24 73:14 114:10

**situations** 60:19

**size** 91:10,14,15

**small** 71:17 78:14

**smaller** 13:19

**Smith** 7:4 8:3,10,15,17,20 9:14 15:11 16:17 16:19 24:8 26:2,17 27:5 33:1,24 39:8,12 41:24 44:5 47:9 55:20 57:8 62:17,21 64:2 76:2 80:12 82:21 84:24 86:1,4,15,16 87:15,17 88:6 96:17 97:8 102:22 108:6 119:6 124:20 127:2 128:16

**so-called** 49:11

**software** 52:21

**sold** 40:17 118:13

**sort** 22:4 27:14,16 31:25 88:22,23 106:17

**sorts** 87:13

**sought** 67:16 68:11,16 77:5 104:24 108:24 109:2,21 111:22

**source** 68:18

**Southern** 7:7,8

**SPAS** 101:6

**speaking** 63:7

**specialist** 7:16

**specific** 41:14 44:16 51:13 64:19 77:8 91:4 94:9 95:9

**specifics** 73:5,11

**speculate** 77:3,8 118:23

**speculation** 49:4

**spell** 16:5

**SPF** 91:19

**SPF's** 37:18

**SPOC** 98:13

**spoke** 90:17 120:23

**spoken** 63:20

**Spruill** 7:10 9:16 10:24 11:4,9 15:10 16:16,19,25 17:20 18:1,11 86:13

**standard** 51:9 106:19 114:22,23

**standards** 23:11 35:22,23 36:2,6 37:3 38:6 51:7 53:8 66:18,23 70:23 102:12 106:21,22 114:11,16

**standing** 30:23,25

**stands** 42:24 56:7

**start** 13:4,8 20:2 38:4 77:18 114:18 117:19

**started** 36:15

**starting** 73:8

**state** 8:15 14:7 19:18,25 29:17 31:17 63:6 99:18 101:18

**stated** 33:1 57:11 70:18 99:20 100:7 112:10 128:6

**statement** 9:11 97:11

**states** 7:6,7 11:24,25 12:10,11 19:9 38:11 82:24 97:11 103:6

**statistical** 91:23

**statistically** 36:19 91:20 92:25 122:7,12 123:1,15

**stay** 55:11 99:5,11

**stayed** 56:2 102:15 126:10

**Stein** 17:10,12,14,15 63:21

**step** 36:19

**steps** 74:20 111:10

**Steven** 8:2

**Street** 7:11 9:18

**strike** 32:5,8,17

**strings** 15:22

**structure** 72:16

**studied** 31:20,21

**stuff** 92:1

**Subchapter** 127:3

**subject** 39:14 40:8 53:8 55:11 69:19 73:10 84:8 99:5,10 101:5 120:21

**subjected** 36:21

**subjects** 42:9

**submission** 25:23 37:4

**submit** 92:21

**subpoena** 9:16,24 10:2

**subsequent** 14:21

**subsequently** 74:1

**subsidiary** 15:18

**substances** 100:15

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

Index: substantial..types

**substantial** 58:10

**subsumed** 101:11

**subtest** 37:18

**sufficient** 113:7

**suggests** 35:10

**Suite** 7:11

**Suntrust** 11:17

**supervising** 125:7,20

**suppose** 119:25

**supposed** 27:17 89:6 108:15

**surprise** 34:21 120:12

**surprised** 34:22 73:18,21

**Svobada** 63:22,23,24

**Svoboda** 10:6 17:6

**swear** 8:5

**sworn** 8:6,11

**system** 21:11,14 22:7,8,12 24:12,16,
25 29:25 33:12,16 60:8 65:21 69:24
70:3 71:4,16 72:11,19 73:1 74:8,22
91:1 94:15 122:15 123:3,5,9,13,18,19,
20,25

**systems** 21:22,23,24 22:3,6,13,14,19
23:22 24:9 32:25 33:2,15,22 49:22,24
66:16 72:13 73:2 76:22 89:24 90:19
121:3,12 123:10

---

**T**

**talking** 10:3 59:14 66:19 81:3,4 91:4,
7 95:10 98:20 109:9,24 114:14 118:3

**talks** 76:18 119:11

**Tantillo** 7:21,22 8:9,14 16:22 17:4,13
20:12 24:1,7,22 25:4 26:1,5,8,11,14,
16,23 27:1 29:22 30:21 31:4 32:2,15,
22,24 33:14 34:2,6,8,10,20 35:5 39:7
40:3,5,23 41:8,23 42:2,14,21 43:5,12
44:17 45:1,6,11,13,16 46:4,7,12 47:8
50:17 51:14,23 52:14 53:24 55:14,23
56:9,18 57:1,4,7 58:24 60:6 62:10,13,
16 63:11,18 64:21 65:11 66:3 67:1,9
68:2 69:1,18 70:11,17 71:2,23 72:6
73:6 74:16 76:1,6,7 77:10 78:4 79:11
80:5,8 81:1 82:2,17,20 83:17 84:14,23
85:8,11,19,21 86:18 87:17,24 88:7,17
89:10 90:16,24 91:6 94:25 95:3,11

96:2,16,24 97:7,22 99:14 100:1,13
101:3 102:1,21 103:1,5,24 104:8,15
107:12 108:1 110:1,21 112:9 113:14
114:8,9,17 116:3 118:9 119:4,5,19
120:8,11 121:14 122:17 124:3,7,18,19
125:18 126:3 128:9

