# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| S&A CAPITAL PARTNERS, INC., et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>JPMORGAN CHASE BANK, N.A., et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>) No.<br>) 15-cv-00293-LTS-<br>) JCF<br>)<br>)<br>) |

VIDEOTAPED DEPOSITION OF LAUNI SOLOMON

Phoenix, Arizona
May 17, 2017

Reported by:   Mark Miller, RMR
                   Certified Reporter, No. 50474
                   R1067
                   www.phoenixdepositionservices.com

```
 1                  I N D E X

 2   WITNESS                                   PAGE

 3   LAUNI SOLOMON

 4        Examination by Mr. Tantillo            7

 5        Examination by Mr. Pistilli          161

 6

 7

 8

 9             INDEX TO EXHIBITS

10   No.            Description              Page

11    1      Sworn Document Checklist          13

12    2      string of emails                  29

13    3      string of emails                  35

14    4      string of emails                  38

15    5      string of emails                  40

16    6      string of emails                  43

17    7      email dated 12-29-09              44
            from Launi Solomon to
18          Angelique Reynosa, Larry Schneider

19    8      Agency Codes                      48

20    9      string of emails                  54

21   10      spreadsheet of accounts           50

22   11      email dated 6-20-11               58
            from Launi Solomon to Omar Kassem
23
     12      string of emails                  62
24
     13      string of emails                  67
25
     14      string of emails                  69
```

1                    INDEX TO EXHIBITS (cont.)

2    No.                  Description                    Page

3    15        Assignment of Mortgage                     73

4    16        string of emails                           79

5    17        email dated 2-6-09                         81
              from Victor Fox to Jason Richmond
6
     18        Action Plan                                85
7
     19        string of emails                           88
8
     20        email dated 7-24-12                        91
9             from Patrick M. Boyle to Cara Short, et al.

10   21        string of emails                           94

11   22        string of emails                           96

12   23        Detailed Transaction History              100

13   24        string of emails                          103

14   25        Walk Population Lien Release               104

15   26        email dated 3-23-09                       110
              from Launi Solomon to Jason Oquendo
16
     27        MSP/RCV Interface                          113
17            Business Requirements Document

18   28        string of emails                          116

19   29        Mortgage Banking -                         121
              Borrower Assistance/Default
20
     30        Sys ID Codes                               124
21
     31        string of emails                          126
22
     32        Status Codes                               127
23
     33        string of emails                          130
24
     34        string of emails                          135
25
     35        HUD Consumer Relief Program               141

INDEX TO EXHIBITS (cont.)

| No. | Description | Page |
|-----|-------------|------|
| 36 | 9-13-12 debt cancellation letter | 143 |
| 37 | Consolidated Notes Log | 144 |
| 38 | string of emails | 148 |
| 39 | Note Sale Proposal | 149 |
| 40 | string of emails | 153 |
| 41 | Overall process flow | 155 |
| 42 | Certification of Patrick M. Boyle Intact Lien Validation Process | 157 |
| 43 | Certification of Patrick M. Boyle Intact Lien Validation Process | 160 |

```
 1              VIDEOTAPED DEPOSITION OF LAUNI SOLOMON,
 2   was taken on May 17, 2017, commencing at 9:36 a.m., at
 3   Legal Video Specialists, 3033 North Central Avenue, Suite
 4   100, Phoenix, Arizona 85012, before MARK MILLER, Certified
 5   Reporter No. 50474 for the State of Arizona.
 6
 7   APPEARANCES:
 8
 9   For the Plaintiffs:
10        TANTILLO LAW
11        By:  Mr. Brent S. Tantillo
12             Ms. Mary Jane Fait
13        1629 K. St., N.W., Suite 300
14        Washington, D.C. 20006
15        786.506.2991 btantillo@gmail.com
16
17
18   For the Defendants:
19        COVINGTON & BURLING LLP
20        By:  Mr. Christian J. Pistilli
21        One CityCenter
22        850 Tenth Street, NW
23        Washington, D.C. 20001
24        202.662.5342 cpistilli@cov.com
25
```

```
 1              THE VIDEOGRAPHER:   This is the videotaped
 2   deposition of Launi Solomon taken by the plaintiffs in
 3   case No. 15-cv-00293-LTS-JCF, styled S&A Capital Partners,
 4   Inc., et al., versus JPMorgan Chase Bank, N.A., et al.,
 5   filed in the United States District Court Southern
 6   District of New York.
 7              Today is May 17th, 2017 at 9:36 a.m.  Our
 8   location is 3033 North Central Avenue, Phoenix, Arizona.
 9   Mark Miller is the certified shorthand reporter with
10   Phoenix Deposition Services at 365 East Coronado, Phoenix,
11   Arizona, and Rayce Mortensen is the certified legal video
12   specialist with Legal Video Specialists at 3033 North
13   Central Avenue, Phoenix, Arizona.
14              Counsel may state their name, firm and who
15   they represent, beginning with the plaintiff counsel,
16   please.
17              MR. TANTILLO:   Good morning.  My name is
18   Brent Tantillo.  I represent the plaintiffs, Mortgage
19   Resolution Servicing, LLC, S&A Capital Partners, Inc., and
20   1st Fidelity Loan Servicing.
21              MR. PISTILLI:   Christian Pistilli, Covington
22   & Burling, for the defendants and the witness.
23              MS. FAIT:   Mary Jane Fait on behalf of
24   plaintiffs.
25              THE VIDEOGRAPHER:   You may swear the
```

```
 1   witness.

 2

 3                    LAUNI SOLOMON,

 4   a witness herein, having been first duly sworn by the

 5   Certified Reporter to speak the truth and nothing but the

 6   truth, was examined and testified as follows:

 7

 8            THE VIDEOGRAPHER:  This begins media No. 1

 9   of the videotaped deposition of Launi Solomon.

10            We are on the record.

11

12                    EXAMINATION

13

14   Q.   BY MR. TANTILLO:  Good morning, Ms. Solomon.

15   A.   Good morning.

16   Q.   My name is Brent Tantillo, and as you heard

17   previously, I represent Mortgage Resolution Servicing,

18   LLC, 1st Fidelity Loan Servicing, LLC, and S&A Capital

19   Partners in a case that is currently residing in the

20   Southern District of New York.  The case number is

21   15-cv-00293-LTS-JCF.

22            Earlier today I understand you met Mr.

23   Schneider, who is the principal investor and president of

24   these companies.  I am also accompanied by Mary Jane Fait

25   with my firm.
```

```
 1                    This is a deposition in which I am going to
 2   ask you a series of questions, and you must answer them
 3   truthfully, unless Mr. Pistilli tells you clearly and
 4   directly not to answer.  Although there is no judge
 5   present, this is a formal legal proceeding just like
 6   testifying in court, and you are under the same legal
 7   obligations to tell the truth, the whole truth and nothing
 8   but the truth.
 9                    Ms. Solomon, do you understand this
10   obligation?
11       A.   Yes, I do.
12       Q.   Ms. Solomon, if you don't understand any of my
13   questions, please feel free to do so and just say, "Can
14   you rephrase it, can you make it more clear?" something
15   like that.  And if you need to take a break or speak with
16   Mr. Pistilli, please let me know.
17                    Ms. Solomon, can you please state your full
18   name for the record?
19       A.   Launi Solomon.
20       Q.   And how old are you?
21       A.   4 -- oh, gosh.  I am 45.
22       Q.   Are you on any medication or any substance today
23   that would impair your testimony?
24       A.   No.
25       Q.   And have you ever been convicted of any criminal
```

1    violations?

2        A.    No.

3        Q.    Ms. Solomon, have you ever been deposed before?

4        A.    No.

5        Q.    Ms. Solomon, did you prepare for your deposition

6    today?

7        A.    Yes.

8        Q.    Who did you speak to in preparation for the

9    deposition?

10       A.    Mr. Pistilli.

11       Q.    Did you bring any documents with you that would

12   help you answer any questions?

13       A.    No.

14       Q.    What is your educational background?

15       A.    High school graduate and two-year college.

16       Q.    And where did you attend your two-year education?

17       A.    I got a business degree at Everest Business

18   College.

19       Q.    And where do you currently work now?

20       A.    JPMorgan Chase.

21       Q.    And what is your role there or what is your job

22   title?

23       A.    I am a business analyst.

24       Q.    And how long have you worked for Chase?

25       A.    20 years.

```
 1      Q.    Now did you have positions prior to becoming a
 2   business analyst?
 3      A.    Yes, I did.
 4      Q.    And what were those positions?
 5      A.    I was an Operation Support Supervisor, I have
 6   been Operations Analyst, I have been an Agency Liaison,
 7   Customer Service --
 8      Q.    Okay.
 9      A.    -- Collector.
10            I believe that is it.
11      Q.    Now have you always worked in the same department
12   at Chase?
13      A.    No.
14      Q.    What is the current department you are working
15   in?
16      A.    The mortgage, Recovery Mortgage.
17      Q.    Recovery Mortgage?
18      A.    Uh-huh.
19      Q.    And prior to working in Recovery Mortgage, what
20   department were you in?
21      A.    Auto Recovery.
22      Q.    For how long have you worked in the Recovery
23   Mortgage department?
24      A.    About ten years.
25      Q.    So you started working there in approximately
```

1  2007?

2    A.    Yes.

3    Q.    And who do you currently report to?

4    A.    Richard Darcy.

5    Q.    Richard Darcy?

6    A.    Uh-huh.

7    Q.    And what are your current duties in the Recovery

8  Department?

9    A.    Right now I do projects that come up.  Like

10 currently I am working on the conversion for -- some of

11 our systems are converting to a more upgraded system, and

12 I am doing all the testing and writing a test script and

13 things like that.

14   Q.    And prior to your current position, what were

15 your job responsibilities in the Recovery Mortgage

16 Department?

17   A.    I was a Support Supervisor, and I had a staff of

18 about eight to ten support analysts who would handle any

19 incoming recovery collector requests or agency requests,

20 any type of, I guess, support type of role.

21   Q.    Well, let me ask you a little bit about that.

22             You talked about agency versus collector.

23             What is the difference between the two?

24   A.    The collectors are in-house, they are collecting

25 for Chase; agency is off-site, collection agency

```
 1   third-party.
 2      Q.   Would that be something like Real Time
 3   Resolutions?
 4      A.   Yes.
 5      Q.   And with regards to this staff that you work
 6   with, the eight to ten analysts, how long were you in that
 7   role?
 8      A.   Six years.
 9      Q.   Now when you were in that role and throughout
10   your period at Recovery, did you work with a System of
11   Record or database called RCV1?
12      A.   Yes.
13      Q.   And was RCV1 --
14           Or I guess it is sometimes called Recovery
15   One; is that right?
16      A.   Yes.
17      Q.   -- was Recovery One the principal System of
18   Records that you would work with?
19      A.   Yes.
20      Q.   Now, are you -- obviously you said that you work
21   a lot with various systems within Chase, writing queries
22   and doing that kind of thing.
23           Do you have a background in Information
24   Technology?
25      A.   No.
```

1    Q.   In your role, or in your role previously, did you

2  have signing authority to sign documents on behalf of

3  Chase, things like Assignments of Mortgage or other types

4  of documents similar to that?

5    A.   Yes.

6         MR. PISTILLI:  Object to the form.

7    Q.   BY MR. TANTILLO:  Is there a legal signing

8  authority tracking system that you can use to identify

9  what documents you have authority to sign and what

10 documents you do not have authority to sign?

11   A.   Not that I am aware of.

12   Q.   Is there a -- are you familiar with the Sworn

13 Document Checklist or verification process?

14   A.   I am.

15        (Deposition Exhibit No. 1 was marked for

16 identification.)

17   Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show

18 you what has been marked as Plaintiffs' Exhibit No. 1.

19        Can you take a look at that for me?

20        MR. TANTILLO:  Here is your copy, Chris.

21        MR. PISTILLI:  Thank you.

22        THE WITNESS:  Okay.

23   Q.   BY MR. TANTILLO:  Ms. Solomon, have you seen this

24 document before?

25   A.   No.

```
 1      Q.   Have you seen anything like it before?

 2      A.   No.

 3      Q.   Does this document reflect the types of things

 4   that JPMorgan Chase would require you to verify before you

 5   signed a document?

 6              MR. PISTILLI:  Objection.

 7              You can answer if you are able, even though

 8   you have never seen the document before.

 9              THE WITNESS:  I don't --

10              I'm sorry.  Can you repeat the question?

11      Q.   BY MR. TANTILLO:  Sure.  Let me just walk through

12   the document.  Maybe that is the best way to deal with it.

13              It says here that the entity name has to

14   match the assignment of interest matrix.

15              Do you know what that means?

16      A.   Yes.

17      Q.   Can you explain that for me?

18      A.   Well, I understand this form; however, this came

19   into -- to our procedures after.

20      Q.   After you were doing this?

21      A.   Yes.

22      Q.   So before, when you were involved with this, you

23   didn't have --

24      A.   No.

25      Q.   -- a Sworn Document Checklist like this?
```

1    A.   No.

2           MR. PISTILLI:  Object to form.

3    Q.  BY MR. TANTILLO:  Now in your role as a business

4  analyst as well as the Recovery Support Supervisor, do you

5  have interaction with any other personnel or entities

6  outside of Chase's Recovery unit?

7           MR. PISTILLI:  Object to the form.

8           THE WITNESS:  What does that mean?

9           MR. PISTILLI:  You can answer.

10          THE WITNESS:  Yes.

11    Q.  BY MR. TANTILLO:  And with regards to that, would

12  you speak with individuals, for example, perhaps in

13  Monroe, Louisiana, who are able to pull documents from

14  places like iVault or other Chase business entities?

15    A.   Yes.

16         MR. PISTILLI:  Object to the form.

17    Q.  BY MR. TANTILLO:  Now in your prior position,

18  what was your role in interacting with the buyers of debt

19  or notes from Chase?

20         MR. PISTILLI:  Just to be clear, you mean

21  the Support Supervisor position?

22         MR. TANTILLO:  Correct.

23         MR. PISTILLI:  Okay.

24         THE WITNESS:  My role was to support them

25  for any documentation they needed or with questions,

```
 1   basically post-sale servicing.
 2       Q.   BY MR. TANTILLO:  So let me just ask you some
 3   questions about that.
 4            If a note sale buyer needed an assignment of
 5   mortgage from Chase or other types of documentation, you
 6   would assist them?
 7       A.   Yes.
 8       Q.   And for how many years did you do that?
 9       A.   Six years.
10       Q.   So from like 2007 until?
11       A.   Probably 2014.
12       Q.   Now I am going to ask you a question.
13            Do you know what is commonly -- or not
14   commonly at all -- but what is referred to as a First Lien
15   Walk?
16       A.   No.
17       Q.   You stated you had regular contact with
18   collection agencies as part of your role in Recovery?
19       A.   Right.
20       Q.   And do you have regular contact with
21   record-keeping agencies also as part of your job in
22   Recovery?
23       A.   What do you mean?
24       Q.   Were there other types of record -- for
25   example -- let me ask you this, and maybe you know and
```

1  maybe you don't.

2          What was the process by which -- let's say a

3  person made a payment to a collection agency.  How did

4  that get filtered back down to the Recovery Department?

5      A.   It would just post to Recovery One.

6      Q.   So the payments, if they were -- let's say

7  hypothetically it was Real Time Resolutions that was the

8  collection agency.  There was a system by which the two

9  payments would connect with each other back to Recovery

10  One?

11          MR. PISTILLI:  Objection; lacks foundation;

12  calls for speculation.

13          THE WITNESS:  The payment posting -- the

14  Payment Processing department just posted it to Recovery

15  One.

16      Q.   BY MR. TANTILLO:  Can you explain to me what a

17  collection agency is and how it works with the Recovery

18  Department and Recovery Mortgage?

19      A.   The third-party collection agency that collects

20  on our recovery loans that we have deemed uncollectible

21  in-house.

22      Q.   And you stated previously you were familiar with

23  Real Time Resolutions?

24      A.   Yes.

25      Q.   Are you also familiar with what is sometimes

1   referred to as LCS?

2       A.   Yes.

3       Q.   And are they also a third-party collection

4   agency?

5       A.   Yes.

6       Q.   How about the Five Lakes Agency?

7       A.   Yes.

8       Q.   Are they also a third-party collection agency?

9       A.   Yes.

10      Q.   Did any of these collection agencies handle

11  bankruptcy files?

12      A.   Yes.

13      Q.   Do you know which ones?

14      A.   All of them.

15      Q.   And what is a primary agency?

16      A.   It is an agency that receives the account first

17  from us.

18      Q.   Okay.  And what is a secondary agency?

19      A.   It has already been to a first agency; it is

20  going to go to a second agency.

21      Q.   And is there a tertiary agency or a third one?

22      A.   There has been.  I don't know about currently.

23      Q.   So can you explain to me the process, if you

24  know, of how Recovery sends out loans to the first agency,

25  and then I guess after those are deemed collectible they

1    send them to a second -- or uncollectible, excuse me --

2    then they send them to a second agency?

3        A.   I don't know.

4             MR. PISTILLI:   It would be helpful if you

5    specified points in time.

6             MR. TANTILLO:   Sure.   Of course.

7        Q.   BY MR. TANTILLO:   How does a collection agency

8    know how much a borrower is owed -- how much the borrower

9    owes?   Excuse me.

10       A.   I don't know.   I am not part of that with

11   agencies.

12       Q.   Do you know if the loans in the Recovery

13   Department are owned or serviced?

14            MR. PISTILLI:   Object to the form.

15            THE WITNESS:   There is both.

16       Q.   BY MR. TANTILLO:   And how do you define a

17   bank-owned loan versus what a service loan is?

18       A.   A bank-owned loan is something Chase owns; a

19   service loan is something Chase is servicing.

20       Q.   And do you know if most of the mortgage loans in

21   the Recovery Department are owned or serviced?

22       A.   Owned.

23       Q.   Did you become aware in 2008 of a bulk sale of

24   loans that were sold to Larry Schneider?

25       A.   Yes.

```
 1        Q.    How did you become aware of that?

 2        A.    I was told, because I was the Support Supervisor,

 3   so I would be involved in any post-sale servicing.

 4        Q.    Was it your responsibility to send assignments on

 5   these loans?

 6        A.    No.

 7        Q.    Whose responsibility would that have been?

 8        A.    No one's.

 9        Q.    So you never -- there was nobody in the Recovery

10   Department that would send assignments after there was a

11   note sale?

12              MR. PISTILLI:  Object to the form.

13              THE WITNESS:  After a note sale, yes; after

14   a bulk sale, no.

15        Q.    BY MR. TANTILLO:  Can you explain why?

16        A.    A note sale is an individual sale of a loan.

17   They are handled differently than a bulk sale.

18        Q.    Well, how is the bulk sale handled?

19        A.    I am not sure.  I wasn't part of that.

20        Q.    So you were never instructed to send assignments

21   to Mortgage Resolution Servicing after that bulk sale?

22        A.    No.

23        Q.    Do you know if anybody was?

24        A.    No.

25        Q.    Were you involved in other bulk sales with Chase?
```

1    A.   No.

2    Q.   That is the only one you knew of?

3    A.   Yes.

4    Q.   When did you first become involved in the loan

5    purchase transactions of Mr. Schneider's entities, like

6    S&A Capital, 1st Fidelity and Mortgage Resolution

7    Servicing?

8    A.   You mean the note sales or --

9    Q.   Yes.

10    A.   I would say about 2007.

11    Q.   And how frequently would you be in contact with

12    people from those different corporations?

13    A.   Daily.

14    Q.   Now there were other corporations that also

15    bought notes from Chase?

16    A.   Yes.

17    Q.   And it was also your responsibility to interact

18    with them?

19    A.   Yes.

20    Q.   And provide support to them?

21    A.   Yes.

22    Q.   Now there was a point in time when the Recovery

23    Department moved away from Recovery One, the database, or

24    RCV1.  Is that true?

25              MR. PISTILLI:  Objection.

```
 1                    THE WITNESS:  No.
 2       Q.   BY MR. TANTILLO:  Was there a point in time when
 3  they implemented something called CACS?
 4       A.   No.
 5       Q.   Okay.  So the RCV1 database is still being used?
 6       A.   Yes.
 7       Q.   Are you able to obtain current pay history on the
 8  loans inside the Recovery One database?
 9       A.   No.
10       Q.   And why not?
11       A.   It doesn't house payments from prior to
12  charge-off.
13       Q.   So it does not -- you are saying that the payment
14  history of that particular loan is not found within the
15  Recovery One database?
16       A.   Right.
17       Q.   Where would you have to go to find that?
18       A.   We would have to open a route, it is just called
19  opening a route in that system that we have, and it routes
20  to a team that pulls pay history.
21       Q.   And do you know what System of Record contains
22  those pay histories?
23       A.   No.
24       Q.   Does the Recovery One System of Records contain
25  things like interest rate on the loan?
```

1    A.    Sometimes.  Not all the time.

2    Q.    Does it contain the lien position, like if it is

3  a 1st or a 2nd?

