UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

MORTGAGE RESOLUTION SERVICING,
LLC, et al.,

        Plaintiffs,

    -v-                                No.  15 CV 293-LTS-RWL

JPMORGAN CHASE BANK, N.A., et al.,

        Defendants.

--------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiffs Mortgage Resolution Servicing, LLC ("MRS"), 1st Fidelity Loan

Servicing, LLC ("1st Fidelity"), and S&A Capital Partners, Inc. ("S&A" and, together with MRS

and 1st Fidelity, "Plaintiffs") bring this action for breach of contract, fraud, and negligent

misrepresentation against Defendants JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., and

Chase Home Finance, LLC (collectively, "Chase" or "Defendants").  On February 13, 2017, the

Court granted Chase's motion to dismiss Plaintiffs' conversion, tortious interference, slander of

title, and civil RICO claims.  (Docket entry no. 140.)  On March 30, 2018, the Court denied

Plaintiffs' motion for leave to file an amended complaint reinstating its conversion, tortious

interference, and civil RICO claims, adding a new claim for promissory estoppel, and adding 1st

Fidelity and S&A as plaintiffs to MRS's claims for fraud and fraudulent inducement.  (Docket

entry no. 288.)  The Court granted Plaintiffs leave to amend their complaint to the extent that

Plaintiffs sought to augment allegations related to their remaining causes of action.  (<u>Id.</u>)

        Before the Court are five motions: (1) Chase's July 2018 motion for partial

summary judgment seeking dismissal of Plaintiff MRS's breach of contract, fraud, and negligent

misrepresentation claims as time-barred, and seeking dismissal of MRS's fraud, negligent misrepresentation and punitive damages claims on the merits (docket entry no. 301); (2) MRS's October 2018 motion for partial summary judgment on its fraud and negligent misrepresentation claims (docket entry no. 321); (3) Plaintiffs' March 2019 motion for partial summary judgment on their breach of contract claims (docket entry no. 350); (4) Chase's March 2019 motion to exclude the testimony of Plaintiffs' damages expert, Jeffrey S. Andrien, under Federal Rule of Evidence 702 (docket entry no. 357); and (5) Chase's March 2019 motion for partial summary judgment dismissing Plaintiffs' contract and damages claims (docket entry no. 360).

The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332. The Court has considered carefully all of the parties' submissions. For the reasons stated below, Chase's July 2018 motion for partial summary judgment is granted to the extent that it seeks dismissal of MRS's breach of contract, fraud, and negligent misrepresentation claims as time-barred, and to the extent that it seeks dismissal of Plaintiffs' claim for punitive damages. Chase's March 2019 motion for partial summary judgment dismissing Plaintiffs' contract and damages claims is granted with respect to Plaintiffs' remaining breach of contract claims, including Plaintiffs' claim for disgorgement. In light of those determinations, the Court grants Chase's March 2019 motion to exclude the testimony of Jeffrey S. Andrien, and denies as moot MRS's October 2018 motion for partial summary judgment on its fraud and negligent misrepresentation claims, as well as Plaintiffs' March 2019 motion for partial summary judgment with respect to any time-barred breach of contract claims. Plaintiffs' March 2019 motion for partial summary judgment on their breach of contract claims is denied in all other respects. Judgment dismissing the case will be entered.

Unless otherwise indicated, the following facts are undisputed.[1]  Plaintiff MRS is a Florida limited liability corporation with its principal place of business in Florida.  (Docket entry no. 302, Def. July 2018 56.1 St. ¶ 2; docket entry no. 311, Pl. Aug. 2018 Resp. ¶ 2.)  MRS, 1st Fidelity, and S&A are in the business of buying residential mortgage loans that are not performing according to their original terms.  (Docket entry no. 295, Answer ¶ 93.)  Laurence Schneider and his wife own 99 percent of MRS and 1st Fidelity, with the remaining one percent owned by Real Estate and Finance, Inc., which is controlled by Schneider.  (Docket entry no. 387, Def. Mar. 2019 56.1 St. ¶¶ 3-4.)  Schneider and his wife own 65 percent of S&A, with the remaining 35 percent owned by Schneider's brother-in-law and his wife.  (Def. Mar. 2019 56.1 St. ¶ 5.)

Sale of mortgage loans to MRS

On February 25, 2009, Chase and MRS signed a Mortgage Loan Purchase Agreement for the sale of certain mortgages.  (Def. July 2018 56.1 St. ¶ 18; docket entry no. 304-10, Pistilli Decl. Ex. 10, the "MLPA.")  Under the MLPA, Chase agreed to sell "on a servicing-released basis," and MRS agreed to purchase "on a servicing-released basis," "certain nonperforming and/or impaired closed end first lien mortgage loans that are or have been delinquent for 180 days or more and have been or may otherwise be in default."  (MLPA at Preamble, § 1.)  Specifically, for the purchase price of $200,000, MRS agreed to purchase

---

[1]      Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer.  Citations to the parties' respective Local Civil Rule 56.1 Statements incorporate by reference the parties' citations to underlying evidentiary submissions.

mortgage loans "having an outstanding aggregate principal balance as of December 22, 2008 . . . in the amount of approximately $156,324,399.24 consisting of 3,529 loans." (Id. §§ 1, 3.)  The parties agreed that the loans "to be purchased under this Agreement are described in the schedule . . . attached hereto as Exhibit A." (Id. § 2.)  Exhibit A "shall set forth for each Mortgage Loan the outstanding principal balance thereof as of [December 22, 2008]." (Id.)