**Tape** 7:3

**taxes** 121:4

**tech** 88:14

**technical** 22:23 88:14,15,16

**technology** 21:20

**telling** 51:2

**tells** 9:2 50:22

**template** 66:8

**ten** 38:11

**Tender** 128:9

**term** 64:4,6 106:23

**terms** 18:9 21:4 39:19 44:1 47:25
52:3 60:21 76:20,23 91:9,11 103:16
109:11 111:21 115:10

**test** 36:11,17 37:1,12 47:19,22 92:4
95:18,20,24 111:9 123:15

**tested** 36:2 48:18 53:3 66:1 93:2

**testified** 8:12 84:2

**testifying** 9:5,7

**testimony** 9:24 10:12 32:5 33:5 51:4
69:7 71:7 72:23 123:7 125:15

**testing** 23:8,12 34:19 35:19,24 36:7,8
38:14,19 39:10,15,20,23 40:10 46:19
47:6 49:10,16 50:19 52:12 53:3,23
66:23 73:10 83:15,25 84:3,8 85:4
87:13 90:8 91:5,7,9,12 92:5 94:23
95:23 106:11 107:3 119:25 120:4

**tests** 22:12 35:25 37:3,8,22 49:23
122:11

**Texas** 19:23

**theoretically** 117:15 125:16

**theory** 71:3

**thing** 53:20 58:2 93:11

**things** 17:24 23:5 54:14,19,20 75:3
76:18 100:3 116:14 121:5

**thinking** 85:15

**third-party** 15:5 22:9 65:19 86:20
93:25

**Thornton** 16:11 86:21 87:11

**Thorton** 15:20 16:9 34:12,13,17

**Thorton's** 34:24

**thought** 79:16

**thousands** 110:2

**threshold** 49:1 50:3 51:15 52:5 53:4
64:14

**Tilly** 15:21

**time** 13:15,16 16:21 26:19 29:11
30:12,15 36:4 37:23 38:23 39:9,18
42:10 54:8,24 56:11,15 60:16 61:13
67:21 68:19 70:4 71:22,24 76:14,15
81:15 83:23 93:5 94:6 96:10,13 100:8,
18 105:15 111:15 115:16 118:21
123:5 124:12,15 128:14

**times** 13:18 60:20 109:17,18

**title** 105:22

**today** 7:16 9:24 10:11 31:18,23 115:8

**told** 39:16

**toll** 103:15

**tool** 52:21

**tort** 55:8

**total** 13:13 48:20,21 91:16 93:15

**totality** 48:4

**touches** 29:12

**Treasury** 101:6,10

**trip** 128:13

**trips** 38:11

**trustee** 19:11,12

**truth** 8:11 9:6

**truthfully** 9:2

**tuned** 66:14

**turn** 26:17 53:25 64:22 93:16 106:7

**turns** 127:17

**two-fold** 99:16

**type** 23:2 28:6 75:20 76:8 92:15 105:7
114:11

**types** 23:7 76:13 108:13,17 121:4

MORTGAGE RESOLUTION SERVICING vs JPMORGAN CHASE
SMITH, JOSEPH on 02/09/2017

## U

**Uh-huh** 42:1 45:19 52:1 54:1

**ultimately** 11:19 49:9

**unacceptable** 32:9

**undergo** 67:2

**understand** 9:8,12 24:21 32:19 33:19 51:21,22 67:25 89:11 101:8

**understanding** 9:21 27:10 31:9 97:15 119:22,23

**understood** 89:6 92:6

**uniform** 21:1

**United** 7:6,7 11:24 12:10

**University** 10:17

**USA** 15:18

## V

**valid** 36:20 71:11 77:17 91:20 92:25 122:7,13 123:1,15

**validate** 59:8

**validating** 28:5

**validation** 54:7 57:9 62:1 68:20 82:1 87:4 90:14

**validations** 76:20 81:15

**varied** 13:15 37:11 52:22 109:14 115:19

**varies** 75:22

**variety** 54:14 58:4 67:17

**vary** 58:21 73:3 118:8

**vendors** 65:19

**verified** 113:17,19

**verify** 23:22

**version** 84:20 96:23

**versus** 7:5 17:19

**video** 7:15

**view** 31:18

**viewed** 18:19

**vigor** 98:23

**violate** 32:7,21 52:2

**violated** 52:4 95:5

**violates** 42:5 55:2

**violation** 31:14 42:12 47:10 55:13 64:3,9,10 98:24 100:9 127:22

**violations** 38:24 99:18 102:16

**Virginia** 10:16,17

**VLS** 65:4

**Volume** 7:3

## W

**wait** 80:23

**waiting** 95:1

**waived** 105:20

**waiver** 60:1

**walk** 22:4

**Wall** 9:18

**wanted** 56:22 109:4,5

**ways** 62:3

**web** 126:9

**Wedding** 16:11

**weekly** 20:2

**Wells** 11:21

**West** 10:16

**Wick** 57:2

**widespread** 47:19,24 48:3,19 50:2,4, 12

**William** 16:25

**word** 25:2 73:22 125:11

**words** 52:24 104:4 116:22

**work** 10:22 11:8,19 15:4 18:22 21:2, 25 27:13,22,23 28:2,5,6,8,11,15,18,20 36:8,13 37:18 66:5,6,8 68:20 104:24 111:9 125:8,21

**worked** 11:3 27:9,11 61:11 104:23

**working** 24:11

**Worldwide** 15:19

**write** 58:12

**written** 105:10,11

## Y

**year** 13:18,20 14:20,21 15:4 18:12,14

**years** 8:19 13:21 14:21 18:8

**yellow** 62:7,12 82:15 84:12,17 96:22

**York** 7:8 10:20