4    A.    Yes.

5    Q.    Does the -- you did say, though, that if there

6  are payments made by a collection agency, those payments

7  are recorded somehow into RCV1?

8    A.    Yes.

9    Q.    So are all the payments collected or is it just

10  the most recent payment?

11    A.    All the payments post charge-off.

12    Q.    Did you have -- you obviously said there are

13  other note sale buyers than Larry and his entities?

14    A.    Yes.

15    Q.    Were you aware of similar types of problems that

16  those note sale buyers had to what Larry had with the

17  Mortgage Resolution Servicing pool?

18          MR. PISTILLI:  Object to form.  I will

19  object to the line of questioning.  It exceeds the scope

20  of the partial discovery stay entered by Judge Francis in

21  this case.

22          MR. TANTILLO:  Well, my response to that is

23  that we are trying to know if there was other buyers of

24  the loans who also experienced similar issues.  It goes

25  directly to the breach of contract.  It has nothing to do

```
 1  with the RICO case.
 2              MR. PISTILLI:  It is entirely irrelevant to
 3  the question whether the contracts between their clients'
 4  entities and Chase were breached.
 5              MR. TANTILLO:  I think it is not, because
 6  going to the issue of whether or not there were other --
 7  it goes directly to how Chase dealt with the problems and
 8  if there were other problems.  It has nothing to do with
 9  the RICO claims.
10              And I am obviously happy to give you a
11  standing objection about that.
12              But the reality of it is, it goes to how
13  Chase dealt with problems from all note sale buyers, not
14  just Mr. Schneider and his entities.
15              MR. PISTILLI:  I am going to assert a
16  standing objection.  I will give you some latitude here,
17  but if it goes too far, we will have to get Judge Francis
18  on the phone.
19      Q.  BY MR. TANTILLO:  So just to ask the question, I
20  will rephrase it.
21              Were you aware of other note sale buyers
22  that had issues similar to Mr. Schneider's?
23              MR. PISTILLI:  Same objection.  Also object
24  that the question is vague and ambiguous.
25              You can answer if you are able.
```

1            THE WITNESS:  Are you talking about the bulk

2    sale --

3        Q.   BY MR. TANTILLO:  Correct.

4        A.   -- in comparison to note sales from other

5    investors?

6        Q.   That is right.

7        A.   There is no comparison to that.  I can't compare

8    that, no.  They are handled differently.

9        Q.   And as you said, you were only aware of one bulk

10   sale --

11       A.   Yes.

12       Q.   -- of loans.

13            Do you happen to know what Chase department

14   makes the decision to move loans to the Recovery

15   Department?

16       A.   No.

17       Q.   And have you ever been called upon to provide

18   debt collection agencies with full copies of original

19   payment agreements and statements?

20       A.   Original payment histories?

21       Q.   Correct.

22       A.   Like the entire history?

23            Yes.

24       Q.   And is that something that the collection

25   agencies would need in order for them to do their job?

1          MR. PISTILLI:  Object to form.

2          THE WITNESS:  Yes.

3    Q.   BY MR. TANTILLO:  So you said previously you

4    would create a route.

5          Is that what you said?

6    A.   Yes.

7    Q.   And who would you ask in order to obtain that

8    information?

9    A.   It wasn't a particular person.  They are assigned

10   a route that goes to different departments within Chase.

11   They are assigned to whatever department that is, other

12   states, other countries.  And we ask them to e-mail them

13   or mail them.

14          And that is what they do.

15   Q.   And so do they deliver information back to you or

16   do they just deliver directly to a collection agency?

17   A.   It depends what we ask them to do.

18   Q.   Now the data that is kept by the Recovery

19   Department, is that only stored in RCV1 or are there other

20   Systems of Records where it is stored?

21          MR. PISTILLI:  Object to form.

22          THE WITNESS:  Just Recovery One.

23   Q.   BY MR. TANTILLO:  Now what is a loan history from

24   the RCV1 database?

25   A.   A loan history?

1       Q.    Yes.

2       A.    I am not sure by that, by that verbiage what that

3   is.

4       Q.    Do you know the software that tracks the loan

5   details and history information of the loan in Recovery?

6       A.    No.

7       Q.    And do you ever track payments or does the

8   Recovery Department track payments?

9       A.    Recovery does.

10      Q.    Tell me what InfoSource does.

11      A.    InfoSource?  For us InfoSource, we create

12  letters.

13      Q.    As a nonprogrammer layperson, would it be

14  accurate to describe InfoSource as an application that

15  takes prestored letter templates and then fills in the

16  blanks like a mail merge type application?

17      A.    Yes.

18      Q.    And does InfoSource typically use data stored in

19  the MSP system to produce form letters?

20                  MR. PISTILLI:  Object to form.

21                  THE WITNESS:  Demographics, yes.

22      Q.    BY MR. TANTILLO:  What do you mean by

23  "demographics"?

24      A.    Customer name and address.

25      Q.    Now does the loan information flow automatically

```
 1   from MSP into InfoSource or RCV1 into InfoSource?
 2                MR. PISTILLI:  Object to the form.
 3                THE WITNESS:  Does what flow into
 4   InfoSource?
 5      Q.   BY MR. TANTILLO:  Does it flow automatically,
 6   like you just create -- put the fields in and then the
 7   letter is created?
 8                MR. PISTILLI:  Object to the form.  Also
 9   vague.
10                THE WITNESS:  I don't know what you mean by
11   "does it flow automatically."
12      Q.   BY MR. TANTILLO:  Maybe you can explain how it
13   works for me, because you know more, you know obviously
14   better than me.
15                How would you use it or how did you use it?
16      A.   We would put the payment amounts or settlement
17   amounts, due dates, collect their names, and it would
18   create the letter.
19                InfoSource doesn't create letters for all
20   things Recovery, though.
21      Q.   So there is another type of system that also
22   creates letters?
23                MR. PISTILLI:  Objection; lacks foundation.
24                THE WITNESS:  Not another system, but there
25   is letters that are done, just ad hoc letters, manually.
```

1              (Deposition Exhibit No. 2 was marked for

2    identification.)

3        Q.   BY MR. TANTILLO:   Ms. Solomon, I am going to show

4    you what has been marked as Plaintiffs' Exhibit No. 2.

5    Can you take a look at that?

6        A.   Uh-huh.

7        Q.   Perhaps it would be best to start from the back

8    of this document.

9              Have you had a chance to review it or are

10   you still reviewing it?

11       A.   I am still reviewing it.

12       Q.   Okay.

13       A.   Okay.

14       Q.   Start on the last page.   It says that this is --

15   there is a screenshot.

16              Do you see that?

17       A.   Uh-huh.

18       Q.   Is that what the Chase InfoSource looks like when

19   you log in?

20       A.   Yes.

21       Q.   And the first, I guess, data entry field would be

22   the loan number?

23       A.   Yes.

24       Q.   And then there is a Loan Source.   It says VLS -

25   HE.

1              Is that VLS Home Equity?

2     A.    Yes.

3     Q.    And the Letter Category say Default – Recourse

4  and Recovery.

5              Do you know what that means?

6     A.    It means it is a Recovery loan.

7     Q.    Now I guess there is a Letter Template below.

8  Which I guess you just pick the letter that you want to

9  send --

10    A.    Yes.

11    Q.    -- which pertains to that loan?

12    A.    Yes.

13    Q.    Have you used this system in a similar manner?

14    A.    Yes.

15    Q.    Now moving to -- I believe there is a draft of a

16  letter to Mr. Ronald Barnes.

17    A.    Okay.

18    Q.    Would that have been the letter that they used to

19  or I guess a draft of the letter that they would have used

20  to send out to borrowers?

21    A.    Yes.

22    Q.    Do you know what this letter pertains to?

23    A.    Cancelling the debt on certain loans.

24    Q.    And were you involved in sending out letters like

25  these to cancel out debt on certain loans?

1    A.    If they were individual loans we would.

2    Q.    Were you also involved in the process of sending

3  out sort of bulk letters for large groups of borrowers?

4    A.    No.

5    Q.    Can you turn to the page -- the next page before

6  it.

7          Can you tell me what we are looking at here,

8  this View Summary?

9    A.    That is the Recovery One screen.  That is just a

10  summary screen with a demographic name, account number,

11  Social Security number, origination date and amount,

12  charge-off date and amount.

13    Q.    May I ask you what AGCY means?

14    A.    AGCY is agency.  It is just a field.

15    Q.    Now what does INHSE mean?

16    A.    In-house.

17    Q.    And what does CLTR mean?

18    A.    The collector.

19    Q.    Now on the Comments section it says Lien

20  Position.  I guess that is a 2nd.

21          Was a second lien?  It is hard to see.  I

22  apologize.

23    A.    I don't see that.

24          In the Comments?

25    Q.    Right.

```
 1              This has like Lien Position, CHV --
 2     A.    Oh, okay.  Over to the right.
 3     Q.    Yes, ma'am.
 4     A.    It says Lien Position 2.
 5     Q.    What is CHV?  Do you know what that means?
 6     A.    No.
 7     Q.    Now within the Comments section of RCV1, what
 8  type of data would they usually put inside the Comments?
 9     A.    Over to the right there, that is considered the
10  permanent Comments, not necessarily the Comments, and that
11  would be anything that would help the collector, when they
12  are trying to view it real fast, to get kind of a summary
13  of the account.
14     Q.    Okay.
15     A.    So that is something the collector can change
16  themselves.  So they put whatever helps them.
17     Q.    So these are not consistent --
18     A.    No.
19     Q.    -- I guess codes?
20     A.    No.
21     Q.    Within this View Summary, what of these codes
22  could you actually search by?  Could you search by the
23  Agency code?
24     A.    Search for what?
25     Q.    Let's say you wanted to pull all of the -- I
```

```
 1   mean, I am sure this would be a staggering number of
 2   loans -- but all the in-house loans, could you search by
 3   all of the in-house loans?
 4        A.    You couldn't -- as far as I know, you can't
 5   search in Recovery for that.
 6        Q.    Can you search for different collector codes?
 7        A.    Yes.
 8        Q.    So if you wanted to know all the different loans
 9   that were being collected by Real Time Resolutions, you
10   could search by whatever that moniker is we have for that
11   code you have for Real Time?
12        A.    If it is in that field, yes.
13        Q.    Thanks, Ms. Solomon.
14              Can you tell me a little bit about iVault
15   and how you use it?
16        A.    IVault is our imaging system for files.
17        Q.    What kind of files are stored there?
18        A.    Customer files, origination docs, contracts.
19        Q.    What do you mean by "origination docs"?
20        A.    Contracts, deeds of trust, everything they -- was
21   needed to originate the loan.
22        Q.    So a note?  Mortgage?
23        A.    Yes.
24        Q.    Were all the closing documents there usually?
25        A.    Usually.
```

1    Q.    Do they also store lien releases in iVault?

2    A.    Most of the time.

3    Q.    When would they not store lien releases in

4    iVault?

5    A.    I don't think there is a given reason.  Just once

6    in a while you come across one that is not there.

7    Q.    But generally the lien release is there if it has

8    been executed by Chase?

9    A.    Yes.

10   Q.    Do you know if second lien extinguishment letters

11   are also stored in iVault?

12   A.    Yes.

13   Q.    And how would you go about requesting or

14   obtaining a copy of that?

15              MR. PISTILLI:  Object to the form.

16              THE WITNESS:  I would go into iVault and

17   just search by the account number and around about the

18   scan date would give you around about the time if you know

19   when it was sent.

20   Q.    BY MR. TANTILLO:  So the account number is the

21   best way to find documents within iVault?

22   A.    Uh-huh.

23   Q.    Is the account number also the best way to find

24   documents within the RCV1 database?

25   A.    Yes.

1      Q.    How about for the MSP and VLS platforms, is the

2   account number also the best way to search --

3      A.    Yes.

4      Q.    -- in those?

5             I am going to show you, Ms. Solomon, what

6   has been marked as Plaintiffs' Exhibit No. 3.

7             (Deposition Exhibit No. 3 was marked for

8   identification.)

9             MR. PISTILLI:   Thank you.

10            MR. TANTILLO:   Sorry.

11     Q.   BY MR. TANTILLO:   Can you please take a look at

12   that and let me know when you are ready?

13     A.    Okay.

14     Q.    Thank you.

15            Now within this e-mail chain there is

16   something called Escalated Lien Release CR?

17     A.    Yes.

18     Q.    Can you tell me what that is?

19     A.    That is the Lien Release Department for Escalated

20   issues.

21     Q.    And where is the Lien Release Department located?

22     A.    Monroe.

23     Q.    And do you know who runs that department?

24     A.    Angela Anderson.

25     Q.    Does Jonathan Driver also work there?

1    A.    He used to.

2    Q.    You say here on the bottom of the first page, and

3    I quote you, that this is a big deal and could turn into a

4    legal issue.  We shouldn't have released a lien on an

5    account that we sold and we need to provide a copy of the

6    rescission somehow.

7              Do you remember this?

8    A.    Somewhat.

9    Q.    Was it common for there to be problems with lien

10   releases and the need to rescind them?

11             MR. PISTILLI:  Object to the form.

12             THE WITNESS:  No.

13   Q.    BY MR. TANTILLO:  How often did it occur?

14   A.    Very rarely.  I rarely seen any.

15   Q.    Now at the very last page there is something

16   called the pre DOJ Lien Release Project.

17             Do you know what that is?

18   A.    Where are you looking?

19   Q.    I apologize.  The very last page of this

20   document.

21   A.    I don't think I have what you are looking at.

22             Oh, okay.

23   Q.    You sent something to Mr. Adamovic.  Is that how

24   you say his name?

25   A.    Adamovic.

1      Q.    Adamovic.

2             I guess this lien here was released as part

3   of that project?

4      A.    Okay.  Yes.

5      Q.    No.  I am not trying to speak for you.

6      A.    Yes, I know.

7             MR. PISTILLI:  What is the question?

8             THE WITNESS:  Right.

9      Q.   BY MR. TANTILLO:  Well, the question I asked you,

10  do you know what this pre DOJ Lien Release Project is?

11     A.    I am familiar with it.

12     Q.    Well --

13     A.    I was not involved in it.

14     Q.    How did the pre DOJ Lien Release Project impact

15  you in your work?

16             MR. PISTILLI:  Objection; lacks foundation.

17             You can answer.

18             THE WITNESS:  It didn't really impact me.

19     Q.   BY MR. TANTILLO:  And what role did you have in

20  the execution of the pre DOJ Lien Release Project?

21             MR. PISTILLI:  Objection; foundation.

22             THE WITNESS:  No role.

23     Q.   BY MR. TANTILLO:  So when something like this

24  occurs, you send it to an escalation department?

25     A.    Yes.

```
1              MR. PISTILLI:  Object to the form.
2       Q.   BY MR. TANTILLO:  And what does the Escalation
3   Department do?
4       A.   In this situation if I needed a copy of something
5   or if I needed it actually to be rescinded or reversed
6   they would handle that.
7       Q.   And do you know how they would go about the
8   process of rescinding or reversing a lien release?
9       A.   No, I don't.
10      Q.   You would just request it?
11      A.   Right.
12      Q.   So are you aware of how JPMorgan Chase sent out
13  lien releases or sent out vacations of lien releases or
14  rescissions?
15             MR. PISTILLI:  Object to form.
16             THE WITNESS:  No.
17      Q.   BY MR. TANTILLO:  I am going to show you what has
18  been marked as Plaintiffs' Exhibit No. 4.
19             (Deposition Exhibit No. 4 was marked for
20  identification.)
21      Q.   BY MR. TANTILLO:  Please let me know when you
22  finish your review.
23      A.   Okay.
24      Q.   The very beginning of this e-mail you say that,
25  quote, this was never assigned to them, so we can go ahead
```

1   and release.

2       A.    Yes.

3       Q.    How did you know that it was never assigned to

4   them?

5       A.    Because the e-mail right below it says, "We don't

6   have an assignment for this file."

7       Q.    And as you stated previously, you were not

8   involved in any types of assignments with the Mortgage

9   Resolution Servicing?

10      A.    No.

11      Q.    "No" as meaning I am wrong or "no" --

12      A.    No, I wasn't involved in doing the assignments.

13      Q.    And as you stated previously, you don't know who

14  was supposed to do it?

15      A.    No.

16      Q.    Okay.

17      A.    I know at some point it was decided on that Larry

18  was going to do them and send them to us to sign as he

19  needed them.

20      Q.    Okay.

21      A.    But as for someone at Chase, we weren't doing

22  them.

23      Q.    Now can you tell me a little bit about what a

24  blanket assignment is?

25      A.    I am not sure.  I have never seen one.

1      Q.   I am going to show you what has been marked as
2    Plaintiffs' Exhibit No. 5.
3             (Deposition Exhibit No. 5 was marked for
4    identification.)
5      Q.   BY MR. TANTILLO:  Ms. Solomon, like the rest of
6    these, let me know when you are ready.
7      A.   Okay.
8      Q.   At the very end here you tell Mr. Schneider, who
9    is here in the room, that, quote, you are getting the
10   whole file.  No way would we just send random notes.  I
11   asked them to send all original docs in their original
12   file.  We no longer need them, so it will all be yours.
13   So everything you get is everything we have.  Just FYI.
14            Do you remember writing that, something
15   similar to that?
16     A.   I don't remember writing it, but I did.
17     Q.   Did you send these original docs in their
18   original file to Mr. Schneider?
19     A.   Yes.
20     Q.   And how did you go about doing that?
21     A.   He sent a spreadsheet of requests over to us and
22   we sent about 400 to 500 over a day to our file, the place
23   that holds files in Monroe, and they would ship directly
24   to him overnight FedEx, if it was available.
25     Q.   Do you know if he actually received these files?

```
 1      A.    I know at one point he said he had some boxes,
 2   that he knew there was files in them, but I didn't follow
 3   up on every file.
 4      Q.    Now within these messages there was something
 5   about Eddie Guerrero saying that there should have been a
 6   blanket assignment for all these.
 7      A.    Uh-huh.
 8      Q.    And you asked him whether or not he needs to have
 9   individuals sign these?
10      A.    Yes.
11      Q.    You said before you don't know what a blanket
12   assignment is?
13      A.    I have never seen one.  I know what one is.  I
14   have not seen one.
15      Q.    Well, can you tell me what it was, because just
16   for --
17      A.    An assignment, just one assignment with all loans
18   on one -- one assignment.
19      Q.    There would be an assignment with 2,500 loans or
20   3,000 loans or whatever?
21      A.    Right.
22      Q.    And Mr. Schneider writes back to you saying it is
23   a problem for me as there is no blanket assignment, just
24   the Note Sale Agreement.  My problem is that some of these
25   properties are being foreclosed every day due to back
```

```
 1   taxes and there is nothing recorded in the public
 2   records --
 3               THE REPORTER:  You are reading just a little
 4   too fast.
 5               Would you start again?
 6       Q.   BY MR. TANTILLO:  Mr. Schneider says, "It is
 7   actually a big problem for me as there is no blanket
 8   assignment, just the Note Sale Agreement.  My problem is
 9   that some of these properties are being foreclosed every
10   day due to back taxes and since there is nothing recorded
11   in the public records of the individual counties, we will
12   not be getting notified to try to protect our interests
13   prior to tax deed sales."
14               Then he says, "Is it a big deal to get some
15   assignments done?  What if I paid the attorneys directly
16   for preparing some assignments?"
17               And that is what you were referencing before
18   is that Mr. Schneider told you he was going to do the
19   assignments?
20       A.   Right.
21       Q.   Did Mr. Schneider ever send you any assignments
22   to sign?
23       A.   I honestly don't remember.
24       Q.   Now obviously before this there was sort of some
25   joking going back and forth about the cost and all that?
```

```
 1        A.    Right.
 2        Q.    I am going to show you what has been marked as
 3   Plaintiffs' Exhibit 6.
 4              (Deposition Exhibit No. 6 was marked for
 5   identification.)
 6        Q.    BY MR. TANTILLO:  This is a long one, so just let
 7   me know when you are ready.
 8              MR. PISTILLI:  The Bates numbers on the
 9   document that has been marked as Exhibit 6 don't appear to
10   go in any particular order.
11              Is this a composite exhibit of some sort?
12              MR. TANTILLO:  Yes, it is.
13              MR. PISTILLI:  Just so you understand,
14   Ms. Solomon, this is not one e-mail string, it is a whole
15   bunch of different e-mails and --
16              THE WITNESS:  Okay.
17              MR. PISTILLI:  -- put together willy-nilly
18   and stapled.
19              THE WITNESS:  Okay.  I am ready.
20        Q.    BY MR. TANTILLO:  So after the sale of the loans
21   to Mr. Schneider and the Mortgage Resolution Servicing
22   pool, it appears from here that you would send him
23   payments that were coming in afterwards?
24        A.    Yes.
25        Q.    Did there come a point in time in which you
```

```
 1 | stopped sending these payments?
 2 |    A.   No.
 3 |    Q.   Ms. Solomon, I am going to show you what has been
 4 | marked as Plaintiffs' Exhibit No. 7.
 5 |             Can you please take a look?
 6 |             (Deposition Exhibit No. 7 was marked for
 7 | identification.)
 8 |             THE WITNESS:  Okay.
 9 |    Q.   BY MR. TANTILLO:  Are you ready, Ms. Solomon?
10 |    A.   I am ready.
11 |    Q.   This e-mail denotes something called Corp.
12 | Advance?
13 |    A.   Yes.
14 |    Q.   It cannot be reversed.
15 |             What does Corp. Advance mean?
16 |    A.   Corporate Advance is a bucket where funds are
17 | sitting from customer payments that have -- that are going
18 | out for taxes and it is like an overage bucket, not
19 | actually payments.
20 |    Q.   Who makes the decision that -- where this money
21 | should go or whether or not it should be given to the note
22 | sale buyer?
23 |             MR. PISTILLI:  Object to the form.
24 |             THE WITNESS:  I am not sure.
25 |    Q.   BY MR. TANTILLO:  So is this money that goes to
```

1   the Recovery Department or is it money that goes for other

2   things?