In section 6 of the MLPA, Chase made the following representations and warranties to MRS: "(i) [t]he information set forth on the data tape provided by [Chase] to [MRS] with respect to the Mortgage Loans is true and correct in all material respects as of the date such data tape was compiled; (ii) [Chase] is the sole owner of the Mortgage Loans and has full right to transfer and sell the Mortgage Loans to [MRS]; and (iii) [e]ach Mortgage Loan complies in all material respects with all applicable federal, state, or local laws . . . ." (Id. § 6a.)  The MLPA further provides that "each Mortgage Loan is being sold by [Chase] with NO REPRESENTATIONS OR WARRANTIES of, by or on behalf of [Chase] and on an 'AS IS, WHERE IS, WITH ALL FAULTS' basis with NO RECOURSE WHATSOEVER and, without in any way limiting the foregoing, WITH NO REPURCHASE OR BUY BACK OBLIGATIONS WHATSOEVER." (Id. § 6c.)  The MLPA also provides that "[t]his Agreement shall be deemed to have been made in the State of New York," and that "the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, excluding conflict of laws issues.  The parties hereby agree that all disputes arising hereunder shall be submitted to and hereby subject themselves to the jurisdiction of the courts of competent jurisdiction, state and federal, in the State of New York." (Id. § 15.)

On February 25, 2009, Chase employee Eddie Guerrero sent Schneider a spreadsheet of loans as Exhibit A to the MLPA.  (Def. July 2018 56.1 St. ¶ 22.)  Schneider

testified at his deposition in this action that he informed Chase "immediately" that the

spreadsheet was "woefully insufficient." (Docket entry no. 309-1, DiMarco Decl. Ex. 1,

Schneider Dep. 314:2-317:20.) Schneider further testified as follows:

> Q. As of March 2012, was it your belief that Chase had breached the MLPA?
>
> A. It was my opinion on February 25th, 2009, and despite all of my efforts, there is nothing that has been able to facilitate getting a useful data tape or the usable information in order to try to collect on any of these loans.
>
> Q. And as of the date that you wrote the e-mail we have been looking at in Exhibit 142, as of March 29th, 2012, did you believe that you had been misled about the loans that you would be getting under the MLPA?
>
> A. Yes, I had, I just thought I had answered that. I believed it as of February 25th, 2009, although several months later when I never received a data tape with the information that was promised, that confirmed in part my suspicions and then I just, it just got uglier from there.

(Def. July 2018 56.1 St. ¶¶ 27-28; Pl. Aug. 2018 Resp. ¶¶ 27-28; docket entry no. 304-1, Pistilli

Decl. Ex. 1, Schneider Dep. 435:6-436:3.)

In connection with the instant motion practice, MRS has submitted a declaration

from Schneider in which he states, among other things, that after the MLPA was signed, he

"repeatedly asked Chase to provide [him] all of the necessary information to properly service the

loans." (Docket entry no. 310, Schneider Decl. ¶ 17.) Schneider states that "[t]hrough 2011,

Chase continued to tell me that it wanted to continue working with me and sell me more loans,

and we even went on a business trip to Las Vegas, which delayed my discovery of the fraud as

Chase was actively trying to conceal its fraud." (Id. ¶ 20.) "Based upon Chase's continued

assurances that it would comply with the MLPA, and Chase's various rationales for its delay,"

Schneider states, he "did not consider litigation, or consider Chase in breach of the [MLPA]

and/or suspect that I had been defrauded until Omar Kassem sent me an email on March 1, 2013."[2]  (Schneider Decl. ¶ 24.)

The email from Chase employee Omar Kassem states, in relevant part, that Kassem was "instructed today by our general counsel to obtain your attorney's contact information . . . and address so I can forward it to our litigation department.  I've been asked to step aside as it doesn't appear we're going to get things resolved as we originally intended per the original agreement.  This will insure your concerns are raised to the right party for resolution." [3]  (Docket entry no. 309-56, DiMarco Decl. Ex. 56 (the "Kassem Email").)

MRS alleges that Chase breached the MLPA by, among other things, selling "non-conforming deficiency claims" in place of first lien mortgage loans, withholding information and documents concerning the loans it sold to MRS, selling loans as to which Chase had violated applicable law, selling loans to MRS "where Chase provided a corrupted data tape as Exhibit A to the MLPA," accepting and retaining payments from borrowers and/or insurance companies on loans that Chase had sold to MRS, and, after the sale, changing the loans Chase sold by pulling valuable loans back and adding loans that violated loan servicing and consumer protection laws.  (Docket entry no. 293, Fourth Am. Compl. (the "FAC") ¶ 298.)  MRS alleges that Chase further breached the MLPA and its implied obligation of good faith and fair dealing

---

[2]     Although MRS repeatedly refers to the date of this email as March 1, 2013, the document provided by MRS is dated February 26, 2013.  Accordingly, the Court construes all references to the date of this email as references to February 26, 2013.

[3]     An earlier email from Schneider to Kassem in the same email chain states: "Unfortunately things seem to be coming to an impasse due to continued complications regarding loans which we acquired in good faith from Chase . . . . As you recall, we have an agreement dated December 5th, 2012 (originally dated November 20th, 2012) regarding both parties [sic] obligations in regards to the repurchases and retractions. Chase did not send out formal retraction/apology letters to any 1st Fidelity borrowers as required by the Agreement as dictated by Chase, despite over scores of correspondences from September through early December 2012 requesting such."  (Kassem Email at 2.)

by forgiving the debt owed by borrowers on loans Chase sold to MRS or releasing the liens securing loans sold to MRS in order to satisfy Chase's obligations under certain national settlement agreements.[4]  (FAC ¶ 299.)

In addition, MRS argues in its March 2019 motion for partial summary judgment that Chase breached the warranties contained in section 6 of the MLPA, by failing to "provide a complete and accurate Exhibit A to the MLPA," selling loans that Chase "did not own, but was merely servicing," and not conveying "the number or value of loans as required and bargained for within the MLPA."  (Docket entry no. 352, Pls. MSJ at 18.)  MRS argues that its breach of contract claims "ripened" on February 26, 2013, when Schneider received the Kassem Email, and that "the full extent" of Chase's breach became clear on May 29, 2013, when Chase employee Launi Solomon sent Schneider a file titled "MRS Accounts-xlsx.zip."  (Pls. MSJ at 2; docket entry no. 353-96, DiMarco Decl. Ex. 96.)  MRS contends that this file contained "sufficient information to discern what [Schneider] actually received."  (Pls. MSJ at 11.)