3               MR. PISTILLI:  Object to form.

4               THE WITNESS:  It doesn't go to the Recovery

5   Department.

6   Q.   BY MR. TANTILLO:  You said it goes to things like

7   taxes and --

8   A.   Uh-huh.

9   Q.   So does the Recovery Department have escrow

10  accounts for these potential buyers of these loans?

11  A.   Not that I am aware of.  I am not on that side of

12  things.

13  Q.   So the $20,000 Corporate Advance, you don't

14  really know where that money went?

15  A.   No.

16  Q.   The same with the $3,565, you are also not aware

17  of where that went?

18  A.   No.

19  Q.   Or the $1,023.10?

20  A.   No.

21  Q.   You just know that you weren't allowed to

22  disperse these payments?

23  A.   Right.

24  Q.   Were you ever told why Chase collected on these

25  loans after the sale?

```
 1                    MR. PISTILLI:  Object to form.  Lacks
 2   foundation.
 3                    THE WITNESS:  Chase didn't collect on the
 4   loans.
 5       Q.   BY MR. TANTILLO:  Who did?
 6       A.   I don't know what you mean.
 7       Q.   You are saying Chase did not collect on the loans
 8   after the sale?
 9       A.   No.
10       Q.   So what was the process?  After a note was sold,
11   what would you do or what would Chase do to be sure that
12   these loans were not being collected on?
13       A.   They were moved to a queue just for this.
14       Q.   What was that queue called?
15       A.   It was called MRS209.
16       Q.   And who created that queue?
17       A.   I don't know.
18       Q.   So once the queue was in place, the MR209 queue
19   was in place, what would Recovery do to ensure that the
20   collectors weren't still collecting on it, if you know?
21       A.   The collectors wouldn't see those loans.  They
22   only see loans that are in their own queue.
23       Q.   So was MRS209 in the same queue with other
24   collection agencies?
25       A.   No.
```

```
 1       Q.    What queue was it in?

 2       A.    It was in MRS209 by itself.

 3       Q.    It wasn't within the Agency queue?

 4       A.    No.

 5               MR. TANTILLO:  Can we take like a

 6   five-minute break?

 7               THE WITNESS:  Yes.

 8               THE VIDEOGRAPHER:  The time is 10:47 a.m.

 9               We are off the record, ending media 1.

10               (Recess taken.)

11               THE VIDEOGRAPHER:  My name is Rayce

12   Mortensen with the firm of Legal Video Specialists,

13   Phoenix, Arizona.  The time is 10:57 a.m.

14               This begins media 2.  We are now on the

15   record.

16               MR. TANTILLO:  Thank you.

17               Mr. Court Reporter, can you read back my

18   last question?

19               (Record read.)

20       Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

21   you what has been marked as Plaintiffs' Exhibit No. 8.

22       A.    Okay.

23               (Deposition Exhibit No. 8 was marked for

24   identification.)

25               THE WITNESS:  Okay.
```

1    Q.   BY MR. TANTILLO:   Have you reviewed this

2  document, Ms. Solomon?

3    A.   Uh-huh.

4    Q.   Have you seen this before?

5    A.   No.

6    Q.   Within these different Agency Codes does there

7  appear to be different collection agencies inside?

8    A.   Yes.

9    Q.   Can you turn to page no. 5, at the very top?

10   A.   Okay.

11   Q.   Do you see the code where it says MRS209?

12   A.   Yes.

13   Q.   Mortgage Resolution Servicing.

14        Do you know why Mortgage Resolution

15  Servicing was listed as a collection agency?

16        MR. PISTILLI:   Objection; lacks foundation.

17        THE WITNESS:   It is not listed as a

18  collection agency.   It is just listed as a buyer.   Doesn't

19  necessarily mean that is an agency.

20   Q.   BY MR. TANTILLO:   But previously you just told me

21  that most of these are collection agencies.   Isn't that

22  true?

23   A.   Yes.

24   Q.   So why do you think that this was placed into --

25  why do you believe MRS209 was placed into this Agency

1   Code?

2              MR. PISTILLI:  Objection; lacks foundation;

3   calls for speculation.

4              You can answer if you are able.

5              THE WITNESS:  Just to segregate the accounts

6   so we knew which ones were theirs.

7      Q.   BY MR. TANTILLO:  Was there other segregations

8   done for other note buyers, such as 1st Fidelity or S&A

9   Capital, any codes that are similar to this?

10     A.   Not segregated to those buyers, no.

11     Q.   So moving along to page 3.  Appears to be two

12  highlighted sections.  And the highlighted sections we did

13  not do.  When we got it from document production from

14  Chase.

15             Where it says DOJFUS, do you know what that

16  means?

17     A.   No.

18     Q.   Or DOJLTR?

19     A.   No.

20     Q.   Have you ever used those codes before?

21     A.   No.

22     Q.   Let me ask you a question.

23             Utilizing these codes, would it be possible

24  for you, using the RCV1 System of Records, to query about

25  them?

```
1              MR. PISTILLI:  Object to the form.
2  Objection.  Calls for speculation.
3              THE WITNESS:  I am not sure.
4     Q.  BY MR. TANTILLO:  Previously you talked about the
5  Agency Code and you stated that MRS209 was created for the
6  purpose of segregating the loans.  Isn't that right?
7     A.  Yes.
8     Q.  And is it possible for someone like you, who has
9  used the RCV1 database for many years, to pull all the
10 loans that were denoted MRS209?
11    A.  No, not for me.
12    Q.  So who would you have to go to in order to do
13 that?
14    A.  Our MIS team.
15    Q.  One moment.
16              I am going to give you what has been marked
17 as Plaintiffs' Exhibit No. 10.
18              This is an e-mail that you sent to Larry
19 Schneider and Angelique Reynoso?
20    A.  Uh-huh.
21              (Deposition Exhibit No. 10 was marked for
22 identification.)
23    Q.  BY MR. TANTILLO:  Accompanying it is a list of
24 loans.
25              Can you review these, please?
```

```
 1      A.    Sure.

 2                 Okay.  I am familiar with this.

 3      Q.    I am going to be sure that Mr. Pistilli has a

 4   copy.

 5                 So you do recognize this e-mail

 6   correspondence?

 7      A.    Yes.

 8      Q.    And this is an e-mail in which you sent a

 9   spreadsheet of loans to Mr. Schneider, Ms. Reynoso, back

10   on December 28th, 2009?

11      A.    Yes.

12      Q.    Here you say that, "Okay, here is the spreadsheet

13   of all the accounts you bought in March.  I don't know how

14   to tell what you have and what you don't.  You will have

15   to bump your accounts against this and let me know what

16   you come up with.  But we need to make sure both of us are

17   showing the same thing so when we send customers there

18   they are being services, they get bounced back, and we got

19   to make sure you have the same loans as we show you have."

20                 Can you look at the actual spreadsheet that

21   I provided for you?

22      A.    Okay.

23      Q.    Do you know who created the spreadsheet?

24      A.    It was our MIS team.

25      Q.    Would that be Ms. Christine Price?
```

```
1      A.    Yes.

2      Q.    And what does Ms. Price do?

3                  First of all, is she still with Chase?

4      A.    No.

5      Q.    What did she do when you were there?

6      A.    She worked in MIS.  I don't know everything she

7   did.

8      Q.    Do you know how she created this list?

9      A.    No.

10     Q.    Now there is this Agency number that we have been

11  talking about, MRS209, then there is something called

12  CLTR.

13                 Do you know what that is?

14     A.    Collector number.

15     Q.    And this here it says for all of them that they

16  are sold?

17     A.    Yes.

18     Q.    Now were all sold loans given that designation?

19     A.    It depends on what kind of sale it is, but for

20  note sales, no.

21     Q.    Well, what kind of sale is this?

22     A.    This was a bulk sale.

23     Q.    So for all bulk sales they were provided with a

24  Sold code?

25     A.    I don't know.  I have never been a part of
```

1   another bulk sale, but I don't know.

2       Q.   Now what is the STAT, S-T-A-T?

3       A.   The status of the loan.

4       Q.   And it says NSL?

5       A.   Note sale.

6       Q.   Now do you have the ability to query by Collector

7   code or by Status within the RCV1 System of Records?

8       A.   MIS does by a Collector code.

9       Q.   But you don't personally?

10      A.   No.

11      Q.   So you are able to make requests of individuals

12  that can provide this kind of data?

13      A.   Yes.

14      Q.   And who within Recovery is currently -- provides

15  this kind of data or produces these kind of spreadsheets?

16      A.   You mean today?

17      Q.   Yes.

18      A.   The MIS team.

19      Q.   So the Recovery MIS team?

20      A.   Uh-huh.

21      Q.   And do you know who heads that department?

22      A.   Michael Peterson.

23      Q.   And is there an individual that you interact with

24  most regularly?

25      A.   Michael.

```
1        Q.   So Mr. Peterson would be the type of individual
2    who could produce something similar to this today?
3        A.   Yes.
4        Q.   Ms. Solomon, I am going to show you what has been
5    marked as Plaintiffs' Exhibit No. -- is it 11 I think we
6    are at now?
7        A.   Yes.
8                  MR. PISTILLI:  Was there an Exhibit 9?
9                  MR. TANTILLO:  Did you see one or did I
10   skip?
11                 THE WITNESS:  No, there was no 9.
12                 MR. TANTILLO:  Let's make this 9, then.
13                 (Deposition Exhibit No. 9 was marked for
14   identification.)
15       Q.   BY MR. TANTILLO:  Ms. Solomon, could you take --
16   please look at Plaintiffs Exhibit No. 9.
17       A.   Okay.
18       Q.   Ms. Solomon, do you remember this?
19       A.   No.
20       Q.   Turning to the very last page, there is a shot
21   that says Work Accounts.
22                 Is that within the Recovery One system?
23       A.   Yes.
24       Q.   And is that a different screen than what we saw
25   previously, what was called Loan Summary, I think?
```

1    A.    View Summary.  Yes.

2    Q.    What does this particular screen indicate that is

3    different than View Summary?

4    A.    This is when a collector is working their queue

5    and then they get a call, this is the screen that they

6    have, because they are working inside of a queue.

7    Q.    And here, once again, the Agency is listed as

8    MRS209?

9    A.    Yes.

10   Q.    And the Collector is listed as Sold?

11   A.    Uh-huh.

12   Q.    And at one point in time -- and she may still be

13   there.  Is it Suzie Plumaj?

14   A.    I don't even know how to say that.  She is not

15   still there.

16   Q.    Are you familiar with who Carla O'Brien is?

17   A.    Yes.

18   Q.    Does she still work for Chase?

19   A.    Yes.

20   Q.    And what is her role?

21   A.    She is a collector.

22   Q.    And Ms. O'Brien says she checked iVault and there

23   is no information imaged on the new lien owner who bought

24   the loan.  Did you try sitex?

25           What is sitex?

```
 1      A.    It is a database that the collectors use to see
 2   who the current owner is.
 3      Q.    And how about -- is it netronline?
 4      A.    I am not sure what that is.
 5      Q.    So Ms. O'Brien eventually contacts you asking
 6   you, "Do you know who this was sold to"?
 7      A.    Yes.
 8      Q.    And you ultimately answer that it was Mortgage
 9   Resolution Servicing?
10      A.    Yes.
11      Q.    Do you know how you made the determination?
12      A.    Because they saw that it was MRS209.
13      Q.    And why would they turn to you asking that
14   question?
15      A.    I am not sure.
16      Q.    Can you go back to the last page, the Work
17   Accounts Summary?
18      A.    Okay.
19      Q.    It says here, somewhere in here, it says 9/28
20   2009, Returned to Sold Queue.
21            Do you know what that means?
22      A.    I have no idea.
23      Q.    And what those comments 22016 means?
24      A.    22016?
25      Q.    Yes.
```

```
 1       A.    What do you mean?
 2       Q.    It has like a percentage sign.  It says 022016.
 3       A.    Oh, that is the person's ID.
 4       Q.    So that would have been Ms. Plumaj or somebody
 5   else?
 6       A.    I am not sure who that is.
 7       Q.    Can you tell from that document when it was
 8   returned back from the Sold queue?
 9             MR. PISTILLI:  Objection.  It lacks
10   foundation.
11             THE WITNESS:  When it was returned back to
12   the Sold queue?
13       Q.    BY MR. TANTILLO:  Well, it says Returned to Sold
14   Queue.
15             Can you tell from that document when it was
16   returned to the Sold queue?
17       A.    Looks like 9/28/09.
18       Q.    So where would it have been before?
19       A.    I am not sure.
20       Q.    Now when something is returned to the Sold queue,
21   what does that mean?
22       A.    I am not sure.  I don't see that.
23       Q.    So now I am going to show you what is Plaintiffs'
24   Exhibit No. 11.
25       A.    Okay.
```

```
 1                    (Deposition Exhibit No. 11 was marked for
 2    identification.)
 3        Q.   BY MR. TANTILLO:  There you go, Ms. Solomon.
 4                    (Discussion off the record.)
 5                    THE WITNESS:  Okay.
 6        Q.   BY MR. TANTILLO:  So this is another e-mail from
 7    Mr. Kassem and Ms. Kilgore asking you about a loan and
 8    whether or not I guess it was sold?
 9        A.   Right.
10        Q.   And they were asking you if you could find who
11    owned it?
12        A.   Yes.
13        Q.   And you told them that MRS209, and this
14    highlighted Agency Code meant it belonged to Mortgage
15    Resolution Servicing?
16        A.   Right.
17        Q.   At the very end of this string of e-mails
18    Ms. Alejandra Zamora-Wilson says that she knows the
19    account sold but she is unable to determine investor
20    information.  Where can we get this?
21                    Were there other places where investors were
22    listed within the Recovery One system?
23                    MR. PISTILLI:  Object to the form.
24                    THE WITNESS:  No.
25        Q.   BY MR. TANTILLO:  So as far as you know, there
```

1  weren't other investor codes for people that bought loans?

2      A.    What do you mean?

3      Q.    Well, you just said there was no other place

4  where you could find if a person bought -- let's say a

5  different note sale buyer bought a group of loans or one

6  loan.

7      A.    No.  It would be in the same place.

8      Q.    It would be within the Agency Codes?

9      A.    Uh-huh.

10     Q.    Now you mentioned that there was a collector who

11  works I guess a queue.  Is that right?

12     A.    Yes.

13     Q.    Is there a queue loans?

14     A.    Yes.

15     Q.    Can you tell me a little bit about how that

16  works?

17     A.    They have queues assigned to them in the

18  Collector queues.  So like this one says Sold.  This would

19  be just an identifying number for one person.

20     Q.    Okay.

21     A.    And they go in each day and work in their queue

22  only.  So like this Alejandra would have her own number to

23  go into.

24     Q.    And there would be a handful of loans or more

25  that she is supposed to be working to obtain payment on?

```
 1       A.    Yes.
 2       Q.    And if this loan had been sold previously, why
 3   would it have been in her queue?
 4             MR. PISTILLI:  Objection; lacks foundation.
 5             THE WITNESS:  It wasn't in her queue.  It is
 6   in the Sold queue.  That is what the screenshot is showing
 7   you.  Not in her queue, no.
 8       Q.    BY MR. TANTILLO:  So then why would she be asking
 9   about it?
10       A.    Because the customer called in and she got the
11   phone call.
12       Q.    So the collectors also take phone calls just from
13   borrowers who are calling and asking about their loans?
14       A.    Yes.
15       Q.    Turning back to that Exhibit No. 11.
16             You have known about this MRS209 code since
17   2011 at the very least?
18       A.    Yes.
19       Q.    And then obviously back in 2009.  I showed you a
20   previous document which you were aware of it, MRS2009,
21   Mortgage Resolution Servicing?
22       A.    Yes.
23       Q.    Now was there any reason why you would have
24   particular knowledge about what MRS209 means versus
25   somebody else at Chase?
```

1              MR. PISTILLI:  Object to the form.

2              THE WITNESS:  No, besides that Alejandra

3    might have been new.

4       Q.   BY MR. TANTILLO:  And you have been there a long

5    time?

6       A.   Uh-huh.

7       Q.   Has Chase come to you recently asking you about

8    this MRS209 queue?

9              MR. PISTILLI:  I am going to instruct you

10   not to answer to the extent that it implicates any

11   conversations you had with Chase attorneys.

12             If you have had any other conversations, you

13   can talk about those, but I don't want you to reveal the

14   contents of any communications with attorneys.

15      Q.   BY MR. TANTILLO:  Has anybody inside the company,

16   not your counsel here today, come to you asking about this

17   particular MRS209 queue?

18             MR. PISTILLI:  Same instruction.

19             You can answer yes or no.

20             THE WITNESS:  No.

21      Q.   BY MR. TANTILLO:  Ms. Solomon, did you ever have

22   to deal with loans that were bought back from note sale

23   buyers?

24      A.   Yes.

25      Q.   Was that part of your job responsibility when you

```
 1   were working as a Recovery supervisor?

 2       A.    I had a piece in it.

 3       Q.    And what was your piece in it?

 4       A.    I would be the one that would be requesting

 5   return of the funds to the investor.

 6       Q.    And why would there be -- what situations

 7   occurred that there would have to be a buyback?

 8       A.    I can't think of any off the top of my head.

 9   Didn't happen that often.

10       Q.    Ms. Solomon, I am going to show you what has been

11   marked as Plaintiffs' Exhibit No. 12.

12                 (Deposition Exhibit No. 12 was marked for

13   identification.)

14                 THE WITNESS:  Okay.

15       Q.    BY MR. TANTILLO:  Described herein are routing

16   situations I guess in which buybacks occurred.

17                 Did people have to come for you, to you for

18   approval for the buybacks?

19       A.    They didn't necessarily come to me to do the

20   approval.  I was just the contact person for investors.

21   So they would come to me and I would get the approval.

22       Q.    So in a situation like this was it Mr. McGrane

23   that provided approval or somebody --

24       A.    Chad Paxton.

25       Q.    Chad Paxton.
```

```
 1                 And let me just walk through that a little
 2   bit.
 3                 So was Chad Paxton, was he the supervisor of
 4   Mr. McGrane?
 5        A.   He was the AVP over Recovery.
 6        Q.   AVP.  You mean Assistant Vice President?
 7        A.   Yes.
 8        Q.   And Mr. McGrane here, he was what they call the
 9   Recovery supervisor?
10        A.   Yes.
11        Q.   Was he your boss?
12        A.   No.
13        Q.   Who was your boss at that point in time, 2009
14   let's say?
15        A.   2009?  Nancy Rubino.
16        Q.   Now who is Nancy Rubino?
17        A.   She had just -- hold on.  Let me think.
18                 Actually at this time it was Jason Richmond.
19        Q.   Did there come a subsequent point in time in
20   which Ms. Rubino was your supervisor?
21        A.   Yes.
22        Q.   So Mr. Richmond was before?
23        A.   Yes.
24        Q.   Let me ask you a question.  Do they both still
25   work at JPMorgan Chase?
```

1      A.    Jason does not.  I believe Nancy does.

2      Q.    And how about Mr. McGrane, does he still work

3   with Chase?