In its October 2018 motion for partial summary judgment, MRS argues that Chase fraudulently induced MRS to enter into the MLPA by, among other things, misrepresenting that all the liens sold under the MLPA were "first liens," that Chase had all the necessary information to "board and service" the loans, that the loans complied with federal, state, and local laws, that the loan pool contained "cherries" that had erroneously been "charged off," and that there would

---

[4]     Chase admits that Defendants mistakenly sent debt forgiveness letters to 23 borrowers whose loans were sold to 1st Fidelity or S&A, and that Defendants released liens on certain MRS, S&A, and 1st Fidelity loans.  (Answer ¶¶ 192-193, 271-273.)  Plaintiffs were provided the option to sell back the 23 loans for one and a half times their purchase price or to have retraction letters sent.  (FAC ¶ 194; Answer ¶ 194.)  S&A agreed to sell back 11 loans and 1st Fidelity agreed to sell back two loans, "believing it would be able to successfully communicate the error to the borrowers and collect on the remaining 10 loans."  (FAC ¶ 194; Answer ¶ 194.)

be competition to purchase the loan pool.  (Docket entry no. 323 at 13-15.)  MRS's March 2019 and October 2018 motions for partial summary judgment seek judgment in MRS's favor on its breach of contract, fraud, and negligent misrepresentation claims.

The FAC seeks compensatory and punitive damages for Chase's alleged breach of its obligations under the MLPA.  (FAC at 78.)  In connection with their March 2019 motion for partial summary judgment and their opposition to Chase's March 2019 motion for partial summary judgment, Plaintiffs proffer the expert report of Jeffrey S. Andrien, who opines that MRS suffered lost profits in the amount of $31.93 million as a result of Chase's breach of the MLPA.  (Docket entry no. 377-1, Pistilli Decl. Ex. 1, Andrien Rep. ¶ 9.)  This figure allegedly represents the "proceeds that MRS could reasonably expect to generate" from the MLPA loan pool if, among other things, Chase had provided the proper liens and documentation necessary to service the MLPA loans.  (Andrien Rep. ¶¶ 34, 37.)  Andrien further opines that Chase is required to disgorge $557.14 million because the MLPA transaction allowed Chase to "qualify for millions of dollars in incentive payments through the [federal government's] Making Home Affordable ("MHA") Program and [the federal government's] Home Affordable Modification Program ("HAMP")" and to "claim credit for their obligations under two settlement agreements with the federal government, and state governments, even though [Chase] no longer owned these loans."  (Andrien Rep. ¶ 48.)  Specifically, Andrien concludes that Chase was "eligible to receive between $551.1 million . . . to $2.10 billion . . . in HAMP incentives, that [it] would not have been eligible to receive," and that Chase "received between $6.04 million and $16.18 million of improper credit towards satisfaction of" its consumer relief requirements under certain settlement agreements.  (Andrien Rep. ¶¶ 51, 58.)  Andrien acknowledged at his deposition that neither of these disgorgement estimates is a "measure of economic harm to the [P]laintiff."  Instead,

Andrien testified, they "are measures of economic benefits to the [D]efendants that they would not have gotten . . . but for their bad acts related to their dealings with the [P]laintiffs." (Docket entry no. 363-26, Pistilli Decl. Ex. 26, Andrien Dep. at 108:23-109:13.) Plaintiffs do not dispute that they did not identify disgorgement as a damages theory in their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(i). (Def. March 2019 56.1 St. ¶ 53.)

The Andrien Report does not separately quantify any damages specifically resulting from debt forgiveness letters or lien releases allegedly sent on MRS loans (Def. Mar. 2019 56.1 St. ¶ 44; docket entry no. 395, Pl. May 2019 Resp. ¶ 191), and Andrien testified that he has "not specifically" quantified the economic loss caused by Chase's alleged lien releases (Andrien Dep. at 109:20-23). In response to interrogatories asking it to identify each instance in which a borrower's payments to MRS were ceased or interrupted by the borrower receiving a debt forgiveness letter or Chase's recordation of a lien release, MRS stated that it was "unable to specifically identify any particular loan numbers at this time" and "cannot ascertain with any certainty why payments received from borrowers stopped or were interrupted." (Def. Mar. 2019 56.1 St. ¶ 42.) Similarly, when asked to identify each instance where Chase improperly accepted and retained a payment on an MLPA loan, MRS responded that it "is not now in possession of such information." (Def. Mar. 2019 56.1 St. ¶ 47.)


Sale of mortgage loans to S&A and 1st Fidelity

On April 12, 2005, Chase and S&A signed a Master Mortgage Loan Sale Agreement for the purchase of certain mortgage loans (the "S&A MMLSA"). (Def. Mar. 2019 56.1 St. ¶ 9.) On September 20, 2010, Chase and 1st Fidelity signed a separate Master Mortgage Loan Sale Agreement (the "1st Fidelity MMLSA"). (Def. Mar. 2019 56.1 St. ¶ 10.) Between

2005 and 2010, Chase made approximately 1,000 one-off loan sales to S&A and 1st Fidelity. (Def. Mar. 2019 56.1 St. ¶ 6.) S&A and 1st Fidelity allege that Chase breached each of their respective Master Mortgage Loan Sale Agreements, as well as its obligation of good faith and fair dealing, by releasing mortgage liens securing loans previously sold to S&A and 1st Fidelity, forgiving loans Chase had previously sold to S&A and 1st Fidelity, and accepting and retaining payments it received from borrowers and insurance companies on loans it had sold to S&A and 1st Fidelity. (FAC ¶¶ 304-305, 309-310.)

The FAC seeks compensatory and punitive damages for Chase's breach of its obligations under the two Master Mortgage Loan Sale Agreements. (FAC at 78.) The Andrien Report does not proffer any estimate of compensatory damages in connection with the claims of S&A and 1st Fidelity, and Andrien has testified that he is not offering any opinion relating to damages suffered by S&A and 1st Fidelity. (Def. Mar. 2019 56.1 St. ¶ 45; docket entry no. 403-31, Pistilli Decl. Ex. 31, Andrien Dep. at 111:15-112:12.) When asked to identify each instance where a borrower's payments to S&A or 1st Fidelity were ceased or interrupted by the borrower receiving a debt forgiveness letter or Chase's recordation of a lien release, S&A and 1st Fidelity have stated in their interrogatory responses that they are "unable to specifically identify any particular loan numbers at this time" and "cannot ascertain with any certainty why borrowers from whom they previously received payments stopped making payments and/or why payments were interrupted." (Def. Mar. 2019 56.1 St. ¶ 43.)