4      A.    Yes.

5      Q.    And how about Mr. Paxton?

6      A.    No.

7      Q.    So as this e-mail chain reflects, one reason why

8   loans were bought back is if -- there were liens on the

9   property; is that correct?

10              MR. PISTILLI:  Object to the form.

11              THE WITNESS:  I don't -- I don't know if

12   there was -- because there was liens on the property.  It

13   looks like on these it was because they weren't in the

14   right position.

15      Q.    BY MR. TANTILLO:  So would that be another reason

16   why there was a buyback because they weren't in the right

17   position?

18      A.    Could be, yes.

19      Q.    And do you know generally how much they would buy

20   back the loans for?

21      A.    The amounts that it was sold for.

22      Q.    Do you know of any instances in which they bought

23   back loans for more than that?

24      A.    No.

25      Q.    Now within this e-mail Mr. McGrane says that,

1  quote, we need to make sure we don't give investors

2  anything to hold us to.  They need to buy these notes as

3  is and complete all work prior.  The problem with these 3

4  is that someone gave the investor a buyback out in

5  writing.

6              Was it up to the collector to make the

7  decision about whether or not a loan could be bought back?

8  I'm sorry, the note sale.  The note seller.  I'm sorry.

9      A.   Not that I am aware.

10     Q.   Were you involved at all in the buybacks

11  associated with the second lien Extinguishment Program?

12     A.   Buybacks to who?

13     Q.   To note sale investors when they had received a

14  forgiveness letter, one of their borrowers.

15     A.   I probably had a part in it.

16     Q.   And what was your part in that?

17     A.   Probably requesting the wires.

18     Q.   And you remember in that situation if Chase had

19  provided a premium for those particular loans that were

20  forgiven?

21     A.   I don't know.

22     Q.   So you were only responsible for seeing the note

23  sale investors earn money?

24     A.   Right.

25     Q.   Got you.

```
 1              Can you tell me a little bit about what
 2    Fortracs is.
 3              And Fortracs is F-o-r-t-r-a-c-s?
 4    A.    Yes.
 5    Q.    Okay.
 6    A.    I have never used Fortracs.  It is a system that
 7    is used before it is charged off.  So I am not familiar
 8    with it.
 9    Q.    Can you find documents on Fortracs?
10    A.    I am not sure.
11    Q.    Now what does it mean when an account needs to be
12    recharged off?  Do you know?
13    A.    Recharged off?
14    Q.    Correct.
15    A.    When an -- sometimes an account charges off and
16    then they reverse the charge-off and then it becomes
17    vested again and has to recharge off.
18    Q.    What does that do in the system in terms of what
19    is the process to recharge off a loan?
20    A.    I am not sure.  It is not my area.
21    Q.    Are you familiar with the Agency Code PSEC?
22    A.    Yes.
23    Q.    What is that?
24    A.    It is an old code.  It used to mean secured loan.
25    Q.    Ms. Solomon, I am going to show you what is going
```

 1  to be marked as Plaintiffs' Exhibit No. 13, I believe it
 2  is.
 3              MR. PISTILLI:  I think it is 14.  No, wait.
 4  You are right.
 5              (Deposition Exhibit No. 13 was marked for
 6  identification.)
 7      Q.   BY MR. TANTILLO:  There you go.
 8      A.   Thank you.
 9              Okay.
10      Q.   Going back to the last page.
11              There is a screenshot of something called
12  View Activity.
13      A.   Okay.
14      Q.   Can you tell me a little bit about what is in the
15  far right-hand corner on top?  It says 01100.
16      A.   That is just the bank number that houses
17  charged-off mortgage loans.
18      Q.   And this is for a loan that was owned by Mr.
19  Schneider and his entities?
20              Looking at this, it says -- and perhaps you
21  can help me.  On 9/25/2009 at the bottom it says -- there
22  is a time.  It says Note IIZZ.
23              Do you know what that means?
24      A.   No.
25      Q.   And I guess on 9/29 there was a payment for the

1   loan, is that what that means, or is that when Mr.

2   Schneider purchased the loan?

3       A.    That is not -- I don't know what that is.

4       Q.    Above there it says Note Sale Price Was 20,500.

5       A.    Yes.

6       Q.    And they are waiting for additional 12,500 --

7       A.    Uh-huh.

8       Q.    -- to be paid?  Or was there a credit that was

9   going to go back to --

10      A.    Credit From Investor to Be Applied, so we were

11  waiting for that to be posted to the Recovery.

12      Q.    Okay.

13      A.    I don't know if it had already been sent and not

14  posted or waiting for him to send it.

15      Q.    And once again, the Agency Code here is PSEC,

16  which you said previously was an indication that it was a

17  secured loan?

18      A.    Yes.

19      Q.    Can you tell me what REFR means?

20      A.    REFR?

21      Q.    It is right above Agency Code.

22      A.    That is the Social Security number.

23      Q.    So in this particular instance, once the

24  remaining funds were provided, then the charge-off would

25  have been reversed?

1    A.   No.  They weren't trying to reverse the

2  charge-off, they were trying to recharge it off.

3    Q.   And can you explain the difference between that?

4    A.   It was charged off looks like -- from according

5  to all these notes, it was charged off and a note.  So it

6  was approved with Larry, and while we were waiting for the

7  funds to be received and all that, the open side reversed

8  the charge-off.

9    Q.   What do you mean by "open side"?

10   A.   The collections group prior to Recovery.

11        I don't know why, I can't tell why, but they

12 did.  And then it looks like that is when Wendi got

13 involved and said this was sold to Larry and we need to

14 recharge it off and post his money and it's his account.

15 So they had to rebook it back into Recovery One.

16   Q.   So is there a closed side as well?

17   A.   No.  That is us basically.

18   Q.   Closed side is Recovery?

19   A.   Charge-off, yes.

20        (Deposition Exhibit No. 14 was marked for

21 identification.)

22   Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show

23 you what has been marked as Plaintiffs' Exhibit No. 14.

24   A.   Okay.

25   Q.   Ms. Solomon, do you know who Caroline Iacino is?

```
 1      A.    Yes.

 2      Q.    And who is she?

 3      A.    She worked at S&A Capital, who I dealt with a lot

 4   of times.

 5      Q.    Now within this e-mail string, or string of

 6   e-mails, this is a loan that was purchased by S&A Capital;

 7   is that correct?

 8      A.    Yes.

 9      Q.    And Chase had sent to Real Time Resolutions, or

10   Real Time Solutions, excuse me, to collect upon?

11      A.    On this loan -- well, it is hard to tell without

12   having the accounts in front of me, but this was assigned

13   to RTR prior to it being sold to Larry.

14      Q.    Okay.

15      A.    And it wasn't recalled from them at the time of

16   the sale.

17      Q.    Now, do you know if S&A Capital received the

18   payments when RTR was trying to collect on this debt?

19      A.    If there was any payments made, we would have

20   forwarded them.

21      Q.    So did you instruct anybody with inside Chase to

22   pull it back from RTR?

23      A.    Yes.

24      Q.    And what is that process like?

25      A.    There is Agency managers, and I would have asked
```

1  them to recall it, and when I got confirmation that it was

2  recalled is when I would have sent that e-mail that I

3  recalled it.

4      Q.   Regarding the Dubniczki loan and the Garcia loan,

5  you are saying that both of these had been sent out to

6  Real Time before Mr. Schneider had bought the loans?

7      A.   I don't think Real Time had both of these loans.

8  I thought it was just the first one.

9      Q.   They didn't have the Garcia loan as well?

10     A.   No, not according to these e-mails.

11     Q.   How do you know that the loan was -- had been

12  assigned or sent over to Real Time before the purchase of

13  the loan?  Is there any way to determine that?

14     A.   On these type of loans?

15     Q.   Yes.

16     A.   They were all sent to Real Time.

17     Q.   What do you mean "these type of loans"?

18     A.   With this type of account number.

19     Q.   Well, what is the type of account number?

20     A.   The short account number, not a -- we have long

21  account numbers and short account numbers.

22     Q.   So tell me a little bit about the difference

23  between the long account numbers and the short account

24  numbers.

25     A.   These account numbers were worked out of MSP and

```
 1  Recovery One.
 2      Q.   And the long account numbers, how did they work?
 3      A.   They were just in Recovery One.
 4      Q.   So those are done --
 5      A.   They are not actually worked out of MSP and
 6  Recovery One, they were housed in MSP and then moved to
 7  Recovery One.  So the ones that -- some of the ones that
 8  were in MSP that were with RTR did not get recalled, and
 9  this was probably one of them.
10      Q.   So regarding the long loan numbers, you said that
11  those are done in-house?
12      A.   Uh-huh.
13      Q.   This particular loan was bought by Mr. Schneider
14  in 2006.
15           Do you know why in 2014 RTR would have had
16  it?
17      A.   Which loan?
18      Q.   The -- these are hard names to say.  Dubniczki,
19  D-u-b-n-i-c-z-k-i.
20           MR. PISTILLI:  Did you say 2014?
21           MR. TANTILLO:  Correct.  The e-mail is in
22  2014.
23           THE WITNESS:  2012.
24      Q.   BY MR. TANTILLO:  '12, you are right.  The last
25  one is 2014, but yours is 2012, correct.
```

1              Do you have any idea why six years later --
2      A.    There was probably no activity on it from RTR for
3   us to have realized that they were also working the loan,
4   just like there was no activity from Mortgage Resolution
5   to have realized three years later someone else is working
6   the loan.
7      Q.    Would it surprise you that these people had been
8   taking payment for years?
9      A.    Yes.
10             (Deposition Exhibit No. 15 was marked for
11   identification.)
12      Q.    BY MR. TANTILLO:   I am going to show you what I
13   am marking as No. 15.
14      A.    Okay.
15      Q.    Do you recognize your signature on this?
16      A.    Yes.
17      Q.    It says on May 9th of 2006 this was assigned to
18   1st Fidelity?
19      A.    Yes.
20      Q.    Is there any reason why it was dated three years
21   later?
22      A.    May 9th, 2006 is the date the loan originated.
23   It is not the date it was sold.
24      Q.    Okay.  So going back to RTR.
25             You stated that -- was it common for loans

```
 1   that did not have any activity payments being made, for
 2   them not to be recalled from the different collection
 3   agencies?
 4       A.    They could be.
 5       Q.    And who was responsible for recalling the loans
 6   from Collection after they were sold or assigned to
 7   somebody else?
 8       A.    The Agency Group.
 9       Q.    And who runs the Agency Group, or who did at that
10   point in time?
11       A.    At that time it was -- I think it was Jason
12   Oquendo.
13       Q.    And so it would have been his responsibility once
14   a loan was sold to pull it back from Real Time?
15       A.    I don't know.
16       Q.    But he was head of that group --
17       A.    I don't know if that was on the responsibility --
18   it would have been his responsibility if someone had
19   notified him, but I would say it would be the
20   responsibility of the person managing the note sale.
21       Q.    Now was there a way -- once a note was sold, was
22   there a way to indicate that it was sold in this system so
23   that it could be pulled back from the collection agencies?
24       A.    Yes.  It was linked to a different queue.
25       Q.    And what was that queue?
```

```
 1      A.    For a note sale it was PNSL.

 2      Q.    What does that mean?

 3      A.    Note sale.

 4      Q.    So a PNSL would have indicated that loan was no

 5   longer with Chase?

 6      A.    Yes.

 7      Q.    And with regards to that, did that PNSL queue, do

 8   you have any idea whether or not it would be -- would flow

 9   down to somebody like Jason Oquendo?  Would he receive an

10   update as soon as the note sale occurred saying, "Okay, we

11   need to pull these back from Real Time Resolutions"?

12      A.    I am not sure how their process flowed.

13      Q.    Now who would make the entry within the system

14   that a note sale had occurred or the PNSL was now, you

15   know, indicated on a particular loan number?

16      A.    The Recovery supervisor over the collectors that

17   did the note sale.

18      Q.    And do you remember who that was at that point in

19   time?

20      A.    Jeff McGrane.

21      Q.    Was Eddie Guerrero also a supervisor at some

22   point?

23      A.    He was the manager over all the supervisors.  So

24   Katrina Thompson, and I can't remember who else.

25      Q.    So --
```

1     A.    Linda Sanabria, I believe.

2     Q.    Can you spell Sanabria for the court reporter?

3     A.    S-a-n-a-b-r-i-a.

4     Q.    So it would have been their responsibility to

5  indicate that a particular note sale had occurred on a

6  loan?

7     A.    Yes.

8              MR. PISTILLI:  Object to the form.

9     Q.    BY MR. TANTILLO:  Do you know how a collection

10 agency would be notified that a note sale had occurred?

11    A.    No.  I wasn't in that area.

12    Q.    Now are loans actually assigned to the collection

13 agencies to collect on or is it just the third party

14 contracting relationship between JPMorgan Chase and let's

15 say Real Time Resolutions?

16    A.    It is actually --

17              You mean assigned like an assignment?

18    Q.    Correct.

19    A.    No.  It is not actually assigned that way, no.

20    Q.    So they just are representing JPMorgan Chase --

21    A.    Yes.

22    Q.    -- when a person doesn't pay?

23    A.    Yes.

24    Q.    Now, these are charged-off loans, correct?

25    A.    Uh-huh.

```
 1      Q.    And can you explain to me what you think a
 2   charged-off loan is?  Do you understand that?
 3      A.    A nonpaying loan.
 4      Q.    And after how many days is a loan placed into
 5   Recovery after a person hasn't paid?
 6                 MR. PISTILLI:  Objection; lacks foundation.
 7                 THE WITNESS:  The standard is 180.
 8      Q.    BY MR. TANTILLO:  So after 180 days the loan
 9   comes to your department?  Yes or no.
10      A.    Yes.
11      Q.    And then how quickly thereafter is that
12   particular loan sent to a collection agency?
13      A.    I don't know.  I don't work --
14      Q.    Is it worked in-house first?  Do you know that?
15      A.    I think they go through a -- I don't know.  I
16   don't know.  You would have to ask the agency.
17      Q.    Previously you testified about the fact that you
18   knew what a primary agency was and a secondary agency.
19                 Regarding that, do you know when loans are
20   sent to a primary agency?  Is it after 200 days?  Is it
21   300 days?  Do you have any idea about that?
22      A.    I don't know.
23      Q.    And the same for a secondary.
24      A.    I don't know.
25      Q.    You just know they exist?
```

```
 1      A.    Right.
 2      Q.    You just know these agencies exist?
 3      A.    Right.
 4      Q.    And after a period of time they go from one
 5   agency to another?
 6      A.    Right.
 7      Q.    Do you know why they go from one agency to
 8   another?
 9      A.    For -- if they are not paying on -- for
10   nonpayment.
11      Q.    So it is like, "This particular agency isn't
12   working, we are going to try another one"?
13      A.    Right.
14      Q.    And do you know if they receive, the agencies
15   receive more commission as the debt gets older and older?
16      A.    Yes, they do.
17      Q.    And do you know those breakdowns of the
18   percentages?
19      A.    No, I don't.
20      Q.    But you just know they do?
21      A.    Yes.
22      Q.    Do you know what National Payment Services is?
23      A.    Yes.
24      Q.    Can you tell me what it is?
25      A.    It is our team in Columbus who processes
```

1  payments.

2      Q.   And are those -- what is Speed Pay Payments?

3      A.   Speed Pays are checks over the phone.

4      Q.   I am going to show you what has been marked as

5  Plaintiffs' Exhibit, I think it is 16.

6              (Deposition Exhibit No. 16 was marked for

7  identification.)

8      Q.   BY MR. TANTILLO:  Please take a look and let me

9  know once you have reviewed it.

10     A.   Okay.

11     Q.   Ms. Solomon, can you tell me what fraud buyback

12  is?

13     A.   I am not sure.

14     Q.   Were there times in your career when you had to

15  buy back something because perhaps a deal underlying it

16  that Chase had done was fraudulent in some kind of way?

17              MR. PISTILLI:  Object to the form.

18              THE WITNESS:  Not that I recall, no.

19     Q.   BY MR. TANTILLO:  So in this particular instance

20  you had them reverse the payments that were being made?

21     A.   Yes.

22     Q.   And sent back to Mr. Schneider?

23     A.   Yes.

24     Q.   It doesn't appear that the loan was actually

25  bought back.

```
 1                    MR. PISTILLI:  Objection; lacks foundation.
 2                    THE WITNESS:  Was that a question --
 3        Q.   BY MR. TANTILLO:  Yes.
 4        A.   -- or --
 5        Q.   Yes.
 6                    Does it appear the loan was bought back or
 7   you just refunded the payments?
 8                    MR. PISTILLI:  Object to the form.
 9                    THE WITNESS:  It looks like I requested for
10   the 5,000 that Larry paid to be refunded to him.
11        Q.   BY MR. TANTILLO:  And with regards to these type
12   of problems, were these the kind of things that you had to
13   deal with on a daily basis with all these different note
14   sales investors?
15        A.   No.
16        Q.   Well, what made this different?
17        A.   We didn't do buybacks very often, so it was rare
18   that I had to deal with that.
19        Q.   And why didn't you do buybacks very often?
20        A.   Because no one requested for us to.
21        Q.   Do you know what the note code RLS means?
22        A.   RLS?
23        Q.   Yes.
24        A.   Lien release.
25        Q.   I am going to show you what has been marked as
```

```
 1  Plaintiffs' 16.
 2              (Deposition Exhibit No. 17 was marked for
 3  identification.)
 4              MR. TANTILLO:  Is it 17 or 16?
 5              MR. PISTILLI:  17.
 6              MR. TANTILLO:  17.  Sorry.
 7       Q.  BY MR. TANTILLO:  Would you please review this,
 8  Ms. Solomon?
 9       A.  Okay.
10       Q.  So RLS you said meant that there needed to be a
11  lien release processed on a set of loans, or requested?
12       A.  Yes.
13       Q.  And here it appears that Jason Richmond said he
14  added a note code RLS which will force the account onto
15  Launi's daily task list for the support group.
16              Do you know what he meant by that?
17       A.  My team had a list that they had to work daily
18  and certain note codes would flow to that.  So he was
19  sending these to my team to process.
20       Q.  And you had to process the lien releases on this
21  first lien walks pool?
22       A.  I don't know if we would have done that, but --
23       Q.  So let's talk a little bit about these note codes
24  that get -- that used -- obviously you changed
25  positions -- but that used to get put into your daily task
```

```
 1  list.
 2              How would that work?  What was the process
 3  for that?
 4     A.   If a collector or someone needed something from a
 5  support standpoint, they would put certain codes that we
 6  had built into Recovery One, it would flow to our report
 7  the following morning, and that is how my support staff
 8  got their work.
 9     Q.   And RLS was obviously one of these that Jason
10  Richmond created?
11     A.   Yes.
12     Q.   And who can create these note codes?  Who were
13  the individuals that have responsibility or are allowed to
14  create note codes within the Recovery One system?
15     A.   At that time or today?
16     Q.   At that time.
17     A.   Jason Richmond.
18     Q.   And then subsequent to that it would have been
19  Nancy Rubino?
20     A.   Yes.
21     Q.   And then subsequent to that Mr. Peterson?
22     A.   Yes.
23     Q.   So they are the only ones that are able to change
24  codes within the Recovery One database or --
25     A.   To actually create note codes, yes.
```

```
 1      Q.   And was there a process or a way -- you said
 2   these things flowed down to you.  You would get I guess a
 3   list every morning?
 4      A.   Yes.
 5      Q.   And it was almost like a task list of things to
 6   do?
 7      A.   Yes.
 8      Q.   Regarding that -- so if they told you that you
 9   needed to do an RLS, then does that mean that you had to
10   release those liens?
11      A.   Yes.
12      Q.   And presumably you did that?
13      A.   Yes.
14      Q.   And what would happen when you released liens?
15   Would you have to send them to Monroe?  What was the
16   process for that?  Would you put them into the Payoff
17   Tracking System?
18      A.   At that time we opened routes, which would route
19   to Monroe.
20      Q.   And Monroe was responsible for actually executing
21   the documents?
22      A.   Yes.
23      Q.   Now would you have to sign them or --
24      A.   No.
25      Q.   You wouldn't have to have signed all of these?
```

```
 1      A.    No.

 2      Q.    Monroe would have signed them for you?

 3      A.    Yes.

 4      Q.    And they have individuals in Monroe who do that?

 5      A.    Yes.

 6      Q.    And would these lien releases have been placed

 7  into iVault?

 8      A.    Yes.

 9      Q.    Was there anywhere else that they would have been

10  placed in addition to iVault?

11      A.    No.

12      Q.    So iVault contains all of the documents that you

13  have that are actually filed in the public record?

14      A.    Yes.

15      Q.    Notes, mortgages, that kind of thing.

16            So in this particular instance who decided

17  that RLS would mean that a lien release should be provided

18  or done?  Was that Jason Richmond?

19      A.    Yes.

20      Q.    Were you responsible for sending out 1099s to

21  borrowers?

22      A.    No.

23      Q.    Did you ever have any kind of role in sending

24  1099s to borrowers in terms of creating queues or lists or

25  things of that nature?
```

```
 1        A.    No.

 2        Q.    And do you know what a 1099 is?

 3        A.    Yes.

 4        Q.    And how is it used by JPMorgan Chase?

 5        A.    It is sent out on the charge-offs as a 1099 fee

 6   for the write-off amount.

 7        Q.    So they send these to borrowers saying that your

 8   debt has been charged off?

 9        A.    Not necessarily charged off.  It is not sent

10   until the account is closed and we are actually writing it

11   off the record.

12        Q.    You are actually writing it off your records?

13        A.    Right.

14        Q.    I am going to show you what has been marked as

15   Plaintiffs' Exhibit No. 18.

16              (Deposition Exhibit No. 18 was marked for

17   identification.)

18              THE WITNESS:  Okay.

19        Q.    BY MR. TANTILLO:  Under No. 2 in the Action Plan

20   Task Tracking they have you listed for helping to create a

21   procedure to address providing 1099 information to

22   taxport.

23              Is taxport a separate System of Records that

24   Chase has?

25        A.    Yes.
```

1    Q.   Can you tell me about that?

2    A.   Taxport is used by the tax department.  That is

3  where they create the 1099s, 1098s.