The False Claims Act Action

In May 2013, Schneider filed a False Claims Act lawsuit (the "FCA Action") against Chase in the United States District Court for the District of South Carolina. (Pl. Aug. 2018 Resp. ¶ 84; Schneider Decl. ¶ 29.) The FCA Action was sealed and the Department of

Justice allegedly instructed Schneider not to "disclose the FCA case and any related facts."

(Schneider Decl. ¶ 30.)  The case was subsequently transferred to the United States District

Court for the District of Columbia.  See <u>United States ex rel Schneider v. J.P. Morgan Chase</u>

<u>Bank, N.A.</u>, 224 F. Supp. 3d 48, 55 (D.D.C. 2016).  The FCA Action principally alleged that

Chase made false claims regarding its compliance with national mortgage settlements which

"provided Chase with the benefit of credit for consumer relief that it otherwise should not have

received," and that Chase submitted false or fraudulent certifications that it had complied with

HAMP.  <u>Id.</u> at 56-57.  MRS filed the instant action on December 24, 2014.  (<u>See</u> docket entry no.

1.)  The FCA Action has since been dismissed.  See <u>United States ex rel Schneider</u>, 224 F. Supp.

3d at 61-62.


DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is considered material "if it might

affect the outcome of the suit under the governing law," and an issue of fact is a genuine one

where "the evidence is such that a reasonable jury could return a verdict for the non-moving

party."  <u>Holtz v. Rockefeller & Co. Inc.</u>, 258 F.3d 62, 69 (2d Cir. 2001) (quoting <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  To defeat summary judgment, the non-moving

party "must do more than show that there is some metaphysical doubt as to the material facts."

<u>Caldarola v. Calabrese</u>, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotations omitted).  The

nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must

offer some hard evidence showing that its version of the events is not wholly fanciful." <u>Golden Pac. Bancorp v. FDIC</u>, 375 F.3d 196, 200 (2d Cir. 2004) (internal quotations omitted).

<u>Statute of Limitations</u>

Chase seeks the dismissal of MRS's fraud and breach of contract claims as barred under Florida's four and five-year statutes of limitations, asserting that both claims accrued no later than February 25, 2009, more than five years before this action was commenced in December 2014. The MLPA provides, in relevant part, that "the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, excluding conflict of laws issues." (MLPA § 15.) Under New York's borrowing statute, when a nonresident plaintiff suffers an injury outside of the state, the plaintiff must satisfy the statute of limitations of the state where the cause of action accrued as well as that of New York, effectively subjecting the cause of action to whichever state's limitations period is shorter. <u>Id.</u>; <u>see also</u> N.Y. C.P.L.R. § 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued . . . ."). In New York, an action for fraud or breach of contract must be filed within six years of the date that the cause of action accrued. N.Y. C.P.L.R. §§ 213(2), 213(8). In Florida, where MRS is incorporated and has its principal place of business, breach of contract claims must be filed within five years, and fraud actions must be filed within four years of accrual. Fla. Stat. §§ 95.11(2)(b), 95.11(3)(j). Thus, C.P.L.R. § 202 requires application of the shorter Florida limitations periods to MRS's fraud and breach of contract claims.

The MLPA's exclusion of "conflict of laws issues" does not require a different analysis.  As the New York Court of Appeals has explained, "[c]ontractual choice of law provisions typically apply to only substantive issues . . . and statutes of limitations are considered procedural because they are deemed as pertaining to the remedy rather than the right."  2138747 Ontario, Inc. v. Samsung C & T Corporation, 31 N.Y.3d 372, 377 (2018).  Thus, "the election of New York law" in the MLPA does not "include an election of New York's statutes of limitations unless the parties explicitly indicate such a choice."  Myers Indus., Inc. v. Schoeller Arca Systs., Inc., 171 F. Supp. 3d 107, 115 (S.D.N.Y. 2016) (citing Portfolio Recovery Assocs. v. King, 14 N.Y.3d 410, 416 (2010)).  Because the MLPA's choice of law provision does not specifically exclude application of CPLR 202 by calling for the use of the statute of limitations applicable to claims that accrue in New York, the MLPA's choice-of-law provision cannot be read as rejecting the borrowing provision of CPLR 202.  See Arcadia Biosciences, Inc. v. Vilmorin & Cie, 2019 WL 324213, at *10-11 (S.D.N.Y. Jan. 25, 2019) (finding that a similar contractual choice of law provision did not preclude application of C.L.P.R. § 202).

MRS argues that C.P.L.R. § 202 is inapplicable because its claims did not accrue outside of New York.  In support of this argument, MRS cites section 15 of the MLPA, which states that the contract "shall be deemed to have been made in the State of New York."  (MLPA § 15.)  MRS's argument is unavailing because a claim accrues under New York law at the time and the place of injury and where, as here, the injury is purely economic, "the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss."  Myers, 171 F. Supp. 3d at 115 (quoting Glob. Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529 (1999)).  Thus, MRS's breach of contract and fraud claims accrued in Florida, where MRS resides (see Pl. Aug.

2018 Resp. ¶ 2), notwithstanding the parties' agreement as to where the contract is deemed to have been made.

MRS also argues that, even if its claims are untimely, they are preserved by equitable tolling. Equitable tolling "is used in the interests of justice to accommodate both a defendant's right not to be called upon to defend a stale claim and a plaintiff's right to assert a meritorious claim when equitable circumstances have prevented a timely filing." Machules v. Dep't of Admin., 523 So. 2d 1132, 1134 (Fla. 1988). Generally, the tolling doctrine "has been applied when the plaintiff has been misled or lulled into inaction, has in some extraordinary way been prevented from asserting his rights, or has timely asserted his rights mistakenly in the wrong forum." Id. MRS argues that it was prevented from filing this action sooner because "the parties were diligently working together to complete performance of the MLPA" and because the Department of Justice allegedly instructed Schneider not to "disclose the FCA case and any related facts." (Schneider Decl. ¶ 30.) MRS presents no facts from which the Court can infer circumstances warranting application of the equitable tolling doctrine. MRS's decision to continue working with Chase to complete performance of the MLPA even after it learned that Chase had allegedly failed to perform under the terms of the agreement is insufficient to demonstrate that it was misled or prevented from asserting its rights. That MRS filed the FCA Action in May 2013 premised upon substantially similar assertions only suggests that MRS was aware of the facts giving rise to its claims well before the limitations period had run. Although the FCA Action was sealed and Schneider was purportedly instructed by the Department of Justice not to disclose certain facts in connection with that case, MRS has failed to demonstrate how its obligation to keep the FCA Action confidential prevented MRS from timely commencing the instant action.