4    Q.   And where is that based out of?

5    A.   I am not sure.

6    Q.   Now what was your involvement in creating this

7  procedure, if any?

8    A.   Let me think.

9         So we created a procedure to have a weekly

10  report come out to my team.  Anything that might be

11  missing on a customer's account, like a Social Security

12  number or an address, anything that just doesn't look

13  right that needed to be done for taxport for the 1099, we

14  would go in and update Recovery with all that information

15  before it would go out to taxport so that wasn't going out

16  incorrectly.

17    Q.   So it was a way for you to kind of do quality

18  control on the data?

19    A.   Right.  Uh-huh.

20    Q.   And then you would send that data to taxport?

21    A.   We didn't send it to taxport, we just updated

22  Recovery One, and then at the end of the year all the

23  accounts were sent to taxport.

24    Q.   And how were these accounts sent to one

25  department to another, or did they just have access to it?

1    A.    I am not sure.

2    Q.    Let me ask you another question.

3          Do you have to send a 1099 or 1098 to

4    borrowers after the loan is first charged off or have you

5    ever encountered that?

6    A.    No.

7    Q.    It is only after you decided just to write it

8    off?

9    A.    Right.

10   Q.    You are done with it or Chase is done?

11   A.    Yes.

12         MR. TANTILLO:  Let's take a lunch break.

13         THE VIDEOGRAPHER:  The time is 12:19 p.m.

14         We are off the record, ending media 2.

15         (Recess taken.)

16         THE VIDEOGRAPHER:  My name is Rayce

17   Mortensen with the firm of Legal Video Specialists at

18   Phoenix, Arizona.  This begins media No. 3.  The time is

19   1:19 p.m.

20         We are now back on the record.

21         MR. TANTILLO:  Mr. Miller, can you read back

22   my last question.

23         (Record read.)

24   Q.    BY MR. TANTILLO:  Ms. Solomon, were you involved

25   with the DOJ Opt Out Letter?

```
 1      A.    No.
 2      Q.    You didn't have any responsibilities related to
 3   that?
 4      A.    No.
 5      Q.    Do you know what it is?
 6      A.    I don't recall exactly which letter it is.
 7      Q.    I am going to show you what has been marked as
 8   Plaintiffs' Exhibit No. 19.
 9                MS. FAIT:  18?
10                MR. PISTILLI:  18 is the Action Plan
11   document.
12                MS. FAIT:  You are right.  Sorry.
13      Q.    BY MR. TANTILLO:  Ms. Solomon, can you review No.
14   19 for me?
15                (Deposition Exhibit No. 19 was marked for
16   identification.)
17      A.    Okay.
18      Q.    On the very last page, Ms. Solomon, it says that
19   you were the LOB tester.
20                What is that?
21      A.    I was the tester for letter templates.
22      Q.    And what did that involve?
23      A.    Verifying that the letter worked in InfoSource
24   and all the variable fields were working correctly when
25   inputting whatever was requested and that it would print.
```

1      Q.   And this was for something that was being called

2   the DOJ Opt Out Letter?

3      A.   Yes.

4      Q.   Do you know the purpose of that letter,

5   Ms. Solomon?

6      A.   This was to confirm the customer did not want

7   their account included in the DOJ settlement and wanted to

8   keep it active and pay it themselves.

9      Q.   Beyond the testing of this letter, did you have

10   any other responsibilities?

11      A.   No.

12      Q.   Do you know what IFS 3407 means?

13      A.   That is the InfoSource number that would have

14   been assigned for testing, like the project number.

15      Q.   How about RR737?

16      A.   That is the identification of the Recovery

17   letter.  So if the customer called in and said they wanted

18   to opt out of DOJ, the collector would say in the notes,

19   "Please send an RR737."

20      Q.   And that is the letter that is on page 2 of this

21   exhibit?

22      A.   Yes.

23      Q.   Do you know if this was part of the second lien

24   Extinguishment Program?

25      A.   No, I don't know.

```
 1      Q.   You know it was just part of some DOJ settlement?
 2      A.   Yes.
 3      Q.   Is there any way you indicate on here that these
 4 loans were 1st or 2nds?
 5      A.   No.
 6      Q.   If I direct you to the second to the last page
 7 where it says there is the screenshot of Chase
 8 InfoSource --
 9      A.   Yes.
10      Q.   -- it says Loan Source VLS - HE.
11               Doesn't that mean a second lien?
12      A.   No, that means the loan was -- before the loan
13 charges off there is accounts in VLS and there is accounts
14 in MSP.
15      Q.   Okay.
16      A.   This is just saying it originated in VLS.
17      Q.   Are most of the loans in VLS second liens?
18      A.   No.
19      Q.   So what differentiates MSP versus VLS?
20      A.   For us the account number.  We can tell by that.
21      Q.   What is a home equity loan?
22      A.   What is a home equity loan?
23      Q.   Yes.
24      A.   A loan on the equity of the home.
25      Q.   So there is no difference between MSP versus VLS
```

```
 1   then, just the loan number?
 2        A.   Yes.
 3        Q.   And what makes the loan number different?
 4        A.   The VLS loan numbers are 12, 12 to 18 digits
 5   long, and the MSP are eight to ten.
 6        Q.   And do you know any reason why they would be
 7   different?
 8        A.   Because different systems numbers are different.
 9        Q.   Ms. Solomon, I am going to show you what is going
10   to be marked as Plaintiffs' Exhibit No. 20.
11             (Deposition Exhibit No. 20 was marked for
12   identification.)
13        Q.   BY MR. TANTILLO:  Can you kindly review this for
14   me?
15             MR. PISTILLI:   Thanks.
16             THE WITNESS:  Okay.
17        Q.   BY MR. TANTILLO:  The subject of this is Re DOJ -
18   Recovery Opt Out Process Design Meeting Recap 7/27?
19        A.   Uh-huh.
20        Q.   Is this e-mail here regarding the letter that we
21   just saw previously, No. 19?
22        A.   Yes.
23        Q.   Within this letter it says, quote, from Cara
24   Short.  When will the loan pool move from their current
25   queues to the DOJLTR queue for mailing of the proactive
```

1   lien release notification letter?

2                  Can you tell me what the DOJLTR queue is?

3        A.   I don't know.

4        Q.   On the second page it says, "Depending on the

5   volume of opt-outs, Launi Solomon's team will manually

6   send out the opt-out letters.  A Note code can be used to

7   notify Loss Recovery Support that an opt-out letter needs

8   to be sent to the customer.  Follow-up:  Is there an

9   existing note code that can be used?  If a new note code

10  needs to be created, who can create it?"

11                 My first question for you, Ms. Solomon, is,

12  did you have to manually send out the opt-out letters?

13       A.   Yes.

14       Q.   And how many did you have to send, approximately?

15       A.   I don't know.  It wasn't a very common practice

16  that anyone opted out of that program.  So not very many.

17       Q.   Ms. Solomon, do you know whether or not there was

18  a note code that was created for this process?

19       A.   No.

20       Q.   Was there an existing note code that you created

21  or somebody else did?

22       A.   There was an existing note code we used.

23       Q.   And what was that?

24       A.   SPC.

25       Q.   And what did that mean?

1     A.    Letter request.

2     Q.    Letter request?

3     A.    Uh-huh.

4     Q.    So there weren't that many letters that were sent

5  out for the opt-outs because most people were fine with

6  having their loan forgiven?

7     A.    Right.

8     Q.    Now were you at all involved in the rescission of

9  some of these letters?

10              MR. PISTILLI:  Objection; lacks foundation.

11    Q.    BY MR. TANTILLO:  You can proceed.

12    A.    What was the question?

13    Q.    Were you involved in the rescission of the

14 remediation letters that were sent to note sale buyers?

15              MR. PISTILLI:  Same objection.

16    Q.    BY MR. TANTILLO:  It is a yes-or-no question.

17    A.    No.

18    Q.    Did there come a point in time as you were

19 assisting note sale buyers that you were instructed not to

20 answer questions from either Larry or Caroline Iacino?

21    A.    Yes.

22    Q.    And when was that, approximately?  Do you

23 remember?

24    A.    It was around the middle of 2013.

25    Q.    And why was that?

1      A.    Because Larry had threatened a lawsuit.

2                  (Deposition Exhibit No. 21 was marked for

3   identification.)

4      Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

5   you what has been marked as Plaintiffs' Exhibit No. 21.

6                  Can you please review that?

7      A.    Okay.

8      Q.    Ms. Solomon, I am going to read from an e-mail

9   you wrote to Mr. Omar Kassem on July 5th of 2012 at 2:46

10  p.m.

11     A.    Okay.

12     Q.    You say, "I think we should, quote, close the

13  door, unquote, on them requesting copies of the pay

14  history, notes, deeds, whatever.  I mean they can't come

15  to us for years for pay histories, but Allonges might be

16  more important.  I don't know.  Just let me know how you

17  want to handle.  Keep me updated on this, so I know

18  please.  Thanks.

19                  You remember saying that?

20     A.    I don't remember saying that, but clearly I did.

21     Q.    Is there anything in here referencing a lawsuit?

22     A.    No.

23     Q.    So the reason why you closed the door on them

24  requesting copies is because it was a hassle?

25                  MR. PISTILLI:  Objection; lacks foundation.

1      Q.   BY MR. TANTILLO:  Yes or no.

2                MR. PISTILLI:  You can answer.

3                THE WITNESS:  No, that is not why.

4      Q.   BY MR. TANTILLO:  Then why did you do it?

5      A.   We didn't close the door.  That was me saying I

6  think we should.  We didn't, that I am aware, in 2012.

7      Q.   Now were you being directed to do this by one of

8  your supervisors?

9                MR. PISTILLI:  Object to the form.

10               THE WITNESS:  Was I being directed to do

11  what?

12     Q.   BY MR. TANTILLO:  To close the door.

13     A.   No.  No, not in 2012.

14     Q.   So your testimony is in 2013 you did so?

15               MR. PISTILLI:  Object to the form.

16               THE WITNESS:  In 2013, yes.

17     Q.   BY MR. TANTILLO:  You stated previously that you

18  were not involved in any of the DOJ buybacks; is that

19  correct?

20     A.   Not that I remember.

21     Q.   Ms. Solomon, I am going to show you what has been

22  marked as Plaintiffs' Exhibit No. I believe 22.

23               Please review this for me.

24               (Deposition Exhibit No. 22 was marked for

25  identification.)

```
 1                THE WITNESS:  Okay.
 2       Q.   BY MR. TANTILLO:  Ms. Solomon, do you remember
 3  the facts and circumstances behind these e-mail messages?
 4       A.   Yes.
 5       Q.   So starting from the back.  It appears that
 6  Mr. Kassem sent you a list of the DOJ buybacks.  Is that
 7  correct?
 8       A.   Yes.
 9       Q.   And you wrote back to him saying that you had
10  spoken to accounting and they need the Cost Center for the
11  extra funds.  Is that correct?
12       A.   Yes.
13       Q.   And then Mr. Kassem wrote back to you saying that
14  the reversal should be credited to the RCV1 PIP GL
15  account.
16            Do you know what that is?
17       A.   No.
18       Q.   Was it your responsibility to do the reversal of
19  the credit back to RCV1 PIP GL account?
20       A.   No.
21       Q.   Now it says that this account needs to be charged
22  for either the WTR.
23            What does WTR mean?
24       A.   Where is that?
25       Q.   It is still on the last page of this e-mail
```

 1  string.

 2      A.    I don't know.

 3      Q.    On the page before that Mr. Boyle sends you a

 4  message saying, "Launi, what is the backup solution if

 5  this comes together after you are gone?  This is pretty

 6  mission critical stuff and has major impacts to our

 7  organization.  So while I totally respect your time off,

 8  we still need to get our business done.  Who can do this

 9  if you are out?"

10              Did you accomplish this or finish this or

11  did somebody else?

12      A.    Yes, I did.

13      Q.    Let me just take a step back.

14              Can you tell me who Patrick M. Boyle is?

15      A.    Mike Boyle is the vice president of Recovery.

16      Q.    And he went by the name of Mike?

17      A.    Yes.

18      Q.    And was he the senior level executive of the

19  Recovery Department?

20      A.    Yes.

21      Q.    So he was head of everybody here in Phoenix?

22      A.    Yes.

23      Q.    Now what did he mean, if you know, by "this is

24  pretty mission critical stuff and has major impacts to our

25  organization"?  What was he saying to you there?

1      A.    That he wanted to get this completed whether I

2  was in the office or out of the office.

3      Q.    So you stated you did complete the request by Mr.

4  Boyle and Mr. Kassem?

5      A.    Yes.

6      Q.    Now was Mr. Kassem, he was below Mr. Boyle in

7  terms of his ranking at the company?

8      A.    Yes.

9      Q.    And what was his role or what did he do there at

10  the Recovery Department?

11      A.    He was also a vice president, but he was vice

12  president over like projects and things like that.  Not

13  actually the collectors.  So --

14      Q.    Mr. Boyle was over the entire operation?

15      A.    Uh-huh.

16      Q.    Now if we go back to the -- well, let's stay on

17  that same page, or the page before.

18            There are other investors that must be

19  mentioned here, like Ocean 18.

20            Are you familiar with them?

21      A.    Yes.

22      Q.    Were they a note sale buyer as well?

23      A.    Yes.

24      Q.    And was B&B/First American also a note sale

25  buyer?

```
 1        A.    Yes.

 2        Q.    Was Mortgage First also a note sale buyer?

 3        A.    Yes.

 4        Q.    Was Utah Loan Servicing also a note sale buyer?

 5        A.    Yes.

 6        Q.    And Secured Equity, were they also a note sale

 7   buyer?

 8        A.    Yes.

 9        Q.    Now, each of these different corporations or note

10   sale buyers had loans that had to be remediated or bought

11   back?

12        A.    Yes.

13        Q.    And do you know why that occurred?

14        A.    The loans were included in the DOJ settlement.

15        Q.    So these particular borrowers received a DOJ --

16        A.    Letter.

17        Q.    -- forgiveness letter?

18              Now regarding -- do you know why all of

19   these were just California properties?

20        A.    I don't think they were.

21        Q.    Did you ever receive any explanation as to why

22   corporations or individuals who had bought notes from

23   Chase were included in the second lien forgiveness letter?

24        A.    No.

25        Q.    They never said it was like a coding error or
```

```
 1   something like that?
 2        A.   Not to me, no.
 3        Q.   Before we turn away from that, I apologize.
 4                   This first spreadsheet, I guess of 31
 5   loans --
 6        A.   Uh-huh.
 7        Q.   -- do you know where that came from or how it
 8   would have been generated?
 9        A.   I have no idea.
10        Q.   Do the fields appear to be fields that you find
11   in Recovery One?
12        A.   Yes.  It has a charge-off date, so I would say
13   yes.
14                   (Deposition Exhibit No. 23 was marked for
15   identification.)
16        Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show
17   you what has been marked as Plaintiffs' Exhibit No. 23, I
18   believe.
19        A.   Okay.
20        Q.   Are you ready?
21        A.   I am ready.
22        Q.   Ms. Solomon, have you seen statements like this
23   before?
24        A.   Yes.
25        Q.   Can you tell me what System of Records these
```

1  statements which discuss Corporate Advance Paid came from?

2      A.    MSP.

3      Q.    And was it customary for these type of statements

4  to be included with the note sale purchases when

5  transmitting information to the note sale buyer?

6                    MR. PISTILLI:  Object to the form.

7                    THE WITNESS:  Yes.

8      Q.    BY MR. TANTILLO:  And how do you know that?

9      A.    Because my team completed the note sale file and

10 closed it out, mailed them out.

11     Q.    So when you did a note sale, what would you

12 include, including this, with the package or file that you

13 would send to somebody like Larry, let's say, on a one-off

14 basis, not a bulk sale?

15     A.    This is the precharge-off history, we would send

16 this, any postcharge-off history, if there is one, the

17 original file and all the documents within that --

18     Q.    Okay.

19     A.    -- the assignment.

20            I think that is it.

21     Q.    Would there be borrower payments or payment

22 history in there?  I guess you said pre -- before

23 charge-off history?

24     A.    Yes.

25     Q.    And then if they had collected any money

1   afterwards?

2       A.   Yes.

3       Q.   So you would have pretty much a full payment

4   history with them for that note?

5       A.   Yes.

6       Q.   Would you also include a RESPA letter in that

7   packet?

8       A.   I don't know what that is.

9       Q.   A good-bye letter.

10      A.   Yes.

11      Q.   Just saying your loan is now being serviced by

12  somebody else?

13      A.   Yes.

14      Q.   And at that point in time you said that you

15  included an assignment of mortgage.

16           Was that assignment of mortgage executed by

17  Chase?

18      A.   Yes.

19      Q.   Now during this period of time, was it Chase Home

20  Finance that you were working for directly or was it

21  JPMorgan Chase?

22           You know it is just all one entity

23  basically?