Accordingly, for MRS's breach of contract claim to be timely under C.P.L.R. § 202 it must have been filed within five years of its accrual, and its fraud and negligent misrepresentation claims must have been filed within four years of accrual.

1. Breach of Contract Claim

For a breach of contract action, the statute of limitations "runs from the time of the breach, although no damage occurs until later." Med. Jet S.A. v. Signature Flight Support-Palm Beach Inc., 941 So. 2d 576, 578 (Fla. Dist. Ct. App. 2006). Accordingly, MRS's claims are time-barred to the extent that they are premised upon breaches that occurred before December 23, 2009, i.e., more than five years before this action was commenced on December 24, 2014. The parties disagree, however, as to when Defendants breached the MLPA. Defendants argue that, to the extent that MRS's breach of contract claims are based upon Defendants' failure to (1) deliver the types of loans and records allegedly required by the MLPA, (2) deliver a proper Exhibit A to the MLPA, and (3) comply with the warranties set forth in the MLPA, those breaches occurred no later than the MLPA's closing date of February 25, 2009. In support of their argument, Defendants cite Schneider's deposition testimony that it was his "opinion on February 25th, 2009," that "Chase had breached the MLPA," and that, as of that same date, he believed that he "had been misled about the loans that [he] would be getting under the MLPA." (Schneider Dep. 435:6-436:3.)

MRS disputes the date of the breach, arguing instead that its cause of action accrued on February 26, 2013, when Chase employee Omar Kassem emailed Schneider stating that he had been "asked to step aside as it doesn't appear we're going to get things resolved as

we originally intended per the original agreement."[5]  (Kassem Email at 1.)  In connection with its

argument, MRS proffers the August 20, 2018, Declaration of Laurence Schneider, which states

that "[b]ased upon Chase's continued assurances that it would comply with the MLPA, and

Chase's various rationales for its delay, I did not consider litigation, or consider Chase in breach

of the [MLPA] and/or suspect that I had been defrauded until Omar Kassem sent me an email on

[February 26], 2013."  (Schneider Decl. ¶ 24.)  MRS argues that until February 26, 2013, the

parties were "working to get things resolved" and that "Chase continued to send data tapes and

otherwise promised Schneider that it would comply with the terms of the MLPA."

MRS's argument is unavailing to the extent that its breach of contract claim is

premised upon Chase's failure to deliver the loans and documentation specified in the MLPA or

to comply with the warranties in the MLPA.  As Schneider's testimony demonstrates, these

deficiencies were apparent on the MLPA's closing date, February 25, 2009, when Chase

allegedly did not deliver the requisite loans and documentations as promised.  (See, e.g.,

Schneider Dep. 314:2-317:20 (testifying that Schneider informed Chase "immediately" that the

spreadsheet provided as Exhibit A was "woefully insufficient.")).  That Chase allegedly

endeavored for some period of time to provide Schneider with the correct loans and

documentation, and then purported to acknowledge in the Kassem Email that it could not do so,

does not delay the date of occurrence of, or the accrual of the cause of action for, the breach.

Potiker v. Gasiunasen Gallery, No. 09-82356-CIV, 2010 WL 2949943, at *2 (S.D. Fla. Jul. 26,

2010) ("A cause of action accrues, for statute of limitations purposes . . . when the action may be

---

[5]     The Court notes that it is at best unclear whether, as MRS urges, the reference to the
        "original agreement" in the Kassem Email is even a reference to the MLPA.  Indeed,
        earlier discussions in the Kassem Email reference an agreement dated December 5, 2012,
        involving Chase and 1st Fidelity, not the February 25, 2009, MLPA between Chase and
        MRS.  (See Kassem Email at 2.)

brought. . . . This is so regardless of whether the plaintiff knew that it had a claim and even though plaintiff did not suffer damages until after the alleged breach.") (internal citations and quotations omitted).[6]

Accordingly, the Court finds that MRS's claims for breach of contract are time-barred to the extent that they are based upon Defendants' failure to deliver the loans and documentation specified in the MLPA or to comply with the warranties in the MLPA.[7] In light of this determination, Plaintiffs' March 2019 motion for partial summary judgment is denied as moot to the extent that it seeks judgment in MRS's favor with respect to these claims. Chase's March 2019 motion to exclude the testimony of Jeffrey S. Andrien is granted to the extent that Andrien proffers testimony regarding lost profits arising from these claims, as those portions of Andrien's Report are no longer relevant to any issue in this case. See Fed. R. Evid. 702. Because Chase does not seek dismissal on statute of limitations grounds of MRS's additional claims for breach of contract premised upon, among other things, Chase's recording of lien

---

[6]    The Court is similarly unpersuaded by MRS's argument in its March 2019 motion for partial summary judgment that the "the full extent" of Chase's breach only became clear on May 29, 2013, when Chase employee Launi Solomon sent Schneider a file containing "sufficient information to discern what [Schneider] actually received." (Pls. MSJ at 2.) As discussed above, the date on which Schneider came to realize that the MLPA had been breached is not relevant under Florida law.

[7]    To the extent that MRS argues that Chase breached an implied covenant of good faith and fair dealing by abandoning its efforts to comply with the MLPA on February 26, 2013, MRS has not demonstrated how that claim, which also appears to be premised on Chase's failure to deliver the promised loans and documentation, is distinct from its claim that Chase breached the MLPA by failing to deliver a proper Exhibit A. See Harris v. Provident Life and Acc. Ins. Co., 310 F.3d 73 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

releases, issuance of debt forgiveness letters, and retention of borrower payments on loans sold to MRS, the Court addresses those claims separately below.