24      A.   I don't know.

25      Q.   Can you tell me what a -- I see this a lot in

```
 1   documents -- what a UPB is?
 2        A.   Unpaid principal balance.
 3        Q.   Now are there different ways that Recovery
 4   accounts for balances within the RCV1 system or is unpaid
 5   principal balance pretty much it?
 6             I guess there is a charge-off amount?
 7        A.   Charge-off amount, origination amount.
 8        Q.   And then unpaid principal balance amount?
 9        A.   Yes.
10             (Deposition Exhibit No. 24 was marked for
11   identification.)
12             MR. TANTILLO:   Does 24 sound right to you,
13   Chris?
14             MR. PISTILLI:   24 sounds right to me.
15        Q.   BY MR. TANTILLO:   Ms. Solomon, take a look at
16   this, please, Plaintiffs' Exhibit No. 24.
17        A.   Okay.
18        Q.   Ms. Solomon, can I direct you to page 2 of this
19   string of e-mails?  At the very bottom there is a message
20   from Nancy Rubino to Mike Boyle, Jason Oquendo and
21   Christine Price.
22             Do you see that?
23        A.   Yes.
24        Q.   The second queue that is there is something
25   called 4Sale.
```

```
 1              Do you know what that means?
 2      A.   No.
 3      Q.   Now within this e-mail string they are talking
 4  about purging different queues.
 5              Were you ever involved in that process of
 6  purging the queues?
 7      A.   No.
 8      Q.   Do you know why they would have wanted to do
 9  that?
10      A.   No.
11              (Deposition Exhibit No. 25 was marked for
12  identification.)
13      Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to let
14  you review Plaintiffs' Exhibit No. 25.
15              Can you actually just turn to page 16, I
16  think it is?
17              MR. TANTILLO:  Sorry.
18              THE WITNESS:  Okay.
19      Q.   BY MR. TANTILLO:  Do you see those list of names
20  there on page 16 of this exhibit?
21      A.   Yes.
22      Q.   Can you tell me, if you know, who these different
23  people are?
24              Do you know who Bob Langston is?
25      A.   No.
```

1     Q.   Do you know who Catherine Henderson is?

2     A.   No.

3     Q.   Do you know who Ryan Crowley is?

4     A.   No.

5     Q.   Do you know who Jim O'Donnell is?

6     A.   No.

7     Q.   We have spoken about Mike Boyle?

8     A.   Yes.

9     Q.   Do you know who Mr. Robert --

10    A.   Adamovic.

11    Q.   -- Adamovic is?

12    A.   Yes.

13    Q.   Can you tell me what he does at the Recovery

14 Department?

15    A.   He is not there anymore, but at the time he -- he

16 handled projects.

17    Q.   Like what kind of projects?

18    A.   Lien release and DOJ.

19    Q.   Do you know who Lisa Shepherd is?

20    A.   No.

21    Q.   Do you know who Joe Bryant is?

22    A.   No.

23    Q.   Do you know who James Langwell is?

24    A.   No.

25    Q.   Do you know who Steve Solof is?

```
 1      A.   No.

 2      Q.   Do you know who Greg Purtee is?

 3      A.   No.

 4      Q.   Do you know who Jack Evans is?

 5      A.   No.

 6      Q.   Do you know who Justin Heuer is?

 7      A.   No.

 8      Q.   Do you know who Gary Miller is?

 9      A.   No.

10      Q.   Do you know who Christian Bloor is?

11      A.   No.

12      Q.   Do you know who Rich Saavedra is?

13      A.   No.

14      Q.   Do you know who John Gang is?

15      A.   No.

16      Q.   Do you know who Jamie Moy is?

17      A.   No.

18      Q.   Do you know who Carol Boyd is?

19      A.   No.

20      Q.   Is there anybody on this list that you recognize

21  besides Mr. Boyle and Mr. Adamovic?

22      A.   Jonathan Driver and Dawn Eason.

23      Q.   Okay.  And Jonathan Driver, what does he do?

24      A.   At the time he was vice president over Lien

25  Release in Monroe.
```

1    Q.   And what is he doing now?

2    A.   He is not at the bank anymore.

3    Q.   Is Mr. Adamovic still at the bank?

4    A.   Yes.

5    Q.   Where is he -- is he still here in Phoenix?

6    A.   He is still in Phoenix, but he is not with us.  I

7 don't know what he is doing.

8    Q.   And you said Dawn Eason.

9              Is she still in Monroe?

10   A.   I don't know if she is still there.  I just know

11 she used to work in Lien Release.

12   Q.   But you haven't had interaction with her

13 recently?

14   A.   No.

15   Q.   Let me just take a step back, because we haven't

16 really talked about it.

17             Obviously we know what you did prior to your

18 current position, but what are you doing in your current

19 job now?

20   A.   Right now I am working on -- well, like I told

21 you earlier, the conversion for -- we are converting our

22 VLS system to MSP, so I am working on doing any testing

23 that would impact Recovery with that conversion.

24   Q.   Okay.

25   A.   So I am kind of like -- there is about four

1   people or so that is working in Recovery -- making sure

2   that that doesn't impact us at all with accounts flowing

3   from MSP down instead of VLS.

4       Q.   Now how do accounts flow from MSP to Recovery?

5       A.   I don't know how that happens behind the scenes.

6   I don't know.  I don't know.

7       Q.   So what kind of concerns would there be on your

8   end from loans flowing from MSP to Recovery?

9       A.   Like making sure that fields are going to all

10  come over, name, Social, last payment, you know, all the

11  fields will still come over to Recovery like they are

12  supposed to and nothing is affected.

13      Q.   Okay.

14      A.   So I would do the testing.  We do test accounts

15  to make sure when they actually charge-off everything

16  looks like it is supposed to look, everything came over

17  exactly how it was supposed to and all that.

18      Q.   Now regarding that particular issue, are there

19  differences in the fields in MSP that flow down or migrate

20  to Recovery One?  For example, maybe there are two phone

21  numbers versus one phone number or more than one address,

22  that kind of thing.

23      A.   Yes.  I mean, yes, but they should all flow over

24  like they are supposed to.  There are two fields in

25  Recovery and two fields in MSP, so however it is filled in

1  there should come over the same.

2  　　Q.　So there shouldn't be any interruption of data --

3  　　A.　No.

4  　　Q.　-- coming from one place to another?

5  　　A.　No.

6  　　Q.　And that is what you are working on right now --

7  　　A.　Yes.

8  　　Q.　-- is trying to ensure that?

9  　　A.　Yes.

10 　　Q.　Now, you stated previously that RCV1 is still

11 being used?

12 　　A.　Yes.

13 　　Q.　And are you guys -- is Chase going to be moving

14 to any type of new system or Recovery One is still in

15 place?

16 　　A.　Recovery One is still in place.

17 　　　　　Not that I know of anyway.

18 　　Q.　Now who is the current -- who replaced Mike Boyle

19 at Recovery?

20 　　A.　Mike Zeeb and Rick Ivie.

21 　　Q.　And who?

22 　　A.　Rick Ivie.

23 　　Q.　Can you spell his last name for me?

24 　　A.　I-v-i-e.

25 　　Q.　And Mike Zeeb, how long has he been there at

1    Recovery?

2         A.    About a year and a half.

3         Q.    And for the court reporter, can you spell Mr.

4    Zeeb's last name?

5         A.    Z-e-e-b.

6         Q.    And do you know what he did prior to becoming the

7    V.P. of Recovery?

8         A.    No, I don't know.

9         Q.    You didn't have interaction with him?

10        A.    No.

11        Q.    And do you have interaction with him now much?

12        A.    Yes.

13        Q.    Does Mr. Zeeb, is he familiar with the same types

14   of codes and the same types of agency codes and collector

15   codes like you are?

16             MR. PISTILLI:  Objection; lacks foundation;

17   calls for speculation.

18        Q.    BY MR. TANTILLO:  Just from your personal

19   experience working with him.

20        A.    I am not sure.  He is more involved in, you know,

21   upper management than account level type thing.

22             (Deposition Exhibit No. 26 was marked for

23   identification.)

24        Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

25   you what has been marked as Plaintiffs' Exhibit No. 26.

1    A.    Okay.

2    Q.    Have you read that sentence you sent to

3  Mr. Oquendo?

4    A.    Uh-huh.

5    Q.    You mentioned here that there was another bulk

6  sale.

7              Do you know what you were talking about, who

8  that references?

9    A.    I don't remember, no.

10   Q.    But there had been other bulk sales to other

11  investors?

12   A.    I don't remember there being one, but there must

13  have been.

14   Q.    And do you remember why you were asking Jason for

15  a copy of the assignments that were sent for the other

16  bulk sale?

17   A.    Well, this seems to tie in with the other e-mail

18  where he is asking for assignments and we are saying we

19  don't -- we can't handle that volume.

20   Q.    Okay.

21   A.    So I was asking for a copy of a previous one.

22              I was not involved in any other bulk sales.

23  Maybe Jason was and I knew it at the time.

24   Q.    And with regards to your statement that you would

25  have difficulty processing a large number of assignments,

```
 1  was there anybody else at Chase who could do that, who
 2  could have processed the assignments for the company?
 3              I mean, Chase is a huge corporation.  I am
 4  sure they do thousands of assignments a day.
 5              MR. PISTILLI:  Is that a question?
 6      Q.   BY MR. TANTILLO:  Was there anybody else who
 7  could have processed it beyond --
 8      A.   Yes.  We offered our attorney to do it, but that
 9  was $150 an assignment.  So that is who was doing our --
10  all of our assignments our attorney did.  We did not do
11  them at Chase.
12      Q.   And what attorney did you use?  Do you remember?
13      A.   Pherin & Yelsky, P-h-e-r-i-n and Y-e-l-s-k-y.  He
14  is in California.
15      Q.   Now going back.  There was an e-mail or an
16  exhibit we discussed previously which was this RLS note
17  code.
18              Do you remember that?
19      A.   Yes.
20      Q.   And is there any reason why an RLS note code
21  would have been appended to loans that were sold?
22      A.   No.
23              MR. PISTILLI:  Objection; lacks foundation.
24      Q.   BY MR. TANTILLO:  So if the loans had been sold,
25  Chase would not have released them?
```

1    A.    No.

2    Q.    Or not customarily at least?

3    A.    No.

4          (Deposition Exhibit No. 27 was marked for

5    identification.)

6    Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

7    you what has been marked as Plaintiffs' Exhibit No. 27.

8    A.    Okay.

9          MR. PISTILLI:  Do you have a copy?

10         MR. TANTILLO:  Yes, of course.  Sorry.

11         MR. PISTILLI:  Thanks.

12         THE WITNESS:  Okay.

13   Q.    BY MR. TANTILLO:  Have you seen this document

14   before?

15   A.    No.

16   Q.    It sounds similar to the kind of work you are

17   doing now, though?

18   A.    Not necessarily me.  No.

19   Q.    On page 8 of the document they talk about in 2.1

20   Recovery has a critical business need to automate the

21   charge-off processes between MSP and Recovery One.  The

22   objective is to automate the load of charged off loans

23   from MSP to RCV via a daily feed for both MSP Clients 465

24   and 156 Bank Owned recoverable accounts.

25         Let me stop there.

```
 1              Can you tell me what MSP Clients 465 and 156
 2    Bank Owned recoverable accounts are?
 3        A.   An MSP there is two separate clients, 465 and
 4    156, that hold however many loans.
 5        Q.   Okay.
 6        A.   I think they can only hold so many loans, so they
 7    make another client.
 8              The 156 loans are Washington Mutual and 465
 9    are Chase.
10        Q.   And at some point in time did Chase Bank purchase
11    Washington Mutual?
12        A.   Yes.
13        Q.   Now can you tell me, if you know, how Chase
14    automates the charge-off process between MSP and Recovery
15    One and how that gets loaded onto the Recovery One system?
16        A.   I don't know.
17        Q.   You just know loads appear, right?
18        A.   Right.
19        Q.   Now on this document in 2.4 it discusses that
20    they are considering a Recovery One replacement system
21    initiative.
22              And you said previously that has not been
23    done?
24        A.   No, it hasn't.
25        Q.   Do you know what MSP transaction 043 is?
```

1      A.    No.

2      Q.    Is there a separate System of Records called Info

3  One?

4      A.    Info One is where the tables are that they could

5  pull the information.  Like MIS uses Info One tables.

6      Q.    So is that like where the type of spreadsheets

7  that Christine Price would create or something like that?

8      A.    Yes.

9      Q.    So you could create different queries through

10  there?

11      A.    I believe that is how she did it, yes.

12      Q.    But you don't have access to that?

13      A.    No.

14      Q.    Now is there a different System of Records called

15  EDW?

16      A.    No.

17      Q.    And you said previously that -- was it Mr.

18  Peterson that runs the MIS now?

19      A.    Yes.

20      Q.    And does a similar type of job?

21      A.    Yes.

22      Q.    Seems like one of your specialties is in testing,

23  is that correct, different --

24      A.    Not really.  They just -- I get assigned to do it

25  because I have been here so long.

```
 1      Q.   Right.
 2                I am going to show you what has been marked
 3   as Plaintiffs' 28.
 4                (Deposition Exhibit No. 28 was marked for
 5   identification.)
 6                THE WITNESS:  Okay.
 7      Q.   BY MR. TANTILLO:  The first thing I am going to
 8   ask you, Ms. Solomon, are there ways to pull exclusions
 9   within the RCV1 database?
10      A.   Yes.
11      Q.   How would that be done?
12      A.   I don't know.
13      Q.   You just know it can be?
14      A.   Yes.
15      Q.   And who would conduct those exclusions?
16                MR. PISTILLI:  Object to the form.
17                THE WITNESS:  Michael Peterson's team.
18      Q.   BY MR. TANTILLO:  Now did you ever work with
19   Panickos Palettas?
20      A.   No.
21      Q.   How about Rick Satterfield, did you ever work
22   with him?
23      A.   Yes.
24      Q.   What was his role at Chase?
25      A.   He was over MIS in -- well, he was -- he was over
```

```
 1   MIS but he did a little more, like creating reports and
 2   things like that.
 3        Q.   And is he here in Phoenix?
 4        A.   He was in Texas.  He is not here anymore.
 5        Q.   He doesn't work for the bank anymore?
 6        A.   No.
 7        Q.   How about Christa Hensley, does she still work
 8   for Chase?
 9        A.   Yes.
10        Q.   And where is she located at?
11        A.   She is in Phoenix.
12        Q.   And what are her job responsibilities?
13        A.   Today I am not sure.  She is in another job role.
14        Q.   How about during the time period in which this
15   e-mail was written, 2012, what was she doing prior to
16   that?
17        A.   She was the V.P. over the Recovery collectors.
18        Q.   So she was responsible for the actual employees
19   that were collecting the debt?
20        A.   Yes.
21        Q.   And was Mike Boyle her supervisor?
22        A.   Yes.
23        Q.   Is Kathy Madison still with Chase?
24        A.   Kathy who?
25        Q.   Madison.
```

1      A.    I don't know.  I have never heard of her.

2      Q.    And obviously we have spoken about Jason Oquendo

3  and Jeff McGrane.

4            Let me turn your attention to the second

5  page of this e-mail.  We have spoken about the CLTR code.

6            That is the collector code, right?

7      A.    Yes.

8      Q.    Do you know -- what is a tier 2 collector?

9      A.    Tier 2 collector?

10     Q.    Yes, ma'am.

11     A.    It is a collector -- same thing as a secondary

12  agency.  Basically round two, new voice.

13     Q.    Have you heard of National Asset Recovery

14  Services before?

15     A.    Yes.

16     Q.    Are they also a collection agency?

17     A.    Yes.

18     Q.    RTR, is that Real Time Resolutions?

19     A.    Yes.

20     Q.    Is Allied International Credit a collection

21  agency that you work with?

22     A.    Yes.

23     Q.    Now LCS-Primary VLS Secure, that doesn't sound

24  like a collection agency.

25     A.    Where do you see that?

Page 119

```
 1      Q.   I think it is the fourth or fifth one down.

 2      A.   Yes, it is.  It is LCS.

 3      Q.   It is LCS?

 4      A.   Uh-huh.

 5      Q.   Is PRS Recovery also a collection agency?

 6      A.   Yes.

 7                These are all collection agencies.

 8      Q.   I guess there is a JPMorgan Chase Employee

 9  Probate Accounts.

10                That is a collection agency too?

11      A.   Which?

12      Q.   I'm sorry.  The next page.

13      A.   Okay.

14      Q.   I apologize.  It is nine or ten down.  The code

15  is EMPDCM.

16      A.   That is a collection agency.

17      Q.   If you -- let's see, nine down on the second page

18  it says DESIST, CHF Unsecured Cease And Desist Queue.

19      A.   Uh-huh.

20      Q.   Is that also a collection agency as well?

21      A.   No.  Just segregated cease and desist loans so we

22  don't call.

23      Q.   And is there a reason why there is cease and

24  desist loans, like a lawsuit or something like that?

25      A.   No.  When we receive a letter saying, "Don't
```

```
 1   contact me again," it goes in that queue.
 2       Q.   Now also on that it says that the loans I guess
 3   are unsecured?
 4       A.   Where does it say that?
 5       Q.   On the same one, DESIST, CHF Unsecured --
 6       A.   Oh.
 7       Q.   -- Cease and Desist Queue.
 8       A.   I suppose.  I didn't know they were unsecured,
 9   but --
10       Q.   Are there loans in Recovery One that are
11   unsecured?
12       A.   Yes.
13       Q.   And why would that be?
14       A.   Why would they be unsecured?
15       Q.   Yes.
16       A.   Some of them originate as unsecured, some of them
17   have been foreclosed, some of them have been short sold,
18   deed in lieu.
19       Q.   And does the Recovery Department still try to
20   collect on that debt?
21       A.   Depending on state laws, yes.
22       Q.   Does Recovery also collect on bankruptcies?
23       A.   Yes.
24       Q.   Do you know if Recovery collects on loans that
25   have been lien released?
```

1    A.    Yes.

2    Q.    Does Recovery collect on loans that where a

3    borrower received a forgiveness letter?

4    A.    No.

5          (Deposition Exhibit No. 29 was marked for

6    identification.)

7    Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

8    you what has been marked as Plaintiffs' Exhibit No. 29.

9    A.    Okay.

10   Q.    Plaintiffs' Exhibit No. 29 has a Project Title or

11   Objective of Project Status Update and Task Item Follow-up

12   for the Project Name/ID DOJ:  Default:  Recovery 2nd Lien

13   Credit Initiative/WRM# 12019772.

14         It says you were listed as an attendee on

15   this call?

16   A.    Yes.

17   Q.    For the first -- the second page of this it

18   discusses that there was a final population for the 1st

19   mailing.

20         Did you have anything to do with the

21   creation of that population?

22   A.    No.

23   Q.    Why would you have been included on this kind of

24   meeting update?

25   A.    It looks like because I was in charge of the

1  op-opt letter, so just to keep me in the loop.

2      Q.   Going down to No. 3 on the second page, it says

3  MIS Reporting Status Update Rick Satterfield.  It says

4  need to add QA process to check for DFL note codes.

5           Do you know what DFL note code means?

6      A.   I don't.

7      Q.   I guess below there it says DOJ Forgiveness

8  Letter is what it means.

9           Let me ask you about a note code.

10          How does that work?  We talked about it a

11 little before, but how many note codes can a note have?

12     A.   So a note code is, if you are going to go in, say

13 you are going to note an account, there is a field for a

14 note code.  That is not going to be your notes, that is

15 just going to be a code.  Like they are all three digits

16 and they all do something.

17     Q.   Okay.

18     A.   So you can put as many note codes as you want on

19 an account.

20     Q.   Okay.

21     A.   Uh-huh.

22     Q.   So you could put 20 different note codes on there

23 and it would be, at different points in time, it would

24 allow the bank to understand, you know, I guess different

25 identifiers for that particular note?

1    A.    Yes.

2    Q.    And according to, I guess, our prior discussions,

3  MIS could pull those different note codes and create

4  lists?

5    A.    Yes.

6    Q.    So you could possibly say, "Okay, I want this DFL

7  DOJ Forgiveness Letter" and at the same time you could

8  also ask for a different note code?

9    A.    Uh-huh.

10    Q.    Now would it be possible to have the DFL note

11  code in conjunction with a search for Agency code, like

12  MRS209, let's say?

13    A.    Yes.

14    Q.    Now, a note code also, does it indicate an

15  action, like something is going to happen, for example,

16  the RLS note code we talked about before, how it flows

17  down to you?

18    A.    Not all of them.

19    Q.    Some are just identifiers?

20    A.    Yes.

21    Q.    So a process would have to be created for it to

22  flow to your team?

23    A.    Yes.

24            MR. TANTILLO:  Let's take a short break.  I

25  will be right back.

```
 1                THE VIDEOGRAPHER:  The time is 2:37 p.m.

 2                We are off the record, ending media 3.

 3                (Recess taken.)

 4                THE VIDEOGRAPHER:  The time is 2:55 p.m.

 5                We are now back on the record.  This begins

 6   media 4.

 7      Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show

 8   you what has been marked as Plaintiffs' Exhibit No. 30.

 9                (Deposition Exhibit No. 30 was marked for

10   identification.)

11                THE WITNESS:  Okay.

12      Q.   BY MR. TANTILLO:  Can you tell me what an Sys ID

13   Code is?

14      A.   This is the original system that it came from,

15   the loan.

16                Some of these I have not seen before, but

17   like you will see VLS.  That is a VLS originated loan.

18      Q.   And what is LSAM1 - Subprime?

19      A.   LSAM1?

20      Q.   Is that a different system that it came from?

21      A.   That is MSP.

22      Q.   And how about LSAM2 - Prime?

23      A.   That is MSP.

24      Q.   Now I see there is an ACL code for the WaMu ACLS

25   Conversion --
```

1    A.    Yes.

2    Q.    -- in 2009.

3          Is that one of the ways in which Chase

4    employees determine whether or not this is a WaMu loan?