2. Fraud and Negligent Misrepresentation Claims

The limitations period for an action founded upon fraud commences at the time "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence."  Fla. Stat. § 95.031.  MRS argues that Chase fraudulently induced MRS to enter into the MLPA by, among other things, misrepresenting that all the liens sold under the MLPA were "first liens," that Chase had all the necessary information to "board and service" the loans, that the loans complied with federal, state, and local laws, that the loan pool contained "cherries" that were erroneously "charged off," and that there would be competition to purchase the loan pool.  (Docket entry no. 323 at 13-15.)

Defendants argue that MRS could have and should have known that these statements were false on February 25, 2009, when it executed the MLPA without receiving the promised loans and documentation.  Once again, Defendants rely on Schneider's testimony that as of February 25, 2009, he believed that he "had been misled about the loans that [he] would be getting under the MLPA."  (Schneider Dep. 435:6-436:3.)  Relying principally upon the Schneider Declaration's description of MRS's interactions with Chase after the MLPA was executed, including a 2011 business trip to Las Vegas, Chase's "continued assurances that it would comply with the MLPA," and Chase's "various rationales for its delay," MRS disputes the date on which it should have known about the acts giving rise to its fraud and negligent misrepresentation claims.  (See Schneider Decl. ¶¶ 20, 24.)  MRS argues that "it was not until Chase ceased complying with the MLPA in [February] 2013 that Plaintiff truly began to

understand and investigate whether Chase had intended to defraud Schneider from the inception of the parties' negotiations of the MLPA."  (Docket entry no. 308 at 20.)

Here, too, MRS's arguments are unpersuasive.  Once MRS assented to the MLPA and was not provided with the items it was promised, it should have known—and indeed, Schneider's testimony suggests that he did know—that the statements allegedly made by Chase to induce Schneider to enter into the MLPA regarding the nature and provenance of the loans were untrue.  Evidence of MRS's reliance on any alleged misrepresentations made after the MLPA was signed is insufficient to delay the accrual of its fraud claim because Schneider has admitted that MRS was already on notice of the facts that gave rise to MRS's claims based on alleged pre-closing representations as of February 25, 2009, the MLPA's closing date.  To the extent that MRS's fraud and negligent misrepresentation claims are based upon assurances made after February 25, 2009, that Chase would comply with the MLPA or Chase's "various rationales" for its delay, MRS's claims are duplicative of its breach of contract claim.  See Wyle Inc. v. ITT Corp., 130 A.D.3d 438, 439 (N.Y. App. Div. 1st Dep't 2015) ("In the context of a contract case, the pleadings must allege misrepresentations of present fact, not merely misrepresentations of future intent to perform under the contract, in order to present a viable claim that is not duplicative of a breach of contract claim.").  Because MRS did not file its fraud and negligent misrepresentation claims until December 24, 2014, more than four years after February 25, 2009, those claims are dismissed as time-barred.

In light of the dismissal of MRS's fraud and negligent misrepresentation claims as untimely, the Court denies as moot Plaintiffs' October 2018 motion for partial summary judgment on those claims.

## Punitive Damages Claim

Under New York law, punitive damages are unavailable in connection with a breach of contract claim are available if the plaintiff demonstrates that "(1) that the defendant's conduct is actionable as an independent tort; (2) the tortious conduct [is] of [an] egregious nature; (3) the egregious conduct [is] directed to plaintiff; and (4) [the tortious conduct is] part of a pattern directed at the public generally."  N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 130 (2d Cir. 2001) (internal quotation marks omitted).  Plaintiffs argue that the "FCA Complaint, and the facts established [in Plaintiffs' opposition to Chase's July 2018 motion for partial summary judgment], clearly establish that Chase violated the law," and that Chase's actions were "morally culpable, and actuated by evil and/or reprehensible motives."  (Docket entry no. 308 at 32.)  The record makes it clear that Plaintiffs cannot meet their burden.  Among other issues, Plaintiffs cite no specific evidence, and the Court can find none in the record submitted in connection with Chase's July 2018 motion for partial summary judgment, from which a reasonable juror could infer that Chase's conduct was directed at the public generally.  See Topps Co. v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 263 (S.D.N.Y. 2005) ("An isolated transaction incident to an otherwise legitimate business . . . . does not constitute conduct aimed at the public generally.") (internal citations and quotations omitted).  Accordingly, Defendants' July 2018 motion for partial summary judgment is granted to the extent that it seeks dismissal of Plaintiffs' claim for punitive damages.

## Disgorgement Claim

In conjunction with their proffer of the Andrien Report, Plaintiffs assert a claim against Chase for disgorgement to Plaintiffs of amounts that Chase allegedly received from the federal government pursuant to mortgage-related relief programs.  Relying primarily upon the

Andrien Report, Plaintiffs seek disgorgement of $557.14 million which they contend Chase received in the form of HAMP incentives and consumer relief credits under certain settlement agreements with the U.S. government.  Andrien acknowledged at his deposition that his disgorgement estimate is not a "measure of economic harm to the [P]laintiff," but rather a "measure[] of economic benefits to the [D]efendants that they would not have gotten . . . but for their bad acts related to their dealings with the [P]laintiffs."  (Andrien Dep. at 108:23-109:13.) Under New York law, "the theory underlying damages for breach of contract is to make good or replace the loss caused by the breach."  Scienton Techs., Inc. v. Comp. Assocs. Intnat'l, Inc., 703 Fed. App'x 6, 9-10 (2d Cir. 2017).  Thus, damages are generally measured by the plaintiff's actual loss, and not the defendant's profits.  Id. at 10.