5    A.    No.   It just tells us that it originated in the

6    ACLS system that I think WaMu used.

7    Q.    Now down at the very bottom there is the previous

8    two codes we talked about?

9    A.    Yes.

10   Q.    156.   And that is MSP Client 156 HWaMu?

11   A.    Yes.

12   Q.    Is that a code?

13   A.    Yes.

14         You know what?   LSAMS is not MSP.   I'm

15   sorry.   That was a system -- that was a system called

16   LSAMS.

17   Q.    Now are the 156 and the 465 codes how you

18   determine where the loans originally came from?

19   A.    Yes.

20   Q.    Did you ever work with Wendi Miller?

21   A.    Yes.

22   Q.    Is she still with the company?

23   A.    No.

24   Q.    What was her role back in 2009?

25   A.    She was my employee.   She was a -- she was a

```
 1   support analyst.  So she just worked on support functions.
 2        Q.   Ms. Solomon, I am going to show you what has been
 3   marked as Plaintiffs' Exhibit No. 31.
 4        A.   Okay.
 5                  (Deposition Exhibit No. 31 was marked for
 6   identification.)
 7                  MR. PISTILLI:  This doesn't have a Bates
 8   number on it.
 9                  Has it been produced?
10                  MR. TANTILLO:  I am sure it has.
11                  We will give you the Bates number on this
12   one, 31.
13                  THE WITNESS:  Okay.
14                  MR. PISTILLI:  But do you have the original
15   with the number on it?  We can just put it on the record
16   then.
17                  MS. FAIT:  No.  We will get it for you, to
18   you.
19                  MR. TANTILLO:  We produced all the e-mails
20   he has.
21        Q.   BY MR. TANTILLO:  Down at the bottom of the
22   message there is a message from Wendi Miller to Larry
23   Schneider.
24                  She says, "That is where the problem lies.
25   We are unable to access WaMu pay histories (this is a
```

1  converted loan), and I do not have any of the loan

2  documents imaged.  I can e-mail you the assignment.  But

3  nothing else until I get the file."

4      A.   Yes.

5      Q.   Was that a problem that you had when the WaMu

6  loans came into Chase?

7      A.   Yes.

8      Q.   And did the documents eventually get imaged?

9      A.   Yes.

10     Q.   And is there pay histories for the WaMu loans

11 now?

12     A.   Yes.

13     Q.   And what System of Records does the WaMu loans

14 reside on?  Is it also MSP?

15     A.   Some are in MSP.  Prior -- MSP is prior

16 charge-offs and Recovery One once it charges off.

17     Q.   So once the loan charges off it comes to

18 Recovery?

19     A.   Uh-huh.

20          (Deposition Exhibit No. 32 was marked for

21 identification.)

22     Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show

23 you what has been marked as Plaintiffs' Exhibit No. 32.

24     A.   Thank you.  Okay.

25     Q.   This is entitled Status Codes?

1       A.     Yes.

2       Q.     Do you know what those are?

3       A.     Yes.   Those are codes that would tell us the

4    status of the loan.

5       Q.     Now the status of the loan like as of right now?

6       A.     Yes.

7       Q.     And do these Status Codes change over time?

8       A.     Yes.

9       Q.     Are these Status Codes searchable in the RCV1

10   system?

11      A.     Yes.

12      Q.     Was that searchable in like your View Summary or

13   is it just something that can be pulled by MIS?

14      A.     You can't -- I mean, if you are in an account,

15   you can go in and look at the status.   Like I couldn't go

16   in and pull every Status Code, but MIS could.

17      Q.     So at that point in time you know where that loan

18   is, you know what happened to it?

19      A.     Yes.

20      Q.     These Status Codes appear to show up on a bunch

21   of different things, I guess bankruptcies, whether or not

22   it was part of the DOJ settlement, whether or not a 2nd

23   Lien Extinguishment was sent, whether it was granted,

24   whether a 2MP Extinguishment was granted.

25             So at that point in point when you see these

1    you know whether the loan is at its current status?

2        A.    Yes.

3                MR. PISTILLI:  Object to the form.

4        Q.    BY MR. TANTILLO:  Can you tell me what the SARS

5    notes are?

6        A.    That is the -- when the notes get older, we purge

7    them to another archive system.

8        Q.    Do you know the time frame in which that occurs?

9        A.    I don't know.

10       Q.    You just know it happened at some point?

11       A.    Yes.

12       Q.    So what resides in the SARS system that you can

13   access?

14       A.    Just notes, old notes.

15       Q.    Now are there Comments that are inside these SARS

16   notes?

17       A.    Uh-huh.

18       Q.    And where is SARS located?  Is it a repository

19   like physical or is it an electronic repository?

20       A.    It is in our mainframe.  It is something that MIS

21   has to pull.

22       Q.    And is MIS able to search the SARS notes or the

23   SARS record system?

24       A.    Yes.

25       Q.    But you are not aware of the time frame in which

```
 1   those loans are placed?
 2       A.   No.
 3                  (Deposition Exhibit No. 33 was marked for
 4   identification.)
 5       Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show
 6   you what has been marked as Plaintiffs' Exhibit No. 33.
 7                  MR. PISTILLI:  I will just note that this
 8   appears to be a Chase-produced document, but again the
 9   Bates numbers aren't on here, they are cut off.
10                  MR. TANTILLO:  Okay.  We will get that to
11   you.
12                  MR. PISTILLI:  If you will let us know the
13   Bates number.
14                  MR. TANTILLO:  Sure.
15                  THE WITNESS:  Okay.
16       Q.   BY MR. TANTILLO:  Ms. Solomon, you read the very
17   top of this that there are thousands of Recovery loans on
18   hold due to this indicator, so I got a little concerned.
19                  Do you know what that indicator was?
20       A.   It looks like the paid-in-full indicator was --
21   hold on.  It looks like the paid-in-full indicator was an
22   "N" instead of a "Y," so it wasn't creating a lien release
23   on anything paid in full.
24       Q.   Now, in the e-mail below the one that you sent to
25   Ms. Rubino and Mr. Driver and Mr. Ingua there is these
```

1  different status indicators?

2      A.   Yes.

3      Q.   Are those the same status indicators we just

4  talked about?

5      A.   No.

6      Q.   These are different?

7      A.   Yes.

8      Q.   Where do those particular status indicators

9  reside?  Are they -- where are they located?

10     A.   You mean from over here on the left?

11     Q.   Yes, ma'am.

12     A.   Okay.  I thought we were looking at Default

13  Indicator.

14           Yes, those are the same status indicators.

15     Q.   So the Paid in Full is a status indicator, the

16  SSL for Short Sale?

17     A.   Yes.

18     Q.   SCL Settled or SS?

19     A.   Yes.

20     Q.   RELs is a Release Lease (Amended Release)?

21     A.   Yes.

22     Q.   The 2MGs Dodd Frank 2MP 2nd Extinguishment?

23     A.   Yes.

24     Q.   Do you know what that is?

25     A.   For the 2MP Extinguishment letters or projects,

```
 1  that is to release the liens on those.
 2      Q.   The AFP, that is the DOJ 1st Lien Release, do you
 3  know what that is?
 4      A.   Somewhat, yes.
 5      Q.   Can you tell me what you know?
 6      A.   I don't remember.  I think it was just we
 7  released the liens.  I don't remember if we made them --
 8  if we closed them or not.
 9      Q.   And for DOJ, was that also a similar lien release
10  project?
11      A.   Yes.
12      Q.   And HUD, the HUD Settlement Lien Release, do you
13  know what that is?
14      A.   No.
15      Q.   So regarding this message, were they lien
16  releasing loans that hadn't been paid in full, or was that
17  the problem?
18              MR. PISTILLI:  Object to the form.
19              THE WITNESS:  No, they weren't releasing
20  liens that were paid in full.  That was the problem.
21      Q.   BY MR. TANTILLO:  Now, can you tell me what the
22  POTS system is?
23      A.   It is the Payoff Tracking System.
24      Q.   Okay.
25      A.   I have never seen it.  I don't know.  I just know
```

Page 133

1   that is where the lien releases go to be processed.

2       Q.   And do you send documents there pursuant to your

3   job responsibilities?

4       A.   I don't send documents there, but these status

5   indicators on here, this code being placed in the status

6   field in Recovery sends a request systematically to POTS

7   to release the liens.

8       Q.   So if you place one of these different codes in

9   there it will automatically release the lien?

10      A.   Yes.

11      Q.   Now what is a PIF account or a PIF account?

12      A.   Paid in full.

13      Q.   Paid in full.

14              Now who is Arvin Ingua?  Do you know him?

15      A.   Yes.

16      Q.   Does he work at Chase?

17      A.   He does.

18      Q.   Is he still with the Recovery Department?

19      A.   He is not with Recovery.  He is with Lien

20   Release.

21      Q.   Is he in Monroe?

22      A.   No, he is in Manila.

23      Q.   Do you know what types of processes are done in

24   the Manila?

25      A.   They do lien releases.  I am not sure why there

1  are some in Manila and some in Monroe.  I think they just

2  have two teams doing it.

3     Q.   And I guess are the e-lien released, are they

4  done in Manila?

5     A.   Not necessarily.  I don't know how they have them

6  split.  Maybe by state or something or county.  I don't

7  know.

8     Q.   Now do you know if they use, if Chase uses,

9  excuse me, third-party vendors to conduct these lien

10 releases?

11    A.   Yes, they do.

12    Q.   And do you know any of those third-party vendors?

13    A.   It is just one, but I can't remember the name.

14    Q.   Is it Nationwide Title Clearing?

15    A.   That doesn't sound familiar.

16    Q.   Pearson Patterson?

17    A.   No.

18         I don't pay that much attention to the name.

19 Some of them they do in-house and some of them they have

20 to send out.  So I don't know which ones.

21    Q.   Do you know who is responsible for processing the

22 lien releases?  Is there a current supervisor?

23    A.   I know Angela Anderson is over Monroe.

24    Q.   Do you know who is over the Manila project?

25    A.   I don't know.  I just go to Arvin.  I am not sure

```
 1  who he reports to.
 2              (Deposition Exhibit No. 34 was marked for
 3  identification.)
 4     Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show
 5  you what has been marked as Plaintiffs' Exhibit No. 34.
 6              Can you please take a look at that?
 7              MR. TANTILLO:  I will give you your copy.
 8              THE WITNESS:  Okay.
 9     Q.   BY MR. TANTILLO:  At the very end of this chain
10  on the last page you write to Mark Shea and Amanda Peachey
11  --
12              Is that how you say it?
13     A.   Yes.
14     Q.   -- "Did you receive a request to stamp 242
15  accounts with, quote-unquote, DOJ?  If so, from who and
16  for what and how often will that happen?  That has
17  affected our workload quite a bit."
18              What was the, quote-unquote, DOJ code that
19  they were talking about here?
20     A.   A note code.  If they did the note code, it would
21  -- it would roll to my daily task report.
22     Q.   And what did you have to do once you received
23  that DOJ code?  What was your responsibility?
24     A.   Open routes for -- I am not sure at that time if
25  we were opening routes for lien releases or if they were
```

```
 1  being automated to POTS, but we would have to open routes
 2  for credit bureau updates.
 3      Q.    And so once you received a credit bureau update,
 4  what would happen next?
 5      A.    We just opened the route and it would go to
 6  whoever updates credit reports, and they worked the route,
 7  and then we would note Recovery that we opened the route.
 8      Q.    On the next page, or the page I guess before
 9  that, Mark Shea writes to you saying, "I stamped 239
10  accounts on 9/21/12 for a CCR."
11              What is a CCR?
12      A.    A CCR is a -- I don't know what it stands for, I
13  can't remember, but it is something -- someone opens a
14  request to MIS to do something.
15      Q.    And following up it says titled, quote,
16  accelerate ROL --
17              Do you know what ROL is?
18      A.    Release of Lien.
19      Q.    -- for 239 DOJ Active BK accounts.
20              BK stands for bankruptcy?
21      A.    Yes.
22      Q.    Now above that -- oh, let me just ask you a
23  question.
24              What was Mark Shea's role at this time in
25  the company?
```

1    A.    He was in MIS.

2    Q.    And how about Ms. Peachey?

3    A.    She was my employee in Support.

4    Q.    So above that Ms. Rubino sends you an e-mail

5    saying -- it says "I", but I am sure she was saying "it"

6    was a one-time event except in October when we start

7    releasing 6000 a day.

8              What were they releasing 6,000 a day of?

9    A.    DOJ, DOJ lien releases.

10   Q.    So they were releasing notes that had the DOJ

11   code on them?

12   A.    Yes.  Well, they were saying they were going to

13   in October.

14   Q.    And then Ms. Rubino says that they were pushing

15   those accounts through the POTS interface?

16   A.    Yes.

17   Q.    Now at this point in time, what was Ms. Rubino's

18   role?  Was she your supervisor or --

19   A.    I don't think she was at this time.  She was over

20   MIS but she wasn't my supervisor.

21   Q.    Now are you considered to be in the MIS

22   Department?

23   A.    No, no.  She was.  I can't remember who I was

24   reporting to at this time.

25   Q.    Now you say on the page before that, the e-mail

1  from you on September 24th of 2012 to Jason Oquendo and

2  Nancy Rubino, copying Amanda Peachey, you say, "I don't

3  want them to input the DOJ note code because that is going

4  to make my cbr exception report go wild, but I would think

5  they will have to, in order to request a lien release

6  right?"

7          What did you mean by that?

8      A.    I didn't want them to put the DOJ as a note code

9  because if I -- if it goes as a note code it is going to

10 come to my work list the following day of 6,000 or

11 whatever note accounts, which obviously we couldn't

12 handle.  We had a two-day SLA and exception report that

13 would catch anything not done within two days.  So

14 everything was going to start going a little bit crazy if

15 they did it that way.

16     Q.    Okay.

17     A.    So I was wanting them to do it kind of another

18 way, a way that wouldn't go on my report.

19     Q.    And what ended up happening?  Did you have to

20 process all these?

21     A.    No.  No, definitely not.

22     Q.    Okay.

23     A.    It looks like from what Jason was saying, and I

24 think I remember that, is she did do it through the

25 interface, so we didn't see any of the lien release things

1  happen, and then we just sent a spreadsheet to credit
2  bureau reporting to handle them that way instead of
3  manually one by one.
4      Q.   And what was this interface you are talking
5  about?
6      A.   They just sent it -- she just did it directly
7  through the POTS instead of manually having us do it.
8      Q.   On the first page of this document, I think it is
9  JPMC-MRS-00027113 at the bottom, you write that, we will
10  have to do, quote-unquote, a CLC and also a CBI.  The CBI
11  will ignore the looking for the route part.  So it will be
12  two stamps.  So do I just open a CCR each day this
13  happens?
14            Can you explain what you mean by that?
15      A.   The CLC just means -- it is a closure code
16  that -- it is a note code but it is the closure code
17  saying that Support did what you asked us to do.
18      Q.   Okay.
19      A.   So that means closed lien release and credit
20  bureau update.  That is what CLC is, completed.
21      Q.   Okay.
22      A.   And then the CBI, we had to create an ignore code
23  for note codes, because on my exception report it is going
24  to look for 6,000 credit bureau requests in the system I
25  was telling you about where you have to open a route.  I

1    had an exception report tied to that that would show if

2    the employees were actually opening a route or just saying

3    they opened a route.

4        Q.    Okay.

5        A.    So this would -- that is going to look for all

6    these routes.  And if we are not doing it that way and we

7    are doing it by sending a bulk request on a spreadsheet,

8    it is going to look up all these things.

9        Q.    Okay.

10       A.    So we created a note code, CBI credit bureau

11   ignore, don't look for that route.  So the report wouldn't

12   look for it.

13       Q.    And why did the corporation or Chase want you to

14   run a credit report or credit bureau update before they

15   did a lien release?

16       A.    They didn't.  It could be done at the same time.

17       Q.    So there was no reason why they asked you to do

18   that or none that you know of?

19       A.    Before a lien release?

20       Q.    Right.

21             Why would they even bother to ask you to

22   send for a credit bureau report?

23             Because you wanted to see if those loans

24   were being collected on?

25       A.    I don't know what you mean.

```
 1      Q.   Well, I am just asking, if the decision had been
 2   made to lien release the loan, why would a CBI update be
 3   needed?
 4      A.   Because we needed to update the customer's credit
 5   report saying it was a closed loan and not a collectible
 6   balance.
 7      Q.   Previously you mentioned that there are some
 8   loans that Chase does collect on that are lien released?
 9      A.   Yes.
10      Q.   Were these those loans or were they different
11   loans?
12              MR. PISTILLI:  Object to the form.
13              THE WITNESS:  No, they weren't these loans.
14      Q.   BY MR. TANTILLO:  So these were different loans
15   than the ones that were there?
16      A.   Yes.
17              (Deposition Exhibit No. 35 was marked for
18   identification.)
19      Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show
20   you what has been marked as Plaintiffs' Exhibit No. 35.
21              I am going to ask you to turn to page, I
22   guess 1, which is behind the cover sheet.
23      A.   Okay.
24      Q.   It says there is a Program Team.
25              Is there anybody on here that you recognize
```

```
 1   or you have worked with?

 2       A.   Nope.

 3       Q.   On the next page, page 2, as is labeled at the

 4   bottom, do you know who Kevin Race is?

 5       A.   No, I don't.

 6       Q.   How about Steve Hemperly?

 7       A.   Yes.

 8       Q.   Have you ever worked with him before?

 9       A.   No.  He was like one step under Jamie Diamond.

10       Q.   So you know the name but you don't know the --

11       A.   Right.

12       Q.   How about Eric Schuppenhauer?

13       A.   No.

14       Q.   Did you ever work with Rohin Tagra?

15       A.   No.

16       Q.   Moving to page 4.

17            Did you ever work with Trung Nguyen?

18       A.   No.

19       Q.   I don't know who Amit is.

20            Do you know who that happens to be?

21       A.   I don't know -- I don't think I am on the same

22   page as you.

23       Q.   I apologize.  I was on page 4.  It has a page 4

24   at the bottom of the page.

25       A.   This one doesn't have a page number.
```

```
 1                 Okay.  Who is that again?
 2      Q.    It says Trung Nguyen.
 3                 MR. PISTILLI:  It is the Bates page ending
 4  in 731 if that helps you.
 5                 THE WITNESS:  Okay.  You are looking over
 6  here.
 7      Q.    BY MR. TANTILLO:  Yes.  I apologize.
 8      A.    No.  I don't know who that is.
 9      Q.    Do you happen to know who the Amit they are
10  talking about here is?
11      A.    Nope, I don't.
12      Q.    Have you interacted with Joy Palazzo?
13      A.    No.
14      Q.    Or Nicky Holsopple?
15      A.    No.
16      Q.    Going to the Bates number that ends 733.
17                 Do you know who Brent Boyer is?
18      A.    No.
19      Q.    And obviously you know who Mike Boyle is?
20      A.    Yes.
21                 (Deposition Exhibit No. 36 was marked for
22  identification.)
23      Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show
24  you what has been marked as Plaintiffs' Exhibit No. 36.
25      A.    Okay.
```

```
 1        Q.    Do you recognize this type of letter?  Ever seen
 2   one before?
 3        A.    Yes.
 4        Q.    Did you have any involvement in sending out of
 5   this letter to borrowers?
 6        A.    No.
 7        Q.    Just the opt-out letters?
 8        A.    Yes.
 9               (Deposition Exhibit No. 37 was marked for
10   identification.)
11        Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show
12   you what has been marked as Plaintiffs' Exhibit No. 37.
13               MR. PISTILLI:  These don't have a Bates
14   number on them.
15               Have they been produced?
16               MR. TANTILLO:  They've been produced.  They
17   are in a filing that you can see at the top.
18               We will go back through the Bates numbers.
19               THE WITNESS:  Okay.
20        Q.    BY MR. TANTILLO:  Let me ask you on page 1 of
21   this document.  It says Consolidated Notes Log.
22               Can you tell me what that is?  Is this a
23   screen that you would find in Recovery?
24        A.    No.  This is MSP.
25        Q.    How do you know that?
```

1    A.    Because I know what MSP looks like.

2              That is just -- that is the note -- it is

3    hard to read this, it is blurry, but -- it is the note

4    screen.