Chase argues that it is entitled to summary judgment dismissing Plaintiffs' disgorgement claim because, among other things, Plaintiffs have waived this claim by failing to include it in either the FAC or their initial disclosures, and because disgorgement is not an appropriate remedy for breach of the MLPA.  In response, Plaintiffs contend that Chase was on notice of their disgorgement claim because they had asserted a substantially similar claim in the FCA Action and because the FAC alleges that Chase "has sought to, and still seeks to, benefit from incentive payments that were made available through [HAMP]" and that Chase "began releasing . . . liens to avoid compliance with the servicing and consumer relief requirements of [certain national mortgage settlements] and to obtain credit thereunder."  (FAC ¶¶ 37, 81.) Plaintiffs do not dispute that they failed to include disgorgement as a damages theory in their initial disclosures.  (Def. March 2019 56.1 St. ¶ 53.)   Nor can they show that the FAC explicitly asserted any claim against Chase for payment to Plaintiffs of amounts Chase may have received from the federal government.

As explained above, contract damages normally focus on the restoration of losses allegedly suffered by the plaintiff, and Plaintiffs have proffered no authority from New York or any other American jurisdiction that recognizes disgorgement of benefits received from third parties as a proper element of damages for breach of contract. However, citing the Restatement (Third) of Restitution and Unjust Enrichment § 39, Plaintiffs argue that "the collateral damage caused by Chase's fraudulent inducement, and opportunistic and intentional breach of the contracts, cannot go unpunished" and that "[j]ustice and equity require Chase's ill-gotten gains, received at the expense of Plaintiffs, to be disgorged." (Docket entry no. 388, Pls. Opp. at 24.)

The Court finds that Plaintiffs have waived their disgorgement claim. The FAC only seeks compensatory and punitive damages, and the paragraphs identified by Plaintiffs are not sufficient to give Chase fair notice that Plaintiffs intended to assert a claim against Chase for disgorgement to Plaintiffs of amounts Chase received under certain government programs. See Gershanow v. County of Rockland, No. 11-CV-8174 (CS), 2014 WL 1099821 (S.D.N.Y. Mar. 20, 2014) (disallowing claim for money damages where complaint sought only declaratory and injunctive relief and pleaded no facts that could lead to a reasonable inference that money damages were sought). Furthermore, Plaintiffs offer no explanation for their failure to include this theory in their initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1), which are required to include damages computations and backup materials. The Andrien Report was not provided in Plaintiffs' Rule 26(a)(1) disclosures or any amendment of the disclosures, and thus is properly excluded from the evidentiary record. See Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.") Without the Andrien Report, which Chase

argues is insufficient in any event to provide a factual basis for the disgorgement claim, there is nothing in the record to supply factual or legal support for Plaintiffs' disgorgement claim.

The disgorgement claim also fails on the merits. Plaintiffs have proffered no legal foundation for their claim other than their citation of a Restatement provision that has not been adopted by any New York court. See Kansas v. Nebraska, 135 S. Ct. 1042, 1064 (2015) (Scalia J., concurring and dissenting) (noting that section 39 constitutes a "novel extension" of the law that finds little, if any, support in case law). Even that provision—Restatement (Third) of Restitution and Unjust Enrichment § 39—only allows for disgorgement of profits gained by an opportunistic contract breach where "the available damage remedy affords inadequate protection to the promisee's contractual entitlement." Plaintiffs proffer no argument or evidence to suggest that traditional contract damages would be insufficient to make Plaintiffs whole here.

Under these circumstances, the Court finds no reason to depart from the ordinary rules that "damages for a breach of contract should put the non-breaching party in the position it would have occupied but for the breach" and "the injured party should not recover more from the breach than the party would have gained had the contract been fully performed." Topps, 380 F. Supp. 2d at 269. Because Plaintiffs' disgorgement claim does not seek to quantify any economic harm to Plaintiffs caused by Chase's alleged breach of the MLPA, and seeks recovery of amounts greater than what Plaintiffs would have gained had Defendants performed under the MLPA, Plaintiffs' claim for disgorgement is meritless and will be dismissed. In light of this determination, the Court grants Chase's March 2019 motion to exclude the testimony of Jeffrey S. Andrien to the extent that Andrien proffers testimony regarding disgorgement damages, as that testimony is no longer relevant. See Fed. R. Evid. 702.

<u>Plaintiffs' Remaining Claims for Breach of Contract</u>

Plaintiffs' remaining claims for breach of contract assert that Chase breached the MLPA, the S&A MMLSA, and the 1st Fidelity MMLSA by, among other things, recording lien releases, issuing debt forgiveness letters, and retaining borrower payments on loans sold to MRS, S&A, and 1st Fidelity pursuant to those agreements. Chase moves for summary judgment dismissing these claims, arguing that Plaintiffs have failed to adduce any admissible evidence of damages caused by these alleged breaches. Chase points to Plaintiffs' interrogatory responses and the Andrien Report's failure to separately quantify any losses resulting from these alleged breaches. For example, MRS's interrogatory response states that it is "unable to specifically identify" any instance where a borrower's payments to MRS were ceased or interrupted because the borrower received a debt forgiveness letter or Chase recorded a lien release, and that it "is not now in possession of" information regarding any instance where Chase improperly accepted and retained a payment on an MLPA loan. (Def. Mar. 2019 56.1 St. ¶¶ 42, 47.) Similarly, S&A and 1st Fidelity have stated that they are "unable to specifically identify any particular loan numbers" where a borrower's payments to S&A or 1st Fidelity were ceased or interrupted because the borrower received a debt forgiveness letter or Chase recorded a lien release, and that they "cannot ascertain with any certainty why borrowers from whom they previously received payments stopped making payments and/or why payments were interrupted." (Def. Mar. 2019 56.1 St. ¶ 43.)

Moreover, although the Andrien Report estimates that MRS lost profits in the amount of $31.93 million as a result of Chase's various alleged breaches of the MLPA, the Report does not separately quantify the lost profits attributable to these remaining aspects of MRS's causes of action (<u>i.e.</u>, those resulting from lien releases, debt forgiveness letters, or the

retention of borrower payments), and Andrien has testified that he has "not specifically" quantified the economic loss caused by Chase's alleged lien releases. (Def. Mar. 2019 56.1 St. ¶ 44; Pl. May 2019 Resp. ¶ 191; Andrien Dep. at 109:20-23.) The Andrien Report also does not estimate any compensatory damages for the claims of S&A and 1st Fidelity, and Andrien has testified that he is not offering any opinion relating to damages suffered by S&A and 1st Fidelity, including damages arising from lien releases. (Def. Mar. 2019 56.1 St. ¶ 45; Andrien Dep. at 111:15-112:12.)