5    Q.    And on that note screen it indicates something

6    called the Pre DOJ Lien Release Project?

7    A.    Yes.

8    Q.    Do you know what that was?

9    A.    No, I don't.  Not in MSP.

10   Q.    Was there a similar project in the Recovery One

11   database?

12   A.    I don't know that it was called Pre DOJ, but I

13   am just thinking of DOJ, but I don't know of anything that

14   happened in MSP.  I don't work in there.

15   Q.    Does Recovery staff have access to the MSP

16   Consolidated Notes Log or other screens?

17   A.    Yes.

18   Q.    Do you have to like toggle between the two

19   sometimes?

20   A.    Yes.

21   Q.    And I guess the same is true for VLS?

22   A.    Yes.

23   Q.    Ms. Solomon, if you turn to page 3 on the

24   Consolidated Note Codes.

25              Does MSP -- is it common for MSP to have

```
 1  these type of notes?
 2      A.    The Pre DOJ Lien Release Project or -- is that
 3  what you are talking about?
 4      Q.    Well, that, but also -- obviously, the rest is
 5  hard to read because it is not complete.
 6               But is it common for the Consolidated Notes
 7  Log to have these kinds of things within it?
 8      A.    Oh, yes.
 9      Q.    And are there notes that are contained inside the
10  RCV1 system as well or is it different?
11      A.    No --
12      Q.    Different?
13      A.    -- it is different.
14      Q.    How are notes, I guess, written in the RCV1
15  system?
16      A.    Well, I mean --
17               Okay.  If you are talking about the style of
18  the notes, they are the same.  Pretty much the same, yes.
19      Q.    The style is the same?
20      A.    Yes.
21      Q.    You just have to go to a different place to look
22  at them?
23      A.    Yes.
24               MR. PISTILLI:  You are going to point me to
25  the produced version of this?
```

 1               MR. TANTILLO:  Sure, because obviously we

 2    filed --

 3               MR. PISTILLI:  Does the produced version

 4    contain the redactions that appear in this version?

 5               MR. TANTILLO:  Yes.

 6               MR. PISTILLI:  What is the basis for those

 7    redactions?

 8               MR. TANTILLO:  The redactions are just the

 9    loan number.  We were just trying to protect the identity.

10    That's all it was.

11               I guess when we filed this, we filed it so

12    that the loan number wasn't put on to PACER, the

13    borrower's account number.

14               MR. PISTILLI:  If you could just point us to

15    where you produced the --

16               MR. TANTILLO:  Okay.

17               MR. PISTILLI:  I would appreciate it.

18    Q.   BY MR. TANTILLO:  Looking back at this, is there

19    any way to determine whether or not this loan was also in

20    Recovery One?

21    A.   No, I can't tell.

22    Q.   Was it common for there to be notes written in

23    MSP and Recovery One once a loan was migrated to Recovery?

24    A.   No.

25    Q.   So once it is in Recovery, it is unusual for

```
 1   there to be a loan then that would have that kind of
 2   documentation?
 3       A.   Yes.
 4               (Deposition Exhibit No. 38 was marked for
 5   identification.)
 6       Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show
 7   you what has been marked as Plaintiffs' Exhibit No. 38.
 8       A.   Okay.
 9       Q.   In this e-mail from Mr. Kassem to Mr. Boyle, Omar
10   talks about how there has been, I guess, several of the
11   big investors that have been complaining about the
12   Canceling Her Debt letter.
13       A.   Uh-huh.
14       Q.   Did you have any active role, beyond what we have
15   already talked about, in remediating the Canceling Her
16   Debt letter, the 2nd Lien Extinguishment letter?
17       A.   No.
18               MR. TANTILLO:  We are going to take a
19   few-minute break, because we are getting down to the last
20   of our documents.  I want to see how we can wrap up.
21               THE VIDEOGRAPHER:  The time is 3:43 p.m.
22               We are off the record, ending media 4.
23               (Recess taken.)
24               THE VIDEOGRAPHER:  The time is 3:58 p.m.
25               We are now back on the record, starting
```

```
 1   media 5.
 2                   MR. TANTILLO:  Can you read me back my last
 3   question, sir?
 4                   (Record read.)
 5      Q.   BY MR. TANTILLO:  Ms. Solomon, do you know if I
 6   am on 38 or 39?
 7      A.   39.
 8                   (Deposition Exhibit No. 39 was marked for
 9   identification.)
10      Q.   BY MR. TANTILLO:  Ms. Solomon, I am going to show
11   you what has been marked as Plaintiffs' Exhibit No. 39.
12      A.   Okay.
13      Q.   Ms. Solomon, have you seen a Note Sale Proposal
14   before?
15      A.   Yes.
16      Q.   And are the documents herein Bates marked as
17   JPMC-MRS-00017830 through looks like 17838 --
18                   MR. PISTILLI:  Hang on.
19      Q.   BY MR. TANTILLO:  Is that right?
20      A.   Yes.
21                   MR. PISTILLI:  My copy skips from 834 to
22   838.
23                   MR. TANTILLO:  Here we go.
24                   MR. PISTILLI:  Thank you.
25                   THE WITNESS:  Mine does too.
```

```
 1                    MR. PISTILLI:  So this is Bates pages 30,

 2   31, 32, 33, 34 and 38?

 3                    MR. TANTILLO:  So we are missing two pages.

 4                    THE WITNESS:  Three pages.

 5                    MR. PISTILLI:  Three pages.

 6                    MR. TANTILLO:  Three pages, yes.

 7       Q.   BY MR. TANTILLO:  Absent the fact that we are

 8   missing pages, were these the type of documents that were

 9   sent to potential note sale buyers, do you know, Ms.

10   Solomon, or not?

11       A.   I don't know.

12       Q.   Let me ask you to turn to Bates No. 17832.  It is

13   the third page in that packet.

14                    Can you tell me what this is that we are

15   looking at?

16       A.   The View Summary screen?

17       Q.   Yes.

18       A.   That is just Recovery One, the View Summary

19   screen.

20       Q.   It says there is a balance of 15,176.42?

21       A.   Yes.

22       Q.   Can you tell me what the "P" stands for?

23       A.   The principal.

24       Q.   What does the "O" stand for?

25       A.   Pre charge-off interest.
```

```
 1        Q.    What does the "I" stand for?
 2        A.    Post charge-off interest.
 3        Q.    So after charge-off there is still interest that
 4   is charged?
 5        A.    There was back in 2007, not today.
 6        Q.    And do you know when that stopped?
 7        A.    Around 2012 or '13.  I am not sure.
 8        Q.    Now the Agency code, it says PSEC.
 9              What does that mean?
10        A.    Secured collector 03.  It just means that whoever
11   was working this up, their number.
12        Q.    And within the note section it says "received
13   offer from S&A for note," 5,050?
14        A.    Yes.
15        Q.    Does the View Summary have comments like that in
16   which these particular loans were sold?
17        A.    The View Summary screen only shows like the last
18   couple of notes, the most current notes.  If you want all
19   the notes, you have to go to View Activity.
20        Q.    And that is a different screen within the
21   Recovery portal?
22        A.    Yes.
23        Q.    So let me ask you this.  Is it possible to
24   search, for example, let's say, S&A within the notes?
25        A.    No.
```

1    Q.   And the only way to obtain similar statements

2  like this, the View Summary or the View Activity, would be

3  to search by loan numbers?

4    A.   Yes.

5    Q.   Now on the Comments section it says that Wells

6  Fargo 1st.

7            Do you know what that means?  I guess that

8  Wells Fargo had a first lien on it, right?

9    A.   Wells Fargo was the first lienholder on this

10  property.

11   Q.   Is there any way to indicate that this was a

12  second lien?  I am probably missing it somewhere.

13   A.   Not on these screens, and I think in '07, no.  We

14  wouldn't even have that.

15   Q.   Could you turn to the next page where it says

16  View Activity?

17   A.   Uh-huh.

18   Q.   Is that the screen you are talking about where

19  there is additional notes?

20   A.   Yes.

21   Q.   And within that there is notes regarding property

22  taxes, commission, I guess gain/loss.

23            What is the gain/loss?  Is that something

24  that is present in every note or --

25   A.   No.

1          At this time, when we were doing note sales,

2    we had this kind of note in here, probably for just -- I

3    don't know if it was for the investors or for the

4    collectors.

5          Q.    Would that have been something that was added

6    by --

7          A.    The collector.

8          Q.    Now the following page it says -- I guess Bates

9    No. JPMC-MRS-00017834.

10          Have you ever seen something like this

11    before?

12          A.    What is this?

13          Q.    At the top it says Valuations.

14          A.    Yes.  I am not very familiar with it, though,

15    because I wasn't a collector.

16              (Deposition Exhibit No. 40 was marked for

17    identification.)

18          Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

19    you what has been marked as Plaintiffs' Exhibit No. 40.

20          A.    Okay.

21          Q.    On the second to the last page in an e-mail from

22    you, I guess it is Bates stamped JPMC-MRS-00005049, an

23    e-mail I guess from you to Jason Richmond --

24          A.    Yes.

25          Q.    -- you ask, "Is there any way with Eddie out you

```
 1    can give an update on the S&S Sale and when we will be
 2    ordering file from Monroe?"
 3                 What did you mean by that, if you can
 4    remember?
 5        A.    I needed to know what was happening, if the -- if
 6    even when the sale was going to take place so we could get
 7    the files ordered and not at the same time as they are
 8    handling the WaMu conversion.
 9        Q.    So at the same point in time the WaMu loans were
10    coming in?
11        A.    Uh-huh.
12        Q.    And Monroe is where -- is that where the paper
13    files were?
14        A.    Yes.
15        Q.    Let me ask you a question.
16                 Do you know why the amount that an investor
17    paid for a loan was deducted from what the borrower owes?
18    Did you ever see that before?
19        A.    I don't know why, but yes, I saw that.
20        Q.    So you saw if Mr. Schneider had paid $5,000 for a
21    loan that would have been taken off the principal balance?
22        A.    Yes.
23        Q.    Okay.
24        A.    Not for the customer, though, just for our
25    records.
```

```
 1      Q.    For your records?

 2      A.    Uh-huh.

 3      Q.    Let me just pop back to the previous exhibit.

 4            On page JPMC-MRS-00005048.

 5            MR. PISTILLI:  You are on Exhibit 40?

 6            MR. TANTILLO:  Yes, sir, still on Exhibit

 7   40.

 8            THE WITNESS:  Okay.

 9      Q.    BY MR. TANTILLO:  Do you know where it says

10   Subject doclink:  document, et cetera, do you know what

11   that means?

12      A.    I don't.

13      Q.    Do you know what Volume Status is as a code?

14      A.    No.

15      Q.    What does it mean if a loan is active versus

16   inactive?

17      A.    Active means it is in an active collection queue

18   and inactive is closed, paid.

19            (Deposition Exhibit No. 41 was marked for

20   identification.)

21      Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

22   you what has been marked as Plaintiffs' Exhibit No. 41.

23            If you could turn to --

24            MR. PISTILLI:  Can I have a copy, please?

25            MR. TANTILLO:  Yes, of course.
```

1      Q.    BY MR. TANTILLO:   If you could turn to page 6 of

2   that document.   I think -- it is Bates stamped 33593.

3      A.    Okay.

4      Q.    I will give you a chance to look at it.

5      A.    Okay.

6      Q.    Are you familiar with this Overall process flow?

7      A.    Somewhat.   Yes.

8      Q.    So where it says File Creation, who would have

9   created the file here?

10     A.    MIS.

11     Q.    Then it says Loans loaded to queue (DOJLTR).

12              Was that a note code or was that a status

13   code, or do you know?

14     A.    That was a queue like where we have seen the

15   collectors and where we were looking at that PO3 I was

16   telling you.   That was their number.

17     Q.    It would go into that collector code?

18     A.    Yes.

19     Q.    Now, it goes through different reviews and

20   approvals and address updates.

21              No. 5 there is a note code DFL that is

22   added.

23              Regarding that DFL code that was added, do

24   you know who would have done that?   Would that have been

25   MIS?

1    A.    It would be MIS, yes.

2    Q.    Now moving to No. 7.

3          I believe this may have been the area where

4  you worked, right, in terms of the opt-out codes?

5    A.    Yes.

6    Q.    Were you responsible for the few borrowers you

7  said who wanted to opt out putting that code into the

8  system or --

9    A.    No, I didn't put the code in.  We just sent a

10 letter.

11   Q.    And the borrower had to opt out within 15 days of

12 the mailing?

13   A.    Yes.

14   Q.    Do they usually do that by telephone or they just

15 send you a letter back?

16   A.    I think most were phone calls.  I am sure we got

17 some letters too.

18          (Deposition Exhibit No. 42 was marked for

19 identification.)

20   Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show

21 you what has been marked as Plaintiffs' Exhibit No. 42.

22   A.    Thank you.

23          Okay.

24   Q.    If I may turn your attention to the second page

25 marked with the number 23727, 6a.

1     A.   Uh-huh.

2     Q.   Here it says that for the 1st Mailer loans on or

3 about November 15th of 2012, a Change Control Request was

4 processed.

5           Do you know what a Change Control Request

6 is?

7     A.   Yes.  That is that CCR thing I couldn't remember

8 the name.  So there is the name.

9           It is a request to our internal MIS team to

10 do something.

11    Q.   And then it says, quote, AR the 5529 accounts to

12 the R1099C File?

13    A.   Yes.

14    Q.   What does that mean?

15    A.   Manually move the 5,529 accounts to the R1099C

16 queue.

17    Q.   And then once it goes to the R1099C, the R1099C

18 is mailed to the borrower?

19    A.   Yes.

20    Q.   The next line says, "Note code each account with

21 DCL note code followed by the DOJ note code."

22           Can you explain to me how it would work in

23 the RCV1?

24    A.   So that was probably part of the Change Control

25 Request was to have them note code all those accounts with

1   the DCL.

2                I am not sure what DCL stands for.

3       Q.    Okay.

4       A.    And then followed by the DOJ note code, which is

5   what was going to prompt the lien release and the credit

6   bureau update.

7       Q.    Next line says, "On or about May 8th, 2013, a

8   second Change Control Request was processed for a subset

9   of the 1st Mailer loans after a confirmatory Core Logic

10  review.  Please apply the DCL note code to the attached

11  list of loans from the 1st DOJ Mailer."

12               So that is the same thing, they are

13  attaching the DCL note code to the mailers?

14      A.    Yes, it looks like it.

15      Q.    Now, on the second line it says, "The DCL note

16  code indicating an intact lien exists."  It looks like on

17  6b.

18      A.    6b.  Okay.

19               Yes.

20      Q.    Do you know why there had to be an intact lien in

21  existence for the loans in order for them to take credit

22  for DOJ?

23      A.    No, I don't know why.  I don't know the details

24  of the DOJ.

25      Q.    Now, on that same paragraph it says ARD.

```
 1                    Do you know what ARD means?
 2       A.    I don't know what that means.
 3                    (Deposition Exhibit No. 43 was marked for
 4   identification.)
 5       Q.    BY MR. TANTILLO:  Ms. Solomon, I am going to show
 6   you what has been marked as Plaintiffs' Exhibit 42.
 7                    MR. PISTILLI:  43?
 8                    MR. TANTILLO:  43.
 9                    Thank you, Chris.
10                    MR. PISTILLI:  That is what I am here for.
11                    THE WITNESS:  Okay.
12       Q.    BY MR. TANTILLO:  Ms. Solomon, could you turn to
13   the second page where it starts with No. 6 on
14   JPMC-MRS-49870.  Here it says, "Following this extensive
15   intact lien validation process and prior to each mailer,
16   the following codes were placed on each account in
17   Recovery One (the system of record) to identify the loan
18   is eligible for HUD.  And the codes are HCE, HCH, HUD and
19   HLS.
20                    Do you know what kind of codes these are?
21       A.    I don't.  I don't know anything about the HUD
22   project.
23                    MR. TANTILLO:  All right.  I tender the
24   witness to Mr. Pistilli.
25
```

```
 1                        EXAMINATION

 2

 3      Q.   BY MR. PISTILLI:   Just a couple questions, Ms.

 4   Solomon.

 5                You testified earlier that in 2013 you were

 6   asked no longer personally to provide support to Mr.

 7   Schneider and his companies?

 8      A.   Yes.

 9      Q.   And that was because he had threatened litigation

10   against Chase?

11      A.   Yes.

12      Q.   And you told him at that time if he had future

13   requests he would need to file them through the legal

14   department?

15      A.   Yes.

16      Q.   So he was still permitted to request support but

17   that the request needed to go through the legal

18   department?

19      A.   Yes.

20      Q.   Prior to that time in 2013 were you Mr.

21   Schneider's primary point of contact for support on the

22   loans that he purchased?

23      A.   Yes.

24      Q.   And were you in routine contact with him?

25      A.   Yes.
```

1      Q.   He came to you with requests regarding loans he
2  purchased?
3      A.   Yes.
4      Q.   Did you ever decline to fulfill one of his
5  requests?
6      A.   No.
7      Q.   So for instance -- could you take a look at
8  Exhibit 10?
9      A.   10?
10      Q.   Please.
11      A.   Yes.
12           I think that is where we got out of order or
13  something.
14      Q.   So Exhibit 10 is actually --
15      A.   Here it is.
16      Q.   It is two separately stapled documents and e-mail
17  and then a kind of long printout of an Excel spreadsheet.
18           Do you have it?
19      A.   Yes.
20      Q.   And this reflects your sending data regarding
21  loans that MRS purchased to Mr. Schneider?
22      A.   Yes.
23      Q.   And then the next day did you follow up by
24  providing additional information regarding these loans to
25  Mr. Schneider?

1      A.    Yes.

2      Q.    At that time did you provide him all of the data

3   elements that he requested?

4      A.    Yes.

5      Q.    Did there come a point in time there when he

6   requested additional data elements?

7      A.    Yes.

8      Q.    Did you provide him those data elements?

9      A.    Yes.

10      Q.    Were there ever any data elements that he

11   requested that you didn't provide him?

12      A.    No.

13      Q.    Did Mr. Schneider come to you from time to time

14   with questions regarding individual loan files?

15      A.    Yes.

16      Q.    Did you respond to those inquiries to the best of

17   your ability?

18      A.    Yes.

19      Q.    If he requested a document and you were able to

20   find it, you sent it to him?

21      A.    Yes.

22      Q.    Regarding the loans purchased by MRS in the debt

23   sale, did there come a time that Mr. Schneider requested

24   certain original loan files from you?

25      A.    Yes.

```
 1      Q.   How did that work?  Did he provide you a list of
 2   all loans for which he wanted original files?
 3      A.   Yes.
 4      Q.   And then did you set about to provide him with
 5   those original files?
 6      A.   Yes.
 7      Q.   So if they existed they were sent to him at the
 8   time of his request?
 9      A.   Yes.
10               MR. PISTILLI:  No further questions.
11               MR. TANTILLO:  No further questions.
12               The deposition is complete.
13               Thank you so much.
14               THE VIDEOGRAPHER:  The time is 4:26 p.m.
15               This concludes the deposition, with media
16   No. 5.
17               (Whereupon the deposition concluded at 4:26
18   p.m.)
19
20                        ------------------
21                           Launi Solomon
22
23
24
25
```

1  STATE OF ARIZONA          )

2  COUNTY OF MARICOPA        )

3          BE IT KNOWN that the foregoing deposition

4  was taken by me pursuant to stipulation of counsel; that I

5  was then and there a Certified Reporter in and for the

6  County of Maricopa, State of Arizona, and by virtue

7  thereof authorized to administer an oath; that the witness

8  before testifying was duly sworn by me to testify to the

9  whole truth; that the questions propounded by counsel and

10  the answers of the witness thereto were taken down by me

11  in shorthand and thereafter transcribed into typewriting

12  under my direction; that the foregoing pages are a full,

13  true and accurate transcript of all proceedings and

14  testimony had and adduced upon the taking of said

15  deposition, all to the best of my skill and ability.

16          A REVIEW OF the transcript was requested.

17          I FURTHER CERTIFY that I am in no way

18  related to nor employed by any parties hereto nor am I in

19  any way interested in the outcome hereof.

20          DATED at Phoenix, Arizona, this 30th day of

21  May, 2017.

22

23                      Mark Miller
                        CCR # 50474
24

25