Despite these admitted evidentiary gaps, Plaintiffs contend that summary judgment is unwarranted because "there exists ample proof of substantial direct damages to Plaintiffs." (Pl. Opp. at 6.) In support of their assertion, Plaintiffs raise several unpersuasive arguments regarding the appropriate measure of damages and cite evidence which fails to establish a genuine factual dispute as to the issue of damages. For example, Plaintiffs cite the Andrien Report's assertion that Chase received between $6.04 million and $16.18 million in consumer relief credit under certain government settlement agreements, arguing that the "recorded lien releases and debt forgiveness letters sent by Chase to borrowers interfered with over $16 million in secured debt after March 1, 2012 alone." (Pl. Opp. at 5-6.) As explained above, however, Defendants' alleged gains are not the appropriate measure for breach of contract damages. Moreover, Plaintiffs have proffered no evidence connecting any amounts allegedly claimed or received by Chase under federal government programs with loans covered by agreements with Plaintiffs. Thus, Chase's alleged receipt of consumer relief credits is insufficient to establish that Plaintiffs were injured by Defendants' issuance of debt forgiveness letters, recordation of lien releases, or retention of borrower payments.

Plaintiffs also point to Chase's admission that Defendants mistakenly sent debt forgiveness letters to 23 1st Fidelity and S&A borrowers and released liens on certain MRS, S&A, and 1st Fidelity loans, arguing that it "defies logic" for "Chase to now argue that Plaintiff did not suffer a direct monetary loss as a result of [the] same." (Answer ¶¶ 192-193, 271-273; Pl. Opp. at 5.) On their own, however, Chase's admissions do not establish that, as a result of Chase's actions, Plaintiffs were subsequently denied payments on mistakenly forgiven loans or were otherwise injured by Defendant's recordation of lien releases. Plaintiffs also contend that, because Chase bought back certain mistakenly forgiven loans, Plaintiffs are entitled to the unpaid balance of any remaining released or forgiven loans. (Pl. Opp. at 7.) Once again, however, Plaintiffs identify no loans mistakenly forgiven by Chase for which Plaintiffs have not already been compensated, nor do they offer any evidence from which a jury can infer that Plaintiffs would have recovered the entire unpaid balance on each remaining loan but for Chase's breach.

Similarly, Plaintiffs argue that they have incurred litigation and operating expenses that "logically and directly resulted from Chase's actions," including "having to defend lawsuits brought by borrowers and municipalities," but fail to proffer any evidence of legal expenses directly attributable to Chase's conduct, asserting instead that "Schneider will testify" to these expenses at trial. (Pl. Opp. at 6.) Plaintiffs' promise to produce evidence of damages at a later stage "through trial testimony, as well as through evidence offered by Schneider, Chase's own witnesses, and records that Mr. Andrien reviewed to form his opinion," is insufficient to meet Plaintiffs burden at summary judgment to produce "hard evidence" showing that there is a genuine issue of material fact for trial. Golden Pac. Bancorp, 375 F.3d at 200.

Because Plaintiffs have failed to come forward with evidence from which a jury could infer that they were injured as a result of Chase's issuance of debt forgiveness letters,

recordation of lien releases, or retention of borrower payments, Plaintiffs' remaining breach of contract claims are dismissed.[8]  In light of this determination, Plaintiffs' March 2019 motion for partial summary judgment with respect to any of the remaining breaches of contract is denied.

<sub>C</sub>ONCLUSION

For the foregoing reasons, Chase's July 2018 motion for partial summary judgment is granted to the extent that it seeks dismissal of MRS's breach of contract, fraud, and negligent misrepresentation claims as time-barred, and to the extent that it seeks to dismiss Plaintiffs' claim for punitive damages.  Chase's March 2019 motion for partial summary judgment on Plaintiffs' contract and damages claims is granted with respect to Plaintiffs' remaining breach of contract claims, including Plaintiffs' claim for disgorgement.  In light of those determinations, the Court grants Chase's March 2019 motion to exclude the testimony of Jeffrey S. Andrien, and denies as moot MRS's October 2018 motion for partial summary judgment on its fraud and negligent misrepresentation claims, as well as Plaintiffs' March 2019 motion for partial summary judgment with respect to any time-barred breach of contract claims. Plaintiffs' March 2019 motion for partial summary judgment on any remaining breach of

---

[8]     Plaintiffs' opposition to Defendants' March 2019 motion for partial summary judgment raises additional breach of contract theories.  For example, Plaintiffs also argue that they were injured by Chase's failure to provide "RESPA letters," Chase's recall of certain profitable loans, Chase's retention of a $264,980.09 title insurance payment, Chase's failure to provide loan assignments, and Chase's assignment of loans to the wrong Plaintiff.  (See Pl. Opp. at 8.)  Although Plaintiffs cite voluminous documentary evidence which they contend demonstrates that Chase engaged in these actions, Plaintiffs have not identified any evidence showing that they were entitled, as an initial matter, to these payments under the terms of their respective agreements with Chase, or that Chase's actions caused Plaintiffs to lose payments which Plaintiffs would otherwise have obtained, or to otherwise quantify the losses associated with these actions.  Instead, Plaintiffs argue that "Schneider has, can and will testify at trial that [these] actions have caused direct damages in significant amounts."  (Id.)  Plaintiffs' conclusory and self-serving assertion that they will prove their case at trial is plainly insufficient to meet their burden at summary judgment, and accordingly these claims are also dismissed.

contract claims is denied.  The Clerk of Court is respectfully requested to enter judgment

accordingly and to close this case.  This Memorandum Opinion and Order resolves docket entry

nos. 301, 321, 350, 357, and 360.


       SO ORDERED.

Dated: New York, New York
       September 27, 2019


                        /s/ Laura Taylor Swain
                        LAURA TAYLOR SWAIN
                        United States District Judge